UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

VITALY KORCHEVSKY,

    Defendant.

IND.#: 15 Cr. 381 (RJD)

MEMORANDUM OF LAW

PRELIMINARY STATEMENT

On May 11, 2018, the government exchanged its initial trial exhibits and 3500 material. After reviewing the exhibits, Defendant Vitaly Korchevsky respectfully moves *in limine* that this Court: (1) preclude the government from entering into evidence copies of public press releases obtained in 2018; (2) preclude the government from introducing documentary evidence and testimony regarding an alleged trading scheme discussed in its April 30, 2018 letter motion; (3) preclude the government from introducing evidence concerning employment records from 2008 and 2000; (4) preclude Eugene Canjels from testifying that certain trades were made on the basis of possession of material non-public information; (5) preclude Thomas Carocci from testifying as an expert witness and from offering opinions that usurp the jury's function; (6) grant permission for Mr. Korchevsky to join in any new motions filed by co-defendant Khalupsky to the extent that they are applicable to Mr. Korchevsky

and do not conflict with the relief requested above.

## ARGUMENT

### I. THE PRESS RELEASES, OBTAINED AND EXCHANGED IN 2018 CANNOT BE AUTHENTICATED UNDER F.R.E. 901 AND SHOULD BE EXCLUDED.

The government has exchanged 694 trial exhibits (GX 4001-GX 5026) that are, apparently, public press releases downloaded within the last several weeks from various sites on the internet. These press release should be precluded from being entered into evidence because they cannot be authenticated as what they are proposed to be as required under Rule 901 of the Federal Rules of Evidence.

From the outset of this case, Mr. Korchevsky has requested the government provide the **uploaded** but unreleased press releases allegedly possessed and relied on during the course of the conspiracy. In the July 13, 2017, hearing before this Court the topic was discussed at length. Central to a charge of insider trading is the element that an accused is in possession of material, non-public information ("MNPI"). Indeed, the Court noted that "[i]f you don't have the press release itself, which is somewhat surprising, how does a lawyer decide whether or not the press release itself contains material private information, material nonpublic?" (**Exhibit 1**). As the trial is now less than three weeks away, the Court's query could be reframed as "how is a jury to decide what Mr. Korchevsky is alleged to have possessed and whether it was material and non-public?"

The government admitted, at the time of the July hearing, that it was not in possession of the stolen press releases nor were those press releases contained on any of Mr. Korchevsky's devices. (Exhibit 1: 10, 22). The government averred that

the press releases were available via google. (Exhibit 1: 4). This contention misses the point entirely.

Once a press release is disseminated, it is no longer non-public information. A press release that was uploaded to the server is not necessarily the same one that was released hours or, in some cases, days later, or that is available via a google search years later. This is not a technical, insignificant issue. The nature of the information on which Mr. Korchevksy is alleged to have traded is an essential element that must be proved at trial. *See United States v. Martoma,* 869 F.3d 58, 63 (2d Cir. 2017) (noting "someone who is not a corporate insider but who nevertheless receives material nonpublic information from a corporate insider, or 'tipper,' and then trades on the information—can also be held liable under § 10(b) and Rule 10b-5").

It may well be that these exhibits are similar to what was released to the public, and were the paralegal or investigator who compiled these exhibits called to testify the individual may be able authenticate that these press releases were indeed found publically available on the internet in 2018. Perhaps if a witness from each of the websites on which the government found these documents were called to testify they might be able to authenticate that the press releases were actually distributed on the dates on the documents. The issue, however, is not what was told to the public on a given date, but what was obtained by the hackers from the newswire services prior to what was released to the public. These exhibits can in no way be construed as proper evidence, admissible on that issue.

3

To show that these exhibits are admissible and comply with Rule 901 the government would have to be able to provide "testimony of a witness with knowledge" that could verify that what was distributed to the web (obtained by the government in 2018) was identical to what was obtained by the hackers for **each exhibit**. The government would have to produce either a representative of the company issuing the release who could identify what was uploaded to the server at the time, or a witness from the newswire service that could testify from personal knowledge, in each case, that what was uploaded was identical to what was released.

It would not be enough to produce a witness to testify, generally, regarding the process of upload and distribution, because the existence of a publically distributed press release is not evidence of any element of the crimes of which Mr. Korchevsky is charged. More disturbingly, allowing the government to enter the public press releases obtained in 2018 into evidence would create an inference to the jury that this information was in Mr. Korchevsky's possession and that he traded on it, even when many of the exhibits are counter to government's proffered theory of the case. Representative examples of such exhibits include the following:

- government exhibit GX-4005 concerning Epicor Software, attached as **Exhibit 2**, is the transcript of a conference call that was also web-cast. The information contained in the transcript was already public when it was uploaded to the newswire service;

- government exhibit GX-4013, attached as **Exhibit 3**, is a press release

4

containing Lattice Semiconductor Corporation's announcement that "MachXO2 PLD Family Sets New Standards for Low Cost, Low Power Designs." This is clearly not an earnings release, could not have been anticipated, and does not relate to any trade made by any conspirator within a week of the press release;

- government exhibit GX-4017, attached as **Exhibit 4**, is a November 10, 2010 press release in which MedCath Corporation announces that it will release its earnings on November 23, 2010—it contains no material non-public information;
- government exhibit GX-4030, attached as **Exhibit 5**, is a Tellabs Inc. press release dated January 11, 2011, simply indicating that earnings will be announced on January 25, 2011;
- government exhibit GX-4344, attached as **Exhibit 6**, is a press release that was uploaded to the newswire service more than two months before it was submitted to the public;
- government exhibit GX-4357, attached as **Exhibit 7**, is not an earnings report, but a press release by Hospira Inc. announcing a new "Senior Vice President of Quality;"
- government exhibit GX-5001, attached as **Exhibit 8**, may be a press release, although it does not correlate to any alleged trade, and it concerns "a creative agency[ ] launching their online store this Friday, November 26th in honor of Black Friday;"

5

- government exhibit GX-5015, attached as **Exhibit 9**, is press release headlined "Sappi Fine Paper North America Completes Capital Projects Totaling $49M at its Somerset Mill"—no trades are ever made by Mr. Korchevsky (or any accused conspirator) at any time during the conspiracy with respect to Sappi LTD;
- government exhibit GX-5017, attached as **Exhibit 10**, is a series of symbols with a few words and is thus incomprehensible;
- government exhibit GX-5026, attached as **Exhibit 11**, is a press release from the United States Mint announcing a new Native American $1 Coin. The U.S. mint is not a publically traded company and cannot be the subject of a charge of insider trading.

Evidently, the government has merely done an internet search in the last few months for press releases that may or may not relate to accused trades. It would like to present them to the jury as evidence of material non-public information without establishing that these are the same non-public press releases uploaded to the newswire servers, and when even a cursory review reveals that many cannot be construed as such.

Further supporting the argument that the government should not be permitted the fact that there is no evidence from the newswire services that these particular 694 press releases were actually downloaded from the hundreds of thousands of press releases stored on their servers. Fidelis Cybersecurity, the company tasked with investigation the intrusions into Business Wire, stated in an

6

interim report in 2015, "[at] the current time, we are unable to definitely conclude <u>what if any</u> data was viewed or taken by the Attackers." (emphasis added).

Even the forensic analysis of the seized Ukrainian computers was unable to identify specific press releases alleged to be stolen. For example the analysis of one computer led conclusion that at one point over 528 thousand files were obtained, but many of the files could not be analyzed because the "contents were unrecoverable, corrupted, or encrypted." Another computer analyzed led to the finding of a listing of the filenames, along with a date and time, "[t]he analyst could not view the files themselves[.]"

Because these exhibits cannot be shown to be the press releases uploaded to the newswire services and obtained by the hackers, they are inadmissible and of no evidentiary value under the Federal Rules of Evidence 901 and 401. The Court should precluded the government from introducing them into evidence.

II. **THE COURT SHOULD PRECLUDE THE GOVERNMENT'S ADMISSION OF EVIDENCE REGARDING AN ALLEGED TRADING SCHEME REFLECTED IN EXHIBIT GX-274-274a2.**

In the government's Omnibus Motion there is a lengthy section titled "A Summary of the Government's Anticipated Trial Evidence." In that narrative, there a subheading titled "The Dubovoys' other Business Dealings with Korchevsky and Khalupsky." In that section, the government states the following:

> In addition, the Dubovoys continued to test both Korchevsky's and Khalupsky's interest in other legally questionable trading schemes. For example, in January 2013, Pavel Dubvoy (Arkadiy Dubvoy's brother) emailed Khalupsky about a trading strategy that involved ordering and cancelling trades prior to execution in order to cause temporary price changes that could be arbitraged in parallel trading. A

7

few days later, Arkadiy Dubovoy forwarded an email to Korchevsky on the same topic.

(Government Motion 6). Any testimony or documentary evidence regarding this, specifically government exhibits GX- 274- 274a2, attached as **Exhibit 12**, must be precluded, as it is not direct evidence of the crimes charges, and as (unannounced)[1] 404(b) evidence it has no probative value and is overly prejudicial to Mr. Korchevsky.

It should be noted that the email in question is the forward of an email sent to Arkady Dubovoy from his brother. There is no message to Mr. Korchevsky included, and a review of the contents of the email make it clear that it is from a trading group that was soliciting business from Pavel Dubovoy. In fact the email does not, on its face, suggest an illegal activity. More to the point, however, this email solicitation forwarded to Mr. Korchevsky with no explanation and no response from him cannot be considered to be evidence tending to make the charged conspiracy more or less probable. The fact that a cooperating witness forwarded an email to Mr. Korchevsky, ostensibly to induce him to participate in an independent, unconnected questionable activity cannot be considered direct evidence of the charged crimes, particularly when there is absolutely no evidence that Mr. Korchevsky had any inclination to engage in the conduct.

In the same way, although not noticed as such, Arkady Dubovoy forwarding an email to Mr. Korchevsky cannot be considered 404(b) evidence as to Mr.

---

[1] The government has not noticed this as 404(b) evidence, but Mr. Korchevsky is that a strict textual reading of the rule would permit a latter notification.

Korchevsky's intent, motive, plan, preparation or opportunity. Even if the government were to argue that it is evidence of his knowledge, first it would be required to show that Mr. Korchevsky received and read the email. Then the logical question would be, knowledge of what? The Dubovoys' desire to engage in unconnected bad act? Under Rule 403, the Court would have to balance this minimal probative value against the very real prejudice and jury-confusion that would occur.

First, it would be necessary to explain to the jury exactly what is proposed in the email; that is, what is spoofing. The jury would have to be educated on why might it or might it not be crime, how it occurs, did it occur—in short, the Court's and the jury's time would be wasted on a tangential issue not relevant to the charged conduct. More than likely, a certain amount of confusion would arise.

Second, Mr. Korchevsky would be unfairly prejudiced because Mr. Korchevsky had no control over what Arkday Dubovoy sent him, or what he may have proposed. There is no evidence that Mr. Korchevsky even received the email, but there is certainly no reply indicating interest. Yet, the specter the government wishes to raise is encapsulated in the heading in this section of the motion "Dubovoys' other Business Dealings with Korchevsky." The implication is that forwarding an email, an email that is not even acknowledged, is a business dealing. To allow the government to make this implication to the jury is patently unfair, and the Court should preclude any such attempt.

### III. THE COURT SHOULD PRECLUDE THE GOVERNMENT FROM INTRODUCING EVIDENCE RELATING TO MR. KORCHEVSKY'S EMPLOYMENT AS REFLECTED IN EXHIBITS GX-601 AND GX-602.

In the government's Omnibus Motion, it stated as follows:

> [Mr. Korchevsky's] personnel evaluation during his less-than-two year stint at Morgan Stanley in 2000 and 2001 reflected, inter alia, that Korchevsky's investment performance had been "very disappointing." After leaving Morgan Stanley, Korchevsky worked at a hedge fund in New York, and then at an asset management firm in Baltimore, from where he was discharged in 2008.

(p2). The government has exchanged as Exhibit GX-601, a copy of Form U-5 dated October 6, 2008, and Exhibit GX-602, an employee profile from Morgan Stanley from 2000. The Court should preclude both of these documents, attached as **Exhibit 13**, and any testimony relating to them, as the exhibits cannot be considered direct evidence of the charged conduct. Furthermore, this evidence has no probative value whatsoever, and at the same time are highly prejudicial.

An employment review from nearly 20 years ago and a ten-year-old, pro-forma FINRA-required form, cannot under the most liberal interpretation be considered evidence of the crimes or conspiracy charged; as such, they are not admissible as direct evidence.

Although the government has not noticed these exhibits or "conduct" as 404(b) evidence, even if the Court were to entertain such a late-announcement, the evidence could not reasonably be considered admissible for any of the 404(b) purposes. The facts reflected in Mr. Korchevsky's 2000 performance review at Morgan Stanley have no bearing on his alleged conduct in this case. Certainly, his

investment performance following the market crash of 2000 is not only irrelevant, it would be extremely confusing to the jury.

Similarly, the Form-U5, ominously called a "Uniform Termination Notice," is a form that FINRA requires be filed every time a registered employee leaves a securities firm. In fact, a close reading of the form indicates that the reason for Mr. Korchevsky's termination is clearly indicated: "Position Eliminated."

In contrast with the complete lack of any probative value, would be the unfair prejudice that would result from allowing the government's innuendo to be presented to the jury. The narrative in the Omnibus Motion implies that somehow Mr. Korchevsky had been terminated in 2008 for some unnamed transgression. Furthermore, the government implies that, in 2000, during an historic crash when the NASDAQ lost 78% of its value, Mr. Korchevsky was inept investment professional. Neither of these assertions is true, and allowing the government to put such evidence before the jury would be extremely prejudicial.

IV. GOVERNMENT EXPERT WITNESS, EUGENE CANJELS, SHOULD NOT BE PERMITTED TO GIVE EXPERT OPINION REGARDING "HIS CONCLUSION THAT CERTAIN OF THE TRADING DURING THE CHARGED TIME FRAME WAS BASED ON THE RECEIPT OF COMPANY PRESS RELEASE INFORMATION IN ADVANCE OF THE PRESS RELEASES' PUBLIC DISSEMINATION"

In an expert witness exchange, dated March 15, 2018, attached as **Exhibit 14**, the government indicated that, *inter alia*, Mr. Canjels will testify that "certain of the trading during the charged time frame was based on the receipt of company press release information in advance of the press releases' public dissemination." Any such testimony must be precluded. It is well established that an expert in

11

criminal trial may not offer an opinion regarding the guilt or innocence of the accused. Indeed, the Second Circuit has cautioned that experts can exceeded their role, "no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense." *United States v. Mejia*, 545 F.3d 179, 191 (2d Cir. 2008). *See also United States v. Conyers*, 118 F.3d 755, 758 (D.C. Cir. 1997); *United States v. Alexander*, 87 F. App'x 889, 890 (4th Cir. 2004); *United States v. Nungaray,* 145 F.3d 1343 (9th Cir. 1998) (holding "an expert may not state his opinion about the defendant's guilt or innocence").

The ultimate fact that jury must find in this case is whether Mr. Korchevsky traded on illegally obtained press releases before they were distributed to the public. Dr. Canjels must not be allowed, under the mantle of an expert witness, "to usurp . . . the role of the jury in applying that law to the facts before it." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11CV6201 DLC, 2015 WL 353929, at *3 (S.D.N.Y. Jan. 28, 2015), *aff'd sub nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017). If allowed to testify as the government has indicated, there is real danger that he will be displacing the jury's province.

V. **GOVERNMENT DISCLOSED EXPERT WITNESS, THOMAS CAROCCI, SHOULD NOT BE PERMITTED TO TESTIFY AS AN EXPERT WITNESS IN THE AREAS INDICATED ON THE GOVERNMENT'S DISCLOSURE.**

In the government's expert witness exchange, it indicates that it will call Thomas Carocci, an attorney with FINRA, to testify about the following:

(1) FINRA's role in regulating the trading of stocks of publically traded companies; (2) general securities industry terms; (3) disclosure requirements

> of publicly traded companies registered with the SEC; (4) documents required to be filed with the SEC to comply with such disclosure requirements; and (5) types of trading, including particular trades that were executed based on material non-public information.

(Exhibit 14). Items 1-4 do not require expert testimony as they are not beyond the ken of the lay person and item 5 runs afoul of the same jury prohibition against usurping the jury's function discussed above.

First, although the disclose makes clear that Mr. Carocci is a lawyer employed by FINRA, it is unclear his area of expertise. Notwithstanding items 1-4 in the disclosure are not "directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). In fact, "[t]he SEC rightly points out that the necessity of expert testimony depends on circumstances, and that there is no categorical rule requiring expert testimony in a securities case. *S.E.C. v. Ginder*, 752 F.3d 569, 575 (2d Cir. 2014).

The fact is that, Mr. Carocci can explain certain basic requirements of SEC documents and stock trading terms without being designated as expert witness and risking the jury afford a greater level of credibility due to that label.

As with Dr. Canjels, Mr. Carocci should not be permitted as an expert or otherwise to offer an opinion as to what amounts to Mr. Korchevsky's guilt or innocence.

13

## CONCLUSION

For the aforementioned reasons, the Court should grant the above requested relief.

    RESPECTFULLY SUBMITTED.

New York, New York
May 21, 2018

                      SULLIVAN & BRILL, LLP

                      By:    Steven Brill
                               James Healy
                               Rachel Brill
                    *Attorneys for Mr. Korchevsky*
                    115 Broadway, 17th Floor
                    New York, NY 10006
                    (212) 566-1000
                    E-Mail: steven.brill@sullivanbrill.com