1

1                  UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,    :    15-CR-381(RJD)
4
        Plaintiff,    :
5                             United States Courthouse
     -against-          :    Brooklyn, New York
6
VITALY KORCHEVSKY and       :
7  VLADISLAV KHALUPSKY,         May 31, 2018
                         2:30 p.m.
8          Defendants.    :

9  - - - - - - - - - - - - - - X

10               TRANSCRIPT OF STATUS CONFERENCE
        BEFORE THE HONORABLE RAYMOND J. DEARIE
11           SENIOR UNITED STATES DISTRICT JUDGE.

12  APPEARANCES:

13  For the Government:       RICHARD P. DONOGHUE
                     United States Attorney
14                       BY: RICHARD M. TUCKER
                        JULIA NESTOR
15                          DAVID N. GOPSTEIN
                     Assistant United States Attorneys
16                       271 Cadman Plaza East
                     Brooklyn, New York
17

18  For Deft. Korchevsky:      STEVEN G. BRILL, ESQ.
                     JAMES L. HEALY, ESQ.
19

20  For Deft. Khalupsky:      MILDRED M. WHELAN, ESQ.
                     LaKEYTRIA W. FELDER, ESQ.
21

22  Court Reporter:          Charleane M. Heading
                     225 Cadman Plaza East
23                       Brooklyn, New York
                     (718) 613-2643
24

25  Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1          THE CLERK:  We are on this afternoon for a status

2    conference.  This is USA versus Vitaly Korchevsky and USA

3    versus --

4          You are going to have to help me with the

5    pronunciation of your first name.

6          DEFENDANT KHALUPSKY:  Vladislav.

7          THE CLERK:  -- Khalupsky.  Thank you.  15-CRIM-381.

8    We're on Superseder 1.

9          Can I ask the attorneys please to note their

10   appearance beginning with counsel for government.

11         MR. TUCKER:  Good afternoon, Your Honor.  Rich

12   Tucker, Julia Nestor and David Gopstein for the United States.

13         MS. NESTOR:  Good afternoon, Your Honor.

14         MR. GOPSTEIN:  Good afternoon.

15         THE COURT:  Good Afternoon.

16         MR. BRILL:  Judge, good afternoon.  Sullivan & Brill

17   by Steven Brill and James Healy for Vitaly Korchevsky.  How

18   are you.

19         MR. HEALY:  Good afternoon.

20         THE COURT:  Good afternoon.

21         MS. WHALEN:  Good afternoon, Your Honor.  The

22   Federal Defenders of New York by Mildred Whalen and LaKeytria

23   Felder for Mr. Khalupsky and we have the Russian interpreter

24   joining us on standby.

25         THE COURT:  Thank you so much.  Welcome all.

3

1          I hardly know where to begin.  Actually, I do know

2     where to begin.  I was a little put out, frankly, by the

3     complaints that I did not entertain the request for a

4     questionnaire, a request I would have readily granted had it

5     been made in a more timely fashion because I am sure you all

6     as experienced lawyers know the use of questionnaires requires

7     a separate dedicated panel and there just was not sufficient

8     time to do what has to be done by the jury people.  We asked

9     them many times to arrange that.  So that was the only reason

10    why a questionnaire was not viable.

11         That said, I have ordered at least a double panel so

12    we are not going to hopefully have a false start at it.  Right

13    now, I am hoping to be able to select the jury myself.  That

14    said, we would like probably at least begin the process,

15    because with the size of the panel, we will not be able to fit

16    here, in the ceremonial courtroom.  At some point, we will at

17    least reduce the number of prospective jurors to a point where

18    we can, at a break, conveniently reunite here.

19         I will expand my usual inquiry of the jurors, the

20    voir dire, to cover many of the subjects that seem to be of

21    concern to the defense as are reflected in a letter, I

22    believe, Ms. Whalen, you sent to me.  I have so many letters

23    and so many submissions that it is hard to keep them all

24    separated, but I have at least one letter reflecting a request

25    for specific areas of inquiry and for the most part, I will

4

1   get into that with the prospective jurors.

2          I can tell you that we will not open day one.  We

3   will open the morning of day two so that you can plan

4   accordingly.  If I am unable to select the jury myself, rest

5   assured I have Judge Reyes standing by and he will be duly

6   instructed to cover the areas that I am comfortable addressing

7   during the examination of prospective jurors.

8          You know this is very helpful to me.  I do not mean

9   to suggest otherwise.  But as you know, some of these calls

10  are discretionary of an evidentiary nature and as much as I

11  would like to give you a bright line today, I am not going to

12  do that.  I do not think it would be responsible for me to do

13  that.  I will identify, as we go through these, the areas

14  where I have some concerns and give you my thinking on it and,

15  to some extent, give you a flat out ruling on it.

16         One side is worried about the case getting into the,

17  I hate to use the terminology that has become lately popular

18  lately, but the dark area of internet hacking and Russians and

19  all of that business and so forth and so on.  That is not

20  going to happen.  The allegation is here that certain people

21  were able to access these computers, they happened to be

22  Russian and that is probably about as far as it is going to

23  go.  On the other side, the government is concerned that we're

24  going to have "This is your life" for Mr. Korchevsky and we

25  are going to recite, ad nauseam -- I shouldn't say "ad

5

1    nauseam" -- at great length Mr. Korchevsky's virtues, so forth

2    and so on.  That is not going to happen either.  On the other

3    hand, his character may very well be put in issue.  If he

4    chooses to testify, certainly his credibility is an issue.

5            So, these are two areas where I know you are

6    battling back and forth.  I cannot say anything more about it

7    today other than I think I am sensitive to the concerns that

8    the defense has raised and I am certainly going to keep the

9    government on the short leash when it comes to some of these

10   other areas.

11           That is my opening statement.  Before I get into

12   some of the specifics, I want to give you an opportunity to

13   speak up.

14           We will turn first to the government.  Is there

15   anything you want to speak to specifically before we get into

16   some of these motions?

17           MR. TUCKER:  No, Your Honor, only to say that we

18   will, as we offered before, work with defense counsel to try

19   to at least provide some points of agreement on proposed

20   voir dire to make the Court's job slightly easier in that

21   respect.

22           Also, the government understands the Court's

23   admonishment about straying into areas that are not

24   appropriate in terms of the activities overseas.  Obviously,

25   the government has a case to prove here and that involves

6

1  criminal actors in the Ukraine and elsewhere, but we have no

2  intention nor does the evidence take us there into other

3  topics that are, to say, politically sensitive but totally

4  irrelevant.  So we'll be -- we are already scrutinizing our

5  case and we will be editing where appropriate so we're

6  sensitive to that point as well.

7            THE COURT:  One other area before I turn to

8  Mr. Brill and Ms. Whalen and their colleagues.

9            Of course we have the complication of the 4th of

10  July and what to do about it.  I can tell the jurors up front

11  what to expect, hopefully, project the length of the trial,

12  give them a realistic sense of how long it will take and also,

13  to the extent I am able to, and I invite your input here, what

14  I am going to do about the 4th of July, other than take it

15  off.  The obvious suggestion would be, well, it falls on a

16  Wednesday, the worst possible day for these arrangements, so

17  maybe we take the two days after it off.  I am not comfortable

18  with those lengthy breaks.  People who have plans for the 4th

19  of July or on holiday for the 4th of July week, we're not

20  going to sit them in any event.

21            So my current thinking, and you needn't respond now

22  but let me know your thoughts, is perhaps we will take the 4th

23  of July off, perhaps what I call a short day which I do sit

24  from time to time which is we work through lunch, we break at

25  about 2:00 and call it a day.  Maybe I could do that on

1    Tuesday and start a little later on Thursday.  I invite your

2    input.  It is something I want to be able to be somewhat more

3    specific with the jurors when it comes time to select them.

4              MR. TUCKER:  From the government's perspective, that

5    sounds fine, Judge.  Just two sort of data points to provide

6    the Court.

7              Of course much depends on what the defense pursues

8    in terms of a defense strategy and cross-examination, rightly

9    so.  The government's efforts to edit its case have led us to

10   conclude about based upon what we know about how Your Honor

11   runs a trial, I think there's a good chance we can be done

12   with our case in chief in less than three weeks and we have

13   three weeks between the commencement of trial and that 4th of

14   July week.  So I would propose -- I think it's a good idea to

15   not take jurors who can't do the 4th of July week, I think

16   that that's probably a barrier to entry for them, but -- I

17   guess what I'm getting at is maybe that problem will never

18   really form up because there is a nontrivial chance we could

19   be more or less done before the holiday.

20             THE COURT:  Fair enough.  And on the other side of

21   that coin, there is a nontrivial chance that we could be in an

22   acute stage of the trial at that point where I am loathe to

23   take other than minimal time off in the middle of summations,

24   let alone deliberations, et cetera, et cetera.

25             I'm going to figure out a way to speak to the jurors

8

1  that will not commit me to too much of a specific course of

2  action but we have to let them know.

3        Are you suggesting that I still stick to my four to

4  six week estimate in terms of the jurors?

5        MR. TUCKER:  Your Honor, the anxiety that the

6  government always has about erring on the side of caution is

7  that it will create the appearance that something went wrong

8  if we're faster than expected.  So I think what we would say

9  is around four weeks is what we would predict.  That way, if

10  we finish in three, nobody gets the idea that we didn't do

11  something that we had planned on doing.

12        THE COURT:  In all my years, I never even thought of

13  that.

14        MR. TUCKER:  I'm a worrier, Judge.

15        THE COURT:  So am I.  I will give it some thought.

16  I will figure out a way to say it.  I just do not want to

17  create a false hope in the jurors and then I have disgruntled

18  jurors.  That is in nobody's interest to have disgruntled,

19  impatient jurors.

20        MR. TUCKER:  Agreed, Your Honor.

21        THE COURT:  Mr. Brill, you are chomping at the bit.

22        MR. BRILL:  No.  Just with respect to scheduling,

23  even if the government's now estimate becomes reality which is

24  a three week area, I mean, my math puts us right at the heels

25  of July 4th and, certainly, as Your Honor can see, just at

9

1   least with respect to our expert exchanges, potential

2   character evidence, we are going to put on some sort of case,

3   obviously not committing to anything at this point.  So I see

4   us going through the holidays is what I'm saying in my best

5   guess.  In terms of our case, just to give to the Court and

6   everybody an understanding, you know, we certainly would seek

7   to present our case in a week or less.

8           THE COURT:  Okay.  You too will edit down as the

9   government claims it is in the process of doing.  I am being

10  facetious.

11          Ms. Whalen, anything you want to add on this so far?

12          MS. WHALEN:  Your Honor, I can't remember who sent

13  out the ECF bounce about the voir dire requests being due on

14  June 6th.  I just wanted to confirm that.  If it came from

15  Magistrate Reyes, are you still sticking to that date or do

16  you want us to send general requests earlier than that?

17          THE COURT:  No later than the 6th.  I am sitting in

18  another court the week before.  I will be in touch with

19  chambers but the sooner, the better.

20          MS. WHALEN:  I think we'll be able to get them to

21  you sooner rather than later the more difficult questions

22  included in the questionnaire.

23          I do want to apologize.  I didn't realize you needed

24  a special panel for the questionnaire so please ignore my

25  lament.

1         THE COURT:  Complaints.

2         MS. WHALEN:  I would call it a lament, not a

3  complaint.

4         THE COURT:  It's all right.

5         MS. WHALEN:  And then with respect to jury

6  selection, Your Honor, we had asked for an additional two

7  peremptory challenges.  I think that was more because we were

8  concerned about what might come up given the length of the

9  trial and then also just our general concerns about how

10  Russian, how the current news might figure into the jury

11  selection and so that's why we were just asking for one

12  additional peremptory challenge to be exercised independently

13  by each defendant.

14         THE COURT:  That I can give you a ruling on today:

15  No.  Okay?  I do not see the reason for it.  I do not see the

16  basis for it.  I understand your concerns.  I am going to do

17  the best I can to address the process of jury selection and I

18  think, frankly, if I was a little bit -- I will be candid.  I

19  understand the position you are in.  I was a little bit

20  surprised because, on the one hand, you clearly want to

21  deemphasize certain aspects of the case and yet, on the other

22  hand, those questions did anything but, but I understand you

23  have to have it put to the jury in substance.  I understand

24  but we'll have 10 and 6 in the ordinary course.

25         All right.  Let me at least frame the discussion for

1  the balance of the afternoon however long it takes:  My

2  reaction and to some extent, my rulings, and if I missed any

3  one of these many applications, you will not hesitate to let

4  me know.

5  I will tell you my one area, again, of concern, my

6  one area of real concern here, and I am somewhat dealing in

7  the dark because I have your respective characterizations of

8  expert opinions, but my one area of real concern here is in

9  the quality and the adequacy of the expert submissions.  I do

10  not want to be, no judge wants to be in the position in a

11  criminal case, in particular, of precluding evidence.  So a

12  word to the wise.  Some of these opinions at least as

13  presented or as characterized seem a little white bread to me,

14  general and generic, and do not really address what I think is

15  anticipated clearly in the rule.  That is not a ruling because

16  there is a lot for me to cover here and I have not really had

17  a chance to literally digest line for line what it is that is

18  being, that is presented so far in the submissions, but having

19  done it a couple of times, I do have some real concerns.

20  Perhaps I can amplify it as I go on.

21  All right.  There is a request for two panels which

22  I have granted and which I have ordered.  It will be two

23  dedicated panels solely for our use at least until we

24  discharge any of those jurors.

25  There is a joint motion by both defendants to

1  preclude the government from using certain terms reflected in

2  their indictment. I, frankly, don't find these terms

3  particularly exciting, much less prejudicial. Indeed, one

4  side or the other uses them in the voir dire requests such as

5  "hacking." I mean, that has become pretty much commonplace in

6  our jargon today and I have no doubt ultimately that two hours

7  into this proceeding, we are going to be talking about

8  hacking, targeting victims, targeted attacks, Russian hackers.

9  I mean, they do not concern me and I am not going to direct

10  that they be deleted or expunged from anything.

11           MR. BRILL: Can we jump in? I'm sorry. I didn't

12  mean to interrupt but do you want us to jump in or do you want

13  to just lay out --

14           THE COURT: Go ahead.

15           MR. BRILL: I didn't know how Your Honor wanted to

16  do it.

17           THE COURT: I am here to please.

18           MR. BRILL: I guess just with respect to

19  Your Honor's statement regarding the terms, just pick one of

20  the ones that we did highlight which was "Newswire victims."

21  It seems to me that the word "victim" is a word that's often

22  used in cases even unlike these and I know it seems to me to

23  be fundamental that there's usually an objection to that and I

24  would hope that some courts try to stay away from that only

25  because it's conclusory, basically, and it's also, it's an

13

1   inflammatory word.  You react that way when you hear that

2   someone's a victim.

3          So, I guess really what I'm saying is I'm asking the

4   Court a question which is that is it your ruling that you

5   would permit the government to use that term?

6          THE COURT:  Yes, I would, and I do not think this

7   trial is going to be about whether or not we have victims in

8   this case or whether these news services have been victimized.

9   I don't think anybody is going to dispute that.  That is not

10  what the case is about.

11         MR. BRILL:  Well, we certainly don't dispute that

12  there could have been some intrusion on their computers.

13         THE COURT:  That's the word you want admitted.

14         MR. BRILL:  But my question is are they going to be

15  called victims by Your Honor and by the government.

16         THE COURT:  I am not going to call them anything,

17  but I don't find offensive the use of the word "victim."  I

18  think it is an accusation.  I don't engage in that language

19  except to the extent if I am reading from the indictment.

20         MR. BRILL:  Well, yes, that's part of our objection.

21         THE COURT:  Well, I understand your objection and I

22  simply disagree with great respect.

23         There is a motion to preclude this Business Wire

24  business, Business Wire business on the grounds that it does

25  not reflect the specific charge, it is not specifically

14

1  charged in the substantive counts in the indictment, although

2  it is certainly referenced in the indictment and as far as I

3  can see, part of the conspiracy, certain proof of the

4  existence of the conspiracy. So my inclination there is to

5  deny that application as well.

6     Brady and Giglio. I mean, these cases are

7  unprecedented as far as there has been such an exchange of

8  information. One of the government's letters took me a half a

9  day to read. Do we have any problems with Brady and Giglio?

10    MS. WHALEN: Your Honor, in terms of Giglio, we have

11 an indication that we may have a problem given the

12 government's submission of the 29th requesting that we be

13 precluded from cross-examining Arkadiy Dubovoy, Igor Dubovoy

14 and Leonid Momotok about an action that's pending in Latvia.

15    THE COURT: Latvia, yes.

16    MS. WHALEN: Yes, and while I understand the

17 government's argument that it is not a, I don't know what the

18 equivalent phrase would be, indicted, if it's not an indicted

19 matter.

20    THE COURT: It is an allegation. There has been an

21 allegation.

22    MS. WHALEN: It's a serious allegation, and given

23 the attachments, it's an allegation that's been referred for

24 prosecution. I don't know if the Court has had an opportunity

25 to review the attachment, but it --

1          THE COURT:  I looked at it.

2          MS. WHALEN:  So it sets forth a serious allegation

3    on the part of Mr. Dubovoy.  I didn't see a reference to,

4    rather, a reference to, I'm sorry, Igor Dubovoy as opposed to

5    Arkadiy Dubovoy and Leonid Momotok.

6          I guess our concern is the government is

7    characterizing this as not relevant to the case whereas Leonid

8    Momotok was charged in the underlying indictment, not the

9    superseding indictment, but he was charged in this indictment

10   as being part of a money laundering conspiracy.  Both Arkadiy

11   and Igor Dubovoy were charged in the District of New Jersey

12   with an underlying money laundering conspiracy.  This act to

13   buy the hotel took place I think it is in 2013 and they

14   allege, I mean their position is, oh, we lost $100,000, but

15   Your Honor, I think the $100,000 is probably proceeds from the

16   instant offense which I think makes it relevant to this case.

17         THE COURT:  What is your request?

18         MS. WHALEN:  Our request is that we should be

19   permitted to cross-examine on this.

20         THE COURT:  I was asking about Brady material.

21         MS. WHALEN:  In terms of Giglio.  I guess what my

22   request is that we see this clearly, as Judge Korman informed

23   me, it's called "Jiglio" material.  I started to laugh too and

24   then he stared me down and he said, "I argued that case."

25         THE COURT:  Yes.

16

1        MS. WHALEN:  So Giglio material, Your Honor, I think

2   it clearly falls upon within Giglio material and we have

3   secondary concerns about it because the government has

4   received a letter from the government of Latvia.  We don't

5   know whether -- and that letter was dated in I believe

6   December of 2017.  There were additional documents attached at

7   the end showing that the case had been referred for a

8   prosecution and that letter was dated January 2018.

9        So there could be issues of whether the government

10  has asked the government of Latvia to hold off on an

11  extradition, that they may have asked for other consideration

12  to be shown to Igor, and that would be relevant to us to

13  cross-examine on because that would be evidence of why Igor,

14  Mr. Dubovoy, would have a desire to shade his testimony to

15  help government.  It would be a benefit that was offered

16  to him along with the cooperation agreement and so we think

17  that there needs to be additional disclosure about this

18  specific incident and that we should be allowed to question

19  these witnesses and if there are other, if there's other

20  evidence like this, it should be brought to our attention as a

21  Giglio discussion.

22        THE COURT:  Let's keep in mind that we have two

23  issues.

24        On the Giglio side -- that case arose out of the

25  Eastern District of New York.  I think I know how to pronounce

1   it notwithstanding Judge Korman's erroneous pronunciation.  On

2   the Giglio side, yes, you should have what the government has

3   by all means and, certainly, if the government has intervened

4   on behalf of any witness to a foreign government to withhold

5   extradition or anything of the sort, I hope I do not have to

6   tell these Assistants that has to be disclosed to you.

7               On the issue of whether or not you cross-examine on

8   it, that is one of the issues I was going to get to.  It is

9   open in my mind because I am not quite sure I know enough

10  about it right now.  Chances are, if you are permitted, you

11  would be bound by the witnesses' answers.

12              MS. WHALEN:  Understood.

13              THE COURT:  These are after all accusations and that

14  is my view it.

15              MS. WHALEN:  Okay.  And we would just, because the

16  allegations are manipulations of bank accounts and possible

17  false statements, we think they clearly go to credibility and

18  we would like to cross-examine on them and we understand that

19  we may be stopped by the witness' answer or bound by the

20  witness' answer.

21              THE COURT:  You know, I am essentially on your side

22  here, but because they involve bank records, they, therefore,

23  involve credibility?  I am not following this.

24              MS. WHALEN:  Well, Your Honor, one of the

25  allegations -- I'm sorry.  The pages aren't numbered but I'll

1    refer to it.

2            In one of the allegations, Mr. Igor Dubovoy is

3    alleged to have caused money to be transferred from one bank

4    account back to another bank account, both bank accounts under

5    his control, in an effort to show that monies had been paid

6    over to the shareholder or the purported shareholder for this

7    hotel to show that this was an exchange of money or debt or a

8    loan for the shares.  I think that given a fraudulent

9    transfer, that clearly goes to credibility and we should be

10   allowed to cross-examine on that.

11           THE COURT:  Well, either it is a fraudulent transfer

12   or if the evidence available suggests by inference it may be a

13   fraudulent transfer, I will likely agree with you.

14           MS. WHALEN:  And then there's another issue -- we

15   can detail them for the Court, but there's another issue as to

16   Mr. Dubovoy signing a false document about the transfer of

17   shares in this company that --

18           THE COURT:  It is a credibility issue obviously.

19           MS. WHALEN:  Yes.  So I think with respect to this,

20   we can present the Court with a list of the issues that we

21   think are relevant for cross-examination in the specific case

22   but, again, if there's been any kind of assistance in terms of

23   delay of extradition or delay of requiring Mr. Dubovoy to be

24   in court in Latvia, we think we should be told about that so

25   that we can make that argument as well.

19

1          THE COURT:  I agree.

2          MR. BRILL:  We join in our co-counsel's argument.

3          THE COURT:  Yes.  And, of course, the government

4   agrees as well?

5          MR. TUCKER:  We also agree there has been no such

6   effort.

7          THE COURT:  To your knowledge.

8          MR. TUCKER:  To our knowledge.

9          Look, Your Honor's point is well taken.  We -- the

10   reason that we're having this argument now is that because the

11   government disclosed this information and made a motion.  We

12   understand our Giglio obligation and where it's a close call,

13   we're going to move and where it's not, we'll make

14   disclosures.

15          Just for the record, this particular incident was

16   summarized in reporting that was disclosed to the defense well

17   in advance of the letter that we filed earlier this week.  He

18   talked about it in his first proffer.  So we understand our

19   obligations.  Nobody wants the trial to go slowly.  We will

20   continue to make timely disclosures as best we can.

21          THE COURT:  All right.  Moving right along, the

22   government represents there will be no 404(b).  I believe that

23   there is a slight bone of contention, but we will get to it in

24   a different context in a moment.

25          They have no intention of going into Mr. Khalupsky's

1  contesting extradition.  So that is out.

2          Venue, you have made your record.  It may or may not

3  be a serious issue in the case.  I have read the government's

4  response.  It is matter of fact, it is ultimately a matter for

5  the jury.  I'm not going to dismiss it now on the basis,

6  dismiss those two counts now on that basis.

7          MS. FELDER:  Your Honor, if I may?

8          THE COURT:  Yes.

9          MS. FELDER:  I have asked the government for

10 additional Rule 16 disclosures regarding venue.

11         THE COURT:  Regarding?

12         MS. FELDER:  Venue.  In its last letter, it

13 indicated there is a data center in Brooklyn that was

14 responsible for clearing certain securities transactions.

15         THE COURT:  Right.

16         MS. FELDER:  I have asked that any additional

17 documents are disclosed, any Rule 16 or other documents in my

18 response to their claim, so we have an opportunity to review

19 that to see if that's actually substantial.  Given the nature

20 of that particular company, there are subsidiaries, one

21 located in New York City that is also responsible for clearing

22 securities.  So I would like an opportunity to review whatever

23 evidence that they intend to submit as their obligation to

24 disclose under Rule 16.

25         THE COURT:  All right.

1          MR. GOPSTEIN:  Your Honor, we will provide any

2     additional evidence that we have that we're intending to rely

3     on at trial including relating to this.

4          MS. WHALEN:  Also, we haven't come across it in the

5     discovery that has already been provided.  So if you have

6     provided it, can you just give us the Bates number?  That

7     would be helpful.

8          MR. GOPSTEIN:  Sure.  For the record, we anticipate

9     additional discovery with respect to venue and it should be

10    coming shortly, but to the extent there's anything else, I'm

11    happy to the point you to it.

12         MS. FELDER:  Thank you.

13         MS. WHALEN:  Thank you.

14         THE COURT:  There is another issue that I think -- I

15    certainly understand what layering is.  I'm certainly not

16    ready to rule now whether or not that, the government's

17    proposed evidence concerning the parties' layering their

18    transactions to affect the price, whether or not it comes in

19    certainly suggests something about the relationship of the

20    parties, but I'm not there yet.

21         MR. HEALY:  Your Honor, if I might, respectfully,

22    Your Honor said the parties layering their transactions.

23    There's no accusation that anyone engaged in layering.  In

24    fact, there's a forwarded e-mail is what it is.

25         THE COURT:  I understand.  I understand.  They're

1    interesting e-mails but I'm not quite there yet.

2           There's an application, I think --

3           MR. TUCKER:  I apologize, Your Honor.  I don't mean

4    to interrupt.  Just on that last point, the way I would see

5    this going then is as we approach the moment when the

6    government would propose to introduce that evidence, we'll

7    raise it the night before so as not to waste the jury's time.

8    Is that how Your Honor wants to proceed?

9           THE COURT:  That is the way I like to do it.

10          MR. TUCKER:  Sounds good.  Thank you, Your Honor.

11          THE COURT:  There is an application by Mr. Khalupsky

12   to suppress statements that he made to the government that he

13   was interested in providing certain details.

14          I honestly don't understand the nature of that

15   objection.

16          MS. WHALEN:  I guess Your Honor what I'm concerned

17   about is that it's going to lead the government or it's going

18   to lead the jury to speculate about what he would or would not

19   have said.  We have no objection to what he said about when in

20   that incident we don't have a problem with this but saying,

21   "Oh, and I can tell you more," and then having no further

22   information, I mean, I think I will honor the Court's

23   admonishment or instruction to the jury that they're only to

24   consider evidence that's actually been presented, but this is

25   the problem with this statement, the statement, "Oh, I can

 1    tell you more" and then no evidence of that more being

 2    admitted.

 3              I think, you know, he might have been able to tell

 4    them more but he remained silent.  I mean, if he testifies at

 5    the trial, clearly, it would be an area for cross-examination,

 6    but I'm just not -- I think that it does impinge on his right

 7    to remain silent if the government is allowed to present it on

 8    their direct case.  We have no basis to object to the actual

 9    statements of information that he gives.  It's just our

10    concern that "I could tell you more," that may have been true

11    and he may have chosen to remain silent and everyone has to

12    respect that right.

13              MR. GOPSTEIN:  Your Honor, I think there's no

14    dispute that the statement was lawfully obtained.  There's no

15    dispute that it is highly relevant to his knowledge, both of

16    the crimes with which he's charged and his co-conspirators,

17    and there's no dispute that this statement will be offered in

18    a complete fashion.  I don't think there is any basis to

19    preclude the statement.

20              THE COURT:  I don't think Ms. Whalen is disputing

21    any of that.  It is the coda, it is the phrase, "And I can

22    tell you more."  Why do you need it?

23              MR. GOPSTEIN:  It goes to his knowledge.  He has

24    knowledge about this case.  He has knowledge about his

25    conspirators.

24

1      THE COURT:  Let me think about that.  I may not have

2  focused on that specific aspect, that particular phrase, and I

3  will do just that.

4      Okay.  Moving along, Mr. Khalupsky continues to

5  challenge the admissibility of co-conspirator statements.  We

6  all know where we come out on that.  The government has to

7  satisfy the Geaney standard.  They can do it prospectively in

8  the hopes that I agree with them, but I am not going to

9  conduct a hearing in advance of trial or in advance of the

10  testimony of the witnesses.  I take the government's

11  representations seriously.  I do not want a disruption in the

12  trial.

13      There is another one here.

14      MS. FELDER:  Your Honor, if I may, on that issue,

15  the government -- I believe the response focused on whether or

16  not there was a conspiracy.  Mr. Khalupsky raised a concern

17  that the statements were not in furtherance of a conspiracy.

18  None of the statements that were highlighted went toward any

19  of the goals or advanced the goals of the conspiracy at all

20  and I think it fails on that part of the test.

21      THE COURT:  Well, you know, I do not have the

22  statements themselves specifically but they have to satisfy

23  me, A, there was a conspiracy, B, that the speaker was or

24  acted on behalf of the member of the conspiracy and, C, the

25  statements were, as you said, in furtherance of that

1  conspiracy. You have to satisfy me before I formally admit

2  them into evidence. That's all I can tell you. I agree with

3  you. I agree with what you say. We deal with these all the

4  time in conspiracy cases and the government proceeds at its

5  peril if they tell me subject to connection, that they are

6  going to be able to satisfy, meet the somewhat, somewhat

7  relaxed but nevertheless serious threshold of Geaney. That's

8  my view of it.

9       Mr. Khalupsky asks that the government identify when

10  the exhibits come in, if they pertain to only one defendant

11  and not the other defendant and that I stand up in somewhat

12  ceremonial fashion and announce to the crowded courtroom and

13  the jurors that this only relates to defendant A and not to

14  defendant B.

15       I have two things to say about that. If I were

16  defendant A, I would be upset with that. My second thing is

17  that's your job. On rare occasion, I will grant you, on rare

18  occasion, something comes in, that they will be of such

19  potential significance or prejudice, that it justifies that

20  kind of modest interruption by the court. I don't know that

21  we are going to have such an occasion in this case, I would

22  doubt it, but if it happens, you will make your application.

23  Beyond that, that is all on that.

24       Okay. Expert testimony. It is troubling. I read

25  the rule you all are familiar with. I read the

1   characterizations and the summaries.  They do not appear to

2   give enough by way of opinions and methodology, specific

3   opinions.  They are not going to discuss the reasonableness of

4   trades and so forth and so on.  That is a different matter.  I

5   do not know that we will need any expert to opine on the

6   reasonableness of trades and I am not sure it's relevant but I

7   am not making a ruling there.  That is an open matter as far

8   as I am concerned.

9          I would urge you, both sides, to go back to your

10  expert disclosures and amplify where you think appropriate

11  because I have a rule to enforce and I will enforce it.  I

12  don't want to cut your legs out from under you.

13         MR. BRILL:  Judge, if I may on that point, you are

14  being very diplomatic with respect to that.  I'm not really

15  sure who, who you're referring to.  I'll certainly assume

16  that -- I mean, we're certainly going to take Your Honor's

17  words under advisement and do what you're saying with respect

18  to our exchange, but --

19         THE COURT:  Well, Dr. Mayer or Mr. Mayer, he is one

20  such character.  They are pretty nondescript.  There's no meat

21  to it.  There's no specifics.  And Katz gives no opinions.

22         I mean, as long as you stick your chin out, I

23  will -- you are not a loan.  I don't mean to suggest it is

24  only you.

25         MR. BRILL:  Understood.  And just with respect, at

27

1    least with respect to Mr. Mayer who's, who deals with the

2    securities and trading aspect of the case, you know, I think a

3    lot of his work which is, continues to evolve and he continues

4    to consider, has to do with the information that we get from

5    the government and that we give him in order to meet this rule

6    and to provide a sufficient conclusion and opinion.

7           One of our objections is the somewhat moving target

8    of the crux of this case which is the trades that the

9    government claims were illegal or accused or however you want

10   to identify them.  It's very hard for anyone, especially an

11   expert, to come to a conclusion when the database -- I say

12   that with a small "D" -- the database keeps changing in terms

13   of, well, now we're going to add ten more accused trades, we

14   might take that one way, we didn't need that one, here's an

15   additional, here's additional trades that we as a government

16   are going to allege are accused.  So that has, in significant

17   part, a lot to do with our expert's ability to draw a

18   conclusion because of this, because of this moving target.

19          To be more specific, if we get evidence from the

20   government's expert that draws a conclusion and we get a slide

21   from them which is somewhat of a PowerPoint drawing a

22   conclusion and that slide or that conclusion is based on a

23   subset of stocks or of trades, and then we give that to our

24   expert and our expert looks at that and discusses it, maybe

25   talks about how we can rebut that, you know, advises us and

1   educates us, and then in a month, we get additional slides and

2   maybe even a modification of that slide that we presented to

3   the expert which now changes the subset of stocks and changes,

4   to some extent, the government's expert's opinion, then it's

5   almost impossible and unfair.

6            I mean, really, the ultimate thing here is that it's

7   completely unfair, but it's almost impossible for our expert

8   to be able to have a set target in order to give his proper

9   conclusion.

10           THE COURT:  So the monkey's on your back.

11           MS. NESTOR:  Sure, Your Honor.

12           The government has provided defense counsel a

13  spreadsheet of all trades that it is considering in this case.

14  The expert's actual exhibits that he's using, to the extent

15  that they've changed over time, have been mostly us taking

16  away an exhibit or providing an extra example from that

17  database that we've provided to defense counsel.  They have

18  the information.  They requested the information.  We provided

19  them the information.

20           So to the extent that they're concerned that we're

21  highlighting certain things for the jury as opposed to other

22  things, that's really the government's prerogative in how to

23  prove their case, but the database itself hasn't changed,

24  Your Honor.

25           THE COURT:  Well, is the body of information that

29

1   the expert has available to him, in your perspective, is that

2   changing?

3           MS. NESTOR:  No.

4           MR. BRILL:  Okay.  All right then.

5           THE COURT:  Well, somebody asked for a final list of

6   trades.

7           MR. BRILL:  Well, you know what, Judge, I

8   respectfully disagree with what the government is saying.  We

9   tried to present the court with a chronology here that early

10  on, last year, February and specifically of 2017, we asked for

11  this very question, a list of the accused trades because as I

12  presented to the court, it's, it is the crux of the case.

13          You know, we are being charged with insider trading

14  or trading on nonpublic information.  Certainly we must have

15  the trades that make up that crime allegedly.  So we asked for

16  that.  We did receive a spreadsheet which included

17  approximately 750 trades, approximately, and to be frank, we

18  were told that that is the universe, that is the universe of

19  accused trades.  Frankly, we have, subsequent to that, have

20  received additional exchanges where, you know, some have been

21  added to that, some have been taken away, some were never

22  included in that original spreadsheet but now are and so I

23  don't -- I'm not sure what the government --

24          THE COURT:  Excuse me.  When you say "some," you

25  mean some trades?

30

1    MR. BRILL:  Yes.  Some trades that were not a part

2 of that original spreadsheet that we were told were the

3 accused trades.  Now, as we stand here today, we're dealing

4 with other allegedly accused trades that were not part of that

5 original exchange back in February of 2017.

6    THE COURT:  You know what really confounds me here?

7 I don't know if the word is "unprecedented."  There was a

8 considerable exchange of information early on which you

9 certainly didn't object to understandably.  The government has

10 an ongoing obligation to update the information.  You

11 certainly don't have any quarrel with that.  To the extent

12 that it has disabled your expert because the body of

13 information has changed in a material way, assuming that has

14 happened, I understand what you are saying.

15    Somebody has asked for the final list of trades.  Do

16 we have the final list of trades?

17    MR. TUCKER:  Yes, Your Honor.  It was among the

18 exhibits disclosed on May 11th.

19    THE COURT:  There is your final list of trades.

20    MR. HEALY:  If I might, Your Honor, and I think that

21 people aren't saying things that are exactly in opposition but

22 I think that there's a point that's missed.  The government

23 did give us a spreadsheet that had every trade that

24 Mr. Korchevsky made, not even just during the course of the

25 conspiracy, but going back even a year or so before that.  It

1    is well over a thousand, many over a thousand.

2         The expert has given us slides that focus in on

3    January '11 to May of '15 and in that, there's a number, there

4    are often, 592 trades, 670.  A slide will say -- and those are

5    the numbers that are change changing, 670 short-term

6    round-trip trades.

7         What we are asking for, frankly, again there's 600,

8    don't hold me to it, what are those out of the thousand or

9    more trades that you've told us exist which we know exist,

10   which 670 are you referring to and there's two reasons we're

11   asking.  One is so we can give a more precise disclosure to

12   our expert because once he knows, okay, this is what their

13   expert is saying are these 600 trades, he can do that and,

14   secondly, Mr. Korchevsky has a right to know what he's accused

15   of.  Yes, they gave us on May 11th a huge spreadsheet but

16   they're not accusing all of those trades.

17        THE COURT:  So I see you shaking your head yes and

18   shaking your head no.

19        MR. TUCKER:  So that we're all operating from the

20   same body of vocabulary, I want to sort of lay out a few key

21   points.

22        Our expert, Dr. Canjels produced what we call a

23   deck.  It's a PowerPoint presentation.  We provided the first

24   version of that deck to defense counsel last summer which is

25   well in advance of trial with the idea that we can help

1  counsel focus on the body of trades that was relevant.  Each

2  slide of the deck includes a footnote which defines the

3  relevant universe that would allow someone to work with the

4  spreadsheets to reproduce the numbers.

5         Rather than wasting the Court's time, I would

6  propose that we work with counsel.  We can explain to them

7  perhaps more precisely how to use the data we provided so they

8  can back into some of the decks.  But the point here at the

9  end of the day, right, Judge is that there is an a enormous,

10 an enormous body of trades that the government will take the

11 position at trial are suspicious and have indicia to suggest

12 they're based on the stolen press releases.

13         MR. BRILL:  I'm sorry.  So if that is the adjective

14 "enormous," then how --

15         MR. TUCKER:  I wasn't done.

16         MR. BRILL:  -- do I go to my expert and say

17 here's -- there's going to be an enormous amount of illegal

18 trades that look suspicious.  Give me your expert opinion on

19 why they're not suspicious.

20         THE COURT:  The case is about trades made in a

21 specific, fairly confined period of time relative to a certain

22 release of public information.  Why is it so difficult then to

23 focus it in on those trades?

24         MR. BRILL:  Well, for one is, Your Honor, that are

25 we to assume that every trade that is made within that

33

1   particular period of time is a suspicious trade?  I mean, is

2   that what the government is saying?

3              THE COURT:  I assume that question was asked a long

4   time ago.

5              MR. BRILL:  I mean, it may have been.  I didn't

6   know -- I didn't think the answer is yes.

7              THE COURT:  I think the answer is no.

8              MR. TUCKER:  You are correct, Your Honor.

9   Your Honor did this a few years ago when we were first before

10  you.

11             The point is simply this.  Trades that were made

12  during a particular period of time between 2010 and 2015 where

13  the initial position was taken by the defendant and his

14  co-conspirators during the period between press release upload

15  and press release distribution, that is the universe we're

16  talking about.  We slice and dice it and focus on particular

17  trades mostly to aid the jury, but that's the universe and

18  that's not difficult to get to with the data we provided.

19             And just to put a fine point on it, Judge, what we

20  have provided defense counsel with, because in order to run

21  that analysis, you need the upload data from the press

22  release -- sorry, from the Newswire companies and you need the

23  trading data from the different defendants and their

24  co-conspirators and all of that came from different databases.

25             THE COURT:  Good.

1          MR. TUCKER:  So what the government did, working

2     with other regulatory authorities, was create a single

3     database where all of that information was put together in a

4     readily modifiable and manipulatable format and that

5     information was provided to the defense and early iterations

6     and final version of that document was disclosed on May 11th.

7          MS. NESTOR:  In addition to that, Your Honor, all

8     the underlying trades are also available to defense and were

9     disclosed as an exhibit on May 11th so they have all the

10    information that they need.

11         MR. BRILL:  Your Honor, what we're left with then

12    is -- essentially what the government has disclosed to us is

13    we're not going to tell you what the specific trades are.

14    We're going to tell you -- I mean, I guess I'm just trying to

15    make clear as to what they're saying.

16         Are they saying that all of the trades that were

17    done within 2010 and 2015, during the time of what they call

18    the window which is the upload time and submission of that

19    press release time, is the government saying that their

20    position is that those are all suspicious trades?

21         THE COURT:  I cannot believe I am being asked this

22    question, A, and I can't believe I'm being asked this question

23    today.  The answer to the question is?

24         MR. TUCKER:  Suspicious?  Yes.

25         MR. BRILL:  Well, come on.  Your Honor, I mean, are

35

1    they accused -- are those trades going to be, in the

2    government's case, the ones that they accuse Mr. Korchevsky

3    trading on nonpublic information?  I mean, that's the charge.

4         THE COURT:  Not an unreasonable question.

5         MR. TUCKER:  Well, Judge, just two points.

6         THE COURT:  You don't convict on smoke.  I don't

7    have to tell that you.

8         MR. TUCKER:  Absolutely not, Judge, and that's

9    really the problem.  That's the nub here.  Right?  The first

10   is the defendant is charged not only with substantive

11   securities fraud but multiple conspiracies.  So we wouldn't

12   actually need to flag a single trade in order to convict him

13   of those crimes.  That said, we have identified numerous

14   trades, many trades, because the defendant was a prolific

15   trader, that have those indicia of suspiciousness.  The

16   government has other evidence bearing on particularized trades

17   in that body, in that universe.  So the government will take

18   the position that those trades are suspicious and we will

19   highlight specific trades from that body with additional

20   evidence.

21        THE COURT:  To prove that those specific trades

22   were, in fact --

23        MR. TUCKER:  Correct, Your Honor.

24        THE COURT:  -- the execution of the conspiracy?

25        MR. TUCKER:  Yes, Your Honor.

1          THE COURT:  And have you identified those trades?

2          MR. TUCKER:  Your Honor, they can be identified

3   using the spreadsheet.  The defendant was a prolific trader.

4   He traded an enormous amount.

5          THE COURT:  I understand.

6          MR. TUCKER:  So in view of the fact that a lot of

7   the trades he made were criminal trades doesn't place an

8   additional burden on the government.  The spreadsheet is very

9   simple to use.  If you filter based on trades made in the

10  window during this period, you'll get your list.  It's one

11  click, Judge.

12         THE COURT:  Trades in the window.  So the trades in

13  the window --

14         MR. TUCKER:  During the time frame.

15         THE COURT:  -- are the trades that you are going to

16  prove?

17         MR. TUCKER:  We will allege, Your Honor.

18         MR. HEALY:  Your Honor, if I might.

19         THE COURT:  You have alleged.  You will try to

20  prove.  Go ahead.

21         MR. HEALY:  They've talked about the deck that their

22  expert, the spreadsheet that their experts provided.  There

23  have been, I think, three different iterations on it and

24  that's not objectionable in and of itself, but the

25  footnotes -- and I was once told by a learned judge always

1   know that the bad stuff are in the footnotes -- the footnotes

2   changed.

3           So, for example, one slide might say the universe

4   here is not just in the window and not just a three-day

5   turnaround time, but now it has to be on the same day the

6   trade was made, on the same day as the upload because

7   sometimes the uploads are outside the same day.  Some of the

8   trades were made on earnings reports in the footnote.  You

9   haven't heard a thing about that in the government's

10  representation that all in-the-window trades are now going to

11  be accused or allegedly suspicious trades.

12          This whole conversation started with why hasn't the

13  expert, your expert given more meat to his opinion because

14  he's calling and saying, hey, I just noticed, for example, in

15  2015, they gave us a spreadsheet in February that the

16  government put ID numbers on the trade, 633, some of those

17  trades were in two different accounts so they occupy one ID

18  number.  In 2015, there was a subset of numbers that has now

19  increased.  Now, they've had this information all along.  The

20  indicia, whatever their expert has been using, suddenly has

21  included trades that weren't included earlier.  So our expert

22  is, like, well, I guess I have to rethink what I was thinking

23  they were thinking in advising you and that's not fair.

24          THE COURT:  You have a list of trades that you are

25  going to prove are criminal.

1          MR. TUCKER:  Yes, Your Honor.  We will help defense

2     counsel.

3          THE COURT:  I do not want this to linger.  I want to

4     you get together.  Today is Thursday.  I want to hear from you

5     by Monday because part of this discussion sounds like ships

6     passing in the night and then part of it is a little troubling

7     to me.  If you have specific trades that you are going to

8     attempt to prove were illegal, not suspicious, but

9     manifestation of the conspiracy itself, give them a list of

10    those trades and let's have it done with.

11         MR. BRILL:  I appreciate what Your Honor is saying

12    and I don't want to belabor it either but I just need to,

13    because I hear what Your Honor is saying and I think there are

14    two categories here.  There are the wide universe of what the

15    government calls suspicious trades, but then there are the

16    subset of that --

17         THE COURT:  I am talking about the subset.

18         MR. BRILL:  Okay.  That's why I wanted to make that

19    clear.  So Your Honor is asking that the government provide

20    the subset that they're going to --

21         THE COURT:  Illegal trades, not suspicious trades.

22    The illegal trades.  All right?

23         MR. BRILL:  Yes.

24         THE COURT:  And if there are any rough spots, I am

25    available.  I won't be in the building but I will be

1   available, we can talk, but I need you to get on this because

2   I cannot be taking shots at his experts if the information is

3   in any way, whether it is materially changing or not.  If it

4   is changing, I cannot study the expert opinion to decide

5   whether or not it satisfies the rule unless this is put to

6   bed.  Okay?

7              MR. TUCKER:  I hear everything Your Honor is saying.

8   This is putting the government in a little bit of an unusual

9   spot here and I just want to set something out.

10             The universe of suspicious trades is the universe

11  that I described.  We are, I hope everyone feels relieved, to

12  know not going to walk through the literally hundreds of

13  examples with the jury.  We're going to talk --

14             THE COURT:  I am not relieved.  We were not going to

15  do that in any event.

16             MR. TUCKER:  So there is a universe of trades that

17  are potentially criminal trades.  The statistical analysis

18  that the government's expert runs shows that there is not an

19  innocent explanation for that universe of potentially

20  suspicious trades.  Then there are subsets of those trades

21  that the government has other evidence pertaining to.

22             THE COURT:  Okay.

23             MR. TUCKER:  What the government will provide

24  defense counsel with which it has already provided for the

25  record is the list of that larger universe which, again, are

1   the trades that were made during the period of conspiracy

2   where the positions were taken inside the window.  The

3   government will not take the position at trial that it has

4   other extrinsic evidence that each and every one of those

5   thousands of trades was, in fact, based on material nonpublic

6   information, however, the trades taken together statistically

7   are significant and that's what's important.

8           So, I'm happy to help defense counsel through this,

9   but a bit of a straw man argument is being advanced here.  The

10  government is not under an obligation to prove that each and

11  every one of the trades that were made in the window were, in

12  fact, based on material nonpublic information in order to

13  prove the charges in this case --

14          THE COURT:  Agreed.

15          MR. TUCKER:  -- and Your Honor knows that.

16          THE COURT:  Agreed.

17          MR. BRILL:  But, Your Honor --

18          THE COURT:  Relax.

19          We have to take it a step further.  You can prove it

20  circumstantially.  You can satisfy the fact finder that all of

21  these trades in the window are not only suspicious but were so

22  suspicious, that they were likely the product of the criminal

23  conspiracy.  You can do that circumstantially, whether the

24  jury finds it or not, but you told me beyond that you had

25  specific identifiable trades that you are going to prove with

41

1    other evidence that indeed were the illegal trades.  Did I --

2         MR. TUCKER:  So Your Honor is asking us to flag for

3    counsel the other trades for which we have other evidence in a

4    way beyond having disclosed our trial exhibits.

5         THE COURT:  He's accused of it.  Let's do it.  They

6    have the window of trades.  If they don't have the window of

7    trades, they haven't been paying attention, and I know they

8    have been paying attention.  It is, for lack of a better word,

9    a subset within the subset.  I want you to identify that to

10   the defendants.

11        You know what they are.  Why the sigh?

12        MR. TUCKER:  Your Honor, the government went above

13   and beyond here and made disclosures.

14        THE COURT:  I have no quarrel with that.

15        MR. TUCKER:  And it's just an enormous burden and

16   totally prejudicial and unfair to the government to require us

17   to try our case for counsel a week before we begin.  If that's

18   Your Honor's ruling, we, of course, respect it, but that's not

19   required and not appropriate and it binds the government's

20   hands in a way that's not fair.

21        THE COURT:  But you've accused him of making illegal

22   trades.  At a minimum, he should know what trades are you

23   accusing him of making that are the product of nonpublic

24   material information.  What am I missing?

25        MR. TUCKER:  I understand Your Honor's ruling.

42

1          THE COURT:  I have already talked about briefly

2     about this whole business of good conduct.  Mr. Korchevsky's

3     work will be limited.  It will be a very short tether.  I'm

4     not ruling on it, but be aware.

5          There was a question about authentication that

6     Mr. Brill has raised so persistently.  Obviously, the

7     government is going to have to authenticate these documents

8     before they come into evidence.

9          MR. HEALY:  Is Your Honor talking about the press

10    releases that we've called the 2018 press releases?

11         THE COURT:  Right.

12         MR. HEALY:  It's a twofold argument, Your Honor.

13    One is authentication.

14         THE COURT:  I understand your argument.  I have read

15    the papers.  All right.  Go ahead.

16         MR. HEALY:  Our argument is, one hand, they can

17    authenticate that somebody did download them in 2013 perhaps,

18    but the second part of the argument is what is the relevance

19    of a document that is, A, clearly not necessarily the same

20    thing, in other words, a paralegal can say, Yes, I downloaded

21    that from Google last week, what knowledge does he have that

22    that's exactly the same press release that was distributed

23    and, secondly, what's the relevance of that?  Because once

24    it's public knowledge, it has nothing to do with material

25    nonpublic information.  Once it's public knowledge, it's

1    irrelevant, and especially when a lot of these press

2    releases --

3              THE COURT:  I do not follow the last comment.  Once

4    it is public knowledge, I don't know if it is irrelevant, but

5    it is not terribly germane to the issue of proof, but there

6    was a time when it was not public knowledge.

7              MR. HEALY:  Not necessarily what that paralegal

8    downloaded a month ago.  The assumption is, well, since we

9    were able to get it in April of 2018, it must have been on a

10   computer server exactly as it is.

11             THE COURT:  I understand your point and I am simply

12   repeating it.  The government has got to be able to satisfy me

13   that what they downloaded in 2018 appeared on that computer

14   back then.

15             MR. HEALY:  That was our argument, Your Honor.

16   Thank you.

17             THE COURT:  I do not disagree with that.

18             MR. TUCKER:  Sorry, Your Honor.  So Your Honor's

19   point is that we have to be able to establish that the press

20   release as downloaded in 2018 is sufficiently identical, if

21   not identical to the distributed press release.  That's

22   Your Honor's point, right?

23             THE COURT:  That's right.

24             MR. TUCKER:  To the extent defense counsel wants to

25   argue that there's some material difference between the press

44

1   releases uploaded and the press releases distributed, they'll

2   be free to do that.  The government will, when possible,

3   provide uploaded press releases including the large body of

4   them that were in the e-mail account that Mr. Korchevsky

5   received the stolen press releases from, but not for the

6   purposes of every trade that we're alleging here introduce

7   into evidence the uploaded version of the press release.

8   Defense counsel can make the argument but that's the

9   government's proof.

10          MS. NESTOR:  Your Honor, this goes to the weight of

11  the evidence, not to the evidence itself.  They can argue this

12  to the jury.

13          THE COURT:  As long as I am reasonably confident

14  that what purports to be a copy of what was indeed in

15  existence back when and it is the operative document on which

16  the defendants are alleged to have traded -- you shake your

17  head no.  Am I wrong?

18          MS. NESTOR:  Your Honor, I understand your point.  I

19  think that our point is that we are not going to present to

20  the jury every single press release as it was uploaded to the

21  Newswire.  We're going to present the final press releases.

22  Then the jury, based on the defense's arguments, can decide

23  whether those press releases changed.  We will have testimony

24  about that for the jury.

25          THE COURT:  I do not really see a problem but when

1    the time comes, you will alert me if I am wrong.

2         Mr. Korchevsky's employment records, if he

3    testifies, it's a different story.  If the door is opened in

4    some other fashion, it may be a different story, but standing

5    alone, I don't see any real use for it.

6         MR. BRILL:  Your Honor, I'm sorry.  You mean if he

7    testifies, it's a different story, is that, that simply the

8    idea of testifying opens --

9         THE COURT:  No.  No.

10        MR. BRILL:  I'm just trying to clarify.

11        THE COURT:  I am not going to clarify.  That is the

12   whole point.  If he testifies, it may very well may be

13   relevant and may be germane.  I don't know the specifics of

14   the records.  I know he had some ups and downs as a trader.

15   If he gets on the witness stand and talks about his great

16   prowess as a trader, he is going to open himself up to being

17   cross-examined on his history with Morgan Stanley, for

18   example.

19        It is hard for me in the abstract right here and now

20   to give you every conceivable possibility that may come up.

21   I'm telling you that I agree with you but, as a general

22   matter, I am not going to let the government just simply

23   affirmatively prove that he had an up and down history as a

24   trader.  If it becomes germane to either issues of credibility

25   or in some other fashion, then we'll have to revisit it but

46

1    that's my general sense of it now.  Okay?

2              MR. BRILL:  Yes, I understand you.  I do.  That

3    issue though ties in -- I don't know if you already addressed

4    this -- it ties into, and you may have alluded to this, the

5    404(b) evidence that we weren't really given as 404(b) which

6    is motive.  I don't know.

7              THE COURT:  I do not see this ties into motive.

8              MR. BRILL:  I don't either, but I think the

9    government is in some way extrapolating that after 2008, there

10   was this level of desperation but to me, it's extremely

11   contrived and I have no clue where that comes from other than

12   a creative speculative universe.

13             THE COURT:  There is a lot of creating of the

14   universe going on about here.

15             MR. BRILL:  I don't mean to make light of it.  I

16   guess what I'm saying --

17             THE COURT:  Here is what I am saying.  Quit while

18   you are ahead.

19             MR. BRILL:  Okay.  I will.

20             THE COURT:  Is it "Canjels" or "Canjeels"?

21             MS. NESTOR:  Canjels.

22             THE COURT:  What I understand about his proposed

23   testimony, I applaud it.  It's essentially a tutorial.

24             MR. BRILL:  No one is disputing that he shouldn't

25   come and give a tutorial.  The question is does he give a

1  tutorial -- well, I think do you mean Canjels or Carocci?  You

2  might mean Carocci.  Canjels is more of the statistician.

3  Carocci is more of the background.

4      THE COURT:  I think you are right.  I think I mean

5  Carocci.

6      MR. TUCKER:  You mean Carocci, Your Honor.

7      MR. BRILL:  That's fine.  Nor do we feel that's

8  inappropriate.  What we felt was inappropriate was Your Honor

9  deem him an expert before he does that.

10      THE COURT:  I do not use the term "expert" anyway.

11  If he is going to express opinions, I will call him an opinion

12  witness.  If he is not going to express opinions, he will be

13  treated like any other fact witness.

14      MR. BRILL:  Okay.

15      MR. GOPSTEIN:  Your Honor, we will take in your

16  guidance as well.  We're also going to supplement his expert

17  disclosures specifically, but he's testified numerous times on

18  these topics as an expert and we'll be supplementing his

19  opinions in addition to the explanations that he is going to

20  be giving.  So we will move, based on that disclosure, to

21  qualify him as an expert in the fields that we designate.

22      THE COURT:  Okay.

23      What else?

24      MR. TUCKER:  Your Honor, may I have one moment to

25  confer with my colleagues?

1          THE COURT:  Sure.  Take your time.

2          (Pause.)

3          THE COURT:  Yes?

4          MR. TUCKER:  So Your Honor, mindful of the Court's

5    strong preference to sort these things out before trial, I

6    want to be clear what the government's, for lack of a better

7    word, homework is here on the trades.

8          The government will happily identify for defense

9    counsel the particular trades we're going to highlight and the

10   corresponding exhibits so that will include e-mails that bear

11   on particular days of trading and I guess we'll identify

12   particular press releases in the overseas e-mail accounts.

13         I just want to make one point clear for the Court

14   and make certain that this is not going to trip us up

15   mid-trial.  Much of what we deem our critical evidence coming

16   from the economist, Dr. Canjels, stems from his statistical

17   analysis of suspicious trades, those trades identified as

18   suspicious in the way that I explained a moment ago,

19   in-the-window trades.

20         I want to make certain that I understand the

21   confines of the Court's ruling that the government is not

22   going to be precluded from contending that those trades are

23   criminal as well even though we might not have an e-mail from

24   Mr. Korchevsky talking about a particular trade or mentioning

25   it in a particular chat.

49

1          I see Your Honor is shaking your head.

2          THE COURT:  I made no such comment.

3          MR. TUCKER:  Okay.  So all we're being asked to do

4  here is basically is help counsel match up exhibits with

5  trades we're going to spend extra time on at trial.

6          THE COURT:  Trades for which you have evidence

7  beyond the circumstantial evidence of these window trades that

8  will suggest that he, they are illegal trades.

9          MR. BRILL:  May I have just a moment, Your Honor?

10          THE COURT:  Take your time.

11          (Pause.)

12          MR. TUCKER:  Your Honor, could we get those to

13  defense counsel by Monday?  It will take some time to pull it

14  together in that way.

15          THE COURT:  Yes.

16          MS. NESTOR:  And, Your Honor, just to be clear, they

17  have those exhibits in their possession.

18          THE COURT:  I totally understand what you are

19  saying.  I know they are not helpless.  I have to run a trial.

20          MS. NESTOR:  We understand, Your Honor.

21          (Pause.)

22          MR. HEALY:  Your Honor, I just wanted to clarify.

23  We appreciate the government's willingness to try to hone in

24  on this issue.  One thing that is concerning to us, I

25  appreciate the idea that they're going to identify the trades

1   that are going to be proved up with other extrinsic evidence,

2   but this idea that there's this universe of suspicious trades,

3   the government, for example, said from 2010 to 2015

4   in-the-window trades.  That's not the universe of Dr. Canjels,

5   at least in everything that we've been given to date and there

6   are 47 different 3500 pieces.  He's always starting in January

7   of '11.  Now, the question is should Mr. Korchevsky then say

8   which is the universe.  Is it '10 to '15 or is it '11 to '15?

9            Again, those footnotes.  If Dr. Canjels identifies,

10  and there are footnotes, a specific criteria and those are

11  what he's basing his statistical analysis on, will the

12  government then be bound by that or will they say, oh, well,

13  but there's many more suspicious trades that we are alleging

14  are the product of material nonpublic information.

15           MR. TUCKER:  Just a helpful point on that, Judge.

16  So the way that Dr. Canjels' deck works is he slices and dices

17  the data in a variety of different ways to test and illustrate

18  certain theories based on the data.  So he does pare down and

19  ramp up the universe, slide by slide, always operating from

20  that central premise that the suspicious trades are

21  in-the-window trades.

22           So, for instance, he has, he has a slide where he

23  shows if you were to just look at trades that happened between

24  9:30 and 4:00 p.m. where the press releases were uploaded on

25  that same day, it is statistically virtually impossible that

1    the trading pattern is innocent.  It is certainly not the

2    government's contention that that is the limit or that is the

3    complete universe of suspicious trades.  It is a subset of the

4    suspicious universe to illustrate a particular point.

5            THE COURT:  I understand that.  Let's be clear.

6    These experts, both sides have made this point, I am going to

7    hold these experts to a very short tether when it comes to

8    opinions expressed with ultimate facts that are the province

9    of the jury.

10           MS. WHALEN:  Yes.  My understanding from reading

11   your reports that are relevant to our case is the use is I

12   think the appropriate word is "random" as opposed to

13   "innocent" and we would object to the use of the word

14   "innocent."  I think that the expert can talk about what's

15   random, what's not random but, again, I don't think he should

16   be permitted to talk about what's innocent and what's not

17   innocent.

18           MS. NESTOR:  Your Honor, that's not going to happen

19   in this case.

20           MS. WHALEN:  Okay.

21           THE COURT:  That's apropos what I just said.

22           MS. WHALEN:  Thank you.

23           THE COURT:  Well, I hope we have made some progress.

24   I will hear from you sometime Monday or Tuesday at the latest.

25           MR. TUCKER:  Yes, Your Honor.

52

1          THE COURT:  If there is a lingering issue, I will

2   conference you in where I am and we will talk it out some

3   more.  I will probably have some more information for you on

4   the logistics of selection.  Ellie is already giving me some

5   information.

6          I am told that I guess I should formally grant the

7   motion by each defendant to join in the motions of the

8   co-defendant which, of course, I do.

9          We will probably have some more information

10  vis-a-vis logistics of the trial and jury selection and so

11  forth sometime next week for you.  In the interim, if you need

12  to get ahold of me separate and apart from these issues or

13  because of these issues, please do not hesitate and get ahold

14  of Ellie and she'll get a hold of me.

15          Thank for your time, folks.

16          MR. TUCKER:  Thank you, Your Honor.

17          MR. BRILL:  Thank you, Your Honor.

18          MS. WHALEN:  Thank you, Your Honor.

19          (Matter concluded.)

20

21               *     *     *     *     *

22  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
23

24   /s/ Charleane M. Heading              June 1, 2018
    _____    _____
25       CHARLEANE M. HEADING                  DATE

CMH      OCR      RMR      CRR      FCRR