2775

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - X
3   UNITED STATES OF AMERICA,      : 15-CR-00381 (RJD)
                                   :
4                                  :
                                   :
5        -against-                 :
                                   : United States Courthouse
6                                  : Brooklyn, New York
                                   :
7                                  :
    VITALY KORCHEVSKY and          :
8   VLADISLAV KHALUPSKY,           :
                                   : Monday, July 2, 2018
9           Defendants.           : 9:00 a.m.
    - - - - - - - - - - - - - - X
10

11

12        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
       BEFORE THE HONORABLE RAYMOND J. DEARIE AND JURY
           UNITED STATES SENIOR DISTRICT JUDGE
13

14

15              A P P E A R A N C E S:

16  For the Government:   RICHARD P. DONOGHUE, ESQ.
                          United States Attorney
17                        Eastern District of New York
                          271 Cadman Plaza East
18                        Brooklyn, New York 11201
                          BY:  JULIA NESTOR, ESQ.
19                             RICHARD M. TUCKER, ESQ.
                               DAVID N. GOPSTEIN, ESQ.
                               Assistant United States Attorneys
20

21  For the Defendant    SULLIVAN & BRILL, LLP
    Vitaly Korchevsky    115 Broadway
22                        17th Floor
                          New York, New York 10006
23                        BY:  STEVEN G. BRILL, ESQ.
                               JAMES LEE HEALY, ESQ.
24                             YOUNGJIN CHOI, ESQ.

25                             AND
```

Proceedings                                    2776

1              A P P E A R A N C E S:   (Continued)

2

3   For the Defendant          RACHEL BRILL, ESQ.
    Vitaly Korchevsky         Mercantil Plaza Building
                              263 Domenech Avenue
4                             San Juan, Puerto Rico 00918
                              BY:  RACHEL BRILL, ESQ.

5

6   For the Defendant          FEDERAL DEFENDERS OF NEW YORK, INC.
    Vladislav Khalupsky       One Pierrepont Plaza
7                             16th Floor
                              Brooklyn, New York  11201
8                             BY:  MILDRED M. WHALEN, ESQ.
                                   LaKEYTRIA W. FELDER, ESQ.

9

10          Court Reporter:      DAVID R. ROY, RPR
                                 225 Cadman Plaza East
11                               Brooklyn, New York 11201
                                 drroyofcr@gmail.com

12
    Proceedings recorded by Stenographic machine shorthand,
13  transcript produced by Computer-Assisted Transcription.

14

15              P R O C E E D I N G S

16                    --ooOoo--

17          THE COURTROOM DEPUTY:  It's my understanding --

18  good morning, Mr. Korchevsky.  It's my understanding that

19  the Government would like to put something on the record.

20          MS. NESTOR:  No, Your Honor, we were just

21  discussing.  It sounds like we will be done by noon today.

22          THE COURT:  Done, including as well?

23          MS. NESTOR:  Yes, Your Honor.  We just have a

24  stipulation to read into the record.

25          THE COURT:  Okay.

```
                    Proceedings                    2777
```

1          MS. NESTOR:  We obviously have to discuss the

2    Charge, Your Honor.  I assume you would want to discuss a

3    Charge in the advance of the closing arguments.

4          THE COURT:  Of course.  I assume you want to.

5          MS. NESTOR:  Of course, Your Honor.

6          THE COURT:  This is catching me by surprise.

7    Well, we will discuss the Charge after the -- I was going to

8    take a moment this morning to broach the subject, broach a

9    couple issues regarding the Charge.  As I started to fine

10   tune, if you will, a Charge over the weekend a couple things

11   occurring to me:  Number 1, and we will discuss it later,

12   that introduction which goes on for about a week and a half

13   if I were to read it.  I'm not inclined to read it.  It

14   is -- I will keep -- it will be in written Charge that goes

15   to the jury, but I am not going to read it.  Does anybody

16   have any contrary feelings?

17         MR. TUCKER:  No, Your Honor, we agree.

18         MR. BRILL:  Which one, which introduction are you

19   talking about?

20         THE COURT:  The introduction to the Indictment

21   which goes on for pages and pages.

22         MS. BRILL:  So what is the intention with respect

23   to the Indictment?

24         THE COURT:  What do you mean?  In terms of whether

25   or not to give it to them?

1          MS. BRILL:  Yes.

2          THE COURT:  The charges are in the written

3    instructions as will be the introduction.  I will let them

4    know there is an introduction.  I will invite their careful

5    perusal within the Charge, but I am not going to read it

6    here in open court during the Charge.  It will put

7    everybody, including yours truly, to sleep.  Think about it

8    you don't have to decide anything right now.

9          MS. BRILL:  Well, certainly not about the -- no

10   problem with not reading the introduction, but I have a

11   bigger concern about the actual Indictment going to the

12   jury, and that's what I was alluding to.

13         THE COURT:  I generally do not send it back to the

14   jury because there is no reason to send it back to the jury

15   because everything that is in the Indictment is in my

16   written instruction, including in this case the introduction

17   that I would prefer not to have to read in open court during

18   my Charge.  That is issue one.

19          Issue two was there are a lot of requested Charge

20   that focus on issues that may or may not be the focus of the

21   lawyers in their summation.  I will give you an example:

22   What do you call it, punishment, not an appropriate subject

23   generally for discussion during summation and therefore I do

24   not believe the jury needs to be instructed on it unless a

25   lawyer starts to cross the line, in which case I will give

Proceedings                                    2779

1    them the usual instruction, the punishment is my business

2    and not theirs.

3          There are a number of others, investigative

4    techniques.  If no lawyer is going to make an issue that

5    the Government did not use this technique or that technique,

6    I do not see the point in giving the jury an instruction.

7    It is just crowding up this otherwise lengthy Charge.  We

8    have an obligation to keep it as simple as we possibly can.

9    I put the word "simple" in quotes because if I remove the

10   quotes, I could charge the jury in two minutes.  If the

11   Government has not proven beyond a reasonable doubt that a

12   defendant did not knowingly trade on stolen press releases

13   that contain material nonpublic information, acquit the

14   defendant.  Nobody could really quarrel with that.  I

15   realize I am obligated to instruct them on all the elements

16   but let's say that's the case.  So unless arguments are

17   made, and this afternoon I will go through them one by one,

18   I do not intend to include these instructions.  We will keep

19   it as short as we possibly can and as palatable as we

20   possibly can, and if you have any different feelings, you

21   will let me know.

22          In terms of the substance of it, there is one

23   charge in particular that confounds me as I was thinking

24   over the weekend, multiple conspiracy.  Ordinarily I would

25   not hesitate to throw in a short multiple conspiracy

Proceedings                                    2780

1    instruction, but in this case we have three specific

2    conspirators.  As I sit there and trigger my imagination or

3    at least try to and yours is, no doubt, more fertile than

4    mine, I cannot come up with a different sort of conspiracy

5    that the Government could prove, all right, that the

6    defendant was a member of but not a member of the charged

7    conspiracy.  I am concerned that the multiple conspiracy

8    charge in the context of this case is, A, confusing; B,

9    substantive unjustified; and 2A, is substantively wrong.  So

10   I would like you to think about that.  Ordinarily I get it,

11   it is no big deal, I give a very short one, make sure they

12   have proven the charged conspiracy or records to that

13   effect.

14            But in this case, an obligation to the jury not to

15   confuse them, and I can't imagine how the jury could

16   conclude that a defendant is a member of the conspiracy as I

17   define the term but not a member of the charged conspiracy.

18   So think about that one as well.

19            Ellie, how are we doing?

20            THE COURTROOM DEPUTY:  I'm going to double-check.

21   We're down one hopefully.

22            THE COURT:  Who is up first, Mr. Mayer?

23            MR. HEALY:  That's correct, Your Honor.

24            THE COURT:  And then all right picking up your

25   subject, so scheduling, so what are you thoughts on

Proceedings                    2781

1    scheduling?

2           MS. NESTOR:  Tomorrow morning at 9:00, Your Honor,

3    the Government will be ready to close.

4           THE COURT:  You are going to finish today, right?

5           MS. NESTOR:  Yes.

6           THE COURT:  You better be.

7           MS. NESTOR:  Yes.  I assume Your Honor didn't want

8    to start this afternoon.

9           THE COURT:  No.  I assume you don't want to start.

10          MS. NESTOR:  I do not, but I'll do whatever the

11   Court instructs me to do.  I think tomorrow morning at 9:00

12   if we start, Your Honor will be dismissing the jury at 4:00

13   and I think you gave the jury an option.  I don't think it's

14   confirmed.

15          THE COURT:  Yes, I haven't confirmed.

16          MR. BRILL:  Hi.  Could the Government give us an

17   idea at this point as to how long they believe their

18   summation will be tomorrow?

19          MS. NESTOR:  Three hours, Your Honor.

20          THE COURT:  Three hours.

21          MR. BRILL:  So --

22          THE COURT:  So why wouldn't you likely have the

23   last word?

24          MR. BRILL:  Right.

25          THE COURT:  I do not know if we will get you and

Proceedings                    2782

1   rebuttal in one day.

2           MR. BRILL:  I think you're right.

3           THE COURT:  I wish that we could.

4           MR. BRILL:  Yeah, right.

5           MS. NESTOR:  But, Your Honor, there is that

6   chance.  Of course, I say three hours.  I don't want to

7   promise three hours, it might be two and a half, it might be

8   three, maybe I'll do it in two.

9           THE COURT:  Well, make sure you do not -- make

10  sure you maintain your pace so we have a record.

11          MS. NESTOR:  Of course, Your Honor.  I'm not

12  saying I'll --

13          THE COURT:  A couple of you can speak very quickly

14  so we will see.

15          Go ahead.

16          MR. BRILL:  Yes.  So is it your intention to treat

17  tomorrow, aside from the fact that we start at 9:00 and we

18  end at 4:00, otherwise normally, we get an hour free for

19  lunch?

20          THE COURT:  Yeah, we will get a modest hour break

21  for lunch.

22          MR. BRILL:  Okay.

23          THE COURT:  58 minutes, something like that.

24          MR. BRILL:  Right.

25          Okay.  I mean, I will certainly wrap up tomorrow

Proceedings                    2783

1   you, but I agree with you, I don't think everything will be

2   done or I guess the only question is what could be done

3   after me, but maybe we just play it by ear.

4            THE COURT:  We will play it by ear.

5            MS. NESTOR:  Mr. Brill, how long do you believe

6   your summation will take?

7            MR. BRILL:  So, like I had said on Friday or

8   Thursday, not more than two hours is my goal.

9            MS. NESTOR:  Okay.

10           MR. BRILL:  But like Ms. Nestor, there's a lot of

11   material and I want to live up to that promise, but I'm not

12   entirely clear.  But I'm going to do my very best to keep it

13   under that.

14           THE COURT:  Well, do not promise.

15           MR. BRILL:  Right.

16           THE COURT:  How about Ms. Whalen, are you summing

17   up?

18           MS. WHALEN:  Yes.

19           THE COURT:  Any idea how long?

20           MS. WHALEN:  I think probably about two hours, two

21   and a half.

22           THE COURT:  All right.  So this afternoon I will

23   take our lunch and then come back and discuss the Charge.

24   Stay where you are, not anybody move.  Is Mr. Mayer here?

25           MR. BRILL:  Yes, Your Honor.

Proceedings                                2784

1          (Pause in proceedings.)

2          THE COURT:  We are waiting for a gentleman from

3    Hicksville, which brings me to another subject, our jurors.

4    Do you recall I mentioned on Thursday that we have Juror

5    Number, I believe, it is 8, who is committed to a trip.  I

6    believe he departs on the 8th, which is Friday.  I think he

7    is the only -- or, excuse me, I have the wrong month here,

8    hold on.  He departs on the 8th, which is next Sunday.  So I

9    am not entirely sure what your collective views are but it

10   does not make sense, at least to me, keep him on here for

11   now, it does not make sense to start deliberations with -- I

12   think he is the only immediate issue.  So can we have an

13   agreement that we will discharge him.

14          MR. BRILL:  We agree, Your Honor.

15          MS. WHALEN:  Yes, Your Honor.

16          MR. TUCKER:  Your Honor, I think we should see

17   where we are when the jury addresses are complete.  If there

18   are two days for him to deliberate if we happen -- even a

19   day and a half, that's a substantial amount of deliberation

20   time.  I think we should see where we are -- he can -- he

21   can sit on Friday.  So --

22          THE COURT:  The jury has agreed to commit and be

23   ready to work at 9:00 until 5:30 tomorrow.

24          MR. TUCKER:  Oh, they have, to 5:30?  Then, Judge,

25   I think we'll be able to finish the jury addresses tomorrow,

1    maybe and then Your Honor will Charge on Thursday morning

2    and they could have the case for a day and a half.

3              THE COURT:  I would hope.  You are really

4    surprising with all these sudden developments, but I will

5    try to get a draft to you sometime this morning.  We will

6    see where we are.

7              MR. TUCKER:  That seems fair, Your Honor.

8              MS. BRILL:  Your Honor, there was also just not a

9    regular juror but Alternate Juror Number 6 who had the issue

10   on July 6th, which is Friday.  So I'm not sure what message,

11   how the message would be conveyed to that juror that if the

12   one that was leaving on the 8th was excused and --

13             THE COURT:  Both of them at six.

14             MS. BRILL:  Yeah, final alternate.

15             THE COURT:  I suggest we excuse her.

16             MS. BRILL:  Him.

17             THE COURT:  Or him.

18             MS. BRILL:  But he was very clear about that day

19   him not being available.

20             MR. TUCKER:  I don't have an objection to that.  I

21   don't -- I'm sure counsel's correct.  Standing here right

22   now I don't have a specific memory that Alternate 6 had an

23   issue on the 6th.  If, in fact, that is true, then the

24   Government doesn't object to that.

25             THE COURT:  We will check the transcript.

Proceedings                              2786

1         MR. TUCKER:  Thank you, Your Honor.

2         THE COURT:  What else can we argue about?  Might

3    as well make use of the time.  We called the gentleman's

4    cell phone and it went immediately to voicemail.  So --

5         But way of some further examples of these optional

6    charges:  Other persons not on trial in the case, if someone

7    is going to make an issue of it, I will include an

8    instruction.

9         MS. WHALEN:  Your Honor, we can't hear you.  I'm

10   sorry, we can't hear you.

11        THE COURT:  Oh, I'm sorry.  No wonder.  Sometimes

12   it is better if you can't hear me, better for everybody.

13        One of the other -- an example of one of the

14   optional charges, this, I think is a Government request, the

15   instruction regarding other persons not on trial in this

16   case.  You know, unless somebody is going to make a big deal

17   about it, you can argue anything you want.  I do not see any

18   need for an instruction unless it becomes an issue.

19   Uncalled witness equally available, I cannot -- I am not

20   sure that that would rear its head.

21        MR. TUCKER:  Your Honor, with respect to those two

22   charges, the Government doesn't disagree shortening the

23   Charge is a great idea, I just know that during this trial

24   what immediately comes to mind is Mr. Brill's line of

25   cross-examination of Arkadiy Dubovoy about Pavel Dubovoy, so

1   if that's not going to be an argument in summation, we can

2   probably live without it.

3          THE COURT:  That is my point.

4          MR. TUCKER:  Yeah.

5          THE COURT:  If an argument is going to be made

6   about it, which is certainly conceivable, then I will -- and

7   I think an instruction is appropriate, I will include it.

8          I just do not want you to tell me in the final

9   draft of the Charge that I am sandbagging you.  I do not

10  want that.  I am open to giving the instruction but only if

11  it becomes an issue.  Pavel Dubovoy is equally unavailable

12  on both sides, I assume.

13         THE COURTROOM DEPUTY:  We're all set.

14         THE COURT:  We are all set.  All right.  We will

15  come back to all of this fun and games.  We will Get the

16  jury going.

17         THE COURTROOM DEPUTY:  Yes, we'll line them up.

18         (Pause in proceedings.)

19         THE COURTROOM DEPUTY:  All rise.

20         (Jury enters the courtroom.)

21         (Jury present.)

22         THE COURT:  Good morning, everyone.  Please be

23  seated.

24         THE JURY:  Good morning.

25         THE COURT:  Nice to take you out of the heat for

1   the day.  Your next witness.

2           MR. HEALY:  Your Honor, Mr. Korchevsky calls

3   Michael Mayer.

4           (The Witness Takes the Stand.)

5           THE COURTROOM DEPUTY:  Mr. Mayer, I'm going to ask

6   you please to stand and raise your right hand.

7   **M I C H A E L   M A Y E R**,

8               called as a witness having been

9               first duly sworn/affirmed, was examined and

10              testified as follows:

11          THE COURTROOM DEPUTY:  Please have a seat.  State

12  and spell your name for the record.

13          THE WITNESS:  Michael George Mayer, M-A-Y-E-R.

14          THE COURT:  Mr. Healy?

15          MR. HEALY:  Thank you, Your Honor.

16  DIRECT EXAMINATION

17  BY MR. HEALY:

18  Q    Good morning, Mr. Mayer.

19  A    Good morning.

20  Q    How are you?

21  A    I'm good.

22  Q    Mr. Mayer, what do you do for a living?

23  A    I'm a financial consultant.

24  Q    And where do you work?

25  A    I work for a firm called Charles River Associates,

Mayer - Direct - Healy                    2789

1   Inc., which has headquarters in Boston but my office is in

2   Chicago.

3   Q   And how long have you been worked for Charles River

4   Associates?

5   A   Well, my seniority, they treat me as if I've been there

6   since 1988 because I started a firm in 1988 that was

7   subsequently acquired by Charles River Associates in 2004.

8   Q   And were you doing the same sort of work in your other

9   firm?

10  A   Yes.

11  Q   So it's fair to say you've been doing this for about 30

12  years?

13  A   A little more.

14  Q   And can you tell the jury about your educational

15  background?

16  A   Yes.  I have an undergraduate degree in business from

17  Indiana University's School of Business in marketing and

18  management policy.

19          And then I have a Master's of business

20  administration from Northwestern University's Kellogg

21  Graduate School of Management in finance.

22  Q   Do you hold any certifications?

23  A   I do.

24  Q   And can you tell us what those are?

25  A   I'm a charter financial analyst and a certified fraud

1   examiner.

2            THE COURTROOM DEPUTY:  Excuse me just one second,

3   sir.  I'm going to ask you to speak into the mic.

4            THE WITNESS:  Okay.

5            THE COURTROOM DEPUTY:  Okay.  Thank you.

6   Q    You just told us you are a charter financial analyst,

7   right, or advisor?

8   A    Charter financial analyst.

9   Q    And can you tell us what is that?

10  A    That's the designation that people in basically the

11  money management world seek.  It's an accreditation that

12  basically takes three year to get.  You have to pass three

13  exams on a what they call the body of knowledge, which would

14  include things like stock analysis, fixed income analysis

15  which are bonds; portfolio management, how to manage money,

16  affects, statistics, things like that.

17  Q    And how many people have that certification?

18  A    I think right now it's about 100,000 worldwide, but

19  that's a rough estimate.

20  Q    And when you say 100,000, do you have any idea of what

21  percentage of people in your field that would encompass?

22  A    It's a very small percentage.

23  Q    Why is that?

24  A    Of the people who decide they're going to try to get

25  the designation, only about 20 percent actually start the

Mayer - Direct - Healy                    2791

1   program and then see it all the way through and get

2   certification.

3   Q    Now you told us that you worked for Charles River

4   Associates.  Can you just tell us generally what does

5   Charles River Associates do?

6   A    Charles River Associates is a consulting firm that has

7   about 800 employees.  It's a public company itself.  And

8   it's focused on basically helping lawyers in complex

9   commercial litigation with the financial aspects, figuring

10  out, you know, things related to transactions and -- and how

11  money passes through various entities and things like that.

12          It's made up of people with economics, finance and

13  accounting background.

14  Q    So simply speaking, your company analyzes finances for

15  lawyers in litigation?

16  A    That's one of our main areas of business, yes.

17  Q    And when you say lawyers, what sides you work for?

18  A    I work for both plaintiffs and defendants and the

19  plaintiffs would include frequently the Government.

20  Q    When you say the Government, is this an organization

21  you can tell us about?

22  A    I work for the Department of Justice, the Securities

23  and Exchange Commission, the Federal Deposit Insurance

24  Corporation, which regulates banks, Resolution Trust

25  Corporation, which is the one, the organization that cleaned

Mayer - Direct - Healy                    2792

1   up the savings and loan crisis.

2          THE COURT:  Mr. Mayer, may I interrupt just a

3   second.  Our microphones are out.  We're working on it, as

4   you can see, so I would ask you to keep your voice up good

5   and loud.

6          THE WITNESS:  I'll try.  Can you guys -- is this

7   loud enough?

8          THE JURY:  Yes.

9          THE WITNESS:  Okay.  Thank you.

10         THE COURT:  And I certainly will try as well.  We

11  should be listening.

12  Q    You said you worked for both sides, both the Government

13  and defendants.  Do you have any idea of what the breakdown

14  is between that?

15  A    It's about 50/50.

16  Q    Mr. Mayer, are you being paid for your time to be here

17  today?

18  A    My company is.

19  Q    And was your company also paid to do the work, the

20  analysis that you're going to tell us about?

21  A    Yes.

22  Q    And to date -- well, strike that.

23         How much has your company been paid?

24  A    Our firm has been paid $650,000.

25  Q    And when you say that, can you explain what that

1    encompasses, what did that include?

2    A    Hundreds and hundreds of hours of my team digging

3    through financial records and assembling databases and

4    looking at the materials that Dr. Canjels, who I understand

5    has already testified, has prepared and it's basically

6    working with counsel as well.

7    Q    When you say your team, how many people have been

8    working on this?

9    A    I think probably eight total people have put some time

10   into this case, but the core team is really four.

11   Q    And over what period of time have you been working on

12   it?

13   A    In varying levels of effort, about a year.

14   Q    And why so many people and so long?

15   A    Well, the record in this case is enormous.  There's a

16   lot of accounts.  There's a lot of individual lines that

17   constitute an individual trade.  All of that has to be

18   assembled and analyzed and there's just a big record in the

19   case.

20   Q    Now, you said that there -- about half the time you're

21   working for the Government, the prosecution, the if

22   plaintiff however you want to characterize it, correct?

23   A    Yes.

24   Q    When you work for the Government, are you also paid,

25   your company?

1    A    Yes.

2    Q    And when you're paid by the Government is it similar or

3    even sometimes more than what you were paid in this case?

4    A    Yes.

5    Q    So, Mr. Mayer, have you ever taught or lectured in you

6    field?

7    A    I have.

8    Q    Can you give the jury maybe an example or two of what

9    that would be?

10   A    Sure.  One example is I used to teach a regular seminar

11   called White Collar Crime seminar for the FDIC and the Board

12   of Governors, the Feds, the Federal Reserve Board for bank

13   examiners, basically, helping them understand

14   securities-related frauds and investigation techniques

15   related to that.

16          I've also given a seminar or two to the SEC on how

17   to use IDENTA study, which is a technique to look at the

18   materiality of information being released by a company and

19   how that impacts market pricing.

20   Q    And in your 30 years as a consultant in the securities

21   industry, have you ever had occasion to give sworn

22   testimony?

23   A    Many times.

24   Q    Can you estimate how many times?

25   A    Over a hundred.

1  Q    Now, in that approximately 100 times you've given

2  testimony, were there times that you gave testimony about

3  statistical analysis?

4  A    Yes.

5  Q    And were there times you gave testimony about stock

6  trading?

7  A    I have.

8  Q    And of that 100 times, how many times would you say

9  you've given testimony about securities trading?

10 A    Oh, out of 100, probably half.

11 Q    And of that half, which would be somewhere in the

12 vicinity of 50 times, correct?

13 A    Right.

14 Q    About how many of those times involve testimony about

15 improper trading?

16 A    More than half of those.

17 Q    And to clear when we say given testimony, what would

18 that include; what types of testimony -- sworn testimony

19 would you have given?

20 A    Sure.  In what I do there's frequently a need to give a

21 deposition, which is sworn testimony, but it's not in a

22 courtroom, it's in conference room and it's still recorded

23 by a court reporter.  So it's got the same importance in a

24 sworn nature as trial testimony, but not every case goes to

25 trial.

1    Q     And --

2    A     So --

3    Q     -- have there been times that you've given testimony in

4    a federal courtroom like this?

5    A     Yes.

6    Q     How many?

7    A     At least ten.

8    Q     And in those ten times do you know the breakdown

9    between the times you've testified for the prosecution

10   versus the defense?

11   A     I think it's slightly more for the prosecution.

12   Q     And in those times that you've testified in a federal

13   court, were you qualified as an expert or opinion witness in

14   those cases?

15   A     Yes.

16   Q     And have you ever been excluded as an expert or an

17   opinion witness when you were offered to testify?

18   A     No.

19         MR. HEALY:  Your Honor, at this time we would like

20   the offer Mr. Mayer as an opinion witness in the areas of

21   finance, statistical analysis and securities trading.

22         THE COURT:  Do you wish to inquire?

23         MR. GOPSTEIN:  No objection.

24         THE COURT:  Please proceed.

25   Q     Mr. Mayer, what were you asked to do in this case?

1   A    Well, I talked a little bit about the massive record.

2   I was asked to review the record in this case and that would

3   include voluminous -- a huge number of trades, 46,000 lines

4   of trading.  And also review Dr. Canjels' materials and

5   basically offer opinions relating to Mr. Korchevsky's

6   trading.

7   Q    And, Mr. Mayer, I'm going to ask, I apologize, I'm just

8   having a little trouble hearing you, so if you could speak

9   up just a bit more for me.

10  A    I'll try.

11  Q    I think the jury may be hearing you.

12          I think I heard you say you reviewed the trading

13  data that was very voluminous.  Is that the word you used?

14  A    I did.

15  Q    Did you also review any spreadsheets relating to press

16  releases?

17  A    I did.

18  Q    And, again, how would you describe those records?

19  A    They were basically data dumps from a service that

20  keeps track of all the press releases and basically lists

21  the headlines for the press releases.  Companies put out new

22  information about themselves, you know, basically in an

23  effort to promote some new activity that they're undertaking

24  or they're recording earnings or something like that.  And

25  so this database would have the information relating to the

1   headline of the press releases.

2   Q    Is it fair to say -- characterize those spreadsheets

3   for the news releases as voluminous as well?

4   A    Yes.

5   Q    And did you also review any industry literature with

6   respect to your analysis?

7   A    I did.  Well, I'm generally familiar with literature

8   relating to earnings trading and insider trading, but I

9   specifically reviewed some articles that relates to this

10  case.

11  Q    Now, after you did all of that review, did you come to

12  any conclusions?

13  A    I did.

14  Q    And can you tell the jury what were those conclusions?

15  A    Well, Number 1, that Mr. Korchevsky's trades were

16  largely earnings trades.

17          THE COURT:  I'm sorry?

18          THE WITNESS:  Largely earnings trades.

19  A    Number 2, is that there is substantial similarity in

20  the types of trading that Mr. Korchevsky undertook in a

21  period where he's not accused to have been trading on stolen

22  information versus the period where he is accused of having

23  traded on stolen information.

24          And then Number 3 is there are categories of

25  trades that are inconsistent with the notion that

1    Mr. Korchevsky knowingly traded on stolen information.

2              MR. HEALY:  Ms. Mulqueen, we're working from

3    voting in HTMI.

4              THE COURTROOM DEPUTY:  Okay.

5              MR. HEALY:  And this is for the witness only.

6              THE COURTROOM DEPUTY:  Witness only.  Okay.

7    Q    Mr. Mayer, I'm showing you what has been premarked as

8    Defendant's Exhibit H.  Do you recognize this?

9    A    Yes.  This is a set of slides that I prepared for this

10   matter.

11   Q    And were these slides prepared from those voluminous

12   materials you told us about a few moments ago?

13   A    Yes.

14   Q    And would these slides be helpful in explaining your

15   conclusions to the jury?

16   A    Yes, they would.

17             MR. HEALY:  Your Honor, at this point we would

18   offer into evidence, Subject to Rule 10006, Defendant's

19   Exhibit H.

20             THE COURT:  Any objection?

21             MR. GOPSTEIN:  No objection, Your Honor.

22             THE COURT:  Proceed.

23             (Defendants' Exhibit Number H so marked and

24   received in evidence.)

25             THE WITNESS:  Excuse me, Your Honor, apparently

1    the microphones are working now.

2              THE COURT:  They are.

3              THE WITNESS:  I'll stop yelling.

4              THE COURTROOM DEPUTY:  Yes.

5    Q    The microphones are working but my hearing may not be,

6    so just keep your voice up for me.

7    A    Okay.  I'll do that.

8    Q    So to begin kind of at the very beginning, let's --

9              MR. HEALY:  Why don't we pull that down just for

10   the moment.

11             THE COURTROOM DEPUTY:  I'm sorry.  Okay.

12   Q    To begin at the very beginning, Mr. Mayer, just tell

13   the jury in very simple terms what's a stock trade?

14   A    So basically when a company is publicly traded they

15   have shares of stock.  So -- and a share of stock is simply

16   a proportional interest in the overall ownership of the

17   company.  So let's say we're talking about IBM.  I'm showing

18   my age because that's an old company -- but IBM, if you

19   owned one share of IBM and they have 1 billion shares

20   outstanding you are the owner of one one-billionth of IBM.

21   And if you want to buy that share you would, you know, go to

22   a broker and they would execute the trade for you.  And all

23   the trade really means is that you're buying or selling

24   something, some security.  There's nothing fancy in the

25   notion of being a trader or what the trade is.  It's just a

1    purchase or a sale.

2    Q    Okay.

3         MR. HEALY:  If we can show the jury Slide 1 which

4    is in evidence.  It's up on the monitor here.

5    Q    So you talked a moment ago what a stock trade is.  You

6    said that -- you used the term earnings trade.  Can you tell

7    us what is an earnings trade?

8    A    Sure.  So first we should talk about how earnings

9    information comes out to the marketplace.  So companies that

10   are public have to tell the public how much money they're

11   making, how much revenue they had, and how much money

12   they're making every quarter, every quarter a year.  And

13   they do that through a press release and through filing

14   reports with the SEC.  So there are -- that -- every quarter

15   you get this new information about how that company's doing.

16   And people who are buying and selling the company or

17   following the company, want to know how they're -- how that

18   company is going are playing close attention to those

19   earnings reports because that's the new most recent

20   information on how they've been performing.

21        So that creates an opportunity for people to

22   anticipate what that report's going to look like.  And

23   essentially bet on whether or not the company's going to

24   have done better than people think on average or worse than

25   they think on average.  And usually -- not usually -- but

1    frequently there are significant price changes in the stock

2    price right after an earnings announcement and earnings

3    traders seek to take advantage of those price changes.

4    Q    And it may be a simple question, but why would somebody

5    trade around that earnings analysis when the stock prices

6    move?

7    A    They're making a bet basically to see if they're right,

8    then the stock price will go in the direction that they're

9    betting.  And their big -- those are days where there's big

10   movement.

11   Q    To make money?

12   A    To make money, yes.

13   Q    Anything wrong with making money?

14   A    Not that I -- well, not that I know of.

15   Q    Now, Slide Number 2 talks about earnings trades.  How

16   would someone go about making an earnings trade?  What would

17   the process be?

18   A    So these companies when they report these quarterly

19   earnings, they announce ahead of time what day they're going

20   to do that, so the market knows on July 15th IBM is going to

21   announce how they did last quarter.

22   Q    And I don't mean to interrupt, but when you say the

23   market knows --

24   A    The public.

25   Q    -- that's just basically people buying stock?

1    A      The people paying attention.

2    Q      Yes.

3    A      Yeah.  That's a good point.

4           So people know that they -- they announce ahead of

5    time that they're going to tell everybody what the earnings

6    are and that's a known date.  And so meanwhile, there are

7    people who work at investment banks and research firms who

8    are following the performance of the company over time and

9    they're writing reports on what they think the outlook for

10   that company's going to be going forward.  And they will

11   actually make predictions of what the earnings are going to

12   be on July 15th, and there are many of those people.  Let's

13   say for IBM there might be 50 separate analysts who are

14   following the can company.

15          And then there are other people who accumulate

16   that information, those estimates, people like Zacks and

17   they give what they call a consensus estimate.  And the

18   price of the stock is usually reflective of what the

19   consensus estimate of the performance of the company is

20   going to be.  So if you know -- if you're an earnings trader

21   you say, all right, the consensus estimate for July 15th

22   announcement of earnings by IBM is going to be a dollar a

23   share, and I personally, I'm an earnings trader, I

24   personally think IBM is going way better than the consensus

25   view, then I would go in and buy securities that would give

1    me exposure to the price increase that I expect relative to

2    what the market -- the rest of the people think.

3    Q    So let's follow that a little bit along.  When you say

4    you would buy the security, when might you buy it if you're

5    an earnings trader?

6    A    Well, on average earnings traders usually trade close

7    to the announcement.  And the closer to announcement the

8    better in general because --

9    Q    Why is that?

10   A    Because they're trying to avoid other things impacting

11   the stock price.  If they're just trying to make a bet on

12   whether or not they're right, that the stock price is going

13   to go up because the company's doing better than the

14   earnings -- the consensus that people think it's going to

15   do, if they are just trying to make that bet, they don't

16   want something coming out of left field like a tariff

17   against, you know, the company or something like that, that

18   could interfere with the movement of the stock price if

19   they're just trying to capture related to earnings.

20   Q    So you're going to wait until close to that date that

21   you know because the company announced to buy it, is that

22   what you're saying?

23   A    That's right.

24   Q    And when would you sell it?

25   A    Well, again, you're trying to just capture that price

1  change related to the announcement so you would want to sell

2  it at basically as close in time as you can to when the

3  announcement closes, so first thing after the announcement.

4  Q     So very shortly?

5  A     Typically.

6  Q     Maybe three days?

7  A     Or less.

8  Q     Is there anything inherently improper about selling a

9  stroke quickly?

10  A     No.

11  Q     And you kind of alluded you to it, but I would like the

12  jury to hear a little bit more about, we'll use your example

13  of yourself buy a share of IBM on earnings, but why would

14  you make a bet in one direction versus another direction?

15  A     So this --

16  Q     Is there a flip of a coin or something else?

17  A     No, it's based on your view of how you think the

18  company's doing versus what the consensus view is.  If all

19  those analysts say, well, we think that the company is going

20  to only make a dollar a share and that's what they'll report

21  this quarter and I think, wow, you know, I think IBM's doing

22  even better and the economy is good or whatever, I would

23  make a decision that I'm going to buy those securities.  If

24  I think the company's going to underperform the way

25  everybody else is thinking, I would sell securities.

1   Q    So you mentioned using the services of a financial

2   analyst that gathers a lot of those individual estimates

3   together in one place?

4   A    Yes.  There's services like Zacks.

5   Q    Right.  Zacks is on your slide, so can you just tell

6   the jury what Zacks is?

7   A    So Zacks is a research company that publishes

8   information about stocks.  They have their own analysts as

9   well.  But -- and they give you market commentary meaning

10  like well, we're worried about the tariffs that Mr. Trump or

11  President Trump is currently, you know, putting on trade and

12  that could impact Harley Davidson or something like that.

13  So that would be a stock that, you know, would be effected

14  in those circumstances that Zacks might report on.

15  Q    And are there companies in addition to Zacks that do

16  this?

17  A    Yes.  IBS is one.

18  Q    What about brazing.com, is that another one of these --

19  A    I would need to check to make sure that they have the

20  consensus data, but they do offer market commentary, for

21  sure.

22  Q    And do some of these services offer ratings systems on

23  particular stocks?

24  A    Yes.  Zacks in particular have a 1 to 5 rating system.

25  Q    What does that mean?

1    A    The strong buy to stroke sell.

2    Q    So one is buy it, one is --

3    A    Yeah, this is our best recommendation and five is run

4    away.

5    Q    So having explained to the jury about what an earnings

6    trade is, and how they are accomplish generally speaking, in

7    looking at Mr. Korchevsky's trading history, did you come to

8    any conclusion about his trading?

9    A    Yes.  I would characterize Mr. Korchevsky as an

10   earnings trader.  Most of his trading is around earnings.

11   Q    And, again, is there anything inherently improper about

12   trading around earnings?

13   A    No.  It's a common strategy that people employ.

14   Q    All right.  I'm going to call up Slide Number 3.

15        So can you just explain to the jury what's this

16   slide about?

17   A    So this is a slide and I do this across several of the

18   slides you'll see where I'm comparing two time periods.

19   Q    Well, maybe why are you comparing two time periods?

20   A    Yeah.  So there's the period that Dr. Canjels is

21   focused on, which is 2011 to 2015.  That's the accused, the

22   period where Mr. Korchevsky is accused to have traded on

23   stolen information.  And in 2009 and 2010 he's not accused

24   of trading on stolen information so I wanted to look at were

25   there similarities between the trading in the unaccused

1  period, as I call it, versus the accused period.

2  Q    And just to be clear, the unaccused period is 2009 to

3  2010, correct?

4  A    That's right.

5  Q    And you had the trading data for that period of time?

6  A    Yes.

7  Q    And then the accused trading period is the period

8  that's reflected in the majority of Dr. Canjels' slides

9  which is 2011 to 2015, right?

10  A    That's right.

11  Q    And you had the trading data for that period as well?

12  A    Right.

13  Q    All right.  So what did this particular slide tell us?

14  A    So this slide tells us that most of Mr. -- the majority

15  of Mr. Korchevsky's earnings trades, these are trades where

16  he held a position going into the announcement of earnings

17  were made on the very last day that the earnings release was

18  made public.

19  Q    And so connecting that to what you just told us a few

20  minutes ago, he's waiting until the last day for the more

21  than 90 percent of the time to make his earnings trades at

22  best?

23  A    That's right.  And it's 92 percent for the unaccused

24  period 97 percent for the accused period, and I think those

25  are substantially similar.

1  Q     And just as an aside, you told the jury that the dates

2  of the earnings announcement is publicized.  You said the

3  market, everybody who's following knows what the date is.

4  Is it fair to say?

5  A     Right.

6  Q     What happens, if anything, to the volume of trading as

7  we approach the time that the earnings are going to be

8  announced?

9  A     Typically you see volume of trading increase as you get

10 closer to the announcement day.  The day before an

11 announcement is usually a big volume day.

12 Q     More and more people are trading?

13 A     Yes.

14 Q     All right.  I'm going to show you Slide 4.

15        Now --

16        THE COURT:  Mr. Healy, how many pages is it to the

17 exhibit just so we have a record.

18        MR. HEALY:  Yes, Your Honor.  There are 15 slides.

19        THE COURT:  Thank you.

20 Q     Tell us how does Slide 4 relate to the time of his

21 trades?

22 A     So again, we're comparing the unaccused period to the

23 accused period, so here I'm simply looking at -- the trades

24 that occurred the day before the earnings announcement --

25 excuse me, how many of those trades are late in the day

1   versus earlier in the day.  And I defined late in the day is

2   just after 2:00 p.m. so the markets close at 4:00 and they

3   open at 9:30 and they close at 4:00, so to 2:00 to 4:00 I

4   define as late in the day.

5          And 87 percent of Mr. Korchevsky's trading in the

6   unaccused periods was after 2:00 p.m. and 79 percent of

7   Mr. Korchevsky's trading in the accused period is after

8   2:00 p.m. and I think chose are generally pretty close.

9   Q    And, again, that relates back to what you told us about

10  minimizing other things that could affect the stock trades?

11  A    Right.  It makes sense for an earnings trader to trade

12  shortly before the announcement.

13         MR. HEALY:  I'm actually going to jump for a

14  moment to Slide 6.

15  Q    What is this slide about?

16  A    So this is a summary of, again, the two periods, the

17  accused period and the unaccused period.  But this is how

18  many of Mr. Korchevsky's trades were in stocks that were

19  using the three news wires Business Wire, Market Wire and PR

20  Newswire as their vehicle to get their press releases out.

21  Q    And you chose -- well, strike that.

22         Are there more than just those three Newswire

23  services to your knowledge?

24  A    Yes.  There are others.  Globe is another one.

25  Q    What was the reason that you chose those three?

Mayer - Direct - Healy                    2811

1    A    Those are the ones that Mr. Canjels, Dr. Canjels used

2    in his chart.

3    Q    Basically keeping apples to apples?

4    A    Yes.

5    Q    And what does this chart tell you about the consistency

6    or lack of consistency?

7    A    That 90 percent or more of his trades were made in

8    companies that employed these three Newswire services in

9    both periods.

10   Q    Between the period '09 and '10 when he's not in an

11   accused trading period and '11 through '15 when he is

12   accused of trading improperly?

13   A    That's right.

14   Q    And then staying with the theme of consistency or lack

15   of consistency, what is this slide about?  What is this

16   telling us?

17   A    So this slide gives us a picture of how big a bet is

18   Mr. Korchevsky making relative to his wealth, basically, how

19   much money he had in his account over the two time periods.

20   So the left part of this, the blue part, I didn't think

21   about this, I hope nobody's color blind.  I shouldn't have

22   used blue and green.

23          But the left side is the unaccused trading period

24   2009 and '10 and what this reflects is -- what that line

25   reflects is how much of his account value was he betting

1    over that time period, and then the green part is the same

2    analysis for the accused timeframe.

3            And when I look at that I see one big spike, but I

4    generally see that the bets, if anything, were bigger in the

5    unaccused period relative to his wealth than they were in

6    the accused period, but generally looks similar.

7    Q    There's two things I would like to maybe unpack in

8    that.  The first question is assume with me for a moment

9    that the jury's been told that he was making significantly

10   large bets in the accused period sometimes in excess of a

11   million to $2 million.  Are you saying that he was making

12   the same size bets in '09 and '10?

13   A    The difference is -- he was making those large bets in

14   the later time period but he had much more money.  And so

15   what I'm doing is scaling it for how much money he had.  If

16   he had $500,000 in this account in 2009 and he bet $500,000,

17   that would be 100 percent bet.  If he had $5 million in his

18   account in 2011 and he bet $100,000 it would be only 100,000

19   of out of that $5 million.  It's a much lower percentage.

20   Q    Okay, that makes sense.

21           Now, on the left side you've got that large spike,

22   goes all the way up to 1800 percent.  How was he betting

23   1800 -- 180 times more money that he had?

24   A    So the simple answer there is all I'm doing is adding

25   up all the trades that he makes.  The value of the trades

Mayer - Direct - Healy                    2813

1   he's making, the bets.  And so if has $2 million that he is

2   betting three times, that would be counted as $6 million

3   worth of bets.  So it's the same money being recycled.

4   Essentially he's buying 2 million, selling 2 million; buying

5   2 million, selling 2 million accounts multiple times and so

6   that is how you can get that.

7            And the other reason is the use of margin plays

8   into that as well.

9   Q    And just very briefly what does margin mean?

10  A    Margin is borrowing against your account value so that

11  you can buy more stock.  So it would be like instead of

12  owning you house outright if you had a $100,000 house and

13  you owned it outright you would only be able to -- you

14  wouldn't be able to do anything else with that money.

15           But if you have a hundred thousand-dollar house

16  and you borrow $50,000 against it, you can use that $50,000

17  to buy another house or do something else with it.

18  Q    So excluding that rather large spike, which you just

19  explained, what this chart shows is that whatever money is

20  in his pocket before '11 and after '11 he's betting about

21  the same proportion both times?

22  A    That's my interpretation.

23  Q    What does Slide 7 show?

24  A    So this is a -- just a table that shows how much

25  return.  This is percent return for each year from 2009 to

Mayer - Direct - Healy                    2814

1    2015.

2    Q    So --

3    A    And I should point out that in 2015 it's a partial year

4    because it only goes through May.

5    Q    Before you explain this, I just want to refresh the

6    jury's recollection that Dr. Canjels had a slide that showed

7    profit which is another word for rate of return, isn't it?

8    A    No.  Rate of return is a percentage and profit is a

9    dollar amount.

10   Q    But it would reflect essentially the same?

11   A    They relate.

12   Q    Yeah.

13   A    They clearly relate, but they're +not the same.

14   Q    So this slide shows a huge run time between January of

15   '11 and January of '12.  Do you agree with that?

16   A    A significant increase, yes.

17   Q    And it doesn't show much of an increase at all prior to

18   that, correct?

19   A    Yes.  And I think that's the function of scaling.

20   Q    Well, that's -- when you say a function of scaling I'm

21   going to go back to your slide.  Can you explain how this

22   slide might capture that in a different way?

23   A    So if you look at 2009, Mr. Korchevsky got 103 percent

24   return on his account.  And if we could go back to that

25   other chart.

1            In 2009 you can see that there -- the green area

2    does go up but that 109 percent because it's on a smaller

3    base just is kind of buried in there.  So it's -- you don't

4    really see that 100 -- I'm sorry, 103.  You don't really see

5    that 103 percent increase as starkly because it's on a

6    smaller amount of investment dollars.

7    Q    So --

8    A    There's nothing wrong with the other chart, it's just

9    that you can't pull that kind of information out of it.

10   Q    And your chart is essentially consistent with the chart

11   in that 2011 was the banner year?

12   A    Yes.

13   Q    But his second best rate of return nearly doubled his

14   money was 2009?

15   A    That's right.

16   Q    In some other years he lost, some other years he made.

17   Is it fair to say?

18   A    That's fair.

19   Q    And while we're on the subject of profits and so forth

20   Dr. Canjels over a number of slides of individual trades

21   with the jury where Mr. Korchevsky was making 5, 6 and 7

22   percent a day on a single position.  Is that unusual for an

23   earnings trader?

24   A    Those are not extraordinary returns, really, on any

25   given day 5, 6, 7 percent.  The stock price itself can move

1  that much on an earnings day.

2  Q    Is it possible that sometimes you would loss on an

3  earnings trade in a single today?

4  A    Yes.

5  Q    And is it possible that you might even make a lot more

6  than 5 percent on a given trade?

7  A    Depending on how you position, yes.

8  Q    Going back -- back to your analysis of the consistency

9  or inconsistency of the two periods, can you describe to the

10 jury what this slide is?

11 A    So this is a slide that is really just a recast of

12 Dr. Canjels' scatter clatch slide that I know he testified

13 about to the jury earlier.  And the only difference here is

14 we started the time period at the very beginning of the day,

15 at midnight that night before.

16 Q    And just remind the jury when did Dr. Canjels start his

17 slide?

18 A    At 9:30 in the morning.

19 Q    And is that why your red area is -- I don't know, a

20 rhombus or a polygon rather than a triangle?

21 A    Yes.  It's -- it's basically just including trades that

22 where essentially the upload time was very early in the

23 morning, 1 o'clock in the morning or something like that and

24 then it was trading on -- it just includes more data.

25 Q    And by recasting this did you conclude that there was

1  anything wrong with Dr. Canjels' correlation?

2  A    No.  The statistical analysis holds.  There's nothing

3  inherently wrong with the way Dr. Canjels presented it, it's

4  just that I'm trying to include more data.

5  Q    And then if we look at Slide 9, what is this with that

6  same shape?

7  A    Yeah.  So this is -- so the last one that we looked at

8  was the period that Dr. Canjels focused on, the 2011 to

9  2015.  And I'm trying to compare it to the unaccused period,

10  which is 2009 to 2010, and trying to understand whether or

11  not that same statistical relationship exists that

12  Dr. Canjels was pointing out.

13  Q    And can you tell the jury what you found when you did

14  that?

15  A    That it does.  And so in the unaccused period there's

16  some relationship going on between the upload time and the

17  first order time just as there is in the accused period.

18  Q    And what's the significance of that?

19  A    It calls into question in my mind what is the reason

20  for that nonrandom relationship, and I don't know the answer

21  to that.  But I know that if that relationship exists in the

22  unaccused period that there's question in my mind as to, you

23  know, is it just because Mr. Korchevsky had access to upload

24  data, if that doesn't make sense.

25  Q    So if I could reframe my question, I guess, is based or

1    the similarity that you found -- the significance similarity

2    between those two charts, the difference being one is a

3    period of time when there's not an accusation that he was

4    trading on stolen press releases and the time when he is

5    accused of trading on stolen press releases, is it -- what

6    you're saying is that you cannot determine what causes that

7    statistical correlation?

8              MR. GOPSTEIN:  Objection to form.

9              THE COURT:  Sustained as to form.

10   Q    Do you have an opinion as to what causes this

11   statistical correlation?

12             MR. GOPSTEIN:  Objection, Your Honor.

13             THE COURT:  No, I'll permit that.  Go ahead.

14   A    I don't know.  I have -- I think it had something to do

15   with the fact that Mr. Korchevsky traded late in the day but

16   I don't know -- I haven't been able to figure out exactly

17   why.  It looks the same in the unaccused period as it does

18   in the accused period.

19   Q    But it does look the same?

20   A    The statistics are the same basically.

21   Q    So going back and just talking about the idea that his

22   trading time appears in your Slide 4 and 5 and that his

23   amount of money relative to what he possesses at any given

24   time, which is reflected, I believe, in Slide 7 and the

25   number of trades made on the same Newswires, did you come to

1    any conclusion regarding his trade?

2             MR. GOPSTEIN:  Objection to form.

3             THE COURT:  To be honest with you, you lost me

4    about halfway through the question.

5             MR. HEALY:  I can certainly rephrase, Your Honor.

6    Q    Talking about previous few slides you discussed with

7    the jury, did you make any conclusion regarding

8    Mr. Korchevsky's trading pattern?

9    A    That he's an earnings trader and that there's

10   substantial similarities between the trading in the

11   unaccused period as to what he did in the accused period.

12   Q    Now, I want to shift to Slide 11, and talk a little

13   bit, you mentioned earlier your third conclusion was some

14   inconsistencies that you noticed with respect to the

15   assumptions that Mr. Korchevsky was trading on nonpublic

16   information or stolen press releases.  What does Slide 11 do

17   to help us understand that?

18   A    So this is just focusing on the accused timeframe now

19   and what I'm highlighting here is that a substantial number

20   of, or 13 percent of the number of trades that

21   Mr. Korchevsky entered into were not trades.  So he is an

22   earnings trader, you know, most of the time, 87 percent but

23   for 13 percent of the trades he was not trading on earnings.

24   Q    And why do you find that inconsistent with somebody

25   trading on stolen press releases?

Mayer - Direct - Healy                    2820

1  A    Well, if you essentially could read the paper ahead of

2  time and you knew what the future was going to bring with

3  respect to these earnings reports you would expect somebody

4  to really trade almost exclusively doing that.

5  Q    Now --

6           MR. GOPSTEIN:  Your Honor, objection.  I

7  apologize.  Could we have a very brief sidebar?

8           (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The following occurred at sidebar.)

2          MR. GOPSTEIN:  So this is my concern.  We did this

3     before.  He had a substantial briefing about the scope of

4     Mr. Mayer's argument.  We had argued that original exposures

5     were insufficient, and so it was offered in the most recent

6     disclosure, "It is expected that Mr. Mayer will opine that

7     Mr. Korchevsky typically traded late in the day prior to

8     earnings events, and that this strategy takes advantage of

9     the increased volatility that surrounds..." --

10          THE COURT:  Hold on a second.

11          (Pause in proceedings.)

12          MR. GOPSTEIN:  "...and that this strategy takes

13     advantage of the increased volatility that surrounds

14     earnings announcements.  We have an objection to that as to

15     time.

16          The next section:  "Further based on his review of

17     the trading records contained in the Government's production

18     in this case and the Government's list of accused trades,

19     Mr. Mayer will offer his opinion regarding the similarities

20     between the unaccused trades to the accused trades in terms

21     of size, frequency, and profitability.  Moreover, Mr. Mayer

22     may also opine about instances of purchases and sales that

23     are inconsistent with trading on material, nonpublic

24     information."

25          That now is a subject matter, and we have a number

1   of slides that appear to be the basis of opinion, but these

2   opinions have not yet been disclosed, and so we don't know

3   what they are.  So as he just testified and as we go down a

4   whole row of slides and the slides themselves are a summary

5   of data, and if you find that the whole payment of -- was if

6   you know exactly what his opinion is going off of.  And at

7   this point, I don't think that that opinion has been

8   disclosed.  So we're about to go into disciplinary option

9   versus stock.  But as of now, no opinion on what the offer

10  has been disclosed, and so that's our concern.  I trust the

11  next slides are going to be leading to the opinion that the

12  trading was inconsistent with trading, or material

13  information was the opinion as to why that is.  Sitting here

14  today, and I have had Mr. -- and correct me if I'm wrong --

15  that opinion has never been disclosed to the Government.

16          MR. HEALY:  Well, I think that the opinion is that

17  it's inconsistent.  And I think to explain to the jury why

18  he forms that opinion is the subject matter of his

19  testimony.  I don't think it's particularly clouded or

20  obtuse if you look at the slides.  And one of his arguments

21  is that 35 percent of the trade resulted in losses.  I don't

22  think it's --

23          THE COURT:  All right.  At the risk of having the

24  jury in part of this discussion, I understand your concern.

25  We'll go forward.  Take it one at a time.  The opinion is

Sidebar Conference                    2823

1   the trading is inconsistent with somebody because of the

2   similarity the one year period to another.  He's got slides

3   to demonstrate that, then no problem.  If he starts getting

4   beyond that, then we have a problem.

5           (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Mayer - Direct - Healy                    2824

1          (Sidebar ends; in open court.)

2    BY MR. HEALY:

3    Q    Before we move to the next slide, Mr. Mayer, I just

4    wanted to ask you on the right side of your chart you have

5    the amount that Mr. Korchevsky has invested as 448 million

6    and change.  Does that mean he had $448 million in his

7    account?

8    A    No.  As we talked about a little while ago, that is

9    simply a total of all the individual transactions he

10   undertook.  So if he made 6, $2 million transactions that

11   would be $6 million even if he only had two at that time.

12   So that's just a total amount of those, the value of those

13   transactions.

14   Q    I think you said recycling the same money?

15   A    That's right.

16   Q    Same idea?

17   A    Yeah.

18   Q    I'm going to show you Slide Number 12.  This slide,

19   which talks about his options versus stock purchases.

20   Before you explain to the jury what this is, can you again

21   very briefly generally explain what an option is?

22   A    Sure.  I don't think we need to get into a lot of

23   detail and they are complicated, but an option is basically

24   a type of security that relates to a particular stock.  So

25   if you have an option of IBM, if the price of that option

1    would relate to the stock's price and it's like buying the

2    stock sort of on steroids or owning the stock on steroids

3    because you're getting -- for every individual option you

4    get the price change impacts embedded in it for 100 shares

5    of the underlying stock.  So it's more complicated than

6    that, but just think of it in terms of more bang for your

7    buck if you're trying to bet one way or the other using

8    options.

9    Q    So we understand.  Again --

10   A    The risky, too.

11   Q    -- without getting into too much technical detail, if

12   you invested the same amount of money in an option as you

13   would in the underlying stock, where would you have the

14   potential to make more money?

15   A    Well, if you're right on your bet, you'll make more

16   money; if you're wrong, you'll lose more money.

17   Q    On the option?

18   A    Right.

19   Q    Okay.  So now what does this slide show?

20   A    So this slide indicates that 69 percent of

21   Mr. Korchevsky's earnings trades were just in stock, that he

22   didn't use these securities bets, give you more bang for

23   your buck.

24   Q    So expanding on what you just told the jury a moment

25   ago, that the 69 percent of the money that he's invested in

1   the stock, if he was right, had less potential to make money

2   than the other -- yeah, 31 percent that he invested with the

3   stock, of the stock option or options?

4   A    I would phrase it a little differently.  I would say

5   69 percent of his earnings trades were in stock only.  Had

6   he instead bought options with that money in those similar

7   companies, he could have made or lost that money, but been

8   exposed to more price change.

9   Q    Now, I want to show you a slide that -- and I'm going

10  make that a little bigger.

11  A    If I could suggest you hit the little X next to the

12  bookmarks, it will make it bigger.

13  Q    Then I'll have trouble finding it.

14  A    Oh, I'm sorry.

15  Q    This was a slide that was shown to the jury when

16  Dr. Canjels was speaking with them.  It's a particular stock

17  trade and the ticker, DNDN.  First, generally, are you

18  familiar with this trade at all?

19  A    Yes, I've looked at this.

20  Q    And by the way, did your analysis go into individual

21  trades?  Were you looking at specific individual trades?

22  A    To some extent, yes, but on the whole in my office was

23  more focused on his overall trading.  But Dr. Canjels called

24  up certain individual trades, I looked at those and I looked

25  at some others.

1   Q    Okay.  So can you tell the jury how this particular

2   trade might be illustrative of what you were explaining to

3   them about stocks versus options?

4   A    Sure.  This individual trade was a single largest

5   profit trade that Mr. Korchevsky ever entered into.  And

6   what he did is he invested about $200,000, I guess, it must

7   be a little lower on the screen but I know that -- it must

8   be a little lower.  Yeah, there it is.  $217,000 into the

9   options of this company and ended up making $2.3 million on

10  this individual trade, which is over 1,000 percent return,

11  ten times his money.  So had he just bought the stock, he

12  wouldn't have gotten anywhere near that kind of -- or just

13  sold the stock he wouldn't have gotten anywhere near that

14  kind of return.

15  Q    What was the date he bought those options?

16  A    On 8/3, on August 3rd of 2011.

17            (The continued on the next page.)

18

19

20

21

22

23

24

25

1   DIRECT EXAMINATION (Continued)

2   BY MR. HEALY:

3   Q    Did you review the database to see what his trading was

4   on that day in general?

5   A    Yes, I did.

6   Q    What did you find?

7   A    By the end of the day he had invested in $1.8 million

8   worth of securities, of which $200,000 was in DNDN.

9   Q    Out of a pool of 1.8 million he only invested $217,000 in

10  the DNDN options?

11  A    Yes.

12  Q    Did you calculate what he would have earned had he

13  invested the entire 1.8 million in DNDN options?

14  A    Had he done that, he would have made somewhere between 15

15  and $20 million on that trade instead of 2 million.

16  Q    In your analysis did you have occasion to look at the

17  Dubovoy accounts to see how much Mr. Dubovoy invested in DNDN?

18  A    There was no trading in DNDN by the Dubovoys.

19  Q    Going back to your slides, slide 13 seems to concern

20  options as well in something that you list out of the money.

21  Being very general, please, can you tell the jury what that

22  means, out of the money in an option?

23  A    Sure.  So trying to keep it simple again, again we talked

24  about options being more bang for your buck, if you want to

25  make a bet on a company.  There are flavors of options.  The

1  in the money, out of the money nature is basically relative to

2  what is called a strike price.  We don't need to get into a

3  lot of detail.  There you can get even more bang for your

4  buck.  If you buy for a given amount of investment you can buy

5  out of the money options.  If you're right, they are going to

6  give you a higher return than in the money options.  This is

7  buying the more aggressive security.  In general the options

8  versus stock within options, it's buying the kind of option

9  that will give you the biggest return, higher risk.  The

10  highest risk options, but the one that can give you the

11  highest potential return.

12  Q    So if we put together essentially slides 12 and 13 which

13  talk about options, is what you're telling the jury is that

14  he's not maximizing his use of options to make the most money?

15  A    That's the import of what I'm trying to get across here,

16  that there are examples like this in categories of trades that

17  he's making that show that he's not, it doesn't fit the idea

18  that he knowingly was trading.

19          MR. GOPSTEIN:  Objection, your Honor.

20          THE COURT:  Sustained.

21  Q    Without getting into what he might have known, just, is

22  he maximizing his earning potential?

23  A    No.

24  Q    Slide 14, you have trades made in the opposite direction

25  of earning surprises.  I'm sorry to keep asking to you

1   explain, but explain what is an earning surprise?

2   A    So an earning surprise is simply, remember we talked

3   about the analyst consensus before the earnings are announced,

4   that's where the analysts make their predictions what the

5   earnings will be.  Then it's accumulated by somebody like

6   Zacks.  Their consensus is a dollar a share for IBM.  If the

7   earnings do come in in the actual world like a dollar ten,

8   that's a ten percent or ten cent earning surprise.

9            So what we've done here is out of all the earnings

10  trades, there were 283, where Mr. Korchevsky's bet was

11  opposite of the direction of the earnings surprise that came

12  out in the press release, which is 30 percent of the time.

13  Q    To add to that a little, you talked about for example

14  Zack is giving a higher rating.  So Zacks is saying, this is

15  what we expect; is that correct?

16  A    Well, Zacks is providing two kinds of information.  One

17  is sort of a general grade one through five; this is our best

18  idea, this is our worse idea, a stock you want to get rid of.

19  That's sort of separate from their earning consensus

20  information.

21           So what they'll do is they'll say the earnings

22  consensus on this particular stock is based on the analysts we

23  get data from is a dollar a share.

24  Q    That consensus is before the company actually tells us

25  what happened in the earning announcement?

1  A    As they are accumulating the data they update it, but

2  going into the earning announcement they will have the latest

3  version of it.

4  Q    When the press release is made public, when that goes in

5  the other -- well, when that relates to what everybody

6  thought --

7  A    Think of it as consensus versus actual.  You have the

8  consensus of a dollar, if the actual comes out a dollar ten,

9  it's a 10 percent earning surprise.

10  Q    It's a surprise, no one expected it?

11  A    Right.  It's better than they expected.  Surprises are

12  characterized as meet, beat or miss.

13         So a company like IBM, if they had a dollar ten when

14  the expectation was a dollar, it would be a 10 percent

15  earnings beat, and that would be a 10 percent surprise.  And

16  if it was just the dollar, if it came actually at a dollar

17  which the expectation was a dollar, it would be a meet.  And

18  obviously, if only did 90 cents, it would be a miss.

19  Q    So when there is, as you say, a beat, generally what

20  happens to the stock price?

21  A    The stock goes up.

22  Q    And if you wanted to make a trade thinking it was going

23  to be a beat, what kind of position would you take?

24  A    You would take a long position, you would buy securities.

25  Q    If you say that 30 percent of the time Mr. Korchevsky

Mayer - Direct - Healy                    2832

1    traded in the opposite direction of the earnings surprise,

2    what kind of position would he have taken in that example when

3    a beat is what we're thinking is happening?

4             MR. GOPSTEIN:  Objection to form.

5             THE COURT:  Do you understand that question?

6             THE WITNESS:  I think I do.

7             THE COURT:  Go ahead.

8    A     So I can answer with an example.  So 30 percent of the

9    time it would be a situation where if the consensus estimate

10   was a dollar, and it came in at a dollar ten for IBM,

11   Mr. Korchevsky would actually have been short the stock.  He

12   would be betting against the company and the earnings came in

13   better than expected.

14   Q     Zinged when he should have zanged?

15   A     That's fair.

16   Q     What does slide 15 tell us?

17   A     Slide 15 is summary of during the accused time frame how

18   many of Mr. Canjels' earnings trades had losses versus all

19   trades.  I was just looking to see do the earnings trades look

20   more successful on average versus, setting aside the dollar

21   amount, focusing on wins or losses, were the earnings trades

22   similar in terms of success to all his trading or not.  And my

23   conclusion is that they were.

24   Q     I know you're focused here primarily on just the number

25   of wins versus losses, but you agree that he did make money

1   over this period of time?

2   A    Yes.  He made a lot.

3   Q    2011 he made a lot of money?

4   A    Yes, he did.

5   Q    He actually doubled his money in 2009, right?

6   A    Yes, he did.

7   Q    In 2011 in these losses, even though overall he gained,

8   there was some significant losses, weren't there?

9   A    Yes, several, many of them were in the hundreds of

10  thousands of dollars.

11  Q    I want to just tie this back to slide five, in terms of

12  the amount he's betting in the accused period, is there

13  anything about this slide that you find inconsistent?

14          MR. GOPSTEIN:  Objection, your Honor inconsistent

15  with?

16          MR. HEALY:  With trading on non-public information,

17  trading on stolen press releases.

18          MR. GOPSTEIN:  Objection for the reasons stated.

19          THE COURT:  Sustained.

20  Q    In the period of time reflected on the right side of this

21  chart, 2011, 2015, this is the accused trading period,

22  correct?

23  A    That's right.

24  Q    Is Mr. Korchevsky betting heavier?

25  A    No, it appears he's betting similarly sized to his

1  wealth.  His dollars are bigger, but relative to his account

2  value they are actually smaller.  But I can eyeball it and say

3  it is just similar.

4  Q    I'm showing you Dr. Canjels' slide number 13, I'm drawing

5  your attention to the top line of this chart.  Can you explain

6  first just what that line is asserting?

7  A    What Dr. Canjels is basically doing there is he's saying,

8  out of the 67,000 earnings news announcements across all the

9  stocks during the five year time frame -- that's how many

10  because there are 5,000 stocks and they all report quarterly

11  and there are is five years or something like that, those are

12  the rough numbers -- there are 67,000 opportunities to trade

13  on earnings.  766 of them were traded on by Mr. Korchevsky.

14  499 of them were traded on by Mr. Dubovoy.  289 of those

15  overlap, which is a 57 percent or 58 percent overlap

16  percentage.

17        And he's saying if there was just random trading

18  between these two people, if they had no relationship, that

19  you would expect to see 1.1 percent overlap.  And he's saying

20  that's a statistically significant overlap.  Essentially there

21  is clearly an overlap and it's meaningful.

22  Q    Before we ask your opinion, is there anything wrong with

23  that analysis?

24  A    No.  Fundamentally it's correct.

25  Q    Do you have an opinion as to that particular slide?

1  A    Well, it doesn't get at why.  And my understanding is

2  that there is trading --

3              MR. GOPSTEIN:  Objection, your Honor.

4              THE COURT:  Go ahead.  Let me hear the answer.

5  A    It doesn't get at the fact that there is trading by

6  Mr. Korchevsky in Mr. Dubovoy's account and in his own

7  account.  And so you would expect if somebody's trading in two

8  accounts to trade similarly.

9  Q    Does that result, does the overlap percentage of

10 57.9 percent, surprise you?

11 A    No, there is a reason.

12 Q    Dr. Canjels' scatter chart also shows a statistically

13 significant correlation; is that correct?

14 A    It shows a non-random relationship between upload time

15 and trade time.

16 Q    Having looked at his scatter chart and recasting it as

17 you did, and then doing your own analysis of the unaccused

18 time, what opinion did you have?

19              MR. GOPSTEIN:  Objections for the reasons stated at

20 sidebar.

21              THE COURT:  I'll permit it.  Go ahead.

22 A    The fact that that same relationship exists in a period

23 that's not accused to have been involved trading on stolen

24 information, that would imply to me there is another

25 explanation for why there is a relationship between the upload

1   time and the trade time.

2           MR. HEALY:  No further questions.

3           THE COURT:  Cross-examination.

4           MR. GOPSTEIN:  Thank you, your Honor.  May I

5   proceed?

6           THE COURT:  Yes, please.

7   CROSS EXAMINATION

8   BY MR. GOPSTEIN:

9   Q    Good morning, Mr. Mayer.

10  A    Good morning.

11  Q    My name is David Gopstein.  I'm an Assistant United

12  States Attorney in the Eastern District of New York.

13  A    Nice to meet you.

14  Q    You testified at the beginning of your direct about

15  earnings information.  And your first two slides talked about

16  how earnings information impacts stock price, correct?

17  A    How they can, how earnings information could be used to

18  trade on changes in stock price.

19  Q    You agree that earnings information is material, correct,

20  to investors?

21  A    I think in general.  Normally I would expect to see event

22  studies supporting that, but I agree that earnings reports are

23  generally material.

24  Q    You've previously opined that virtually every

25  circumstance would be material to investment decision making?

1    A    Yes.

2    Q    Earnings information is not the only kind of information

3    that's material to investors, right?

4    A    No.

5    Q    There is other kinds of information that investors

6    consider important, correct?

7    A    Yes.

8    Q    Investors consider revenue important, for example?

9    A    Yes.

10   Q    Guidance is an important factor for investors?

11   A    Yes.  But when I was talking about earnings I was just --

12              THE COURT:  Wait for the question, please.

13              Next question.

14   Q    You testified on direct to a number of comparisons that

15   you made between Mr. Korchevsky's trading in 2009, 2010 on the

16   one hand; and his trading in 2011 through 2015 on the other

17   hand, correct?

18   A    Yes.

19   Q    You called 2009, 2010 the unaccused period, and 2011

20   through 2015 the accused period, correct?

21   A    That's correct.

22   Q    You made those comparisons, you and your team, by

23   reviewing trading data and the spreadsheet that the

24   Government's expert Dr. Canjels used, correct?

25   A    Yes, we looked at that data using Dr. Canjels' materials.

Mayer - Cross - Gopstein                    2838

1   Q    You had access to trading accounts and trade blotters

2   from the brokerage firms, correct?

3   A    That's right.

4   Q    Fair to say almost all of your slides rely, in part, on

5   Dr. Canjels' analysis -- database, correct?

6   A    That's correct.

7   Q    You testified on direct about options trading, correct,

8   you recall that?

9   A    I do.

10  Q    I believe you testified that during the accused period

11  approximately 31 percent of Mr. Korchevsky's trades involved

12  options; is that right?

13  A    I'm trying to remember exactly, but I believe you.

14  Q    Turning to Defendant's exhibit 4H, slide 12, that was

15  your slide comparing the use of stock and options in the 2011

16  to 2015 period, correct?

17  A    I don't see anything.

18            COURTROOM DEPUTY:  Are you using the document camera

19  or your computer?

20            MR. GOPSTEIN:  The document camera.

21            COURTROOM DEPUTY:  Okay.

22  Q    This is slide 12 of your slide, this is showing

23  14 percent, plus 17 percent of his trades during the accused

24  period involved options; is that correct?

25  A    That's correct.

Mayer - Cross - Gopstein                    2839

1   Q    That's 31 percent?

2   A    Yes, thank you.

3   Q    You're aware, Mr. Mayer, from your review of Dr. Canjels'

4   database that Mr. Korchevsky had no option trading between

5   2009 and 2010, correct?

6   A    I don't recall that off the top of my head.

7   Q    That data was -- in the database that you reviewed, that

8   data is available, correct?

9   A    Whether or not he traded in options or not?  Yes, that is

10  available.

11  Q    So you're not aware that his first option trade was in

12  January 2011?

13  A    Not off the top of my head, no.

14  Q    In the comparisons you have here you have no comparisons

15  during of the options trading during the accused period and

16  options trading during the unaccused period, correct?

17  A    That's correct.

18  Q    I'd like to ask you about comparisons that you did make.

19  If we turn to slide number three?

20            THE COURT:  This is three Defendant's exhibit H?

21            MR. GOPSTEIN:  Yes, your Honor.

22            THE COURT:  H in evidence, I should say.

23  Q    This slide, Mr. Mayer, if we look down at source, again

24  you're relying on Dr. Canjels' trade database here?

25  A    That's right.

1    Q    When you're referring specifically to earnings trades in

2    the title, it says down here in the derivation portion of your

3    slide, that specifically what you're referring to are trades

4    where earnings is listed in the news type column in

5    Dr. Canjels' database, correct?

6    A    Yes, earnings of the news type.  That's correct.

7    Q    So having reviewed Dr. Canjels' database, Mr. Mayer,

8    you're aware that between 2009 and 2010, the unaccused period,

9    only approximately 19 percent of Mr. Korchevsky's trades were

10   actually earnings trades, correct?

11   A    I would need to go use the database to determine that.  I

12   don't know that off the top of my head.

13   Q    Are you aware that during the accused period

14   approximately 86 percent of Mr. Korchevsky's trades were

15   earnings trades?

16   A    Again, I would need to use a database to test that.

17   Q    I think you testified that the difference between

18   92 percent and 97 percent wasn't that substantial.  Would you

19   agree, the difference between 19 percent and 86 percent is

20   substantial, correct?

21           MR. HEALY:  Objection.

22           THE COURT:  I think we know the answer.

23           Mr. Mayer, do you want to answer that question?

24   A    Yes, I would generally agree that's a difference.

25   Q    I'm showing what is in evidence as slide number four of

1    Defendant's exhibit Korch H, this is the slide you testified

2    to on direct.  This is another comparison that a made between

3    2009, 2010 and 2011, 2015, correct?

4    A    Yes.

5    Q    And here what you're comparing is trades entered into

6    last day before earnings press releases were issued, correct?

7    A    That's right.

8    Q    Again, this slide also does not take into account how

9    often Mr. Korchevsky was trading in earnings during the

10   accused period as opposed to the unaccused period, correct?

11   A    It's getting at a different point.

12   Q    This slide doesn't show how many trades are reflected in

13   each graph on the left and the right, correct?

14   A    No, it's just giving percentages.

15   Q    Again, you used Dr. Canjels' trade database for this

16   chart?

17   A    I did.

18   Q    You're aware that database includes information about

19   press release upload time, correct?

20   A    Yes.

21   Q    Just to be clear, this slide over here does not in any

22   way take into account press release upload time, correct?

23   A    That wasn't the point I was trying to make.  Just --

24            THE COURT:  Just answer the question, please.

25   A    No, it doesn't.

Mayer - Cross - Gopstein                    2842

1    Q    There is nothing on press release upload time in this
2    slide, correct?
3    A    Correct.
4    Q    You testified you chose 2:00 p.m. as the cut off for this
5    slide?
6    A    I did.
7    Q    You could have chosen 3:00 p.m.?
8    A    Sure.
9    Q    Had you chosen the 3:00 p.m., the 79 percent number in
10   the accused trading period would have dropped to over just
11   over 50 percent?
12   A    I'm not aware.
13   Q    You didn't conduct that analysis?
14   A    I didn't.
15   Q    I'm now showing you what is slide number eight of
16   Defendant's exhibit Korch H, which is in evidence.  You
17   testified about this slide on direct, correct?
18   A    I did.
19   Q    Now, the slide you we were just looking at with the two
20   pie charts, that did not include upload time at all.  This
21   chart does have upload time on one of the axis, correct?
22   A    Yes, the lower one.
23   Q    Just to be clear, slide number nine, which is your chart
24   for the unaccused time period trading period, also includes
25   upload time on the axis, correct?

Mayer - Cross - Gopstein                    2843

1    A    It does.

2    Q    Sticking with slide number nine --

3    A    Is that the one you're showing?

4    Q    Yes.  You testified that you chose 2:00 p.m. as the cut

5    off time in the slide that we were just looking at, correct?

6              MR. HEALY:  Which slide?

7    Q    Slide four with the two pie charts, 2:00 p.m. is the time

8    you chose.  Do you recall your testimony about 2:00 p.m.?

9    A    Relating to that E-Trades mostly late in the day?

10   Q    Yes.

11   A    Yes.

12   Q    Now 2:00 p.m. on this chart that would be on the vertical

13   access 14, correct, because that's military time?

14   A    1400.

15   Q    If I -- I'm going to use my pen, if we were to draw a

16   line directly across at 2:00 p.m. in the unaccused trading

17   period, would you agree that there are seven trades underneath

18   that line?

19   A    I count seven.

20   Q    Now on your graph, four of those trades are outside of

21   the window, correct?

22   A    Yes.

23   Q    Three of them are inside the window?

24   A    Yes.

25   Q    And this is the unaccused trading period?

Mayer - Cross - Gopstein                    2844

1   A    Right.  There was missing data.  Dr. Canjels' database

2   doesn't have all the upload time.

3   Q    Just answer the question.

4   A    Yes.

5        THE COURT:  Don't volunteer, just answer the

6   question.

7        THE WITNESS:  Yes, your Honor.

8   Q    Turning to slide eight, this is the earnings, this is the

9   window of opportunity slide for the accused period 2011 to

10  2015, correct?

11  A    Yes.

12  Q    If we draw the same line at 14, which is 2:00 o'clock,

13  based on your analysis would it surprise you that there are

14  148 trades below that line?

15  A    I'm not going to attempt to count them, but I'll believe

16  you.

17  Q    137 of them were before the upload time?

18  A    That doesn't make sense to me.  Could you repeat the

19  question?

20  Q    I misspoke, thank you.  After the upload time.

21       THE COURT:  Repeat the whole question.

22  Q    Would it surprise you that there are 137 of 148 trades

23  that fall within the window?

24  A    Of trades that are after 2:00 p.m.?

25  Q    Before 2:00 p.m.

Mayer - Cross - Gopstein                    2845

1    A     Before 2:00 p.m.  Without counting them or running the

2    database, I don't know for sure.  I can't say.

3                THE COURT:  Do we need to take a morning break,

4    unless your about to finish?

5                MR. GOPSTEIN:  Yes, your Honor.

6                THE COURT:  We'll take a mid-morning break.  Don't

7    discuss the case.  We'll resume in ten minutes.

8                COURTROOM DEPUTY:  All rise.

9                (Jury exits.)

10                  (Brief recess.)
                 (Jury enters the courtroom.)
11               THE COURT:  Please be seated everyone.

12               Mr. Gopstein, when you're ready.

13               MR. GOPSTEIN:  Thank you, your Honor.

14   Q     Turning back to slide three, this was the comparison of

15   earnings trades during the unaccused and the accused period,

16   correct?

17   A     That's right.

18   Q     In slide four, this is also a comparison of earnings

19   trades between the accused and the unaccused period, correct?

20   A     That's right.

21   Q     Slide five is titled Mr. Korchevsky's investments

22   relative to his account value.  This is not a comparison in

23   the earning trades in the accused time period and unaccused

24   time period, correct?

25   A     This is all of his trades.

Mayer - Cross - Gopstein                    2846

1  Q     All trades, correct?

2  A     Yes.

3  Q     You've reviewed the database underlying this slide,

4  correct?

5  A     Yes.

6  Q     So you're aware you could have done a comparison of just

7  earning trades as you did with the prior two slide, correct?

8  A     Yes, I could have filtered it.

9  Q     You're aware that had you done so, it would have shown

10 the average size of Mr. Korchevsky's largest investment

11 increased substantially during at excused period, correct?

12 A     I don't know that.

13 Q     Directing your attention to this spike up here, around

14 the 1800 percent mark, you testified about that on direct,

15 correct?

16 A     I did.

17 Q     That spike reflects trades that Mr. Korchevsky made in

18 Bank of America stock, correct?

19 A     I would need to go back to the database but I know he

20 traded in Bank of America quite a bit.

21 Q     In fact, he traded in Bank of America during the

22 accounted period.  He made over 130 round trips in Bank of

23 America, correct?

24 A     I don't know the count.

25 Q     He traded in it a lot?

Mayer - Cross - Gopstein                    2847

1   A    I agree with that.

2   Q    Are you aware from your review of Mr. Korchevsky's

3   trading activity in the accused period that he traded in the

4   same stock over six times?

5   A    In Bank of America?

6   Q    During the accused period, Mr. Korchevsky traded in the

7   same stock no more than six times.  You're aware of that from

8   your review?

9   A    I don't know the count.

10  Q    That's not a comparison you made between the accused time

11  period and the unaccused time period, correct?

12  A    I didn't.

13  Q    Going back to this spike up here in the accused time

14  period.  Now this investment here is actually larger in terms

15  of monetary value than the 1800 investment here, correct?

16  A    I would need to run the database to be sure, but it

17  wouldn't surprise me.

18  Q    Showing you slide six in Defendant's exhibit Korch H in

19  evidence, this is another slide you testified to on direct.

20  And in this comparison we are back to comparing just earnings

21  trades in the accused time period and the unaccused time

22  period, correct?

23  A    That's right.

24  Q    Mr. Mayer, is it fair to say that what you're showing

25  here is that most of Mr. Korchevsky's earnings trades were in

Mayer - Cross - Gopstein                    2848

1   companies where press releases were issued by the three news

2   wires you have listed on the top Business Wire, Marketwired,

3   and PR Newswire?

4   A    Right.

5   Q    That's not surprising because as you have at the bottom

6   of your slide you say, note this is consistent with the top

7   three news wire providers from 2009 to 2013, which were

8   Business Wire, Marketwired, and PR Newswire, correct?

9   A    That was kind of my point, right.

10  Q    And just to be clear, this slide says nothing about when

11  within the time periods Mr. Korchevsky was trading on any one

12  particular news wire, correct?

13  A    That's right.

14  Q    So if Mr. Korchevsky traded on PR Newswire in 2012, and

15  Marketwired in 2013, and Business Wire in 2015, your slide

16  number six would look exactly the same, correct?

17  A    That's right.

18  Q    Turning to slide number seven.  This is your slide

19  looking at Mr. Korchevsky's rate of return in the years 2009

20  through 2015, correct?

21  A    That's right.

22  Q    Now this slide is not comparing earnings trading, this is

23  back to comparing all tradings, correct?

24  A    That's right.

25  Q    And as you did for earlier slides, you could have made

Mayer - Cross - Gopstein                2849

1  just an earnings-based comparison of Mr. Korchevsky's rate of

2  return in the accused time period and the unaccused time

3  period, correct?

4  A    I could have filtered for that, yes.

5  Q    You're aware from your review of the database that had

6  you done that, numbers for 2010 and -- the numbers for 2009

7  and 2010 would have both been negative?

8  A    I'm not aware of that.

9  Q    Now according to your slide, in 2011 Mr. Korchevsky had a

10  1788 percent return on his investment; is that correct?

11  A    Yes.

12  Q    In 2012 you calculated a 31 percent return, correct?

13  A    That's right.

14  Q    You did that using the formula you have at the bottom,

15  states of return was calculated as ending value minus

16  withdrawals divided by starting value plus deposits, correct?

17  A    Yes.

18  Q    Withdrawals are money going out of the accounts, correct?

19  A    That's right.

20  Q    Deposits are monies going into the accounts?

21  A    We wanted to account for that.

22  Q    You would agree, the purposes of your chart here is money

23  that goes from one Korchevsky account to another Korchevsky

24  account is neither a deposit nor a withdrawal, correct?

25  A    That's true, but it would be reflected on both sides of

Mayer - Cross - Gopstein                    2850

1   this equation then.  It would show up as a deposit in another

2   account.

3   Q    So if it's just moving around within the account, your

4   testimony is that is both a deposit and a withdrawal.  If Mr.

5   Korchevsky transferred $5 million from his E-Trade account to

6   his JP Morgan account, your testimony is that $5 million, for

7   the purposes of your calculations, is both a deposit and a

8   withdrawal?

9   A    That's how we should reflect it.  I would need to go back

10  and look at work papers, but I'm pretty sure that that would

11  be the case.

12              (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS EXAMINATION

2  BY MR. GOPSTEIN: (Continued)

3  Q    Just to be clear, when you are talking about rate of

4  return here, that's a return on all of these accounts

5  combined, correct?

6  A    Yes.

7  Q    So you are treating them as one single account.

8  A    All of those accounts, correct.  Well, not treating them

9  as one account; I'm calculating a return across all of them

10 combined.

11 Q    For example the 1,788 percent return is a return by

12 looking at all of these accounts, correct?

13 A    That's right.

14 Q    Now, finally, here you have -- you testified, I believe,

15 that this 45 percent return is just for the January through

16 May period, correct?

17 A    That's right.

18 Q    So had you annualized that return to make it a full year,

19 you agree that would have been somewhere over 100 percent,

20 correct?

21 A    If annualize it, it would be over a hundred.

22        THE COURT:  Do you have water there, Mr. Mayer?

23        THE WITNESS:  I do.  Thank you very much.

24        THE COURT:  Okay.

25 Q    I would like to go back to slide eight and nine.

Mayer - Cross - Gopstein                2852

1          Now, and you testified to these on direct, and I

2    believe your testimony was that there was some relationship

3    between upload time and first order time in both of these,

4    correct?

5    A    In both periods, right.

6    Q    Now, just to be clear, Mr. Mayer, this slide contains no

7    p-value analysis of the relationship between upload time and

8    trade time, correct?

9    A    It doesn't show it, but it was statistically significant

10   in both.

11   Q    It's your testimony that you conducted a p-value analysis

12   between -- during the un-accused trading period?

13   A    Yes.  We ran the same statistical analysis and it came up

14   as statistically significant.  That's why we extended the time

15   period to capture more data and could get a statistically

16   significant result.

17   Q    Let's talk about extending the data.

18          You chose the factors that set the parameters for

19   this chart, correct?

20   A    No.  Dr. Canjels chose them.  I made one alteration to

21   the tame frame.

22   Q    The alteration you made was to add the time period

23   midnight to 9:30 a.m.; is that correct?

24   A    Yes.

25   Q    Now, turning down to the bottom of your slide where it

Mayer - Cross - Gopstein                    2853

1   says derivation --

2   A    Yes.

3   Q    -- you write here:  The graph only includes earning

4   trades that (1) were opened in 2009 and '10; (2) the opening

5   trade was on the same day as the press release upload; (3) the

6   opening trade occurred during regular trading hours between

7   9:30 a.m. and 4:00 p.m., correct?

8   A    Right.

9   Q    And that is a parameter that you set for this chart, yes?

10  Correct?

11  A    That's the same parameter that Dr. Canjels used on his

12  chart and I was adopting that.

13  Q    Well, on your chart, having created a window here between

14  zero and 9:30 a.m. on your chart, it's true, Mr. Mayer, that

15  based on the fact that your graph only includes trades between

16  9:30 and 4:00 p.m., it is literally impossible for there to be

17  a trade anywhere between zero and 9:30 p.m., correct --

18  9:30 a.m. based on what you chose for your chart, correct?

19  A    During normal trading hours, it would be impossible.  You

20  can trade before the market opens using -- there are -- you

21  can do outside normal trading hour trades, but that's not --

22  that wasn't my point.

23  Q    That wasn't my question, Mr. Mayer.

24       My question was:  Was the change that you made was

25  to add zero to 9:30 a.m. on your chart?  Yes or no.

Mayer - Cross - Gopstein                    2854

1    A    Yes.

2    Q    And you agree that you actually can't have any trades

3    below 9:30 a.m. because your chart shows trades starting at

4    9:30 a.m.

5    A    Yes, but you can have upload times, which is what I was

6    trying to capture.

7              (Short pause.)

8    Q    Showing you slide 11 of your deck which you testified to

9    on direct.

10             So here you are looking at non-earnings trade during

11   2011 to 2015 period; is that correct?

12   A    Relative to all trades, yes.

13   Q    On this slide, you are not drawing any comparison to the

14   unaccused period of 2009 to 2010, correct?

15   A    That's right.

16   Q    But from your view of the data, you know that 81 percent

17   of Mr. Korchevsky's trades during the unaccused period were

18   non-earnings, correct?

19   A    You asked me about that earlier.  I didn't run that, so I

20   don't know.  I need the database to do it.

21   Q    Showing you slide number 12 of your deck.  This is the

22   slide where you show that Mr. Korchevsky's earnings trades

23   more frequently use stocks than options during the accused

24   period, correct?

25   A    That's correct.

1  Q    And, again, you did not draw a comparison to the
2  unaccused period for Mr. Korchevsky's option use, correct?
3  A    I didn't.
4  Q    Now, you would agree, Mr. Mayer, that if an investor
5  knows earnings information before that information is public,
6  he may not know for sure what direction the price will go,
7  correct?
8  A    That's true.
9  Q    Sometimes a stock will go up even though an earnings
10 surprise is in the negative direction, correct?
11 A    It happens.  It's rare, but it happens.
12 Q    Sometimes the opposite will happen, correct?
13 A    It can, right.
14 Q    And even if an investor is correct, and I think your term
15 is "betting" which way the stock will go, he may not know by
16 how much the stock will either increase or decrease, correct?
17 A    Right.  That's true.
18 Q    And you would agree that this determination, based on
19 earnings information, is more complicated than, for example,
20 if an investor had specific nonpublic information about a
21 company's upcoming merger, correct?
22 A    It's more complicated to interpret, you mean?
23 Q    Just more variables, correct?
24 A    I -- I can agree with that.
25 Q    You would also agree that there are a lot of factors that

Mayer - Cross - Gopstein                    2856

1   go into whether an individual is going to buy stocks or

2   options or other securities, correct?

3   A    A lot of factors?

4   Q    A lot of things to consider when deciding whether to buy

5   a stock or an option or some other security.

6   A    Yes.

7   Q    So that decision could be influenced by how much

8   information you actually have that's not public, correct?

9   A    That can be one factor.

10  Q    Another factor can be how much time you have to analyze

11  that information, correct?

12  A    Sure.

13  Q    Another factor could be how many other trades you are

14  trying to make at the same time, correct?

15  A    If it's -- if it's late in the day, are you asking me,

16  or --

17  Q    Just in general.

18       If you are trying to make 12 trades, you may want to

19  consider that as opposed to if you are just trying to make one

20  trade, correct?

21  A    I suppose it could be a factor.

22  Q    You consider the expected profit that you would associate

23  with each trade when deciding whether to buy a stock or an

24  option or some other form of security, correct?

25  A    Yeah.  I would characterize it as degree of profit

Mayer - Cross - Gopstein                    2857

1  probably, because it's very difficult to predict exactly what

2  profit is unless you are doing certain kinds of option

3  trading.

4  Q    I think you testified that you testified in a number of

5  cases involving allegations of trading on -- of a list of

6  trading or trading on material of nonpublic information,

7  correct?

8  A    You are asking me if I have --

9  Q    You have done that before --

10  A    Yes, I have.  Yes.

11  Q    And so you would agree that going from trading on

12  non-options at all to solely options, if you were an

13  individual who is trading on material nonpublic information,

14  that's something you may not want to do, correct?

15          MR. HEALY:  Objection.

16          THE COURT:  Do you understand the question, Doctor?

17          MR. GOPSTEIN:  I'll rephrase it.

18  Q    Do you agree, much more simply -- I apologize.  If you

19  understand the question, go ahead.

20  A    No.  I'm sorry.  It would help if you can rephrase.

21  Q    Based on your experience, individuals who are trading on

22  material nonpublic information take steps to not be detected,

23  correct?

24  A    I -- I have said that, yes.  I agree with that.

25  Q    And one way for individuals who are trading on material

Mayer - Cross - Gopstein                    2858

1   nonpublic information take steps to not be detected by

2   sometimes not maximizing the investments they make, correct?

3   A    That's true.

4         (Short pause.)

5   Q    Showing you slide 14 of your slide deck.  This is the

6   slide titled:  Mr. Korchevsky made earnings trades in the

7   opposite direction of the earnings surprise 2011 to 2015.

8         This is where you noted that he traded in the

9   opposite direction of an earnings surprise 30 percent of the

10  time, correct?

11  A    That's right.

12  Q    So that means, according to your slide, that

13  Mr. Korchevsky traded in the same direction as the earnings

14  surprise seven out of ten times, correct?

15  A    That's right.

16  Q    Now, do you agree that the information in earnings

17  surprise is not public until that information is announced,

18  correct?

19  A    Yes.

20  Q    Again, just to be clear, in this slide, you have no

21  statistical analysis of whether there's any correlation

22  between Mr. Korchevsky trading seven out of ten times in the

23  same direction as an earnings surprise, correct?

24  A    I haven't done a statistical analysis.  I think it would

25  be very difficult to do that.

1  Q    Now, this slide does not look at whether Mr. Korchevsky

2  made money by trading against an earnings surprise, correct?

3  A    It doesn't address whether he made money or not.

4  Q    But that data is included in the database that you

5  reviewed, correct?

6  A    Um, I -- we could filter for the ones that are opposite

7  and then look at the profitability.

8  Q    That is not something that you did as part of your work

9  in this case?

10  A    No.

11  Q    Turning to slide 15, this is the slide titled:  One-third

12  of Mr. Korchevsky's earnings trades had losses 2011 to 2015.

13          And so, Mr. Mayer, just like the last slide, this

14  means that two out of every three trades for the

15  four-and-a-half-year period that you reviewed were profits for

16  Mr. Korchevsky, correct?

17  A    Yes.

18  Q    And that's 67 percent profit rate resulted in over

19  $15 million, correct?

20  A    Across all of this trading it did, yes.

21  Q    And over 1600 percent return in just 4.5 years, correct?

22  A    I have a problem with the way he calculated return.  That

23  sixteen -- you are talking about that 1600 percent calculation

24  is not really a rate of return per se because it's -- it

25  doesn't take into account additions and withdrawals.

1  Q    Now, this slide does not compare Mr. Korchevsky's

2  earnings trade losses to the unaccused period, correct?

3  A    I'm sorry, could you repeat the question?

4  Q    This slide does not compare the losses that

5  Mr. Korchevsky had in the unaccused period to the accused

6  period, correct?

7  A    It's not comparing the periods, right.

8  Q    Based on your review, you know that Mr. Korchevsky lost

9  more than 50 percent of the time when trading on earnings

10 during the unaccused period, correct?

11 A    I don't know that.

12 Q    I believe you testified that your company, Charles

13 River & Associates has, to date, been paid $650,000 for its

14 work on this case?

15 A    Yes.

16 Q    And is there work that Charles River & Associates has

17 done that not yet has been paid?

18 A    Yes.  It's been a busy month.

19 Q    Approximately how much have you billed that has not yet

20 been paid?  "You," being Charles River & Associates.

21 A    I don't know.  We are in a billing cycle and I -- the

22 time is in the system and when I get the report, then I'll

23 bill it.  I don't know.  It's substantial, though.

24 Q    It's substantial?

25 A    It's substantial.

1  Q     You bill at an hourly rate, correct?

2  A     I do.

3  Q     What is your hourly rate in this case?

4  A     $840 an hour is what my company bills for my time.

5  Q     And that's the rate you are charging for your testimony

6  here today, correct?

7  A     Yes.

8            MR. GOPSTEIN:  Can I just have one moment, Your

9  Honor?

10            THE COURT:  Yes, sir.

11            (Short pause.)

12            MR. GOPSTEIN:  Your Honor, can we have a very brief

13  sidebar?

14            THE COURT:  All right.

15            (Sidebar.)

16            (Continued on next page.)

17

18

19

20

21

22

23

24

25

Sidebar                                              2862

1          (Sidebar conference held on the record out of the

2     hearing of the jury.)

3          MR. GOPSTEIN:  Your Honor, during the cross

4     examination, Mr. Mayer testified that he ran a p-value test

5     comparing the upload time to the distribution time.  That

6     analysis is not in his slide and has never been disclosed.

7     All that is in his slide is showing that 93 percent of the

8     trades happened within the window.  There has never been a

9     disclosure with regard to a p-value test, the slide doesn't

10    indicate it, so it is an entirely improper opinion based on

11    the disclosures that we have.

12         THE COURT:  Is there such a slide?

13         MR. BRILL:  We are not in possession of it, that's

14    for sure.

15         MR. HEALY:  I think that there is some -- his

16    initial testimony was that it was statistically significant.

17    He has been qualified as an expert in statistical analysis.  I

18    think the jury has been given a lot of information, so if

19    Mr. Gopstein feels that it would be terribly helpful for the

20    jury to know that the p-value was 1.2 versus what Mr. Canjels'

21    is, 0.6, I'm not sure that's helpful, but the fact of the

22    matter is, Your Honor, his testimony has been consistent with

23    his opinions; it has not been inconsistent.

24         MR. GOPSTEIN:  Your Honor, our expert did conduct a

25    p-value analysis and he found that there was a statistically

Sidebar                                    2863

1   significant relationship during the accused time and that

2   there was not a statistically significant relationship during

3   the unaccused time.  We now have an opinion that that had been

4   disclosed, and we don't have a basis to challenge it and we

5   ask to put on a rebuttal case in order to call our expert to

6   say that this is wrong.  There's no basis for the opinion.

7   This is the same issue.

8            THE COURT:  Just ask him.  He says he did the

9   analysis, but he has no slide?

10           MR. GOPSTEIN:  He has no slide.  Our expert went

11  into detail on what the p-value test was, that is a

12  complicated thing, it was disclosed months in advance, and we

13  had the slides and there's -- all they show is that the

14  time -- they don't -- there is no statistical analysis.

15           THE COURT:  I understand what you're saying.  Why

16  don't you elicit that and see if you can undermine what he's

17  saying?

18           MR. TUCKER:  Just before we go further, Judge,

19  Mr. Healy just stated then a number --

20           MR. GOPSTEIN:  Just for the record --

21           MR. HEALY:  No, no.

22           MR. TUCKER:  -- this witnesses's conclusion as to the

23  p-value?

24           MR. HEALY:  No, not at all.  That was an example I

25  was not -- I don't -- I'm not aware of --

Sidebar                                              2864

1          MR. TUCKER:  Nobody knows --

2          MR. HEALY:  Your Honor, just to be clear, this was

3     going on on cross-examination.  He did not state this on

4     direct that he conducted a p-value test.  He actually said it

5     was statistically significant.

6          THE COURT:  I think you should limit your

7     examination to the fact that he claims to have conducted a

8     p-value, he's aware of Dr. Canjels' p-value -- maybe he

9     isn't -- but he claims to have done one of his own, and leave

10    it at that.

11         MR. HEALY:  Your Honor, while we're here, we took

12    the Court's ruling to heart --

13         THE COURT:  I didn't make any ruling.

14         MR. HEALY:  Earlier -- and did not ask what was the

15    opinion you concluded by doing your comparison of the

16    inconsistencies with the option trading.  I feel Mr. Gopstein

17    has now opened the door.

18         THE COURT:  Nonsense.  Let's go.

19         (Sidebar concludes.)

20         (Continued on next page.)

21

22

23

24

25

Mayer - Cross - Gopstein                    2865

1          THE COURT:  The jurors are having trouble hearing

2     you.  Please speak into the microphone.

3          THE COURTROOM DEPUTY:  Project your voice.

4          THE WITNESS:  I will do my best.  I'm sorry.

5          THE COURTROOM DEPUTY:  And I'm going to ask the

6     jurors, if you can't hear, just raise your hand so we'll know

7     that you're having a problem hearing.

8          Thank you.

9          MR. GOPSTEIN:  May I proceed, Your Honor?

10         THE COURT:  Go ahead.

11    BY MR. GOPSTEIN:

12    Q    You testified earlier on cross-examination that you ran a

13    p-value analysis comparing upload times and trade times; is

14    that correct?

15    A    Well, I ran a statistical analysis.  I know it was

16    statistically significant, so that means we had a p-value,

17    yes.

18    Q    Did you or did you not --

19    A    I didn't personally run it.  My team ran the statistical

20    analysis and found out it was statistically significant.  I

21    didn't bother to look at the p-value, but that would have been

22    an output.

23    Q    Sitting here today, you don't know what the p-value is,

24    correct?

25    A    I know it's less than .05.

Mayer - Cross - Gopstein                    2866

1    Q     Did you ever share that with Mr. Korchevsky's counsel?

2    A     I told him the results.

3    Q     That's not included on your slide, correct?

4    A     No.

5              THE COURT:  What's that hum, Ali?

6              THE COURTROOM DEPUTY:  I'm trying to figure it out.

7    It sounds like it's coming from one of the speakers.

8    Q     Just to be clear, you said that the relationship was less

9    than.05?

10   A     Well, 95 percent statistical significance.

11   Q     That makes it statistically significant?

12   A     Right.

13   Q     Now, you testified that you have testified as an expert

14   in a number of cases involving allegations of trading on

15   material, nonpublic information, correct?

16   A     I have.

17   Q     And one of the things you have done in those cases is

18   compare an individual's rate of return to other benchmarks,

19   correct?

20   A     I have done that.

21   Q     So, for example, you have compared an individual's rate

22   of return to the rate of return on the S & P 500, correct?

23   A     I have.

24   Q     You did not do that in this case, correct?

25   A     I didn't.

1          MR. GOPSTEIN:  No further questions.

2          THE COURT:  Any redirect?

3          MR. HEALY:  Briefly, Your Honor.

4          THE COURT:  All right.

5   REDIRECT EXAMINATION

6   BY MR. HEALY:

7   Q    Hello again, Mr. Mayer.

8   A    Hello.

9   Q    Just a few questions to clarify some of the things you

10  spoke with Mr. Gopstein about.

11         You were asked about a number of your slides,

12  particular slides, whether you were filtering for earnings

13  trades versus all trades and vice versa.

14         Do you remember that?

15  A    Generally, yes.

16  Q    And one of them in particular concerned the rate of

17  return slide.

18         Do you remember that?  I can show you the slide.

19  A    Yeah, the one by year.

20  Q    It was this slide.  Do you remember answering some

21  questions about this slide?

22  A    I do.

23  Q    And do you remember Mr. Gopstein saying this was his

24  total rate of return, not his rate of return on earnings only,

25  correct?

Mayer - Redirect - Healy                    2868

1   A    That's right.

2   Q    And he asked you if you could have filtered for that,

3   correct?

4   A    Yes.

5   Q    I'm going to show you Dr. Canjels' slide, which you

6   discussed around your slide.

7         Do you remember that on direct testimony?

8   A    I do.

9   Q    Do you have an understanding as to whether or not this

10  slide represents total rate of return or just on earnings?

11  A    These are the cumulative profits on all trades, not just

12  earnings.

13  Q    You were asked a number of questions about your scatter

14  charts on cross-examination.

15        Do you remember that?

16  A    I do.

17  Q    And you were asked questions about the number of trades

18  that were made before two o'clock in the unaccused period.

19        Do you remember that?

20  A    I do.

21  Q    And do you remember testifying that there were only

22  seven?

23  A    On the chart.

24  Q    Do you know how many data points there are on this chart,

25  Mr. Mayer?

1  A     Something in the fifties, I think.  I'm not exactly sure

2  of the number.  Sixties?  I'm not sure.

3  Q     Would it surprise you to know there's 57?

4  A     That sounds about right.

5  Q     And then on the scatter chart for the accused period of

6  time, Mr. Gopstein pointed out that there were, I believe, 147

7  trades before two o'clock.

8              Do you remember that?

9  A     He gave me those numbers, yes.

10  Q     And would it surprise you to know that there are over 717

11  trades reflected in this chart?

12  A     There's more than that, but yes.

13  Q     By the way, Mr. Mayer, did you plot all the earnings

14  traded in the unaccused period on this?

15  A     I plotted all the earnings trades for which we had upload

16  times.

17  Q     Were there trades that you didn't have upload times?

18  A     Yes.  A large number in the database we were provided by

19  the government did not have upload times, so I plotted

20  everything that there was.

21  Q     And those upload times refer to the press releases from

22  those three newswires:  PR Newswire, Business Wire,

23  Marketwired.

24  A     That's right.

25  Q     And how many of those three did you not have upload times

Mayer - Redirect - Healy                    2870

1  for?

2  A    I don't know the number off -- it was a lot.  There were

3  a lot of trades that I didn't know.

4  Q    Would it surprise you to know that there were almost 50

5  trades that you did not have upload times for?

6  A    That doesn't surprise me.

7  Q    And none of those are reflected on this chart.

8  A    That's right.

9  Q    And, finally, you were asked about extending the time

10 period back to midnight on the same day rather than 9:30 a.m.

11         Do you remember those questions?

12 A    I do.

13 Q    And did you compare your analysis of your scatter chart

14 with Dr. Canjels' own scatter chart?

15 A    I did.

16 Q    And did it change his conclusion when you added those

17 additional trades?

18 A    No.  It was still highly statistically significant.

19 Q    When you said to Mr. Gopstein that you extended it back

20 to include more data, was part of the reason for that because

21 you didn't have data on 49 trades?

22 A    It -- I didn't have upload times in the '09, '10 period

23 for a lot of data points and I wanted to capture as many data

24 points as I could.

25         MR. HEALY:  Thank you.  Nothing further.

Proceedings                                        2871

1          THE COURT:  Anything else, Mr. Gopstein?

2          MR. GOPSTEIN:  Nothing further.  Thank you, Your

3   Honor.

4          THE COURT:  The witness can step down.

5          (Witness excused.)

6          THE COURT:  Next witness.

7          MS. BRILL:  The defense calls Alekander Sipko.

8          (Short pause.)

9          (The witness takes the stand.)

10          THE COURTROOM DEPUTY:  Good morning, sir.

11          THE WITNESS:  Good morning.

12          THE COURTROOM DEPUTY:  Good afternoon.

13          I'm going to ask you, sir, to please take the stand

14   and raise your right hand.

15   **A L E K A N D E R   S I P K O,**

16          called as a witness, having been first duly

17          sworn/affirmed, was examined and testified as.

18          follows:

19          THE WITNESS:  Yes, I promise.

20          THE COURTROOM DEPUTY:  Thank you.  Please have a

21   seat.

22          State and spell your name for the record.

23          THE WITNESS:  My name is Alekander, last name Sipko,

24   S-I-P-K-O.

25

Sipko - Direct - Brill                    2872

1   DIRECT EXAMINATION

2   BY MS. BRILL:

3   Q    Mr. Sipko, I'm going to ask you a couple questions,

4   first, about your background.

5            Where are you from?  Where were you born?

6   A    I was born in Russia.  Siberia home city.

7   Q    And how long did you stay in Siberia, Russia?

8   A    Twenty-two years.

9   Q    Thirty-two years?

10            THE COURT:  Twenty-two years.

11   Q    Twenty-two years.

12            Forgive the question.  How old are you now?

13   A    Sixty-eight.

14   Q    And did you study in those 22 years in Siberia?  What did

15   you study, if so?

16   A    I'm study school and to medical institute.

17   Q    And did you also work in Siberia?

18   A    I work in some business that's fabric.

19            THE INTERPRETER:  Factory.

20   A    A factory, yeah.

21   Q    Would you rather testify all in Russian and have it

22   translated?

23   A    Okay.  Yes, better translation.

24   Q    Did there come a time, I guess, when you were 22 years

25   old that you moved from Siberia?

Sipko - Direct - Brill                    2873

1    A    Yes.

2    Q    Where did you go?

3    A    I moved to Kazakhstan, Almaty.

4    Q    And what did you do when you were in Kazakhstan?

5    A    In Kazakhstan, I spent a little over a year, I got

6    baptized there, and then I moved to Frunze where I met my

7    future wife.

8    Q    And is that also in Kazakhstan, or is that in Kyrgyzstan?

9    A    Kyrgyzstan, Frunze.

10   Q    You mentioned getting baptized.  Did you eventually

11   obtain other positions in the church?

12   A    In Frunze, I was actually invited to serve the church.

13            MS. BRILL:  Can I ask the translator to speak more

14   loudly, because I can hear the witness speaking in Russian,

15   but I can't hear the translator speaking in English.

16   A    In Frunze, I was invited to serve in the church.

17   Q    Do you mean serve the church as a pastor?

18   A    Further down the road in 1978, I was promoted to pastor.

19            THE INTERPRETER:  Can you hear me?

20            MS. BRILL:  I'm sorry, I can't hear the translation.

21   It's not coming all the way back here.  Perhaps the Court can

22   ask the jury as well.

23            THE COURTROOM DEPUTY:  Try to keep it here.

24            THE COURT:  Hold it up.  Hold it right there.  Right

25   there.

Sipko - Direct - Brill                                    2874

1          THE INTERPRETER:  That's what I was doing.

2          THE COURTROOM DEPUTY:  It's getting distorted.

3          THE COURT:  Put a little gusto in it.

4          MS. BRILL:  We are all going to speak with gusto.

5    Q     So you became a pastor, you said, in 1976 or '77?

6    A     '78.

7    Q     And that would be in Kyrgyzstan?

8    A     That was Bishkek, Kyrgyzstan.  It used to be Frunze, but

9    then it became Bishkek.

10   Q     And what church were you baptized in, and what church did

11   you become a pastor for?

12   A     The Baptist Church of Almaty.

13   Q     And does the process of becoming a pastor require that

14   you be accepted by the congregation?

15   A     Undoubtedly, I have to be a member of that church.  The

16   church vets me and then can offer for me to become pastor is

17   decided by the church.

18   Q     And "by the church" -- you said it's decided by the

19   church.  You mean the congregation in the church.

20   A     Yes.

21   Q     And we see you are here today, Pastor Sipko, so did there

22   come a time when you moved from Kyrgyzstan to the United

23   States?

24   A     In 1993.

25   Q     So were you a pastor in Russia from 1978 to 1993?

1    A    Yes.

2    Q    And when you came to the United States, where did you

3    come to?

4    A    My first place of residence in the U.S. was Kansas City,

5    Missouri.

6    Q    How long did you stay in Kansas City?

7    A    One year.

8    Q    And then where did you move to?

9    A    Spokane, Washington.

10   Q    Are you still in Spokane, Washington now?

11   A    Yes.  That's where I live now.

12   Q    Since about 1995?

13   A    Yes.

14   Q    Did you come all the way from Spokane, Washington here to

15   Brooklyn today?

16          THE COURT:  As opposed to appearing in spirit or

17   what?

18   Q    Did you travel from Spokane to come to Brooklyn?

19   A    Yes, traveled all the way from Spokane.

20   Q    And at this time, do you do anything else besides -- are

21   you a pastor in Spokane?

22   A    Yes, I'm pastor of this church in Spokane, which actually

23   lists 1,000 members in the congregation.

24   Q    Do you hold any other position in the Slovak Baptist

25   Church besides being the pastor of your church in Spokane?

Sipko - Direct - Brill                    2876

1  A    I was president of the Northwestern Alliance.  A few

2  years ago, I surrendered that position, but now I am president

3  of the Alliance of the Slovak Churches of Canada and the U.S.

4  Q    So I understand that you were president of the West Coast

5  Alliance for some time; is that right?

6  A    That's correct, yes.

7  Q    And now you are the president of the alliance between the

8  United States and Canada.

9  A    That's correct.

10  Q    And up until about -- when did you become the president

11  of the alliance between the United States and Canada?

12  A    Approximately ten or twelve years ago.

13  Q    And when you became the president of that alliance

14  between the United States and Canada, who was the vice

15  president of that alliance?

16  A    At one time, that used to be Vitaly Korchevsky.

17  Q    Did that time end in 2015?

18  A    Correct.

19  Q    So we mentioned Vitaly Korchevsky.  How do you know

20  Vitaly Korchevsky?

21  A    I have known Vitaly Korchevsky since my time in

22  Kyrgyzstan.  His parents were members of the church where I

23  was pastor, I know his family very well, and then they moved

24  away from Kyrgyzstan.

25  Q    And was Mr. Korchevsky a boy when they moved away from

1   Kyrgyzstan?

2   A    He was about 11 years old when they moved.

3   Q    And did you come to meet him again after he moved away

4   from Kyrgyzstan and you moved away from Kyrgyzstan?

5   A    Yes, we met here in America.

6   Q    About when was that?

7   A    We met in 2003 again, and after that, we had a period of

8   cooperation.

9   Q    And is it fair to say that you met in 2003 because you

10  were the president of the West Coast chapter?

11  A    Yes.

12  Q    And when you met in 2003, Mr. Korchevsky became the

13  president of the East Coast chapter?

14  A    Yes, that's correct.

15  Q    And is it also fair to say that in the years afterwards

16  you also shared those -- you held those positions of president

17  and vice president of the American/Canadian alliance as well,

18  right?

19  A    Yes, this is correct.

20  Q    So when you came to know him over the course of the

21  years -- came to meet with him together over the course of the

22  years after that, about how many times a year would you meet

23  together?

24  A    The year differs from another year, but two, three times

25  a year.

1    Q    Two, three times a year.

2         In the course of the two, three times a year, we are

3    talking now from about approximately 2005 to 2015, right?

4    A    Yes.

5    Q    Did you come to know about Mr. Korchevsky's activities on

6    behalf of the Slovak Baptist Church?

7    A    Undoubtedly since we have been working together.

8    Q    And did you also come to know of his travels on behalf of

9    the Slovak Baptist Church?

10   A    Yes.  I've known that he's been traveling a lot.

11   Q    And in the course of those travels on behalf of the

12   church, did he have occasion to travel to the republics of

13   what we call the former Soviet Union?

14   A    The former Soviet republics used to invite him.

15   Q    I'm sorry, I didn't hear that.

16   A    The former Soviet republics used to invite him over.

17   Q    They used to invite him over.

18        And he traveled there as well, right?

19   A    Yes.  Upon invitations, he used to travel there to serve.

20   Q    Do you know in the course of your relationship with him

21   that he traveled to Moscow in order to do that?

22   A    He used to be in Moscow for the same purposes.

23   Q    And Kiev?

24   A    Yes, in Kiev, I'm aware of that.

25   Q    And other cities in what we call the former Soviet Union?

Sipko - Direct - Brill                    2879

1    A    That's correct, yes.

2    Q    And did he also travel and speak to groups in the United

3    States as well?

4    A    Yes.  He was traveling around the United States to speak

5    upon invitations from churches and alliances.

6    Q    And last question about all of that.

7              When he did all that traveling and all that

8    speaking, did he also speak to youth groups?

9    A    Yes.  He was invited a few times to speak in front of the

10   youth audiences because he taught the young people, and I was

11   witness to him saying to them that they should work, study,

12   were good taxpayers, paid taxes so that nothing is withheld

13   from the government, and for them to be obeying citizens.

14   That's why we used to invite him.

15   Q    I'm going to ask you some questions now about his

16   reputation in that Slovak Baptist community that we have just

17   been speaking about.

18             Let me ask you a question:  First of all, it sounds

19   like he's well known in that worldwide community, correct?

20   A    Yes, he was well known because he used to be invited and

21   he brought the good to the youth.

22   Q    And you are familiar with his reputation in that

23   worldwide community, right?

24   A    Undoubtedly so, I know about his reputation.

25   Q    And what is his reputation with respect to his honesty?

1    A    To me, I have --

2    Q    Not to you.  To the community.  I'm sorry.

3    A    Same to the community.

4    Q    Okay.

5         So in the community, what was his reputation for

6    honesty?

7    A    He has always been speaking in favor of being honest, and

8    when he used to have speaking engagements, he was starting

9    with a phrase that in the first place, we need to be honest in

10   everything we do.

11   Q    Does he also have a reputation in following the rules and

12   following the laws?  You seem to have spoken to that already.

13   A    Correct.

14   Q    What is his reputation within the community for being

15   accountable and transparent to the community?

16   A    When he was traveling to the former Soviet republics and

17   was coming back, he would almost always report or get

18   debriefed at the committee about his trip, and I would always

19   ask him to make a report at exactly what churches he went to

20   and what he exactly did there.

21   Q    And was he accountable to you and that alliance?

22   A    Accountable to the alliance, to the committee, and

23   certain things he personally conveyed to me.

24   Q    And so I'm going to ask you your personal opinion of his

25   honesty and trustworthiness and law-abidingness.

Sipko - Direct - Brill                      2881

1   A    My personal opinion is of highest esteem.  I have always

2   considered and continue to consider him an honest man,

3   truthful, and someone who has lived in this country, always

4   paid taxes, and have always taught to the churches where he

5   was invited during the course of that time.  I think it's the

6   most important quality in any person, to be honest and to be

7   truthful.

8   Q    And what about his behavior towards others?

9   A    Let me tell you, I think he's the man of great patience.

10  He's never too fast to somehow give opinion about other people

11  and he lives by the word of God; that is to live every

12  person -- to love every person.  That's his quality too.

13            MS. BRILL:  And I heard the second word, but I

14  didn't hear the first word.  So something every person and to

15  love every person.  What was the first --

16            THE INTERPRETER:  To love every person.

17            MS. BRILL:  Before that.

18            THE INTERPRETER:  Scratch that.

19            MS. BRILL:  Oh, okay.  Just to love every person and

20  that means to be generous to every person.

21            THE INTERPRETER:  Right.

22  A    I can also add that Vitaly is also someone who is

23  compassionate toward other people and he feels for people.  I

24  know he has contributed a lot of his own personality into

25  being a servant --

Sipko - Cross - Nestor                    2882

1           THE COURT:  Let's wait for it.

2           Are there any other questions?

3           MS. BRILL:  There are no other questions.

4           THE COURT:  Thank you.

5           MS. NESTOR:  Just briefly, Your Honor.

6           THE COURT:  Okay.

7    CROSS-EXAMINATION

8    BY MS. NESTOR:

9    A    Good afternoon.

10   Q    My name is Julia Nestor and I'm an Assistant United

11   States Attorney here in the Eastern District of New York.

12           On direct examination, you had spoken about

13   Mr. Korchevsky's taxes.

14   A    Yes.

15   Q    You have personally never reviewed Mr. Korchevsky's

16   taxes, correct?

17   A    I have not worked in organizations that can review taxes.

18   I have always trusted him as I would trust myself.

19           THE COURT:  Next question, please.

20   Q    The answer is no?  The answer is no?

21   A    No.

22   Q    Would it surprise you to learn that Mr. Korchevsky didn't

23   disclose some of the earnings on his taxes?

24           MR. BRILL:  Objection.

25           THE COURT:  I will allow it.

Sipko - Cross - Nestor                    2883

1  A    As of now, I'm quite confident that he has always settled

2  his tax payments with the government and has always been a

3  good taxpayer.

4  Q    Would it surprise you to learn that Mr. Korchevsky had

5  money outside of the United States that he didn't disclose?

6              MR. BRILL:  Objection.

7              THE COURT:  Overruled.

8  A    I don't believe that that would be personal money that he

9  would hold outside of the United States.  I know that he has

10  helped people a lot outside of the United States --

11  Q    I will ask you to answer my question, please.  Please

12  answer my question.

13             Would it surprise you to know -- would it surprise

14  you to know that Mr. Korchevsky had money outside of the

15  United States in bank accounts?

16  A    I would be surprised.  I don't believe that.

17  Q    So it would surprise you.

18             Now, you have also talked about Mr. Korchevsky's

19  activities on behalf of the church; is that correct?

20  A    Yes.

21  Q    You are not familiar with Mr. Korchevsky's activity in

22  his trading businesses, correct?

23  A    No, I'm not familiar with that.  I'm not aware.

24  Q    You don't know what NTS Capital is, correct?

25             THE INTERPRETER:  Can you repeat that?

Sipko - Cross - Nestor                      2884

1              MS. NESTOR:  Sure.

2   Q    You don't know what NTS Capital is, correct?

3   A    No.

4   Q    You don't know what SNT Capital is, correct?

5   A    I don't know.

6   Q    You don't know what AWD is, correct?

7   A    No.

8              MS. NESTOR:  No further questions, Your Honor.

9              THE COURT:  Anything else?

10             MS. BRILL:  No, Your Honor.

11             THE COURT:  Thank you, sir.  You may step down.

12             (Witness excused.)

13             MR. BRILL:  At this time, Vitaly Korchevsky rests.

14             THE COURT:  Ladies and gentlemen, Mr. Korchevsky has

15   concluded the presentation of evidence.  In his defense, we

16   turn now to Ms. Whalen.

17             Ms. Whalen?

18             MS. WHALEN:  Thank you, Your Honor.

19             Your Honor, at this time, we would like to read a

20   stipulation into evidence.

21             THE COURT:  Go ahead.

22             MS. WHALEN:  It's Defense Exhibit KHAL-V KKK, and it

23   reads:  It's hereby stipulated and agreed by and between the

24   undersigned parties that if called as witnesses at trial,

25   interpreters with expertise in translating Russian to English

Proceedings                                        2885

1   and Ukrainian to English would testify as follows:  The

2   Khalupsky defense exhibits listed in Attachment A to this

3   stipulation contain fair and accurate Russian to English and

4   Ukrainian to English translations.  This stipulation and the

5   English translations contained in the defense exhibits

6   referenced in Attachment A are admissible as evidence at

7   trial.

8              And it's signed by all the parties.

9              THE COURT:  So stipulated?

10             MR. TUCKER:  Yes, Your Honor.

11             THE COURT:  Mr. Brill?

12             MR. BRILL:  Yes, Your Honor.

13             THE COURT:  It is received in evidence.

14             (Defendants' Exhibit KHAL-V KKK was received in

15   evidence.)

16             MS. WHALEN:  With that, Mr. Khalupsky rests.

17             THE COURT:  Ladies and gentlemen, Mr. Khalupsky has

18   concluded the presentation of evidence.  At this point, I need

19   to recess for just a couple of minutes and speak with counsel.

20   We will resume in just a few minutes.  Please step inside and

21   do not discuss the case.

22             THE COURTROOM DEPUTY:  All rise.

23             (Jury exits.)

24             (Continued on the following page.)

25

Proceedings                                              2886

1          THE COURTROOM DEPUTY:  All rise.

2          (Jury exits the courtroom.)

3          (The following matters occurred outside the

4     presence of the jury.)

5          THE COURT:  Please be seated everyone.

6          Counsel, I am going to inquire briefly of your

7     clients.  Mr. Korchevsky, Mr. Khalupsky, I am sure you are

8     well aware, the decision whether or not to testify is yours

9     to make, not Counsels'.  You have an absolute right to

10    testify in your own defense and the decision of whether or

11    not to offer testimony is your personal decision, one,

12    obviously, you make with the assistance and the guidance of

13    counsel.

14         Do you understand that, gentlemen?

15         MR. KORCHEVSKY:  Yes.

16         MR. KHALUPSKY:  Yes.

17         THE COURT:  And you have had an opportunity to

18    discuss this with your counsel?

19         MR. KORCHEVSKY:

20         MR. KHALUPSKY:  Yes.

21         THE COURT:  And knowing that, it is your decision

22    not to offer testimony in your defense --

23         MR. KORCHEVSKY:  Yes.

24         THE COURT:  -- am I correct?

25         MR. KHALUPSKY:  Yes.

Proceedings                                          2887

1          MR. KORCHEVSKY:  Yes, Your Honor.

2          THE COURT:  All right.  We will momentarily have a

3    draft charge for you.  Why don't you wait for that, and I

4    then give you an opportunity to have some lunch.

5          MR. TUCKER:  That makes sense, Your Honor.  Just

6    one point:  The Government will seek the Court's leave to

7    present about extraordinary brief rebuttal case.  That

8    rebuttal case will be Dr. Canjels testifying specifically as

9    to the P Value Analysis that he conducted during that

10   unaccused period from 2009 to 2011.  We have estimate the

11   testimony will take no more than five -- longer than ten

12   minutes.

13         THE COURT:  Did he not testify to it during his

14   direct?

15         MR. TUCKER:  No, Your Honor.

16         THE COURT:  Okay.

17         MR. TUCKER:  It will be extremely brief.  We'll be

18   ready to go in a few minutes, Your Honor.  So we, obviously,

19   want to try to do this today --

20         THE COURT:  Do you have him here?

21         MR. TUCKER:  Yes, Your Honor.

22         MR. HEALY:  Just to be clear, we have not received

23   that P Value Analysis on that period of time, so...

24         THE COURT:  Well, understandably because it came

25   up first during the course of your examination.

Proceedings                                    2888

1          Do you have any paperwork to share with counsel?

2          MR. TUCKER:  We're pulling it now, Your Honor.

3          THE COURT:  Do that, and when you are ready, let

4  Ellie know and we will assume with that.  In the meantime,

5  we will get your charge.

6          MR. TUCKER:  Thank you, Your Honor.

7          (Pause in proceedings.)

8          MR. BRILL:  Your Honor, just a couple of things,

9  if you don't mind?

10         I mean first of all, as Your Honor sees, it's

11 12:55.  We're just getting this exhibit now.  Our expert who

12 testified this morning has left the building, but we're

13 trying to get him on the phone and deal with this exhibit

14 with him.  And just in terms of fairness, given at this

15 point, we're seeking the Court's approval to have -- if

16 they're going to put on a rebuttal case, put it on at 2:00

17 so we can discuss this new exhibit with our expert witness.

18 That's number one.

19         THE COURT:  I can't -- you use the word

20 "fairness."  You know, I have been extending myself back and

21 forth and back and forth.  I kind of resent it.

22         MR. BRILL:  Well, there's no dispute on that,

23 Your Honor.

24         THE COURT:  Fairness?

25         MR. BRILL:  I'm not speaking about Your Honor's

Proceedings                                            2889

1  fairness.  I'm just speaking in terms of this, we're getting

2  an exhibit now at five minutes 'til 1:00, and it seems to us

3  that we should have an opportunity to have our expert --

4          THE COURT:  Well, you let you expert go.

5          MR. BRILL:  Well...

6          THE COURT:  Where is he?

7          MR. BRILL:  He's local but he left the building,

8  and it's --

9          THE COURT:  Well, I am not going to wait forever.

10 So we'll take a lunch break, and he better be ready by

11 2 o'clock.

12         MR. BRILL:  Understood.

13         The second thing, Your Honor.  We were told that

14 Dr. Canjels' conducted -- we have an exhibit, but we were

15 told that there is an underlying test that Dr. Canjels did,

16 at least that is my understanding with respect to the

17 P Value.  We don't have that.  So we request that as well,

18 unless I'm not understanding.

19         MS. NESTOR:  I don't -- I don't -- Your Honor, I'm

20 speaking from my understanding, and I will confirm this, but

21 my understanding is the text is actually reflected on the

22 slide as it was in Dr. Canjels' initial slide for the

23 "obtuse" period, as we've been calling it.

24         MR. BRILL:  The Government made a big deal about

25 what we had in terms of our preparation -- or what Mr. Mayer

Proceedings                                2890

1    had in terms of our preparation of the P Value test, and

2    they made the request for that -- we didn't have it in our

3    possession, but they made the request and then asked that

4    the testimony be precluded with respect to that because they

5    weren't provided with it, it seems what's good for the goose

6    is good for the gander.  If they had possession of

7    underlying work done by Dr. Canjels in order for him to come

8    to this conclusion, we are now making that same request that

9    they made of us.

10             MS. NESTOR:  Just to be clear, Your Honor, you

11   will be assured that any underlying work is produced, but

12   our objection was the fact that we were never provided the

13   actual P Value --

14             THE COURT:  I understand.

15             MS. NESTOR:  -- test.

16             THE COURT:  I understand your objection.

17   2 o'clock.

18             MS. NESTOR:  Thank you, Your Honor.

19             THE COURT:  You will give them whatever you have.

20             MR. BRILL:  Would the Court mind if I bring up

21   another issue at this point, or do you want to wait until

22   2:00?

23             THE COURT:  No, I would rather hear it now.

24             MR. BRILL:  Okay.  So we will just reiterate our

25   objection with respect to Ms. Nestor's questions of the last

Proceedings                                      2891

1   character witness, and the reason is this:  We have -- I

2   understand that's in general when one is questioning a

3   character witness that there are certain questions that are

4   permissible in order to explore the -- the testimony and the

5   credibility of that character witness.  I don't dispute that

6   rule.  What I'm disputing is that in this -- with respect to

7   the nature of the question, essentially that are accusations

8   that are -- serious acquisitions that are built into those

9   questions that we are not aware of.  And so while the

10  question in general might be in general --

11           (Pause in proceedings.)

12           THE COURT:  I'm sorry.  Go ahead.

13           MR. BRILL:  That's okay.

14           So in general, Your Honor, while a question like

15  that in the entire universe may be permissible, we are

16  seeking an offer of proof from the Government as to what is

17  their basis to essentially within that question make an

18  accusation that, indeed, there was some tax evasion issue or

19  that Mr. Korchevsky had money in an overseas account.

20  That's not part of this case, and I don't see it in the

21  three to four 4 terabytes of information that we got from

22  the Government.  So my request, respectfully, is that at

23  this point, the Government should provide that offer of

24  proof, or if they don't, then I would respectfully ask that

25  the Court strike that particular testimony and instruct the

Proceedings                                          2892

1    jury that they should disregard it in their evaluation of

2    the credibility of the character witness.

3         MR. TUCKER:  Sure, Your Honor, so the two points:

4    First with respect to the tax evasion point, it is in the

5    record for purposes of this trial already that

6    Mr. Korchevsky never collected any wages, never reported, I

7    should say, any wages during the 2011 to 2015 period.

8    That's obviously significant because, as I understand the

9    defendants' theory of the case, he was lawfully employed

10   working for the Dubovoys, as far as he knew.  So the fact

11   that he never reported any of those purportedly lawful

12   earnings is certainly fair grounds for cross-examination,

13   presumably since on direct examination, the witness kept

14   volunteering that Mr. Korchevsky was honest in his tax

15   returns, sort of in a nonsequitur and fully

16   apropos-of-nothing way.

17        With respect to the Mexican bank account, I think

18   counsel is mistaken.  The Government disclosed a number of

19   emails referencing a Mexican bank account, and just for the

20   record I'll read a few of those:  Government's Exhibit 306,

21   Government's Exhibit 344 are two examples of that.

22        But also, Your Honor, in these emails, in

23   Mr. Korchevsky's own emails, 307 is another example, in

24   Mr. Korchevsky's own emails, there is reference to the fact

25   that Mr. Korchevsky owned property in Mexico, and that he

Proceedings                              2893

1  was warned at one point that he had to -- I'll just read

2  from the email.  This is an email dated September 7, 2013:

3  Vitaly, there is a new law to prevent money laundering in

4  Mexico that came into effect in September 2013.  It is very

5  important that you get an accountant; otherwise, the Mexican

6  IRS will expect you to pay 32 percent taxes on all income

7  sitting in your account.

8           So Mr. Korchevsky was warned by his tax accountant

9  in the United States and by the property manager for his

10  property in Mexico that he has a Mexican account that he

11  would need to report, and he never reported that.  That's

12  certainly a fair gain -- that's certainly a good-faith basis

13  to ask the witness about that given that he volunteered all

14  of this knowledge and opinion about Mr. Korchevsky's

15  following tax laws.

16          THE COURT:  The question, if I recall it

17  correctly, was whether or not the witness was aware that

18  Mr. Korchevsky had money outside the United States?  As to

19  that question, I do not have any difficulty.

20          As to the earlier, I realize I do.  You're

21  heading --

22          MR. TUCKER:  I'm sorry, Your Honor, I'm just

23  listening.

24          THE COURT:  Okay?  Because it involves a whole

25  permutation about taxes and so forth that we did not declare

Proceedings                                    2894

1   wages.  I don't like it.  It is risky business.  I do not

2   think this is an unfair question.  I just do not think it

3   should be in the record.  I am going to strike it.  End of

4   discussion.

5             MR. TUCKER:  Thank you, Your Honor.

6             THE COURT:  Thank you.  2 o'clock.

7             (Lunch recess AT 12:27 p.m.)

8             (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Canjels - Direct Rebuttal - Gopstein            2895

1            A F T E R N O O N   S E S S I O N

2                    --ooOoo--

3          (Whereupon, the witness resumes the stand.)

4          (Jury enters the courtroom.)

5          THE COURT:  Please be seated, ladies and gentlemen.

6   Before we proceed with what will be a very brief -- you were

7   sworn in prior and you remain sworn.  Do you understand that?

8          THE WITNESS:  Yes.

9   **E U G E N E    C A N J E L S**,

10      called as a witness, having been previously duly

11      sworn, was examined and testified as follows:

12          THE COURT:  Before we proceed with the brief

13  rebuttal case from the Government.  I want to draw your

14  attention to a question that was put by Ms. Nestor to our last

15  witness concerning Mr. Korchevsky's income taxes, you may

16  recall.  Disregard it.  Disregard the question.  Disregard the

17  response.  I've stricken it from the record.  Put it out of

18  your minds.  Understand?  I see a lot of faces nodding yes, I

19  am relieved.

20          Now, brief rebuttal case.  Mr. Gopstein.

21          MR. GOPSTEIN:  Your Honor, may I inquire?

22          THE COURT:  Yes, sir.

23  DIRECT EXAMINATION (Rebuttal)

24  BY MR. GOPSTEIN:

25  Good afternoon, Dr. Canjels.

Canjels - Direct Rebuttal - Gopstein                2896

1   A     Good afternoon.

2   Q     You testified earlier in this case about a P-value

3   permutation test that you ran comparing press release upload

4   time and first order time between January 2011 and May 2015,

5   correct?

6   A     Correct.

7   Q     And those were for the accounts of Mr. Korchevsky?

8   A     Yes, that's correct.

9   Q     I'm showing you what is in evidence as page ten of

10  Government's Exhibit 8003.  Directing your attention to the

11  rectangle at the bottom right, is that the, are those the

12  results of the P-value permutation test that you ran?

13  A     That's correct.

14  Q     What does it mean that the results of this P-value

15  permutation test were 0.0000?

16  A     So the conclusion of that test is that there is a

17  statistically significant correlation between upload time and

18  trade time.  P-value is typically compared to stand off cut

19  off values.  So P-value smaller than 1 percent, or .01, would

20  be normally considered very strong evidence.  A P-value of

21  less than 5 percent, or .05, would be considered strong

22  evidence.  Then a P-value of 10 percent, or .1, would be

23  considered typically considered weak evidence.

24          And so this P-value is essentially zero.  And done a

25  million times, there was not one time that the simulation give

Canjels - Direct Rebuttal - Gopstein          2897

1   a different result as extreme as this result.

2           Also the P-value for this particular test is

3   indistinguishable from zero.  It's a tiny little bit above

4   zero, but far, far below one.

5   Q    Did there come a time when you were asked to review a

6   slide prepared by the defense expert Mr. Mayer?

7   A    I did, yes.

8   Q    Did that slide include data on upload time and order time

9   during the time period 2009 to 2010?

10  A    It did, yes.

11  Q    Again, from Mr. Korchevsky's accounts?

12  A    Correct.

13  Q    After reviewing that slide did you and your team run a

14  P-value permutation test comparing upload time and trade time

15  for the period 2009 to 2010?

16  A    We did.

17  Q    Did you create a slide reflecting your findings?

18  A    Yes, we did.

19          MR. GOPSTEIN:  If I may show just for the witness?

20          COURTROOM DEPUTY:  Witness only.

21  Q    I'm showing just for the witness what is marked for

22  identification as Government's Exhibit 8010.  Dr. Canjels, is

23  this the slide that you created?

24  A    Yes, that's correct.

25  Q    Is this a true and accurate copy of that slide?

Canjels - Direct Rebuttal - Gopstein          2898

1    A     Yes.

2              MR. GOPSTEIN:  The Government offers 8010 into

3    evidence.

4              THE COURT:  Any objection?

5              MR. HEALY:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibit Number 8010 so marked and

8    received in evidence.)

9              MR. GOPSTEIN:  Permission to publish?

10             THE COURT:  Go ahead.

11   Q     Now looking at Government's Exhibit 8010, not yet

12   focusing on the paragraph on the bottom where it says P-value

13   permutation test, the rest of the slide, the slide that you

14   were asked to review as prepared by Mr. Mayer?

15   A     Yes, everything except in the blue box, that's total

16   number to the end of the permutation value, everything else is

17   the slide.

18   Q     Does the blue box reflect the results of the P-value

19   permutation test that you ran comparing open time and press

20   release upload time during the time period 2009 to 2010?

21   A     Yes, it does.

22   Q     What were the results of your test?

23   A     So here I get a P-value of .2299, so that's

24   22.99 percent, that's very far removed from even the

25   10 percent value, which is considered weak evidence.  So there

Canjels - Cross Rebuttal - Healy          2899

1    is no statistical evidence here that upload time and the trade

2    time are correlated.

3              MR. GOPSTEIN:  No further questions.

4              THE COURT:  Any questions for Dr. Canjels?

5              MR. HEALY:  Yes, your Honor.

6    CROSS EXAMINATION (Rebuttal)

7    BY MR. HEALY:

8    Good afternoon, Dr. Canjels.

9    A    Good afternoon.

10   Q    I want to ask you about a P-value test with respect to

11   the data reflected in Government's Exhibit 8010.

12   A    Okay.

13   Q    Would you agree with me that the underlying data that is

14   reflected in that is the same data reflected in Mr. Mayer's

15   chart?

16   A    I believe so.  We tried to replicate the dots exactly

17   from the footnotes.  And I believe that we were working with

18   the same data.

19   Q    Dr. Canjels, if one were going -- if a statistician were

20   going to analyze, this would you agree with me that the first

21   step would be to randomly assign trade time and upload time to

22   the data?

23   A    If a statistician, what would be -- it depends on the

24   objective of the statistician.

25   Q    Is that what you did, sir, in your chart?

Canjels - Cross Rebuttal - Healy          2900

1  A    When I wanted to compare the correlation, when I wanted

2  to look at the correlation between upload time and trade time?

3  Q    Yes.

4  A    Then I would apply a permutation test.

5  Q    But would you randomly assign trade times and upload

6  time, yes or no?

7  A    No, I use a permute so it's a random switching rather

8  than a random assignment.  I don't know if this is important

9  for you.

10  Q    If I represented to you that Mr. Mayer randomly assigned

11  a trade time and upload time, would you consider that to be an

12  appropriate first step, yes or no?

13  A    I don't know what Mr. Mayer did.  If the way --

14  Q    That wasn't my question.  My question was, would that be

15  an appropriate first step?

16  A    The way you describe it, it's called, I think it's called

17  a bootstrap test, very different from a permutation test.  I

18  prefer a permutation test over bootstrap, but could you use

19  bootstrap here as well.

20  Q    Notwithstanding that would be a first step, yes?

21  A    First step of what?

22  Q    Running a statistical test on this data, sir?

23  A    So every -- the way I did it is I want a simulation of a

24  million times.  The first time you do this, the random

25  assignment would be one simulation.

Canjels - Cross Rebuttal - Healy                    2901

1   Q     The second step would be to calculate the percent of

2   trades in the window, would that be a second step, sir?

3   A     You randomly assign, then you compare the total number of

4   trades within the window for the total number of trades, yes.

5   Q     Then would you repeat that test over and over, I think

6   you said it you did a million times, correct?

7   A     Correct.

8   Q     But would you agree with me, that if you did that more

9   than 5,000 times that would give you an appropriate sampling?

10  A     So the more frequently you do it the more precise you get

11  the P-value.  But 5,000 times would probably be enough, yes.

12  It wouldn't as precise as million times, but probably be okay.

13  Q     Then if Mr. Mayer averaged the results of those many

14  thousands of random assignments, would that be appropriate?

15  A     You would want to add up all the times, the number of

16  times, that the test came out a certain way, yes.

17  Q     Would it surprise you to know that Dr. Mayer -- Mr. Mayer

18  did exactly those steps?

19  A     No, I would think that that's a reasonable thing to do

20  here.

21  Q     Would it surprise you to know that when he did that his

22  P-value was .01?

23  A     Yes, that would surprise me.

24  Q     But you do agree that .01 is statistically significant?

25  A     .01 meaning 1 percent?

Canjels - Cross Rebuttal - Healy                    2902

1    Q    Meaning 1 percent.

2    A    1 percent would be statistically significant in normal

3    values.

4    Q    By the way, Dr. Canjels, you testified that you did this

5    analysis only upon receiving Mr. Mayer's slide, correct?

6    A    The analysis for 2009 and 2010 was, I did that after

7    receiving the slides, yes.

8    Q    That was in the last few weeks?

9    A    Yes, about two weeks ago.

10   Q    You actually produced this slide today just after hearing

11   Mr. Mayer's testimony, I think you were sitting in the crowd,

12   yes?

13   A    No.  This slide, so what we do when we get the exhibits,

14   the first thing you try to replicate there to see if it's

15   accurate.  And then since we have the data, we ran permutation

16   test at that time around that time.  It was not done today.

17   Q    But it was done within the last two or three weeks?

18   A    It was done after we received the slides, yes.

19   Q    You had been working on this case for over a year,

20   correct?

21   A    That's correct.

22   Q    And that was the first time that you ever actually

23   analyzed the data from 2009, 2010 in this case?

24   A    I don't think I ran a permutation test before for this

25   time period.

Proceedings                                          2903

1           MR. HEALY:  No further questions.

2           THE COURT:  Anything else?

3           MR. GOPSTEIN:  Nothing further.

4           THE COURT:  You may step down, Doctor.

5           (Whereupon, the witness was excused.)

6           MR. TUCKER:  With that the Government rests.

7           THE COURT:  Ladies and gentlemen, the Government has

8   completed the presentation of its rebuttal case.  I believe we

9   have completed the evidentiary phase of the case.  So let's

10  tell you where we go from here.

11          We are going to suspend for the day for a couple of

12  reasons.  We begin first thing tomorrow morning with

13  summations.  I think given the amount of the testimony we've

14  heard, the records and so forth, it's a reasonable thing to do

15  to permit counsel to catch their breath, get organized, and be

16  ready to present to you as concisely and factually possible

17  their concluding remarks to you.  We're going to suspended for

18  the day.

19          And we're going to suspend for another reason.

20  We've gotten a dictate order, request, depends upon your

21  interpretation of it, from Con Edison.  As of this moment we

22  are not longer sitting in an air conditioned room.  I think

23  we're all fortunate that the timing is just about right, so

24  they've asked everybody, all the business community and so

25  forth to turn it down because of the heat outside and the

Proceedings                                                    2904

1    concern for overload and so forth.  I promise you a chilled

2    courtroom.  And I particularly thank you for your agreeing to

3    start at 9:00 o'clock tomorrow morning.

4              We have heard all the evidence.  You will hear no

5    more evidence.  You're going to hear the summations of

6    counsel, which of course will refer to the evidence, I'll have

7    more to say about that in the morning.  It's absolutely

8    critical at this point that you continue to abide by my

9    instructions not to discuss the case.  The time will come soon

10   enough when the deliberating jury will assemble in the jury

11   room to begin deliberations.

12             My compliments comments to counsel.  We've moved

13   quickly and covered a lot of ground.  And we'll spend all day

14   tomorrow on summations.  I don't know if we'll finish

15   tomorrow, but we'll certainly finish on Thursday.  Then I'll

16   give you my instructions.  I'm aware of promises I've made,

17   I'm not going to break them, but we'll see exactly where we

18   are come the end of the day tomorrow.  I think that covers it.

19             Get some rest.  It's going be a long day, to say the

20   least.  We're going to go, with your consent, 9:00 o'clock to

21   5:30.  The only reward I can give you for that indulgence is

22   to feed you.  Ellie will give you a menu, we'll have an

23   abbreviated 45-minute lunch recess.

24             Get your rest, you're going to need it.  Arrive home

25   safely.  We'll see you in the morning.

Proceedings                                    2905

1       COURTROOM DEPUTY:  All rise.

2       (Jury exits the courtroom.)

3       THE COURT:  This is a first draft, you caught me off

4  guard here.  Take a careful look at it.  I'll be back in about

5  half an hour or so, or sooner if you're ready.  I'll bring a

6  couple of extra copies of the charge.  Fair enough?

7       MR. TUCKER:  That sounds fair.  Is it possible to

8  get electronic copies of the charge as well?

9       THE COURT:  The powers that be say yes, there you

10  go.  As long as we have your various addresses.  Remember it's

11  a draft.

12       (Brief recess.)

13       THE COURT:  I can't say we removed all references to

14  controlled substances out of the charge, but we're well on our

15  way.  Let's see, shall we start with the requests, or would

16  you just like to just jump right into the draft.  It is a

17  very, as you can see, there is a lot of cleaning up that needs

18  to be done.  And you will get another -- I can't believe, did

19  I leave the charges downstairs?  No, I have them here.  You'll

20  get another -- please, sit down everyone.  You'll get another

21  draft later this evening.  There being no specific proposal --

22       MS. BRILL:  Your Honor, perhaps a specific proposal,

23  a place to start that's neither of those places that you

24  mentioned, but with an overriding concern and request which

25  refers to what your Honor mentioned this morning which is

Proceedings                                    2906

1    reading, making the introduction to the Indictment part of

2    this charge.  It comprises I want to say fully 13 pages, or

3    almost 13 pages of this charge.  And with respect to smaller

4    parts of it there are factual issues, evidentiary issues, we

5    could go through it paragraph by paragraph, and we have gone

6    through it paragraph by paragraph, but our overrule objection

7    would be to -- and our overall request and objection to this

8    draft charge is that that introduction not be part of the

9    charge that is going to the jury.

10            It amounts to essentially an assertion, a very

11   prejudicial assertion, reargument if you will, of the

12   Government's case.  It refers to victims.  It refers to the

13   fraudulent conduct.

14            THE COURT:  It's part of the Indictment.  It's

15   specifically and expressly incorporated into each of the

16   counts.  Whether the Government can prove it or not is another

17   story, but that just makes them vulnerable, it seems to me, on

18   summation if there is information here that is important that

19   hasn't been proven.  How do I avoid that?

20            MS. BRILL:  You don't send -- just as you don't send

21   the Indictment to the jury, you don't send this introduction

22   to the Indictment to the jury.

23            THE COURT:  How do I legally avoid it?

24            MS. BRILL:  Your Honor, as you'll --

25            THE COURT:  -- the charge --

Proceedings                                                    2907

1          MS. BRILL:  There are sections of this introduction

2    that were not proven at trial that cannot be put before the

3    jury.  There is also -- your Honor doesn't, it says at the end

4    of the charge you'll have the charge.  It's sort of what

5    you're telling the jury.  It's not couched as these are the

6    Government's allegations.

7          THE COURT:  It certainly will be.  Make no mistake

8    about that.

9          MS. BRILL:  Well, not in these written instructions

10   that are to be given to the jury, it's not couched that way.

11         The inaccuracies, there is several problems.

12         There is the overall problem, there is the things

13   that weren't proven at trial problem.  There are inaccuracies

14   problems.  There are some sections of this that are pure

15   argument.

16         It was crucial that the texts and e-mails between

17   the defendants be perfectly timed in order to ensure that the

18   fraudulent trading would take place, I'm paraphrasing, but not

19   much, one of the sentences in this introduction.

20         THE COURT:  Do you have any legal authority for me

21   to keep it out?

22         MS. BRILL:  Well, the legal authority that I have

23   looked up and found is that it is a matter of discretion for a

24   Court to give the Indictment or not give the Indictment to the

25   jury in the jury room, and this is tantamount to that.  So the

Proceedings                                    2908

1  legal authority is that at the moment what I found is that you

2  have the discretion.

3         THE COURT:  That's a different matter.  Whether I

4  give the Indictment, I don't as a practice give the Indictment

5  to the jury, because the charging language is reflected.

6         MS. BRILL:  This is 13 pages, word for word, of the

7  Indictment.

8         THE COURT:  I fully understand your concern.  I'm

9  simply saying, do you have any authority for the notion that

10 when specific allegations -- and it's crystal clear to this

11 jury these are allegations -- are incorporated into the

12 charging counts that I'm at liberty to hold that back from the

13 jury or that I even have the discretion to do so?

14        MS. BRILL:  Well, I mean --

15        THE COURT:  Frankly, I don't think it serves

16 anybody's purpose.

17        MS. BRILL:  I think that -- I respectfully disagree

18 with who's served by these 13 pages being part of your

19 instruction.  I do think that it does.  And that's why we're

20 raising the objection.

21        If I could bring up, my research is not complete but

22 it's worthwhile to mention, that the cases that I've read have

23 been cases where the -- for example, I haven't read a

24 securities fraud case yet and I don't want to represent that I

25 have, but a felon in possession charge includes in the

Proceedings                                                    2909

1    Indictment and in the allegations and to use your Honor's

2    words, incorporated as part of the allegations in the

3    Indictment, a defendant's prior convictions what they were for

4    and the nature, arguably prejudicial nature of those charges.

5    And so the request was that that not go to the jury.

6            THE COURT:  That is specific Second Circuit law that

7    would prevent that.  Those particular references to the nature

8    of the underlying crime.

9            MS. BRILL:  Well, again, I'm asking the Court to --

10   the reason is, the reason I would surmise is that because it

11   is prejudicial for the jury to read that someone in possession

12   of a firearm, is also a convicted murderer, or bank robber, or

13   serial bank robber.  And so that's the reason why there is

14   this specific Second Circuit law, and that's the underlying.

15           And perhaps if we go through it, conscious of our

16   overall request, if we go through it maybe your Honor would

17   see a little -- and what needs to be excised from it.  At the

18   very least we contend your Honor would be a little more open

19   to some sort of resolution that doesn't include well over

20   10 percent of this charge that's going to be in the jury room

21   as the judge's words comprising basically what the Government

22   has written and will have had the chance to argue for three

23   hours before the jury sees, that's the overall -- perhaps it's

24   premature to discuss it now, but that was the --

25           THE COURT:  It's hardly premature, you've had the

Proceedings                          2910

1    Indictment for a couple of years.

2              MS. BRILL:  I meant in the terms of how order --

3              THE COURT:  -- to the defense case and suddenly pull

4    that rug out under me, and then hit me with this.

5              MS. BRILL:  To be clear about something, we did make

6    a motion to excise what we call the prejudicial words, like

7    victim, news wire, target.

8              THE COURT:  That's a different issue entirely.

9              MR. BRILL:  We did bring that up months and months

10   ago about the Indictment, just pointing that out.

11             THE COURT:  Do you have any anything you want to

12   offer?

13             MS. WHALEN:  Judge, we join in that application,

14   probably for different reasons, but I think Federal Rule of

15   Criminal Procedure 7(c) requires the Indictment to be plain,

16   concise, definite written statement of the essential facts

17   constituting the evidence charged.  And 7(d) it need not

18   contain a formal introduction or a conclusion.  7(d) permits

19   the Court at its discretion to strike surplusage.  I think a

20   large amount of this introduction is surplusage.

21             For example in the charge in front of you, pages 11

22   through the top of 16, those are all definitional terms.

23   Those don't need to be included.  The jurors have heard the

24   definition of who the individuals involved in this case were,

25   they've heard definitions and evidence as to the targets,

Proceedings                                                    2911

1    entities.  They've heard definitions and evidence as to

2    relevant terms like Internet protocol, malware, SQL script or

3    inquiry.  I think at a minimum the Court can strike the

4    definitional terms.

5              Our real problem with the main body of the

6    introduction is that this, as part of the charge, is going to

7    be available for the jury to review in the jury room whether

8    it helps or no.  But the problem is, they will be able to go

9    and see in writing the inferences that the Government is going

10   to be arguing that they follow in terms of the evidence, many

11   of which is, I would consider, circumstantial because of the

12   nature of this conspiracy.  The way you have to go from a

13   hacker device, then to the server for the business wire, then

14   to the Internet files, the e-mail files on the laptops.  And

15   so this is going to provide the Government with a step by step

16   instruction that the jury is going to be able to rely on.

17             They are not going to have that same kind of -- even

18   if we put in, even if we give you when we do give you -- and

19   we will give you our theory in defense -- the inferences that

20   we're going to be arguing in summation are not going to be

21   readily available; in fact, won't be available at all.

22             The jury is not allowed to look at the defense

23   summation to show how we're arguing that certain inferences

24   shouldn't be made or followed.  They will have the

25   Government's roadmap of what inferences should be made and

Proceedings                                              2912

1   what inferences should be followed.  So for that reason I

2   don't believe that it's necessary.

3            The jurors will have all of the evidence.  They've

4   been paying attention.  They will have all of the testimony,

5   all the physical evidence, all of the exhibits.  I don't think

6   that this is, I don't think that this is a case where they

7   wouldn't be able to put it together on their own as to what

8   the Government is alleging here.  But to permit the Government

9   to in effect have a roadmap of the inferences they want the

10  jury to take and not to have similar roadmap from the defense,

11  I think is what makes using the introduction in this case an

12  issue that the Court can excise discretion in excising from

13  the charge.

14           THE COURT:  All right.  Anything you want to say on

15  the subject?

16           MR. TUCKER:  No, your Honor.  I think that at this

17  point we believe it should be in the charge.  I think the

18  definitions are useful.

19           As your Honor suggested, the Government has no

20  objection to the Court not reading that part aloud during the

21  instructions.

22           THE COURT:  I'll certainly take it under advisement,

23  wish I had a little more time to consider it.

24           MS. WHALEN:  As we go through the charge we'll cite

25  specific paragraphs that need to be excised no matter what.

Proceedings                                                    2913

1          MS. BRILL:  Same here.

2          THE COURT:  All right.  Let's start with the

3    Government, bearing in mind, please, certain amount of

4    repetition here, there are language that doesn't belong here,

5    but more the substantial part of it.

6          MS. BRILL:  I missed what your Honor is referring to

7    right now.

8          THE COURT:  I'm referring to the first draft of the

9    charge.

10         What would you like to bring up?

11         MR. TUCKER:  How would you like us to proceed, your

12   Honor, page by page?

13         THE COURT:  Yes.

14         MR. TUCKER:  Mr. Gopstein is going to lead us

15   through.

16         MR. GOPSTEIN:  First comment is a typo on page six,

17   not substantive at all, just a bracket, if we're going page by

18   page.

19         THE COURT:  That bracket is out.

20         MR. GOPSTEIN:  That was our --

21         MS. BRILL:  No objection.

22         MR. GOPSTEIN:  We have nothing until --

23         THE COURT:  I have to add on the subject the

24   stipulations.  Ms. Whalen closed with an if called

25   stipulation, we'll be adding that language.

Proceedings                                        2914

1         There is a certain amount of repetition, you'll get

2    another charge.  And what I've taken out won't be necessarily

3    indicated, although it's not going to be changed in substance.

4    Any change in language will be highlighted for you.

5         MR. GOPSTEIN:  I will skip for now the language from

6    the Indictment so that the defendants can raise their

7    objections paragraph by paragraph.

8         Our next issue is on page 24 on the top the

9    paragraph that starts with, as an initial matter let me focus

10   on one element.  I think that all of this could be struck.

11   Because at the beginning there is already a definition of

12   knowingly at the beginning of the whole charge.

13        THE COURT:  I've taken a few of them out.

14        MR. GOPSTEIN:  So we suggest cutting everything here

15   up until Count One, because there is also the initial

16   definition of knowingly and also a subsequent definition of

17   knowingly.

18        THE COURT:  You're suggesting taking that whole

19   first paragraph out?

20        MR. GOPSTEIN:  Yes, your Honor.  And specifically,

21   in addition, the reason for that we think there is already the

22   initial definition, it's the second sentence, I think is

23   substantively not accurate.

24        THE COURT:  Hold on.  The paragraph that begins, as

25   an initial matter, that's where we are now?

Proceedings                                          2915

1          MR. GOPSTEIN:  Yes, your Honor.

2          THE COURT:  Take me to where you want to take me.

3          MR. GOPSTEIN:  Our proposal, as a general matter, is

4  to cut that paragraph because there is already a definition of

5  knowingly at the beginning of the charge.  Then there are

6  additional definitions of knowingly within the particular

7  counts.  If it's not going to be cut, we want to flag the

8  sentence too which says, with respect to all charges the

9  Government must prove that the defendant acted knowingly, that

10  they knew they traded on or agreed to trade on stolen press

11  releases that contained material, non-public information.

12          I think that's not accurate with both the computer

13  intrusion and the wire fraud counts.

14          THE COURT:  That's correct.  What is next?

15          MR. GOPSTEIN:  For the same reason we propose

16  cutting the next paragraph about knowledge.  We propose going

17  straight to Count One, conspiracy to commit wire fraud.

18          THE COURT:  The point you just made is absolutely

19  correct.

20          MR. GOPSTEIN:  Page 25 is our next comment,

21  definition of conspiracy, the last sentence of the first

22  paragraph.  The defendant knowingly and willfully conspired

23  with another or others, I think just with others.

24          THE COURT:  Well, the definition of conspiracy is

25  with at least another.

Proceedings                                    2916

1           MR. GOPSTEIN:  Withdrawn, your Honor.

2           THE COURT:  Okay.

3           MR. GOPSTEIN:  Our next comment was on page 27 where

4    we have, this is the next reference to knowingly that we were

5    referring to.

6           THE COURT:  I've taken a few out.  I'll look at it

7    again.  There is no doubt there is some repetition here.

8    Okay.

9           MR. GOPSTEIN:  Our next comment was the controlled

10   substance, which I understand is no longer --

11          THE COURT:  I haven't seen any cases giving the

12   authority to remove, but I will reluctantly remove it.

13          It's repetition on page 29, giving them 1343 a

14   second time, some word changes there.  But go ahead, I'm

15   getting ahead of you.

16          MR. GOPSTEIN:  On page 30, the first element,

17   existence of a scheme to defraud.

18          THE COURT:  The first sentence I've taken out.

19          MR. GOPSTEIN:  The first sentence saying, the first

20   element.

21          THE COURT:  Yes.

22          MR. GOPSTEIN:  We were going to flag that.

23          Then in the second paragraph, a scheme or -- the

24   second sentence, a scheme to defraud is any plan, device or

25   course of the action to obtain money or property.  We suggest

Proceedings                                           2917

1    replacing the intangible right of honest services with

2    including the right to control the use of one's assets, which

3    I think is one form of property under the wire fraud statute.

4    I'm not sure honest services have come up here.

5              THE COURT:  Honest services certainly has not come

6    up.  I'll consider the other one.  I think obtain money or

7    property is probably good enough.

8              What else?

9              MR. GOPSTEIN:  Moving down, still on page 30, the

10   last sentence that says, this means that if you find a

11   particular statement of fact to have been false you must

12   determine whether that statement was one that a reasonable

13   person or investor might have considered important in making

14   his or her decision.  Because we're in the context of wire

15   fraud, I don't believe the reference to investor fits here.

16             THE COURT:  I lost you, where are you?

17             MR. GOPSTEIN:  Page 30, the paragraph that starts

18   with, thus a scheme or artifice to defraud.

19             THE COURT:  Okay.

20             MR. GOPSTEIN:  The final sentence reads, this means

21   that if you find a particular statement of fact to have been

22   false, you must determine whether that statement was.

23             THE COURT:  Okay, I see it.

24             MR. GOPSTEIN:  Then on page 31, right above number

25   two, I think we would have the same point.  You said your

Proceedings                                    2918

1    Honor struck the first sentence.  I think because we're in the

2    context of the conspiracy we don't need this last sentence

3    either, if you find that the Government has sustained its

4    burden of proof that a scheme to defraud as charged did exist.

5              THE COURT:  Okay.  Agreed.

6              MR. GOPSTEIN:  Moving on we have the same comment on

7    the first sentence of the second element.

8              THE COURT:  I could simply, to make it more precise,

9    simply add must prove beyond a reasonable doubt that the

10   defendant agreed to participate.

11             MR. GOPSTEIN:  That would work.  Or just the second

12   element of wire fraud is that a defendant, either of those

13   work.

14             On page 32, in either, the second full paragraph, in

15   either case the essential elements of the crime must be

16   established beyond a reasonable doubt.  I think that here

17   because we're talking about the elements of wire fraud as

18   opposed to conspirators, that that would be confusing.

19             We propose cutting that paragraph that says in

20   either case the essential elements of the crime must be

21   established beyond a reasonable doubt, because we're in the

22   context of describing what substantive wire fraud is here.

23   And obviously that elements of the conspiracy must be proven

24   beyond a reasonable doubt.  Here we're in the substantive

25   discussion.

Proceedings                                          2919

1          THE COURT:  I'm just looking for it, for some reason
2     I can't find it.
3          MR. TUCKER:  Page 32, your Honor.
4          THE COURT:  33?
5          MR. TUCKER:  32, your Honor, is the page that
6     Mr. Gopstein is on.
7          MR. GOPSTEIN:  Page 32.
8          MR. TUCKER:  In either case.
9          THE COURT:  Ahh, you were right.
10          MR. GOPSTEIN:  Then we have a similar comment on the
11     next paragraph which is we're talking about sustaining a
12     charge of substantive wire fraud, the Government must
13     establish beyond a reasonable doubt.  Again what the
14     Government must establish is the conspiracy, not the wire
15     fraud.
16          THE COURT:  Okay.
17          MR. GOPSTEIN:  Then the same comment on the
18     following paragraph, which again is referring to proving the
19     substantive wire fraud.
20          THE COURT:  I'm sorry, what paragraph?
21          MR. GOPSTEIN:  It is the last paragraph on page 32,
22     above the third element.
23          It says, if you find the defendants were not knowing
24     participants in this scheme or lacked the specific intent to
25     deceive, you must find them not guilty.  On the other hand, if

Proceedings                                                    2920

1   you find that the Government has established beyond a

2   reasonable doubt not only the first element, again we're still

3   in the context of substantive wire fraud.

4            THE COURT:  It's the reference to beyond a

5   reasonable doubt that troubles you?

6            MR. GOPSTEIN:  I think the paragraph is not

7   necessary.  We're not proving the substantive elements of wire

8   fraud.

9            THE COURT:  I think you're right.  I want to read it

10  when I'm not sitting in a 90-degree courtroom.

11           MR. GOPSTEIN:  Our next comment is on page 33, the

12  last sentence of the paragraph beginning, in this regard it is

13  sufficient to establish.  And the last sentence says, to sum

14  up if the Government fails to prove beyond a reasonable doubt

15  that a defendant has conspired to commit wire fraud you must

16  acquit.  On the other hand, if the Government has proved that

17  a defendant has conspired to commit wire fraud beyond a

18  reasonable doubt you should convict.  That's obviously an

19  accurate statement of the law, but it's coming in middle of

20  the section of the use of interstate wires in the substantive

21  wire fraud.  Then both the preceding and following paragraphs

22  are about --

23           THE COURT:  It's out of place, you're right.

24           MR. GOPSTEIN:  Also I think the last paragraph on

25  this page should be struck because the dates of particular

Proceedings                                      2921

1    wires only applies in a substantive wire count.  We don't

2    allege any.  We don't have dates of wires.  We have a wire

3    fraud conspiracy charge.

4              THE COURT:  Continuing.

5              MR. GOPSTEIN:  Our next comment is on page 36,

6    securities fraud statutory purpose.

7              THE COURT:  We took it out.

8              MS. BRILL:  The whole thing?

9              THE COURT:  No, just that three-line paragraph, even

10   though the first act is 33 act.

11             MR. GOPSTEIN:  Our next comment is just on page 40,

12   last full paragraph, above the header securities fraud.  It's

13   just missing the word the in the first sentence, but also the

14   second element.

15             THE COURT:  I'm sorry.  I have the paragraph, the

16   paragraph begins on the other hand?

17             MR. GOPSTEIN:  Yes, your Honor.  Then continuing

18   that sentence it goes, if you find that the Government has

19   established beyond a reasonable doubt not only as to the

20   existence of a scheme to defraud but also, the or a, second

21   element.

22             THE COURT:  I see.

23             MR. GOPSTEIN:  Just the missing word.

24             THE COURT:  I got you.  Okay.

25             MR. GOPSTEIN:  On page 41 the first sentence it is

Proceedings                                    2922

1    not necessary that the defendants were directly or personally

2    involved in the use of instrumentalities or interstate

3    commerce, then it says in brackets or the mails.

4            THE COURT:  It's out.

5            MR. GOPSTEIN:  We would suggest language that I

6    think was in our request, something to the effect of the

7    Internet bank wire transfers, interstate or international

8    travel, e-mail was sent over the Internet that traveled across

9    state lines are all instrumentalities of interstate commerce,

10   something to that effect.

11           MR. TUCKER:  That was on page 22 of our charge.

12           THE COURT:  I'll take a look.

13           MR. GOPSTEIN:  Then I guess we would --

14           THE COURT:  There is no dispute about that, I

15   assume.

16           MR. GOPSTEIN:  I assume you already have this, two

17   additional references through the mails in the following two

18   paragraphs.

19           THE COURT:  Yes.

20           MR. GOPSTEIN:  On page 42, which is in the aiding

21   and abetting section, the last full paragraph that begins with

22   if the Government fails to prove beyond a reasonable doubt, it

23   says that a defendant has committed securities fraud.

24           THE COURT:  What page?

25           MR. GOPSTEIN:  Forty-two, last full paragraph

Proceedings                                              2923

1   starting with, if the Government fails.  I think the reference

2   to a defendant shall be another person because we're in the

3   aiding and abetting context.

4                THE COURT:  That concerns me.  I gave them an aiding

5   and abetting charge.  The defendant or another person is

6   committed securities fraud.  I'm reluctant to do that without

7   referring to the aiding and abetting.

8                MR. GOPSTEIN:  This is in the aiding and abetting

9   instruction.

10               THE COURT:  I'm sorry.

11               MR. GOPSTEIN:  I think this instruction, because

12   it's in the aiding and abetting section --

13               THE COURT:  I got you.  I beg your pardon.

14               MS. BRILL:  Is the request that that change be in

15   both sentences in that paragraph?

16               MR. GOPSTEIN:  No.  The following sentence would

17   need some sort of additional as well because simply there

18   can't be conviction just on another person.  But I think the

19   first sentence should read, maybe start to make it clear in

20   the context of aiding and abetting, if the Government fails to

21   prove beyond a reasonable doubt that another person has

22   committed securities fraud you must -- you can't convict on an

23   aiding and abetting theory which -- that was not artfully

24   said, but there should be a distinction.

25               THE COURT:  Okay.

Proceedings                                              2924

1          MR. GOPSTEIN:  Then in the final paragraph on that

2    page, to prove that a defendant, there is an extra word

3    participated before aiding and abetting.

4          THE COURT:  Thank you.

5          MR. GOPSTEIN:  On page 46, overt act D, should be

6    struck because that was one of the layering e-mails that were

7    not put into evidence, D as in David.

8          THE COURT:  Okay.

9          MR. GOPSTEIN:  On page 47 the last full sentence of

10   the first paragraph that starts with, finally you must find.

11         THE COURT:  Yes.

12         MR. GOPSTEIN:  So that is a sentence that deals with

13   venue.  And so I think as a preliminary matter I think it

14   would make sense to move it because it's in the middle of a

15   section that talks about overt acts that are necessary to

16   prove the actual offense.  So I think if it's included at all

17   in this section, I would suggest moving it to the end.  But

18   more substantively, I think there should be an addition where

19   it says, finally you must find that either the agreement was

20   forged or that an overt act was committed.  I think after

21   committed the language or caused to be committed needs to be

22   added.  That comes from both Second Circuit case law and it's

23   actually consistent with the overall venue instruction I

24   believe that's at the end of the charge.

25              THE COURT:  Certainly out of place, that's for sure.

Proceedings                                                    2925

1          MR. GOPSTEIN:   Page 50, I think this is a global

2   comment that follows from the other substantive description of

3   the substantive crimes that are the object of the

4   conspiracies.  If you're is going to change the description of

5   wire fraud elements, we would suggest making the same change

6   here.  Instead of the first element that the Government must

7   prove beyond a reasonable doubt, it could be something along

8   the lines of the first element of computer fraud or the

9   language that your Honor suggested with regard to the

10  conspiracy.

11          THE COURT:  Well, the first element that the

12  Government must prove is that the defendant accessed a

13  computer without authorization.

14          MR. GOPSTEIN:  The only issue is that the defendants

15  are charged with conspiring to commit computer intrusion.  So

16  we actually don't have to prove that they did it, that's it.

17  I know there is other language in the charge.

18          THE COURT:  There are several times.

19          MR. GOPSTEIN:  Several times but --

20          (Continued on next page.)

21

22

23

24

25

*Charge Conference*                                      *2926*

1          (In open court.)

2          THE COURT:  I know it's very awkward to give these

3     kinds of instructions in the conspiracy context, but let me

4     look at it.

5          MR. GOPSTEIN:  So that comment would apply to

6     elements one, two, three -- all of the elements of the

7     substantive offense.

8          THE COURT:  Yes.  Not, two.

9          MR. GOPSTEIN:  Sorry, your Honor.

10         THE COURT:  Not two.

11         MR. GOPSTEIN:  I think it would apply to all of

12    them, your Honor.  Because, again, it's not an element --

13         THE COURT:  He conspired to act intentionally.

14         MR. GOPSTEIN:  Second element, intentional conduct.

15    Page 51, your Honor.

16         THE COURT:  Oh, 51.  Oh, I see what you're saying.

17    Okay.

18         MR. GOPSTEIN:  Our next comment is just on Page 59.

19    And I think for the reasons, I believe, it was this morning

20    that your Honor raised with regards to multiple conspiracies,

21    we don't think that that charge is necessary in this case.

22         THE COURT:  Okay.  Anything after that?

23         MR. GOPSTEIN:  Cooperating Witness Section, Page 65.

24         The second sentence says that a copy of each

25    agreement has been received in evidence.  I haven't confirmed.

*Charge Conference*                                    *2927*

1          THE COURT:  They haven't, that's wrong.  I think
2     only one.
3          MR. GOPSTEIN:  I think that's correct.
4          THE COURT:  So I'm just going to delete the
5     sentence.
6          MR. TUCKER:  Your Honor.
7          MR. GOPSTEIN:  Thank you, your Honor.
8          THE COURT:  Okay.  Is that it?
9          MR. GOPSTEIN:  I believe so, your Honor.
10         THE COURT:  All right.  Thank you.
11         MR. GOPSTEIN:  Thank you.
12         THE COURT:  All right.  Let's go back to the
13    beginning.
14         You put the issue of the introduction aside for a
15    moment, let's just deal with the body of the charge.
16         MS. BRILL:  Should I go forward?
17         THE COURT:  Sure.
18         MS. BRILL:  Do you want to go first.
19         MS. WHALEN:  So, your Honor, I'm going to go through
20    it the same way the Government did.
21         THE COURT:  Sure.
22         MS. WHALEN:  With respect to Page 3 where the Court
23    gives a statement of the indictment as an accusation only.
24         THE COURT:  Right.
25         MS. WHALEN:  If the Court is going to give the

1   introduction to the document, we'd ask that the following

2   language also be used.  "The fact that I am including the

3   introduction to the indictment in the written charge should

4   carry no weight in your determination of the facts.  It is

5   simply part of the accusation."

6           MR. GOPSTEIN:  No objection.

7           MR. TUCKER:  No.

8           MS. WHALEN:  Again, our main objection is that it

9   not be included.

10          THE COURT:  Without waiving your prior objection.

11          MS. WHALEN:  Okay.  Your Honor, then on Page 4, the

12  first paragraph, burden of proof.

13          We would just ask at that time a clause to be added

14  to the last sentence of the first paragraph.  So it would say,

15  "The defendants do not have to prove their innocence.  They

16  need not have submitted any evidence at all including calling

17  any witnesses."

18          MR. TUCKER:  No objection, your Honor.

19          THE COURT:  Okay.

20          MS. WHALEN:  Further down on Page 4.  In terms of

21  the reasonable doubt instruction going to the sentence that

22  begins, "It is a doubt that would cause a reasonable person to

23  hesitate."

24          We ask that the language -- we'd ask that it read,

25  "It's a doubt that would cause a reasonable person to hesitate

1   it act in a matter of the highest importance in his or her

2   personal life."  I believe the "high importance" is the

3   language from the Sand definition.

4          THE COURT:  I'll check.  Is it?  If it is, it's

5   changed.  I'll check it.

6          I'm not so sure I agree with the concept, but that's

7   what's required, of course, I'll add it.  I almost hesitate to

8   pick the right toothpaste in the morning.  My teeth are

9   important to me, but go ahead.

10         MS. WHALEN:  Your Honor, then on Page 5, we would

11  ask that the defense -- that the Court add the language from

12  Page 8, our last paragraph on our submitted instruction which

13  reads, "If after a fair and impartial consideration of all of

14  the evidence and lack of evidence, you were satisfied of Mr.

15  Khalupsky's guilt beyond a reasonable doubt, you should vote

16  to convict.  On the other hand, if after a fair and impartial

17  consideration of the evidence or lack of evidence, you have a

18  reasonable doubt you must find Mr. Khalupsky not guilty."

19         THE COURT:  I'm pretty comfortable with this

20  language, Ms. Whalen.

21         MS. WHALEN:  That's okay.  I'm just telling you what

22  we prefer.  I understand you may prefer something else.

23         THE COURT:  I understand.

24         MS. WHALEN:  Okay.  Then on, I think, the Government

25  moving to page -- on Page 9 in terms of separate counts, I

*Charge Conference*                                              *2930*

1    understand that this language is probably repetitive, but I

2    guess, in an abundance of caution, we would ask that the last

3    sentence have a clause added so that it would begin, "The fact

4    that you may find a defendant guilty or not guilty as to one

5    of the offenses charged does not determine your verdict as to

6    the other offenses charged against him.  Nor again does it

7    determine your verdict against the other defendant on that or

8    any of the other offenses charged against him."

9              THE COURT:  I would just simply say, "or against him

10   or the other defendant on trial."

11             MS. WHALEN:  That would work.

12             THE COURT:  I'm happy to do that.

13             MS. WHALEN:  Thank you.  Again, not waiving our

14   objection, we would go to Page 16.

15             MS. BRILL:  Are you going to --

16             MS. WHALEN:  Yes.

17             THE COURT:  We'll come back to her.

18             MS. WHALEN:  If we're coming back to that, that's

19   fine, your Honor.

20             THE COURT:  We're going to come back to that.

21   You'll have certain paragraphs in the introduction that you

22   have particular grievance with.

23             MS. WHALEN:  Right.

24             THE COURT:  We'll come back to that introduction in

25   a minute.

1              MS. WHALEN:  Okay.  Then, I think, your Honor, our

2    next -- your Honor, I think the Government has addressed some

3    of our concerns.  I'm going to Page 30 about the language in

4    terms of the language used in the existence of a scheme to

5    defraud.

6              THE COURT:  Okay.

7              MS. WHALEN:  So this wasn't specifically addressed

8    by the Government, so I'm just flagging it to your Honor.

9              If you look at -- I'm just going to go by line.  So

10   in the paragraph beginning -- the second paragraph beginning,

11   "A scheme or artifice."

12             THE COURT:  Yes.

13             MS. WHALEN:  Going to the third line.

14             THE COURT:  Yes.

15             MS. WHALEN:  I think that the Court could take out

16   "represents."  It goes, "By means of false or fraudulent

17   pretenses."  And then we could take out representations or

18   promises reasonably calculated to deceive persons of average

19   prudence because I don't believe that's part of the theory of

20   this case.  It's not a swindle per se, it's an intrusion.

21             THE COURT:  I understand your point.

22             I think the word "or promises reasonably calculated"

23   could come out, it's not the case.  I'm going to say,

24   "Promises or fraudulent pretenses."

25             MR. TUCKER:  We're okay with it being pretenses and

*Charge Conference*                                    *2932*

1    representations.  We do not object to striking the promises

2    clause.

3             THE COURT:  I'm going to make it "or

4    representations," and end it there.

5             MS. WHALEN:  Okay.

6             THE COURT:  Okay.

7             MS. WHALEN:  And then going to the last sentence

8    which begins, "Fraud is a general term that embraces."  I

9    think that we could end that sentence at "fraud is a general

10   term that embraces all the various means that an individual

11   can devise or that are used by an individual to gain an

12   advantage over another by false recommendations."

13            I don't believe that there's any issue here of

14   suppression other omission of the truth or deliberate

15   disregard for the truth.  So I think we could just end it at

16   false representations and cut out the rest of that clause.

17            MR. TUCKER:  No objection, your Honor.

18            THE COURT:  Thank you.  Any way we can make it

19   shorter.

20            MS. WHALEN:  Then going to the last sentence on that

21   page.  It begins, "In addition to proving that a statement was

22   false or fraudulent and related to a material fact.  We think

23   it might make more sense to begin at, "In order to establish a

24   scheme to defraud," since I don't think we have any statements

25   that were made.

*Charge Conference*                                           *2933*

1          THE COURT:  Yes, I think that's right.

2          MS. WHALEN:  Then, on Page 31, in the second

3     element, the Court said that it's already -- "I've already

4     instructed you as to the meaning of knowing and willfully."

5     We believe that just a brief restatement is always beneficial.

6          THE COURT:  I bet you do.  I'm going to go through

7     the charge and count how many times and then I'll see how many

8     we're going to leash in and take out.

9          MS. WHALEN:  Yes.  Then, your Honor, our next

10    comment would be on Page 33.  And this is a comment just

11    throughout.  The Court says, I think in the second full

12    paragraph towards the end, "to sum up, if the Government fails

13    to prove," and the Government has already noted that this is

14    out of place.  But we'd ask instead of using the word "acquit"

15    that the Court use the phrase "find not guilty" just because

16    that mimics the jury instruction.

17         THE COURT:  I don't like acquit.  Okay.

18         MS. WHALEN:  Our next substantive request would be

19    on Page 35.  And this is at the bottom of the page.  I think

20    in the substantive -- further on in the substantive portion,

21    you took out Subsection B to make any untrue statements of a

22    material fact or met a material fact.  It is the law, but I

23    don't think it's relevant here so I don't think we need to

24    discuss it.  And later on, you just cite the first and the

25    second.  The first and the third.

*Charge Conference*                                    *2934*

1          THE COURT:  Yes.  Any objection to that?

2          MR. TUCKER:  No, Your Honor.

3          MS. WHALEN:  Again, on Page 37, the last partial

4    paragraph that says, "A statement, representation, claim, or

5    document is false if it was untrue when made."  I don't think

6    that that paragraph is relevant and I don't think the next

7    paragraph is relevant until we come to the second sentence

8    which begins, "A material fact is one that would have been

9    significant to a reasonable investor."

10         And just to clarify on the record, your Honor, I

11   think that that sentence should remain because we think that

12   the fact that there were these stolen press releases, and that

13   people were -- or they're alleged to be stolen press releases

14   and people are alleged to have been trading on them, I think

15   there is evidence in the case that a reasonable investor would

16   not be purchasing or selling stock if they knew someone had

17   advance information.  But the rest of that paragraph

18   continuing on, "A statement is not material with the puffery

19   and sales," so I don't think is relevant to this case.

20         So what we're asking is that starting on Page 37, "A

21   statement representation, claim, or document is false," that

22   that be stricken up until the second paragraph that "A

23   material fact is one that would have been something can

24   remain," and then strike the rest of that paragraph beginning

25   with the next sentence a statement is not material.

*Charge Conference*                                          *2935*

1          THE COURT:  I certainly don't have any trouble with

2     the first suggestion, does the Government?

3          MR. TUCKER:  I'm sorry, your Honor.

4          THE COURT:  The bottom paragraph beginning -- on the

5     bottom of Page 37.

6          MR. TUCKER:  I don't think we have an objection to

7     striking that paragraph.

8          THE COURT:  Yes.

9          MR. TUCKER:  I think where we may have a difference

10    of opinion in the first sentence in the next paragraph.  I

11    think we might want to keep that.

12         THE COURT:  The first sentence on the?

13         MR. TUCKER:  First full paragraph on Page 38.  If I

14    understood Ms. Whalen, she is preparing to strike that

15    sentence as well.

16         MS. WHALEN:  I don't think there have been false

17    statements.  I think that it's a material fact that had other

18    investors known about these press releases, they might not

19    have invested.  But I don't believe that there's any evidence

20    that there was an affirmative false statement or that there

21    was puffery or deceit of a person of ordinary intelligence.

22    So that's why I'm thinking that both the sentence before and

23    the sentences after should be stricken.

24         MR. TUCKER:  I think the issue that we might have

25    here is that it is the Government's theory that one of the

*Charge Conference*                                    *2936*

1   flavors of deceit was omission, and the omission is captured

2   in the language at the beginning and afterwards.  So I don't

3   disagree with Ms. Whalen that the false statements part

4   doesn't necessarily fly, but omissions language does.

5          MS. WHALEN:  But perhaps if the Court could think

6   about deceive?

7          MR. TUCKER:  We'll think about it, too, I see where

8   Ms. Whalen is getting at.

9          THE COURT:  Well, think about it and give me

10  whatever suggestions you have.  The first section we can take

11  out.  Okay?

12         MR. TUCKER:  Just so we're clear.

13         On counsel's proposal that would be to strike that

14  entire first full paragraph of 38 except the sentence reading,

15  "A material fact is one that would have been significant to a

16  reasonable investor in making an investment decision."

17         MS. WHALEN:  Right.  And it may need to be moved

18  around given the other language, but that would be our

19  proposal.

20         THE COURT:  All right.  I'll take a look at it.

21         MS. WHALEN:  Your Honor, then at the top of Page 39

22  beginning intent to defraud.

23         THE COURT:  Yes.

24         MS. WHALEN:  The second sentence, I think it is

25  extraneous.  I don't think it's necessary and I don't think

 1    it's part of the Sand instruction, or the Sand definition.

 2          THE COURT:  I'm comfortable with it at this point.

 3    I'll look at it.

 4          MS. WHALEN:  And then, I guess, our next -- at the

 5    bottom of the page going into the next page.  While I believe

 6    that some -- the first sentence or the first and second

 7    sentence under the antifraud statutes.  "Even false

 8    representations statements or omissions of material fact do

 9    not amount to a fraud unless done with fraudulent intent

10    however misleading or deceptive a plan may be it was not

11    fraudulent and carried out in good faith."

12          But I guess the rest of it, "An honest belief in the

13    truth of the representations," that doesn't apply here.  And

14    also, I don't think there's any evidence in terms of a

15    good-faith belief that everything would work out, or people

16    wouldn't lose money.  I don't think there's been any testimony

17    as to that.  So I think other than the sort of initial basic

18    statement of a good-faith belief is that the Government.

19          THE COURT:  I'm not so sure the entire paragraph

20    belongs in the charge.

21          MR. TUCKER:  Yes, Your Honor.  I think that could be

22    right.  So we could strike under the antifraud statutes

23    paragraph and also the next paragraph is that the proposal?

24          MS. WHALEN:  Yes.

25          THE COURT:  Works for me.

*Charge Conference*                                    *2938*

1           MR. TUCKER:  No objection from the Government.

2           THE COURT:  It's not this case.

3           MS. WHALEN:  Okay.  And then; your Honor, on

4    Page 42.

5           THE COURT:  Page 42?

6           MS. WHALEN:  Page 42.

7           THE COURT:  Yes.

8           MS. WHALEN:  Talking about the Court sort of in the

9    let's see it's in the fourth paragraph the Court says that

10   it's already instructed as to the meaning of knowingly and

11   intentionally.  The Court hasn't already instructed in the

12   definition of intentionally.  You've instructed on the intent

13   to defraud that we would just ask that the Court use the

14   intentional -- define it here and use the Sand instruction

15   which is that it's the defendant acted deliberately and

16   purposefully, the conscious objective --

17          THE COURT:  I do believe it's in here.

18          MS. WHALEN:  I think it comes up later, but I don't

19   think it's previous to that.  If it's there and I missed it,

20   we're just asking that it be defined.

21          THE COURT:  If it hasn't been defined, it will be

22   defined.

23          MS. WHALEN:  Great.

24          THE COURT:  Let me make a note.  Where is it again?

25          MS. WHALEN:  Page 42.  In the paragraph beginning,

1    "With respect to the second element."

2            THE COURT:  Okay.

3            MS. WHALEN:  And then moving to Page 46.

4            We think in Paragraph F the language about

5    Mr. Khalupsky's G-Mail account which was registered in

6    Brooklyn, New York.  We believe that that language should be

7    stricken.  The Government has introduced evidence of our

8    client's creation of the e-mail account which took place, I

9    believe, in 2002 well before the start of this conspiracy.

10           So we don't think that it's relevant as to an overt

11   act in the indictment.  They've introduced evidence that the

12   G-Mail account existed, and we agree that the fact that it was

13   created in Brooklyn in 2008 is outside of the scope of the

14   indictment and I think for purposes of venue takes it

15   beyond --

16           MR. GOPSTEIN:  No objection.

17           THE COURT:  So are you talking about striking it?

18           MS. WHALEN:  Yes.  You have on or about December 18,

19   2013, Khalupsky sent an e-mail but just strike the phrase that

20   says.

21           THE COURT:  The which was.

22           MS. WHALEN:  The which was, yes.

23           MR. TUCKER:  We're keeping the attaching unreleased

24   native version of the press release.

25           THE COURT:  I'm sorry.  Yes, thank you.  Thank you.

*Charge Conference*                                         *2940*

1    We're keeping that phrase.  Just we got which was registered

2    you got that?

3              LAW CLERK:  Yes.

4              MS. WHALEN:  We have no objection to the multiple

5    conspiracies coming out on Page 59.

6              Our next substantive objection is Page 62.  The

7    first sentence at the top of the page reads for the securities

8    fraud counts venue is proper if you find the defendant

9    intentionally and knowingly caused an act or transaction

10   constituting securities fraud to occur.  And then the Court

11   adds the phrase, "At least in part," and don't believe that

12   that's in the statute.  The securities fraud offenses have

13   their own specific venue provision.

14             THE COURT:  Right.

15             MS. WHALEN:  Which reads, "Any criminal proceeding

16   may be brought in the district wherein any act or transaction

17   constituting the violation occurred.  It doesn't have the

18   "limiting at least in part" language.  I think the statute

19   just for the citation is 15 U.S.C. Section 78(8)(a).

20             THE COURT:  That's right.

21             MS. WHALEN:  We will provide you with theory of

22   defense this evening.

23             MR. TUCKER:  I'll let Ms. Whalen finish and then I

24   have a proposal.

25             MS. WHALEN:  I'm sorry.

*Charge Conference*                                      *2941*

1          Your Honor, we would also ask that the conscious

2    avoidance instruction be stricken.  We don't believe that it's

3    part here especially in terms of the conspiracy charges we

4    believe that Mr. Khalupsky had to act intentionally and that

5    he can't have participated in this offense by closing his

6    eyes.  Yes.

7          In order to get this instruction, and, Judge, I

8    think I'm quoting from, I'm sorry, I thought it was our

9    submission but it's not, United States v.  Ferguson says that

10   "A conscious avoidance instruction is appropriate only when

11   the defendant asserts the lack of some specific aspect of

12   knowledge required for the conviction and the appropriate

13   factual predicate for the charge exists.  The evidence is such

14   that a rational juror can reach a conclusion beyond a

15   reasonable doubt that the defendant was aware of a high

16   probability of the fact in dispute and consciously avoided

17   confirming the fact."

18         And that's United States v. Ferguson, 676 F.3d 260

19   citing to Page 278, Second Circuit in 2011.  So we don't

20   believe in this case given the evidence that's coming in that

21   it's an appropriate charge.

22         THE COURT:  As I sit here now, I'm inclined to at

23   least disagree which is unusual because I don't like the

24   charge, but based on what I've been hearing.  On the other

25   hand, it's certainly not your theory of the case, is it?

*Charge Conference*                                    *2942*

1    You're not going to sum up that this man, you know, played

2    blind.

3              MR. TUCKER:  Your Honor, I think in part to depends

4    on the nature of the defense that is advanced during

5    summations.  I could imagine a scenario where on rebuttal we

6    would point to this charge to respond to a particular defense

7    that we're advancing.

8              THE COURT:  They're going to want to know whether

9    this is in or out about of they sum up.

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                      2943

1          MR. TUCKER:  Your Honor, I think the Court is right

2   to put this in.  I think that Ms. Whalen already has

3   attempted to lay -- and Ms. Felder has attempted to lay a

4   foundation for some kind of argument that other employees at

5   Dolphin Trading were the ones doing this trading.

6          THE COURT:  I understand.  I listened to the

7   openings.  I was surprised by it.  I understand it.  That is

8   not a criticism, it is just an observation.

9          All right.  I will give it one last thought.

10         MS. WHALEN:  Your Honor, and then with respect to

11  Page 65, the cooperating witness charge.

12         THE COURT:  65?

13         MS. WHALEN:  Yes.  We would ask that the Court in

14  the second paragraph, We should bear in mind.

15         THE COURT:  Yes.

16         MS. WHALEN:  We'd ask that the language be

17  strengthened to, A witness who realizes he may be able to

18  avoid prosecution, retain his own freedom or receive a

19  lighter sentence by giving testimony favorable to the

20  prosecution, has a motive to testify falsely and that is the

21  language given in Sand --

22         THE COURT:  Yeah, that's true.

23         MS. WHALEN:  -- 711.

24         THE COURT:  That's true.

25         MS. WHALEN:  And then we'd ask, You should ask

1    yourselves whether the witness would benefit more by lying

2    or telling the truth.  We ask that that paragraph be

3    removed.

4              And then with respect --

5              THE COURT:  That whole paragraph be removed?

6              MS. WHALEN:  Yes.

7              THE COURT:  No, I am not going to do that.  Go

8    ahead.

9              MS. WHALEN:  And then on Page 66 at the top, the

10   no conclusions are inference of guilt because those

11   individuals have pled guilty.

12             THE COURT:  Yes.

13             MS. WHALEN:  With respect to the last sentence, we

14   would just ask it to read -- not the last sentence, the

15   sentence before.  The witness' decision or anyone's decision

16   to plead guilty is a personal decision about his own guilt.

17   I think, and remove the phrase, As to matters which are not

18   initiative in this trial because those matters clearly are

19   at issue in this trial.

20             THE COURT:  Absolutely.

21             MS. WHALEN:  And then -- and then that's it for

22   us -- oops -- oh, yeah, Ms. Felder has just reminded me.  I

23   didn't point out every time every instance of acquit, but

24   we're asking for the global change acquit to not --

25             THE COURT:  Yeah, I don't like the acquit.  When I

Proceedings                                        2945

1   find them I will change them.

2          MS. WHALEN:  Okay.  Thank you.

3          THE COURT:  Okay.  Ms. Brill, you're up.

4          What have I done here?

5          MS. BRILL:  On Page 4.

6          THE COURT:  Bear with me just a second.  I have

7   somehow managed to get some papers messed up here.  Okay

8   Page 4?

9          MS. BRILL:  We request -- starting at the top of

10  the page which is the burden of proof, the burden of proof

11  instruction, the last sentence subsumed in the burden of

12  proof instruction is about the defendant's right or, you

13  know, exercise of his right not to testify.  And our request

14  is that that be a separate instruction.  And I can read you

15  what our request would be.

16         THE COURT:  No, I have your requests.  It is a

17  separate instruction -- I don't understand.  You want a

18  separate heading?

19         MS. BRILL:  A separate heading, yes, with a

20  separate instruction and not subsumed in the burden of

21  proof.

22         THE COURT:  What heading would you like?

23         MS. BRILL:  I'm sorry.  Defendant's right not to

24  testify.

25         THE COURT:  Is that okay with you, Ms. Whalen?

Proceedings                                    2946

1          MS. WHALEN:  That's fine, Your Honor.

2          MS. BRILL:  And then the -- the request -- well,

3    it's also an expanded request of that instruction as well.

4          THE COURT:  Wait just a second.  The heading is

5    going to be defendants', plural apostrophe, right not to

6    testify.

7          Okay.  And your next thought?

8          MS. BRILL:  Our next thought is to use the

9    paragraph that Your Honor has and add the following

10   paragraph -- well, Your Honor, I mean at this time it's

11   simply to make the -- I can see that what I'm about to read

12   is what Your Honor has in the paragraph so it's to make it a

13   separate instruction.

14         THE COURT:  Okay.

15         MS. BRILL:  And on that page, Your Honor, I note

16   in the second instruction on that -- well, now the third

17   instruction on that page, but the second instruction is

18   reasonable doubt.  The very last couple of sentences they

19   say, It is not an excuse to avoid the performance of an

20   unpleasant duty and it is not sympathy.  We object to those

21   two sentences.  They don't seem to make sense.

22         THE COURT:  Note.

23         Okay.  Next?

24         MS. BRILL:  Join in the request of Ms. Whalen, of

25   course, about after that comes at the end of that.

```
                     Proceedings                    2947
```

1           THE COURT:  I'm sorry.  Say that again.

2           MS. BRILL:  Ms. Whalen made a request at the end

3      of that instruction.  That is the reasonable doubt

4      instruction --

5           THE COURT:  Yes.

6           MS. BRILL:  -- to use a paragraph that's If after

7      consideration of evidence, and we echo that request.

8           THE COURT:  Well, I have it in here somewhere, but

9      enough is enough.

10          Next?

11          MS. BRILL:  And then moving on to Page 7 and the

12     circumstantial evidence request.

13          THE COURT:  Yes, ma'am.

14          MS. BRILL:  We made a specific request for a

15     different circumstantial evidence instruction.

16          THE COURT:  Yes, you did.

17          MS. BRILL:  And I understand that the Court is

18     giving this instruction but there's a particular sentence

19     which is the -- about two-thirds of the way through the

20     instruction, That's all there is to circumstantial evidence.

21     And we -- our instruction, the one that we requested, really

22     took the opposite stance about that particular concept.  In

23     other words, it's not just that you can draw an inference

24     from someone walking into a courtroom that it's wet, it

25     rained, in the interim it's There are many inferences that

Proceedings                                          2948

1  you can draw.  And so the limiting way, particularly the way

2  that this sentence casts a limiting way on circumstantial

3  evidence is what we are particularly objecting to.

4            THE COURT:  You know what I'm going do for you?  I

5  am going to remove the sentence.

6            MS. BRILL:  And we still wish that you would give

7  the other instruction, but I heard you.

8            THE COURT:  I'm sorry?

9            MS. BRILL:  Yes, Your Honor.  Thank you.

10            THE COURT:  A simple thank you would be -- I am

11  being facetious.

12            But go ahead.

13            MS. BRILL:  Okay.  I'm trying to skip over the

14  pages of the introduction and not repeat.

15            Oh, on Page 26, the end of the paragraph that

16  begins, Let me start with the first element --

17            THE COURT:  Yes, ma'am.

18            MS. BRILL:  The very end is about how you can

19  infer an agreement and then the last clause is, It's

20  ordinarily a conspiracy is secret.  We object to the Court

21  saying that, that ordinarily a conspiracy is secret.

22            THE COURT:  Noted.

23            Next?

24            MS. BRILL:  The next page, Page 27, the paragraph

25  that begins, The extent or duration.

Proceedings                                    2949

1        THE COURT:  Yes.

2        MS. BRILL:  The last --

3        THE COURT:  You would like to strike that

4    paragraph.

5        MS. BRILL:  -- sentence --

6        THE COURT:  That's --

7        MS. BRILL:  Sure.  But join in that request.

8        But at least the last sentence, it seems to me,

9    repetitive of all the other sentences and so we move to

10   strike the last sentence as repetitive.

11       THE COURT:  Okay.

12       Next?

13       MS. BRILL:  Similar request as before on Page 31,

14   the very last two sentences on that -- two full sentences on

15   that page, The direct proof of knowledge and fraudulent

16   attempt is almost never available.  It would be a rare case

17   where it could be shown, et cetera.

18       We object to that aspect of this instruction.

19       THE COURT:  Okay.

20       MS. BRILL:  Request that those two sentences be

21   stricken.

22       THE COURT:  I will look at it.  I am not likely

23   going to change it but I will look at it.

24       Page 32, the discussion of circumstantial evidence

25   at the top of that page is repetitive.

Proceedings                    2950

1          THE COURT:  It is out.  It is already out.

2          Thank you.

3          MS. BRILL:  And Page 39 beginning in the first

4    third of that page, That direct proof of knowledge and it

5    would be a rare case language is repeated.  Whether you take

6    it out or not, these other requests would be denied

7    repeated.

8          THE COURT:  It is somewhat repetitive.  I will

9    take a look at it.

10         You say on Page 39?

11         MS. BRILL:  Yes, 1, 2, 3, the third paragraph

12   begins Direct proof of --

13         THE COURT:  I took that paragraph out.

14         MS. BRILL:  Okay.

15         THE COURT:  It is largely repetitive.

16         MS. BRILL:  All right.  Page 43 is the end of the

17   aiding and abetting --

18         THE COURT:  Yes.

19         MS. BRILL:  -- instruction.

20         THE COURT:  Yes.

21         MS. BRILL:  And our request is that -- that

22   instruction end 1, 2, 3, 4 lines down, The mere presence is

23   not sufficient to establish.

24         The next couple of sentences refer to -- I mean,

25   perhaps the next sentence could remain.  But the sentence

Proceedings                                    2951

1   after that refers to being on the scene and it doesn't seem

2   to apply.  And then the couple of paragraphs after that

3   refer to a series of questions that if they answered yes,

4   the jury must find that they are aiders and abetters, but

5   it's not questions like Was the defendant merely present

6   or -- it's a series of questions that are skewed towards a

7   finding that the defendant is an aider and abetter.

8           THE COURT:  Well, first of all I think your first

9   point is well taken.

10          However, the defendant's presence is for a

11  different sort of case.  I will take that sentence out.  But

12  this is very -- you are the first defense that has ever

13  objected to this.  It has got to answer all three questions

14  yes.  If on the other hand any answer to any one of these

15  questions is no, then the defendant is not an aider and

16  abetter and they must conclude that he is not guilty as an

17  aider and abetter.  I am going to leave that in, but I will

18  take the other sentence that you find, I think,

19  appropriately, so inappropriate to this case, I will take it

20  out.

21          MS. BRILL:  Moving to Page 46 where the list of

22  the overt acts, I'm conscious of the other overt acts that

23  were discussed and I just -- and this could be my -- I mean,

24  the Government having looked at it and codefendants' counsel

25  having looked at it, was there proof of C?

Proceedings                    2952

1          MR. GOPSTEIN:  Yeah.  And I think -- I have not

2    looked at the specific document, but because all of Momotok

3    Brokerage trading records are in evidence, I believe those

4    records include this trade.

5          THE COURT:  Take a look for me, will you?

6          MR. GOPSTEIN:  We'll do, Your Honor.

7          THE COURT:  Okay.

8          MS. BRILL:  Page 47, the sentence about halfway

9    down -- okay, paragraph begins The proof of an overt act.

10         THE COURT:  Right.

11         MS. BRILL:  The next sentence is repetitive of the

12   first sentence.

13         THE COURT:  Oh, all right.  If you want to take it

14   out.

15         MS. BRILL:  And moving down that page, the second

16   to the last sentence on the page, Frequently and apparently

17   innocent act sheds its harmless character, we object to the

18   Court giving that instruction.

19         THE COURT:  Next.

20         MR. TUCKER:  Your Honor, before we move past 47.

21         THE COURT:  Yes, sir.

22         MR. TUCKER:  I believe we need to -- maybe

23   Ms. Brill wasn't cutting this far, but I think we need to

24   leave in language that the jury needs to agree on the same

25   overt act.

Proceedings                                2953

1            MS. BRILL:  Yes, I was only talking about --

2            THE COURT:  I did not take that out.

3            MR. TUCKER:  Okay, great.  Thank you.

4            THE COURT:  I'm sorry, your next page?

5            MS. BRILL:  Yes, I'm sorry.

6       Next page is Page 52.

7            THE COURT:  50?

8            MS. BRILL:  Two.

9            THE COURT:  Okay.

10           MS. BRILL:  And this is part of the instruction as

11  to Count 2, which is the conspiracy to commit the

12  conspiracy; that is, it's the computer intrusion conspiracy

13  mixed with the securities fraud conspiracy, and we had

14  already moved the Court about this.  And it's -- I don't

15  want to use the wrong word I never get it right --

16  duplicitous or multiplicitas nature and so -- and the Court

17  ruled that this was not two different conspiracies and

18  specifically said this is not two different conspiracies

19  that the jury could find as to one or as to the other if

20  putting aside what they need to be unanimous about.

21       But here --

22           THE COURT:  You probably could have charged one

23  conspiracy in this case.

24           MS. BRILL:  They could have charged one --

25           THE COURT:  Instead of both of them.

Proceedings                                    2954

1          MS. BRILL:  -- but they didn't and so you're

2    proposing to instruct right below the three asterisks,

3    you're telling the jury that they could either find a

4    conspiracy to commit securities fraud or a conspiracy to

5    obtain information by computer intrusion and whichever one

6    they find they could find unanimously, but that was

7    precisely our objection back in our July 2017 motion and

8    precisely what the rule -- the Court said, no, there's only

9    one conspiracy charge there's not two different conspiracy

10   charged.

11         THE COURT:  That is right.

12         MS. BRILL:  So we -- looking at this instruction,

13   we -- we find that inconsistent with the Court's ruling.

14         THE COURT:  One conspiracy, two different

15   objective crimes.  I do not think I am inconsistent at all,

16   but you have made you point and others, who knows, may agree

17   with you.

18         Okay.

19         What else?

20         MS. BRILL:  Conscious avoidance charge on Page 62,

21   Your Honor, we do object because the nature of the

22   Government's evidence and the evidence in the case has been

23   of direct knowledge.  And so we understand the case law to

24   be if that is the evidence in the case, then the charge is

25   not necessary.

Proceedings                                    2955

1              THE COURT:  Well, I understand.  I think it is --

2      as I said a moment ago, I think it is legally -- I do not

3      like the charge generally, but I think it is legally

4      justified in this case.  Whether it is needed is a different

5      story given what I know we are going to hear from the

6      Government.  But that is one of the substantive issues you

7      are going to need a decision on before you start in tomorrow

8      morning, conscious avoidance.

9              Okay.  What else?  Likely going to stay.

10             That's the way I look at it.

11             MS. BRILL:  Last one, Your Honor, I think.

12             THE COURT:  Yes.

13             MS. BRILL:  Apart from the biggie, Page 68, the

14     very -- in the character evidence charge, the last clause

15     says, You must not acquit him merely because you believe him

16     to be a person of good character.  The "must not" and

17     "merely" are what we object to.

18             THE COURT:  I am just changing the acquit to not

19     guilty.

20             Now what is the sentence?  On the other hand if

21     after considering all the evidence, including that of the

22     defendant's character, you are satisfied beyond a reasonable

23     doubt you must not acquit him merely because you believe him

24     to be a person of good character.  What is wrong with that?

25             MS. BRILL:  Again, Your Honor, you must not find

Proceedings                                    2956

1   him not guilty, I guess is what you changed it too, merely

2   because you -- we object to the word --

3          THE COURT:  People of good character commit

4   crimes.  That is all it is saying.

5          MS. BRILL:  I understand that's what it's saying

6   but these are the instructions to the jury and so you are

7   acquainting the finding that he is a person of good

8   character with something that's more trivial.

9          THE COURT:  I am balancing the Charge.  I am

10  telling them evidence of good character may alone support a

11  finding of not guilty.

12         MS. BRILL:  No, you're saying it doesn't support

13  it.

14         THE COURT:  No.  You are not looking at the

15  whole --

16         MS. BRILL:  And I lost my page, Your Honor --

17  Page 68 -- I'm looking at the last paragraph and it seems to

18  say that -- well, I understand your -- I understand you're

19  balancing the -- in the two final paragraphs there's a

20  balance going on and again the objection would be to the

21  word "merely."

22         THE COURT:  I'm sorry?

23         MS. BRILL:  The objection is to the word "merely."

24         THE COURT:  Merely, let me see.

25         MS. BRILL:  And, Your Honor, we do object just to

Proceedings                              2957

1   the --

2            THE COURT:  I will take the word "merely" out.

3            MS. BRILL:  Well, I mean, we object to the clause.

4            THE COURT:  You object to the whole sentence?

5            MS. BRILL:  Yes.

6            THE COURT:  All right.  Noted.

7            MS. BRILL:  And that's it except for the other

8   objections.

9            THE COURT:  Okay.

10            MR. TUCKER:  Your Honor, with respect to the --

11   I'm sorry, Your Honor.

12            THE COURT:  No, you go ahead.

13            MR. TUCKER:  With respect to the introduction,

14   it's not a proposal, might get us out of here faster.

15   The Government will consent to removing the introduction

16   section from the Court's Charge if the defense will not

17   include in the Charge the theory of defense case.  We cut

18   our intro, they don't get their statement.

19            THE COURT:  Well, that is horse trading, and you

20   are welcome to do it.

21            MR. TUCKER:  I couldn't --

22            THE COURT:  I said that is horse trading and you

23   are welcome to do it with them.  I do not want to be a part

24   of that.

25            MR. TUCKER:  Understood, Your Honor.

Proceedings                              2958

1          THE COURT:  Otherwise I call them as I see them.

2          I do have some concerns, as I sit here thinking

3    about it, because I have read through this introduction,

4    believe it or not, once.  I do have some concerns.  I am

5    well aware of the law.  There are aspects of that, that

6    concern me.  Frankly the last thing I think you want, maybe

7    the defense wants, but I do not think anybody wants is for

8    them to be sitting in there pouring other this extended

9    introduction much of -- some of which goes into matters that

10   I do not recall there being testimony about, to be honest

11   with you.  I just think it is foolhardy, nobody wants to try

12   the case twice.  So I want to think about it some more.

13          To me -- oh, you wanted to -- you wanted to note

14   specific paragraphs that you found particularly

15   objectionable if I am going to slice the baby in half, which

16   is not likely, but I would like to know what they are.

17          MS. WHALEN:  Okay.  Your Honor, on Page 20.

18          THE COURT:  Do you mean the first nine pages of

19   the introduction are okay?

20          MS. WHALEN:  No, no, we have our standing

21   instruction.

22          THE COURT:  Yes, I understand.

23          MS. WHALEN:  Our waiver.  You are asking for the

24   specific.

25          MS. BRILL:  I got some stuff on --

Proceedings                              2959

1          MS. WHALEN:  Yeah, just to rephrase our -- our

2    initial request is that the introduction Pages 11 through 16

3    be stricken and then in terms of the body of the fraudulent

4    hacking and trading scheme, our first objection would be on

5    Page 20.

6          THE COURT:  Right.

7          MS. WHALEN:  And we believe Paragraphs 37 and 38

8    should be stricken and we conferred with the Government on

9    Paragraph 37, I think we're in agreement that the evidence

10   did not come in at trial and then with Paragraph 38, that's

11   the layering scheme which also did not come in at trial.

12         THE COURT:  Those are two easy calls.  Do you

13   agree with that, gentlemen?

14         MR. TUCKER:  Yes, Your Honor.

15         MR. GOPSTEIN:  Yes.

16         THE COURT:  Okay.

17         MS. WHALEN:  And then, Your Honor, with respect to

18   Page 21 there is a reference to a wish list.  I believe the

19   testimony came in that it was a list or shopping list.  We

20   would ask that the word "wish" come out and it just be

21   referred to as a list.

22         THE COURT:  Okay.

23         MR. HEALY:  Well -- okay, I'm sorry.

24         MS. WHALEN:  And then on Page 22.

25         MR. TUCKER:  Your Honor, somehow I think that's a

Proceedings                                              2960

1  defined term in the introduction, "wish list" is defined in

2  the introduction in the preceding paragraph.

3              THE COURT:  It is defined a couple lines above it.

4              MR. TUCKER:  Yes -- yes, Your Honor.

5              MS. WHALEN:  Your Honor, I don't believe -- well,

6  it may have been defined in the introduction and it may have

7  been defined in this introduction, this further introduction

8  as to the Indictment.  I don't believe that it was defined

9  as such at trial.  I think the testimony at trial was to a

10 list of stocks that he was interested in or a list of stocks

11 that he was asking for, but I don't think that it was

12 referred to as a wish list.  And I think that evidentiarily

13 there is an alternate interpretation of that information and

14 so we would just ask that the word "wish" be removed from

15 the reference to this list.  There was evidence of a list,

16 but I believe that there may have been more than one at the

17 trial, but I don't believe that any of them were referred to

18 as a wish list.

19              And then finally, Your Honor, with respect -- on

20 Page 22 in Paragraph 42 it talks about $30 million in

21 illegal proceeds, I believe that -- I believe that it's now

22 been reduced to the Government's opening to $20 million.

23              THE COURT:  I guess I am going to blind at this

24 hour.  I can't find the number.

25              MS. WHALEN:  Oh, sure.  On Page 22.

Proceedings                                    2961

1          THE COURT:  Yes.

2          MS. WHALEN:  Paragraph 42.  It's the third

3  sentence.

4          THE COURT:  Oh, I see.  Is that right, all the way

5  down to 20 million.

6          MR. TUCKER:  Well, Your Honor, the problem is that

7  the conspiracy is a little broadly defined on the Indictment

8  in this case three years ago than the proof that we've shown

9  at trial.  This is the issue in the introduction that is

10  drafts three years ago with a larger conspiracy.

11          THE COURT:  Which may be one of the best arguments

12  they have to make if you get that exclusion.

13          Is that it, Ms. Whalen?

14          MS. WHALEN:  That is it for us, Your Honor.

15          THE COURT:  In effect, you might say having this

16  as an allegation in the Indictment leaves you vulnerable to

17  the defense standing up and saying to the jury, you can go

18  through the evidence 15 different ways for the next ten

19  years and you're not going to find any evidence that this

20  $30 million in illegal proceeds.  That doesn't do much for

21  the defense.

22          Okay.  Ms. Brill, you had some specifics.

23          MS. BRILL:  We have more concerns, Your Honor.

24  First is on Page 12 there's a very long -- in Paragraph 13

25  it's a very long paragraph that lists tickers and it

Proceedings                                              2962

1    connects them to the press releases and it's -- it just -- I

2    don't -- I mean, the issue of press releases has been

3    litigated.  Press releases has been admitted, but it's

4    just -- I think this -- our concern is that the paragraph

5    sort of sets out, you know, as a fact that all of these

6    tickers have corresponding press releases that are somehow

7    relevant to the case that they heard.

8              THE COURT:  I understand.

9              MS. BRILL:  Okay.  So that's that objection.

10             In Paragraph 14 on Page 14, in the sentence that

11   defines IP address, there's a sentence in the middle that

12   said an IP address served two principal functions and we

13   object to the -- I'm not sure that both of those functions

14   came out in the testimony.  And, again, we object to the use

15   of this introduction to draw that out for the jury of what

16   the function of an IP address was.

17             THE COURT:  Yeah, I actually did think that that

18   came out in the testimony, but that is neither here nor

19   there.  What's next?

20             MS. BRILL:  And then in Paragraph 15 they've got

21   URLs.

22             THE COURT:  Same.

23             MS. BRILL:  Okay.  PHP strict.  I don't know that

24   there was any testimony about that --

25             THE COURT:  That, I don't remember.

Proceedings                                    2963

1          MS. BRILL:  -- without having checked.

2          Well, Page 16, the things that I have circled on

3    Page 16 are just the --

4          THE COURT:  The words that you --

5          MS. BRILL:  Fraudulent hacking and trading scheme,

6    the definition of it.  It's essentially the roadmap argument

7    set forth by Ms. Whalen, which really continues and comes to

8    a head on Page 17 at the bottom of Page 17 and -- 100,000

9    press releases, a thousand inside window trades and

10   $30 million in profits.  There's a lot of evidence there was

11   a lot of press releases, there were a lot of trades but I --

12   you know, those numbers like the 30 million number may need

13   to be -- still need to be adjusted.

14         THE COURT:  Okay.

15         MS. BRILL:  Paragraph 35, which is on Page 19, the

16   last sentence, so the -- the first sentence has to do with

17   an e-mail that I believe was admitted, the first couple of

18   sentences, but the last sentence has to do with the traders

19   trading in 12 specific stocks.  And we heard -- and that may

20   be borne out by the, you know, very -- as we've heard

21   voluminous trading material that could be reviewed, but we

22   heard no evidence at trial about any of those particular

23   tickers and so it just highlights the prejudice that we are

24   calling the Court's attention to for the jury to see this

25   kind of allegation about stocks that weren't even mentioned.

Proceedings                                    2964

1           THE COURT:  A couple were but the point is well

2     taken.

3           MS. BRILL:  We talked about 37 and 38.

4           With respect to Paragraph 39 that Ms. Whalen spoke

5     about, and this -- what I'm about to say which is very

6     similar to what I just said applies to 39, 40, and 41.  It's

7     one thing that the evidence of the e-mail came out.  It's --

8     it's another to set forth in detail what was the testimony

9     at trial about these -- about these trades and it's -- the

10    ability to reiterate that precise testimony which had to be

11    made between 3 or 4 -- you know, had to come out between 3

12    or 4 witnesses that were cross-examined.

13          The paragraph -- sentence that I have referred to

14    referring to that was pure argument is a sentence on

15    Page 22, Paragraph 42.  The timely coordination was critical

16    to success of a scheme that yielded more than $30 million in

17    proceeds.  So that's the kind of a sentence that's not --

18    that ought not go to the jury.  It's not an allegation.  And

19    then the very last sentence of Paragraph 42.

20          THE COURT:  It is -- did you say it is not an

21    allegation?

22          MS. BRILL:  It's not a -- I'm sorry, it's a

23    sentence that ought not go to the jury.  Strike the last --

24          THE COURT:  Okay.  No, I just want to make sure we

25    are all on the same page.  All of these are allegations.

Proceedings                                    2965

1    Your concern is, among other things, collectively it sort of

2    overwhelms the jury potentially.

3              MS. BRILL:  Yeah.  And we are on the same page,

4    Your Honor.

5              THE COURT:  Okay.

6              MS. BRILL:  And in that same paragraph,

7    Paragraph 42 on Page 22, the last two sentences refer to a

8    series of real estate transactions and intermediary

9    transactions and purchases of real estate by Mr. Korchevsky.

10   They are not the real estate purchases that were alluded to

11   during the defense case and they were not proven at trial.

12             MR. TUCKER:  Those are the forfeiture allegations,

13   Your Honor.  As the Court knows, the defense has signed

14   waivers of jury determinations on the issue of forfeiture.

15   That's why the language was in there, just for the record.

16             MS. BRILL:  Right, but it's nothing about that

17   came out during trial.

18             THE COURT:  All right.  Anything else?

19             MS. BRILL:  Well, the same I think as to

20   Paragraph 43 and the ticker track.

21             THE COURT:  It is a very unusual situation --

22             MS. BRILL:  And that's it.

23             THE COURT:  -- to have a 44-paragraph introduction

24   and I am a little uncomfortable with the idea.  I have got

25   to think this through.  I want to make a list with you now

Proceedings                                    2966

1   as to those substantive charges, language I don't think we

2   have to worry about.  Substantive issues that I am going to

3   need to resolve for you before you begin at 9:00 o'clock.

4   One is, of course, is conscious avoidance.  The other is the

5   introduction, what to do about it.  The only thing I can

6   tell you is I am not going to read it.

7            Are there any other substantive disputes?  Is it

8   the hour of the day or is it the heat in the room or is it

9   just that we tapped them all?

10           MS. BRILL:  Must be multiple conspiracies, Your

11  Honor, is a an issue.

12           THE COURT:  Multiple conspiracies.  You are the

13  only one that seems to be insisting on multiple

14  conspiracies, so I do not think I am going to give --

15           MS. BRILL:  Your Honor, I would point out that

16  with respect to U.S. Court and you asked the lawyers this

17  morning about a way that a defendant could be not part of

18  the overall conspiracy but part -- that some other

19  conspiracy could interfere in multiple conspiracies, weigh

20  with the rest of the conspiracy.

21           THE COURT:  Conspiracies.

22           MS. BRILL:  There was testimony at the trial that

23  at one point Arkadiy Dubovoy with the help of Mr. Khalupsky

24  found other hackers in -- or other obtainers of press

25  releases.  I should be more precise.  If Leningrad, was it,

Proceedings                                      2967

1   and there's been no testimony as to how those people, if

2   they existed, and if they did what they said they did,

3   intruded upon computers.  In other words, it would have an

4   impact on Count 2.  That testimony, our assertion is, would

5   have an impact on Mr. Korchevsky and Count 2 and whether

6   there are multiple conspiracies with respect to that count.

7            THE COURT:  Huh?  All right.  I will give it some

8   thought.

9            MR. TUCKER:  Your Honor, the only substantive

10  point that the Government would raise is in regard to

11  something Your Honor mentioned this morning, the

12  investigative techniques instruction.  I could be surprised

13  but my sense is that we -- the Government is going to be the

14  target of substantial fire from both defendants in our

15  failure to employee certain investigative techniques.

16           THE COURT:  Then I am going to insert the charge.

17           MR. TUCKER:  Fair enough, Your Honor.  My point is

18  simply this:  To the extent I responding to those arguments

19  in my rebuttal, it would be useful to know before the

20  rebuttal whether that charge --

21           THE COURT:  Just ask me.

22           MR. TUCKER:  Fair enough, Your Honor.

23           THE COURT:  Ms. Felder.

24           MS. FELDER:  Your Honor, as a procedural matter I

25  just note that we do renew our Rule 29 motions that were

Proceedings                                          2968

1    previously made.

2              THE COURT:  Please do.

3              MS. FELDER:  As to venue in Counts 3 and 4, we

4    move for an acquittal on Counts 3 and 4 because of lack of

5    venue.

6              As to Count 2 we move for an acquittal in terms of

7    the constructive amendment of the Indictment, which is per

8    se prejudicial.

9              THE COURT:  I must say you kept me up by trying to

10   figure that one out.  But you are doing your job.  Go ahead.

11             MS. FELDER:  Lastly we do renew our objection to

12   the testimony from Alexander Garkusha that came in about him

13   overhearing or it being relayed to him that Arkadiy Dubovoy

14   was upset with Mr. Khalupsky about his trading.  I believe

15   initially the Court made one ruling and then after the

16   testimony came out, asked the Government for further

17   information about whether or not the statement in the

18   testimony was actually in furtherance of the conspiracy.  So

19   we made a pretrial motion to preclude that statement.  We

20   renewed our objection at trial and we also maintained that

21   objection based on the testimony at trial.

22             THE COURT:  Well, yeah, and then I eventually

23   agreed with you.

24             (Continued on next page.)

25

*Charge Conference*                                                    *2969*

1          THE COURT:  Well, yes, and I eventually agreed with

2    you.

3          MS. FELDER:  Your Honor, I didn't recall a ruling.

4    So our position is that that statement, that testimony should

5    be stricken.

6          THE COURT:  Fine.  I'll strike it.

7          MS. FELDER:  Thank you.

8          THE COURT:  Take a shot.

9          MR. GOPSTEIN:  Thank you, your Honor.  I'll take a

10   shot.  And I will do did briefly.

11         THE COURT:  You better identify it because if he had

12   made application at the time I would have been able to deal

13   with it, but you didn't.  I simply said I ultimately agreed

14   with you and I put the charge to you to figure out to tell me

15   overnight how to was in furtherance of the conspiracy.  I

16   never heard a word from you.

17         MR. GOPSTEIN:  I did not.

18         THE COURT:  I know you had nothing else to do but go

19   ahead.

20         MR. GOPSTEIN:  The proffer is this, your Honor.  I

21   think that a statement can be in furtherance of a conspiracy

22   in multiple ways.  There's a substantial case law that if one

23   co-conspirator is, for example, informing another -- I don't

24   have the case law here but I looked at it that evening just to

25   make sure I was looking at the right stuff.  If one

*Charge Conference*                                          *2970*

1   co-conspirator is telling another co-conspirator who another

2   member of the conspiracy is, that can fall under the

3   co-conspirator exception.

4            THE COURT:  Absolutely.

5            MR. GOPSTEIN:  If one co-conspirator is keeping

6   another co-conspirator apprised the of the status of the

7   activity in the conspiracy.

8            THE COURT:  We're in agreement on that.

9            MR. GOPSTEIN:  Yes.  And so, I think the factual

10  record at this point is false which is that Mr. Garkusha was

11  in the trading until the very end of the conspiracy.  Your

12  Honor asked him those questions.  If I could do it over, I

13  would ask those questions prior to ask the question I asked.

14  But as I said, I think at sidebar at the time that the

15  statement was made, Mr. Garkusha was trading and was a member

16  of the conspiracy and they were speaking openly about it.

17           So I think the temporal aspect of the statement is

18  what is particularly relevant here.  Just as you know, we only

19  had two statements from Mr. Garkusha on the stand about

20  Mr. Khalupsky.  The first was about meeting in 2013 where he

21  was not informed that Mr. Khalupsky was trading on the press

22  releases even though the record establishes that he was.  And

23  the reason for that is, I think, a reasonable inference from

24  that is he at that point was not trading.  But in 2015 when

25  Arkadiy Dubovoy was telling him about it, he's letting him

*Charge Conference*                                                    *2971*

1  know that Mr. Khalupsky is trading on stolen press releases.

2  And just as Mr. Arkadiy Dubovoy told Garkusha in 2015 that

3  Khalupsky was trading on the stolen press releases, he's

4  testified shortly thereafter, Mr. Garkusha did, that Arkadiy

5  Dubovoy told him about Korchevsky's trading in that same time

6  period.

7            And so, I think, your Honor, for those reasons what

8  you have is you have a time period that I think is what's key

9  here.  And, at the end of the day, you have one co-conspirator

10 telling another that a third co-conspirator, namely, the

11 defendant is, in fact, trading.

12           So that's the proffer.  That was the foundation for

13 the statement, and I think under the case law it's a relevant

14 statement that shows at a minimum one co-conspirator telling

15 the other who the members of his conspiracy are and that's

16 important information for any member of the conspiracy to

17 know.

18           And I understand the way the testimony came out,

19 your Honor, I do.  And I went back and read the record and I

20 read what I said in the sidebar I don't believe that what I

21 said at the sidebar and what I previewed was

22 inconsistent -- certainly wasn't inconsistent with what I

23 anticipated he would say.  I don't believe it was inconsistent

24 with what he did say which is that at the time of this

25 conversation, at the time of this conversation, Mr. Garkusha

1   was trading and you asked those two specific questions were

2   you active life involved at this time and the answer was yes.

3   And I'll just say just I'll just say to your Honor in terms

4   your response to the question you had asked me prior.  You

5   know, the way that this testimony came out was sure slightly

6   different than as I heard it previously.  I think all the

7   factual underpinnings from a legal matter are the same and if

8   I knew everything that Mr. Garkusha was going to do on the

9   stand and how the words were going to come out, he used the

10  word friendly.  And I understand that probably struck a chord

11  he said it was a friendly conversation.

12          THE COURT:  Not really but you if shall your point

13  and I'll tell you my recollection.

14          MR. GOPSTEIN:  No, but my only point was that the

15  foundation for the co-conspirator statement sufficient to have

16  two co-conspirators talking at the time reasonable at that

17  time reasons I said.

18          The only other point was I was make if I knew

19  exactly how his testimony was going to comes I would not have

20  asked him to identify Mr. Khalupsky on the stand.  So I did

21  not know exactly the way things were going to go out, but I

22  didn't know the foundation for the statements.  I think, from

23  a legal matter, it was admissible regardless of the particular

24  words that were used because the question is was there a

25  foundation for it and I believe that there was one.

*Charge Conference*                                                  *2973*

1           THE COURT:  Here's how were I recall it, and if you

2    can go back to the transcript and convince me otherwise I'll

3    keep an open mind.

4           Mr. Arkadiy Dubovoy was explaining to Mr. Garkusha

5    why he decided not to invest in Khalupsky's business

6    50 percent, I think it was 50 percent.  And he said, I'm not

7    going to invest with it because he's gotten lazy and he's

8    trading on stolen invoices.  The implication being that he's

9    not doing his homework, he's not doing his job, he's not

10   running his business the way he once did.  He's just trading

11   on stolen invoices.  And I did not perceive that that

12   statement in that context was in furtherance these

13   conspiracies.  It was an explanation volunteered by Arkadiy

14   Dubovoy as to why he was no longer going to invest with

15   Mr. Khalupsky.  That's not I don't see that in furtherance.

16          MR. GOPSTEIN:  I don't agree with that's how the

17   statement came out.  I think what we have again is you have

18   why are they talking about Vladislav Khalupsky in 2015.  Why

19   are they talking about his trading business and why is he

20   telling him trading on stolen press releases.

21          THE COURT:  Okay.  I can only deal with how the

22   statement came out.  I appreciating your effort.  Okay.  So we

23   have.

24          MS. BRILL:  Your Honor, mercifully, briefly I join

25   we also renew our Rule 29 on Korchevsky for the counts stated

*Charge Conference*                                    *2974*

1    by Ms. Felder.  And also to all the counts for the reasons

2    stated by me last Thursday.  Nothing about the defense

3    presentation has diminished those arguments.

4               THE COURT:  Motion is renewed, motion is denied.  I

5    did say at the time that if necessary might have to take a

6    closer look at the question of the venue on the securities

7    count and to be continued.

8               I would like to see you all here at 8:30 tomorrow

9    morning.  I'm sorry to do that to you but I want to make sure

10   that I give you some rulings.  You've got three:  Conscious

11   avoidance, the what we're going to do with the introduction

12   and multiple conspiracies.

13              And with that, I thank the reporters, hanging in

14   there.  They earn every dollar they make.  I wish I could say

15   that about all the judges.

16              Okay.  Good night.

17              I assume this is your verdict sheet.  Your draft of

18   the verdict sheet have you seen this?  Have you folks seen

19   this.

20              MS. BRILL:  This might be in.

21              MR. GOPSTEIN:  We filed one.

22              THE COURT:  Get them copies, all right?

23              MR. TUCKER:  Sure, your Honor.

24              THE COURT:  We have time for the verdict sheet.

25              (Adjourned to July 3, 2018 at 8:30 a.m.)

INDEX                                    2975

1                    I N D E X

2                 W I T N E S S E S

3

4            M I C H A E L   M A Y E R

5    DIRECT EXAMINATION                        2788
     BY MR. HEALY
6
     CROSS EXAMINATION
7    BY MR. GOPSTEIN                           2836

8    REDIRECT EXAMINATION                      2867
     BY MR. HEALY
9

10        A L E K A N D E R   S I P K O

11   DIRECT EXAMINATION                        2872
     BY MS. BRILL
12
     CROSS-EXAMINATION                         2882
13   BY MS. NESTOR

14

15        E U G E N E   C A N J E L S

16   DIRECT EXAMINATION (Rebuttal)             2895
     BY MR. GOPSTEIN
17   CROSS EXAMINATION (Rebuttal)              2899
     BY MR. HEALY
18

19

20            E X H I B I T S

21
     Defendants' Exhibit Number H             2799
22

23   Defendants' Exhibit KHAL-V KKK           2885

24                                            2898
     Government's Exhibit Number 8010
25