IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
Plaintiff,

v.

VITALY KORCHEVSKY,
Defendant.

Crim. No.: 15-381 (RJD)

OBJECTIONS TO PRE-SENTENCING REPORT

SULLIVAN & BRILL, LLP
117 Broadway 17th Floor
New York, NY 10006
(212) 566-1000
*Attorneys for Defendant Vitaly Korchevsky*

1. As a general objection, Mr. Korchevsky objects to paragraphs in the pre-sentence report that are directly taken from the Indictment or from the government's April 30, 2018 pre-trial letter of its anticipated trial evidence. Many of the assertions in those documents are not reflective of the actual evidence offered at trial. To include them as "facts" in the Pre-Sentence Report is misleading and often at odds with what the actual trial evidence showed.

2. Page 6 ¶ 10. Vitaly Korchevsky was not a member to the conspiracy between February 2010 and August 2015. The evidence offered at trial showed that Mr. Korchevsky did not join the conspiracy until December 2010 or January 2011.

3. Page 6 ¶ 10. Mr. Korchevsky did not employ computer hackers. The evidence at trial showed that the computer hackers independently stole the press releases and then marketed them to the middlemen and/or traders.

4. Page 7, ¶23 – Mr. Korchevsky never resided in Odessa, Ukraine.

5. Page 8 ¶ 28. Mr. Korchevsky was not acquainted with other co-defendants through the "Russian/Ukrainian community." He knew Arkadiy Dubovoy.

6. Page 8 ¶ 29. PR Newswire is not "a wholly owned subsidiary of UBM plc." This is an example of lifting a paragraph word for word from the indictment. The trial testimony was that PR Newswire is owned by Cision.

7. Page 8 ¶ 30. This (again) is directly copied from the indictment. There

1

was no evidence presented at trial that the "Victim Newswires were authorized by to the SEC to issue press releases" from the listed companies.

8.    Page 9 ¶ 31. The evidence at trial indicated that Mr. Korchevsky did not make any trades based on stolen press releases until January of 2011. Nor was there any evidence that Mr. Korchevsky paid the hackers.

9.    Page 9 ¶ 32. Mr. Korchevsky objects to the statement that "the Victim Newswires and Target Companies had a right to control the use of that information" as a legal conclusion that was not proven or addressed at trial.

10.   Page 9 ¶ 33. The Hackers provided the MNPI to middlemen not the Traders. The evidence at trial was that no payment was ever made by Mr. Korchevsky to the Hackers, nor was there any contact between the Hackers and Mr. Korchevsky.

11.   Page 9 ¶ 35. Again this is language lifted directly from the indictment. Indeed, in the government's opening statement the allegation was that the conspiracy netted 20 million dollars. There is no basis in the evidence presented at trial that there approximately 30 million dollars in illegal profits. Looking at the government's expert's slides, contained exhibit 8003 attached as Exhibit A, Mr. Korchevsky's net profit from January 2011 through May of 2015 is $15,004,153 (slide 1). [1] In exhibit 8009, slide1 indicates that the total profit for all Dubovoy

---

[1] The reference to this profit amount is strictly to establish our objection to the language in paragraph 35. As discussed in detail below, we adamantly oppose this number as the calculation of Mr. Korchevsky's gain.

2

accounts, including those traded in by Khalupsky and others, was $8,737,045. Clearly the conspiracy did not net anywhere near 30 million dollars.

12.     Page 10 ¶ 37. This is another paragraph taken from the indictment. The dates and characterization of the intrusion into PR Newswire do not reflect the trial testimony. Only the final two sentences are relevant and were proven at trial. The computer security expert for PR Newswire stated that there was no evidence of PR Newswire press releases being compromised after January of 2011.

**13.**     Page 10, ¶38 –Mr. Korchevsky had no proven access to email accounts where stolen press releases were housed and no press releases were recovered from any computers or phones in his possession.

14.     Page 10 ¶ 40. Mr. Korchevsky did not meet Dubovoy when he was "a visiting preacher at Dubovoy's church in Atlanta." Dubovoy's trial testimony was that a mutual friend introduced them because he thought it would lead to a useful business relationship.

15.      Page 10 ¶ 40. The statement that "Korchevsky netted more than $300,000 in investment losses during the period between January 2009 and January 2011" is misleading or inaccurate. The evidence at trial indicated that the Mr. Korchevsky had carry-over losses from the crash of 2008. The testimony indicated that Mr. Korchevsky actual has a capital gain of $204,000 from stock trading in 2009.

16.     Page 10 ¶ 40. We object to the term "Korchevsky's professional and

financial troubles." There was no evidence of either presented at trial.

17. Page 10 ¶ 40. We object the statement that Dubovoy believed that Mr. Korchevsky was "an ideal partner for monetizing the stolen press releases." In fact, the trial testimony indicated that when he contacted Mr. Korchevsky, Dubovoy did not even know what the information he had received was.

18. Page 11, ¶41. This is another example of the language being taken from the indictment and pre-trial motion. While there was testimony that Mr. Korchevsky was to be paid a percentage of the profits, the financial records entered in to evidence did not correlate with a fixed percentage payment of Dubovoy's profits. There was evidence of a single payment of seventy thousand dollars, which is far less than ten or twelve percent of over three million dollars

19. Page 11 ¶ 41. Mr. Korchevsky agreed to trade for Dubovoy in one account, not "accounts."

20. Page 11 ¶ 42. Although Dubovoy admitted cheating the hackers, the testimony regarding Mr. Korchevsky was simply that Dubovoy said he was unaware that Mr. Korchevsky was trading in his own account.

21. Page 11 ¶ 43. The amounts cited in this paragraph have not been proven to be tied to the timeframe of the alleged hacking and therefore overstates the profitability of Mr. Korchevsky. The numbers in this paragraph are not based on the government's evidence of when the alleged victim wire websites were hacked.

22. Page 12 ¶ 45. This paragraph is directly a restatement of paragraphs

4

in the government's pre-trial memorandum. There was no evidence at trial that "Korchevsky frequently complained that he was not getting the releases with sufficient time to analyze them." Furthermore, there is no need in Mr. Korchevsky's PSR for statements regarding Dubovoy's beliefs about Mr. Khalupsky, particularly when Dobovoy's testimony does not support any such representation.

23. Page 13 ¶51. Despite allegations to the contrary there was no forensic or documentary evidence that Mr. Korchevsky was possession of a stolen press release.

24. Page 13 ¶ 54. The statement that "during various periods of the conspiracy, Korchevsky's inside-the-window trading was limited to issuers using a single newswire company" is vague and misleading. While the government's statistical expert testified that at times Mr. Korchevsky's trades were "almost exclusively" in stocks covered by one newswire company or another, they were never limited to only one newswire. Further, the alleged evidence of patterns does not correspond to the timeframe when the government evidence demonstrated the newswires were hacked.

25. Page 13 ¶ 55. We feel that for purposes of completeness this paragraph should contain the information that Mr. Korchevsky only invested $217,802 in DNDN. Furthermore, the DNDN trade took place in August of 2011; the security expert hired from PR Newswire indicated that there was no evidence of any press releases being stolen after January 2011. No DNDN press release was found on any

5

device of Mr. Korchevsky, and no other co-conspirator traded DNDN on this date.

26. Page 13 ¶ 56. The LM trade took place in January of 2012; the security expert hired from PR Newswire indicated that there was no evidence of any press releases being stolen after January 2011. No LM press release was found on any of Mr. Korchevsky's devices.

27. Page 14 ¶ 57. No press release relating to the Edwards Life Sciences Corp. announcement of April 23, 2013 was found on any of Mr. Korchevsky's devices.

28. Page 14 ¶ 59. There was no evidence that Mr. Korchevsky paid the hackers. Nor was there any evidence that Mr. Korchevsky wired any money to Estonia or any other location outside of the country.

29. Page 14 ¶ 60. The statement "According to the Government, the gain in the offense was more than $30,000,000 for the Trader Defendants in whole" has no basis in the evidence presented at trial.

30. Page 14 ¶ 61. There were only three victims; the named newswires services. The companies should not be considered victims as they suffered no harm through any individual trade and no loss of value in their market value. Moreover, the testimony at trial by the representatives of the "Victim Newswires" made clear that for the most part the companies were not informed of the actual or potential data breach that was occurring in their servers, even though the companies could have taken steps to make their data more secure. Simply stated, the newswires did

not see the companies as victims.

31. Page 14 ¶ 61. We object to the Business Wire loss of $1,265,767. Although the General Counsel of Business Wire provided an affidavit listing expenses that totaled the claimed amount, the letter states that the expenses were made, *inter alia*, to "assist the U.S. government's investigation of the hack." Business Wire's decision to expend funds on behalf of the government in its investigation and prosecution should not be considered "loss." Furthermore, although we are aware of the role that Fidelis played in the Business Wire data breach, there are other entities and significant amounts listed that lack any specific or context (Isthmus Network Consulting, $305,704; and Variable Path, $101,160).

32. Page 15 ¶ 62. Mr. Korchevsky's base level should not be increased by 22 levels as his gains were under $25,000,000. Without advocating for the specific loss/gain amount for Mr. Korchevsky, for guidelines purposes the most favorable expansive view government's evidence at trial indicates that his gain was between $9,500,000 and $25,000,000. Using the conclusions represented in slides 1 and 3 of Exhibit A, the profitability of Mr. Korchevksy's trades is $15,004,153.[2] The

---

2 It is our contention that the calculation of profit from the offense although for each individual trade was done incorrectly. The profit was determined from the difference in cost from the opening of the position, based on possession of MNPI, against the amount realized from the closing of the position. The method for determining illegal profit in this context should be calculated as the difference between the cost of the opening of the positon against the value of the positon when the press release was made public; that is, the time at which the information was no longer MNPI, and all investors had access to it. *See United States v. Nacchio*, 573 F.3d 1062, 1078–79 (10th Cir. 2009) (holding that "in criminal cases as in civil cases 'to examine the movement of a stock's price after the relevant information is made public in order to determine the proper measure of the illicit profit ... to be charged to one who traded illegally while in possession of the material, non-public information'"); *United States v. Mooney*, 425 F.3d 1093, 1106 (8th Cir. 2005) (Bright, J., dissenting) (noting "the gain resulting from the deception stops when the deception stops, though there may be later gain (or

7

evidence at trial only connected Mr. Korchevsky, even tangentially to four Dubovoy accounts, which had a gross profit of approximately $3,202,000. Even if it were assumed that every trade was proven to be made on MNPI, and that every dollar is attributable to Mr. Korchevsky, both of which we oppose, the total profit is between 18 and 21 million. For guidelines purposes, this would add 20 levels not 22.

However, the actual profit does not nearly approach the 18 to 21 million dollar number indicated by the government's evidence. Firstly, the numbers arrived at by the government's expert included trades that were made at time when the computer expert witnesses indicated they investigation found no evidence of computer intrusion. The table below is compiled from the sworn testimony of the computer security experts for each newswire company.

| Newswire Company | Date(s) system was compromised based on company's computer security analyst | Extent of compromise | Date of discovery and/or period without system compromise |
|---|---|---|---|
| PR Newswire | April of 2010 | First evidence of compromise | |
| | Between July of 2010 and January of 2011 | Scripts to retrieve press releases | Discovered in 2012 |

---

loss) as the stock market gyrates along, unmolested by any deception. If someone buys stock illegally on the basis of insider knowledge, there may be an increase in the stock's value when the insider knowledge is made public"); *United States v. Rajaratnam*, No. 09 CR. 1184 RJH, 2012 WL 362031, at *15 (S.D.N.Y. Jan. 31, 2012) (holding "In sum, Rajaratnam's "gain" for purposes of section 2B1.4 of the Guidelines is equal to the sum of . . . (the increase in the price of a company's shares from the time that Rajaratnam purchased them to the time that the public learned the inside information) x (the number of shares that Rajaratnam traded).

8

|  |  | <u>No evidence of press releases stolen after 2011</u> |  |
|---|---|---|---|
|  | February 2013 | System crashing due to failed attempt to install exploit kit |  |
| **Marketwire** | February of 2010 through summer of 2013 | Press releases extracted |  |
|  | June 23, 2013 and July 30, 2013 | Data removed from server | No evidence of compromise between 7/30/13 and 10/17/13 |
|  | October 17, 2013 | Intrusion onto server | Discovered in November 2013 |
|  | February 2, 2014 | Attempted intrusion but no information exposure | Discovered in June of 2014 |
|  | July 18, 2014 July 22, 2014 | Information exposure | Discovered in August of 2014 |
| **Business Wire** | September to October 2014 | First evidence of intrusion into system | Discovered May 19, 2015 (no evidence of intrusion prior to 9/2014) |
|  | November of 2014 | Intrusion into system |  |
|  | January of 2015 | Intrusion into system |  |
|  | April of 2015 | Intrusion into system |  |
|  | May of 2015 | Intrusion into system |  |

In addition, the trial testimony of the cooperating witnesses was unambiguous that there was a periods when they lost access to the stolen press releases, including approximately a year, sometime between 2012 and 2014, when the

9

hackers had withdrawn the information from them; that no trades were made on MNPI, because that information was not available. Indeed, the government's own database shows that between February 28 of 2012 and January 30 2013, when Mr. Korchevsky makes over 110 trades from companies employing all three newswire services, there is only one time that Mr. Korchevsky and Mr. Dubovoy trade in the same security.

The government's numbers, adopted in the PSR, consider every single trade from January of 2011 through May of 2015, of every security meeting the experts criteria, as representing profit obtained from MNPI; this was not only was not proved through the evidence, but in large part is in contradiction to the evidence. For example, there are 52 trades made in 2012 designated as "Business Wire" trades that meet the government's experts criteria: in the window trades, based around earnings announcements, with a three-day or less roundtrip. Yet the representative from Business Wire conducting the internal investigation in the hacking, at a cost of over 1 million dollars, testified there was no evidence that Business Wire servers were intruded on prior to September of 2014.

The actual number of Mr. Korchevsky gain, computed from the evidence at trial by any other metric other than the government's broad, all-inclusive speculative brush, is significantly less than $9,500,000. Prior to trial, at the direction of the Court, the government provided a spreadsheet that represented alleged illegal trades for which there was evidence, other than statistical evidence,

10

that would be proved at trial. The profit on those trades is $9,127,423. A copy of that spreadsheet is attached as Exhibit B.[3]

33. Page 15 ¶ 62. There should be no increase of 2 levels for 10 or more victims. The application notes to the guidelines state, "Victim" means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); . . . "Person" includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies. U.S.S.G. 2B1.1. However, there has been no evidence that the companies whose press releases were the subject of the trades sustained any loss. The nature of the earnings trades, as described by every expert witness, is that positions are held for a very short time in response to the dip or rise in the stock price that occurs whether or not the that information is known in advance. When such a trade is made, even if on the basis of MNPI, "the insider usually does not cause any price inflation or deflation" and therefore does harm or make a "victim" of the company. *United States v. Rajaratnam*, No. 09 CR. 1184 RJH, 2012 WL 362031, at *6 (S.D.N.Y. Jan. 31, 2012) In addition, it has been noted that "[d]efendants' acting on information that was not known to the market cannot reasonably be held to affect the market's perception of the stock's value, because the market remained unaware of the inside information *United States v. Hatfield*, No. 06-CR-0550 JS AKT, 2014 WL 7271616, at *7

---

[3] Paragraph 30 of the PSR limits indicates a much more limited universe of securities. Analyzing just these securities in conjunction with the testimony regarding the periods during which there was evidence of computer intrusion into the newswire companies, shows that the total gains attributable to Mr. Korchevsky that is under $3,000,000.

11

(E.D.N.Y. Dec. 18, 2014). The companies sustained no loss and should be considered victims; thus there should be no two level increase for more than 10 victims.

34.  Page 15 ¶ 62. The two level increase under USSG 2.B1(17)(A) is not appropriate.[4] In Paragraphs 62 (and 70) of the PSR, two points are awarded pursuant to Guideline § 2B1.1(17)(A), because "the defendant was convicted of an offense under 18 U.S.C. § 1030, and the offense involved an intent to obtain personal information." That same guideline has been re-codified in the 2018 edition as § 2B1.1(18)(A). Neither aspect of the Guideline applies to Mr. Korchevsky.

First, Mr. Korchevsky was not convicted of an offense under 18 U.S.C. § 1030. He was convicted of conspiracy under 18 U.S.C. § 371. This particular guideline increase appears to have been intended for those who committed or commissioned the actual computer intrusion. *See* Background Notes to Guideline 2B1.1 ("Subsection (b)(18) implements the directive in section 209 of Public Law 110–326"); P.L. 110-326, Section 209 (guideline enhancements to be drafted "in order to create an effective deterrent to computer crime and the theft or misuse of personally identifiable data."); *United States v. Buchanan*, 586 Fed. Appx.145 (4th Cir. 2014) (personal information is defined as "sensitive or private information involving an identifiable individual"; consequently, enhancement did apply to the person who obtained control of private YouTube channels and videos belonging to other individuals). Here, there was no evidence that Mr. Korchevsky was ever in contact

---

4 This will be 2B1.1(18)(A) now that the new Guidelines have taken effect.

12

with the actual computer hackers, aware of their methods, or at all involved in how they obtained the stolen press releases.

Second, with respect to obtaining personal information, there is no evidence that any of the stolen press releases were the result of the hackers stealing personal information. The evidence at trial revealed a variety of hacking methods – including SQL-Map, SQL-injection, Metasploit, employing webshells and backdoor malware - and no proof at all as to how any of the particular press releases were obtained. Furthermore, there is no indication that Mr. Korchevsky knew that the hackers obtained any personal information as described, nor that obtaining such information was at all foreseeable to him.

As a result, the enhancement pursuant to Guideline § 2B1.1(18)(A) should not be applied to Mr. Korchevsky.

35. No increase should be applied for a substantial part of the offense taking place outside of the United States. The objects of the conspiracy were all contained in the United States: the information that was stolen was located in the US; all of the trading took place in accounts that were located in the US; all trades cleared in the US; and all profits were paid in the US. The guidelines indicate that not just a part of the fraud or scheme must occur outside the United States, but that a "substantial part" must. Here, the substantial part took place inside this country. As a result, there should be no increase for a substantial part of the offense taking place outside of the United States with respect to Mr. Korchevsky's guideline

13

calculation.

36. Pages 17. The correct guidelines level should be as follows:

¶ 70. Base offense level: (7+ 18):[5]     25

¶ 71. Specific Offense Characteristics

(convicted under 18 U.S.C. § 1956):     +2

Total:     27

37. Page 18 ¶ 84. It is misleading to classify Mr. Korchevsky's religious persecution for printing and delivery bibles, in 1984, as "Other Arrests."

38. Page 29 ¶ 113. With a criminal history of Category I and total Offense level of 27, the guideline range of sentence is 70-87 months.

39. Page 19 ¶ 92. ██████████████████████

40. Page 20 ¶ 94. ████████████████████████████████
████████████████████████████

41. Page 20 ¶ 96. ████████████████████████████████


RESPECTFULLY SUBMITTED.

Dated: November 12, 2018.

                                        SULLIVAN & BRILL, LLP
                                        Counsel for Defendant
                                        VITALY KORCHEVSKY

---

[5] The PSR inadvertently listed the base offense level as 6 instead of 7.

By:   s/_____
      Steven Brill
      James Healy
      Rachel Brill

CC: US Probation Dept.
    Via: Email & hand delivery