**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**VITALY KORCHEVSKY,**

**Defendant.**

**Crim. No.: 15-381 (RJD)**

**SENTENCING SUBMISSION ON BEHALF OF VITALY KORCHEVSKY**

**SULLIVAN & BRILL, LLP
115 Broadway, 17th Floor
New York, NY 10006
(212) 566-1000
*Attorneys for Defendant Vitaly Korchevsky***

## I.   **INTRODUCTION**

From June 11, 2018 to July 6, 2018, this Court presided over Mr. Korchevsky's trial, a trial that included dozens of witnesses and thousands of exhibits. In some ways, however, the hard work of this Court has just begun. After deliberating for two days, the jury found Mr. Korchevsky guilty on all charges, and now it is up to the Court to decide what sentence to impose, or more generally, what is just punishment?

These questions though are not asked nor answered in the abstract; the law requires more. The Court is tasked to understand and consider the history and characteristics of Mr. Korchevsky, to consider the Guidelines and analyze the seriousness of the offense, to reflect on the ability of the sentence to deter Mr. Korchevsky and others, to compare the sentences imposed on similarly situated defendants, and to make the Solomonesque determination of what is "sufficient but not greater than necessary."

In this context, the Court must navigate the government's request for a draconian sentence. The Court must operate under the weight of, literally, millions of pages of phone records, banks statements, charts and graphs offered into evidence at trial, for this is for all intents and purposes a numbers case. Added to that pressure is what is not quantified by the numbers, the second part of this case, the "Russian Hackers," a term that appears in the news in other, disturbing instances on a daily basis. It would be easy to be

1

swayed by an inundation of voices calling for a harsh sentence, but fairness requires more than just the loudest voice be heard.

Mr. Korchevsky understands that his conviction requires the Court to impose a sentence that reflects the seriousness of the crimes. But a man is more than a single action, and Mr. Korchevsky is more than just someone who traded stocks from 2011-2015. He is someone, even as a child, who held onto his faith in God although that faith put him at risk of physical harm.  He escaped an oppressive regime, emigrated to the United States, worked hard to become educated in finance and excelled professionally in that field.  Yet, as the hundreds of attached letters indicate, Mr. Korchevsky's true calling was not in financial services, but in the ministry, and in service to others. The character evidence put before the jury at trial was just the tip of the iceberg when it comes to Mr. Korchevsky's history and characteristics; he was, and is, a family man, a humble man, who is caring, compassionate and devoted to serving God and those less fortunate.  This depiction of him is documented by those who know him best. His life-long, selfless behavior stands in stark contrast to the crimes of which Mr. Korchevsky was convicted.

Added to the Court's consideration, must also be the ambiguous and unfair nature of the Sentencing Guidelines in assessing loss in cases such as this. Many courts have noted that there is a disconnect between a financial crime committed and the calculated Guidelines range, particularly when there is no true identified victim and the calculation is based on an imprecise measurement of gain. As a result of this widely-perceived unwarranted severity,

a large percentage of individuals convicted of insider trading or securities fraud offenses are sentenced well below Guidelines range.

There are three significant reasons Mr. Korchevsky does not warrant a Guidelines sentence:

- Mr. Korchevsky's personal history and exemplary conduct in service to thousands of Christians at home and throughout the world;
- the fact that the calculated Guidelines range does not properly reflect the crime of which he was convicted and his role in them, and the other § 3553(a) factors are more instructive; and
- the fact that others similarly situated have been given sentences significantly below the Guidelines range.

In considering these facts, as discussed in detail below, and weighing the goals of sentencing as outlined in 18 U.S.C. § 3553(a)(2), this Court's answer to the seemingly impenetrable question, 'what is punishment sufficient but not greater than necessary?' should be obvious. The Court should impose a non-custodial sentence on Mr. Korchevsky.

## II.   <u>MR. KORCHEVSKY'S HISTORY AND CHARACTERISTICS</u>

### *Early life in the Soviet Union and the road to the United States.*

Mr. Korchevsky was born on May 27, 1965, in Kazakhstan. This was the middle of the Cold War, and Kazakhstan was part of the Soviet Union.  The time at which Mr. Korchevsky was born was immediately following Nikita Khrushchev's five-year anti-religious campaign. In the period from 1959 to 1964, thousands of churches were closed, and parents were restricted from teaching religion to their children. Vitaly's parents, Victor and Lyubov, were devout Christians; in fact, Vitaly's father was a pastor.  As a result, Vitaly lived

his childhood constantly challenged by the antipathy and derision directed at him and his family because of their beliefs.  His mother writes of this time, in a letter attached as **Exhibit A**:

> All the children in the school were forced to join first into the 'Little Octoberist', then into the 'Young Pioneers', progressing to 'Komsomol' in the upper classes. (All young communist leagues for various age groups). Vitaly rejected this proposal as he loved God and attended church. The teachers were atheists and therefore reacted with anger toward him, although teachers respected him for his knowledge and ability; nevertheless, they made fun of him in class and even for the whole lesson kept him in the director's office persuading him to join the young communist leagues and to reject his faith in God.

(Exhibit A).

Vitaly was one of four siblings, two brothers, Pavel, and Andrey, and a sister, Natalya. They have written letters on his behalf attached as **Exhibits B, C, and D** respectively.  Vitaly's brothers expand on the challenges he faced as a child of the church in the Soviet Union. Pavel recounts:

> I remember, how one autumn when he was in middle school, our class was sent to help clean up a harvest field. (At that time this was common practice to use older school kids to help out on the territory of the ex-Soviet Union.) And so, one day when we were working in the field, at noon, a group of kids came up to me and Vitaly and asked us to follow them to the edge of the field. This request seemed a little odd, and we did not understand why they were asking us to do this, because we were still kids at that time. We always enjoyed favor and goodwill from our classmates because we loved all of them and were always ready to help them.
> In that moment, I did not want to leave the rest of the class, but Vitaly trusted them and we followed them to the edge of the field. There the classmates mercilessly beat us, their own classmates.

(Exhibit B). Andrey explains that the boys beat Vitaly and Pavel at the direction of the teachers, "simply because they were Christians." (Exhibit C).

At a young age, without even being consciously aware of it, Vitaly had a choice to make. He could, in order to avoid ridicule and physical harm, reject God; he could become hardened and secretive as many did under this repressive regime; or he could trust in what his parents had taught, have faith, and live the way that he believed God intended.  At that time, Vitaly chose faith and service. "From a young age, Vitaly loved people and was loved by them. When he was growing up, he used to help out many of the older people we knew (split firewood, cultivated gardens, etc…)." (Exhibit D).

Although the seeds of Vitaly, the caring and compassionate man, were sown in childhood, his life in the Soviet Union never became easier.  The family had to move several times because of the religious intolerance. As a pastor, his father faced repeated persecution, often resulting in beatings, and when Vitaly enrolled in college he was pressured "to cooperate with authorities against the church." (Exhibit A). He did not, and at one point was arrested for the heinous crime of transporting bibles.[1] Mr. Korchevsky continued living with his family, helping out wherever he could, until he turned 18 and was required to enlist in the Soviet Army.

Even Vitaly's secondary education was stunted because of his religious conviction. He was not allowed to graduate from Sukhimi University after

_____

[1] This transgression is reported in the Other Criminal Conduct section of the PSR to which Mr. Korchevsky has objected.

studying for three and half years; he was expelled as a consequence of being baptized. It was only after switching to the Ukraine State School that he was allowed to graduate. Shortly afterward, he resolved to leave the Soviet Union.

### *Mr. Korchevsky arrives in the United States and begins his journey in finance and service to God*

Twenty-nine years ago, in 1989, before the fall of communism, Vitaly was able to come the United States as a religious refugee.  Shortly after he arrived in America he met his future wife Svetlana Zalivchii. She describes her decision to marry Vitaly in a letter attached as **Exhibit E**:

> I based my decision only on one fact. It was his love of God; not his looks, not his education or his income or lack of it, but his total commitment to God. I knew that it will be a core of our marriage and all other things will be added to us by God as we need them.

(Exhibit E). After marrying Svetlana, Mr. Korchevsky enrolled in Regent University where he received Masters Degrees in Divinity and Business Administration. It would, on the surface, appear to be a strange combination, but upon closer look, makes perfect sense. His wife explains:

> Vitaly's goal was not to obtain a good paying job in the ministry but to gain more knowledge about God's Word. It was his dream which he could not accomplished during monstrous Soviet times where we as Christians were not allowed to get any education at all. At that time, you can start your schooling, but at the end of it, you would not get your diploma. As I worked, Vitaly also was able to get his Master in Finance, so he can get a job in a private sector to take care of us. From first steps of our marriage, we decided that we do not want to be paid for serving God, and money or church philosophy should never dictate how and what you should preach.

(Exhibit E).

This simple calculus would define the rest of his life. He would work on two fronts.  Vitaly would take his talent and training in the securities sector, work hard and use whatever money he earned to allow him to do the work of his faith.  In short, Vitaly's work as a fund manager, **what he did**, was important in that it financed **who he was**, a man dedicated to doing the work of God.  In some ways, although those activities occurred concurrently, those two parallel worlds were separate.

### *Mr. Korchevsky's career in finance was exemplary long before any accusation of insider trading*

Vitaly will tell you that discussing his career as fund manager is important only to show he was good at it for a very long time, much longer that the period from 2011 through 2015. He worked from the time he graduated with his MBA through 2009 without any meaningful period of unemployment, despite two of the greatest market crashes in history, those occurring in 2000 and 2008. His career saw him working for some of the largest and most respected firms in the industry including Crestar Bank, Gardiner Lewis Asset Management, and Morgan Stanley, where he was responsible for managing funds with over six billion dollars in assets.   His CV, attached as **Exhibit H**, documents his consistent employment history from the time he obtained his MBA.

What is important, however, is not just that he was employed, but that he had a stellar track record as a fund manager long before any allegations of inside information or computer intrusion existed. Wherever he worked, Vitaly consistently beat traditional industry benchmarks, often by a wide margin. At

Gardiner Lewis, for example, he managed between 300 and 500 million dollars and had a rate of return at times approaching 70 percent. Even when was at Morgan Stanley from 2000 through 2001, the time at which the dot-com bubble burst, the funds Mr. Korchevsky managed to lose less than 5 percent, while at the same time the NASDAQ lost over 50 percent. Mr. Korchevsky left Morgan Stanley for Victus Capital at the end of 2001, while the NASDAQ, S&P and Dow Jones were still languishing. At the end of his time at Victus, in 2005, he had achieved an annualized rate of return of over 17 percent. For the same time period the NASDAQ rate of return was about 2 percent; the S&P was under 2 percent; and the Dow Jones Index was just under 3 percent. Although the government attempted to insinuate at trial that Mr. Korchevsky was unsuccessful as money manager without non-public information, his work history does not bear this out.

### *Mr. Korchevsky's extraordinary history as a Pastor*

As impressive as his financial resume might be, Vitaly Korchevsky will say that this was merely a means to far more important ends, his service to God and those in need of help. As talented as he was in investing and managing money, he had far greater impact as a pastor, preacher and spiritual leader. All his early life in the Soviet Union, Vitaly had to mediate expressing his dedication to his faith. The more open he was, the more he put himself and those around him at risk. Once he came to America, he was free to openly practice and preach as a Slavic Baptist minister, and he did so with an almost immeasurable passion.

Even before he received his Masters Degree in Divinity, in 1990, he helped to organize the Slavic Baptist church in Springfield, MA. From there, he started preaching and volunteered as the Choir Director and Youth Leader in the church.  Even as he was studying for his degree at Regent University, he worked as an Assistant Pastor and Youth Leader in Norfolk, VA.  Once he graduated, he began to work for the Baptist Church both locally and all over the country. In 1998, he was chosen as the Vice-President of the Russian Ukrainian Baptist Union of the United States, a position he held until 2000, when he was made President of the Organization.

At the same time as he was beginning to travel throughout the country preaching in Russian/Ukrainian Baptist Churches, he saw a need for a new, local church in the Philadelphia suburbs near where he was living. In 2000, he began the congregation of the Brookhaven Slavic Evangelical Baptist Church, with which he is still affiliated. The Brookhaven Church Council, in a letter attached as **Exhibit I**, recounts Vitaly's connection to that church:

> He is the pastor of this church since it was established in 1999, and under his leadership the church grew from seven people to over three hundred sixty in attendance. During all those years he demonstrated the character of a true godly man, living real Christian life and devoted to serving and ministering to our church members and to any other people. His selfless service is known to all people around him. His house is always open to anyone in need. Many families and people who were in need lived in his house through all these years and our youth regularly have fellowship and Bible study in his living room.

(Exhibit I). The Youth Group echoes these sentiments in a letter attached as **Exhibit J**:

> We know Mr. Korchevsky loves his church and us, his Youth
> Group with a Christ-like love. . . He is there for us to
> celebrate our victories and to comfort us in our difficulties.
> His live is a roller coaster of emotional events, but he
> remains constant and strong for our Youth and our church.

(Exhibit J).

If this, along with his actual paying job at Vitcus Capital was not enough, in 2002, Vitaly organized a new Slavic Baptist Union of the East Coast and was elected as President of the Union, a position he held until 2015. Indeed, Viktor Didovetz who was also a member of the organization was similarly astounded. He writes in a letter attached as **Exhibit AA**:

> After meeting him, and serving alongside him in the same
> union of churches, I never stopped being amazed by life and
> service, how he had time to do all that work that he did for
> God. Him being the president of the Baptist Union of
> Churches, he was always on trips to many parts of the
> world, wherever they called him and most of the times he
> paid for all the trips himself.

Not content to bring together just the Slavic churches in the United States, in 2004, Mr. Korchevsky along with a few other leaders, established a Slavic Baptist Alliance of the Baptist Unions of USA and Canada. He was named Vice-President of that Alliance, keeping the position until 2015.

The unique position of Russian and Slavic Baptist churches throughout the world necessitated extensive travel both in the United States and overseas. Wherever Mr. Korchevsky traveled, he did so more than just as an executive administrator for the Unions. He met people, preached and prayed. Photographs of Mr. Korchevsky preaching throughout the world are attached

as **Exhibit DD**.  Wherever he went he touched people to their core. The

following are but a few examples of individuals whose lives were changed by

Mr. Korchevsky as he traveled in service to the church:

> The first time I heard Vitaly preach was around 2003 when
> he visited our church [in Washington state] for the first time.
> I had known him previously as a relative but this was the
> first time I heard him preach. I remember that sermon to
> this day about living an uncompromised life which followed
> the life of Joseph. This sermon had a profound impact on my
> life as a young adult[.]

(Letter from Sergei Balan attached **as Exhibit CC**);

> We wait for Vitaly again in Moldova. In the church of
> "Bethany", and we believe that as a free person, he can bring
> a lot to our communities, churches and friends. When Vitaly
> came, 100 churches gathered together, totaling around
> 5,000 people, in a stadium for a large "Holiday for
> Thanksgiving", to worship our Lord. It was an amazing time.

(Letter from the Pastor of the Bethany Church attached **as Exhibit K**);

> The first time I saw Vitaly was when I was still a youth and
> he came to our church [in Washington state]. His sermon
> touched my heart to the bottom of my soul. After that I
> started watching his sermons over the internet and every
> time the Lord spoke to my heart.

(Letter from Esse Sofia attached **as Exhibit L**); and

> Brother Vitaly Korchevsky is a doer and not just a talker. His
> sermons were powerful because they come from his real life
> and not just theory. Korchevsky's sermons had a huge
> impact on my personal life. I am a different person because
> of his sermons and his great exemplary life.

(Letter from Yelena Silko attached **as Exhibit M**).

Vitaly did not take money to do what he understood God called him to

do; in fact, he absorbed the expense of his travel when did. His work at

Gardiner Lewis, his work at ICM, his work at Morgan Stanley provided more

than enough for his family's humble lifestyle. It was faith in God and trust in his talent and ability as a pastor that led him to leave his job in the organized world of financial management in 2009, in order to devote himself to the task of building a new church for his growing congregation. Through fundraising and hard work, often rolling up his sleeves late into the night, hammering, painting, doing whatever was needed, the beautiful building represented in **Exhibit N** came to be the home of the Brookhaven Slavic Evangelical Baptist Church. The building exists solely as a result of the effort and dedication of Vitaly Korchevsky.

### *Mr. Korchevsky's commitment to others and his impact on those around him*

On its own, Vitaly's personal history as an unpaid, yet world-recognized, leader of his church, accomplished while working full time as respected fund manager, might be sufficient to constitute a significant factor in determining his sentence. Mr. Korchevsky, however, was not just a diligent, inspirational pastor; he was someone who embodied the best of what people, religious or not, can and should aspire to be.

It could not have gone unnoticed by the Court, the number of people in the courtroom supporting Mr. Korchevsky throughout the trial. Many of these people took time off from work and drove two hours each way, sometimes with children in tow, because of what Mr. Korchevsky represented in their lives.  In addition, well over 200 individuals wrote letters in support of Mr. Korchevsky, individuals ranging in age from 6 years old ("Vitaly Korchevsky is a nice and caring Pastor. He bought our family a big house.") to 79 years old ("He goes

anywhere people call him and helps where help is needed"). The letters came from people all over the United States and all over the world. The letters, other than those specifically quoted and listed as exhibits, are bound and included for the Courts consideration as **Exhibit O**.[2]

Letter after letter give examples, not just of what Mr. Korchevsky believes, but of what he does for others. Vitaly believes that whatever he has should be used for, or given to, those who do not have.  His brother summarizes, "[i]n the country from which we came, there was no such thing as a minister who received a paycheck. Jesus once told his disciples, 'You give them food', meaning he told his disciples to feed the masses, not the other way around. And Vitaly held to this principle." (Exhibit C).

Vitaly's sister tells a story that embodies this selflessness:

> Some time ago, when he was visiting Kyrgyzstan for a conference, he decided to go and find the house we grew up in with ou[r] parents. With a lot of effort, he found it, and he found out that a poor Kyrgyz family lives in there: a mom and four kids, same as ours (three brothers and a sister.) This family was very poor, a few blankets on the floor and a small empty refrigerator in the kitchen. Vitaly asked if he could come back again to visit them. Then he went to a nearby market store and bought a large amount of food and other [items] and returned to the house where he told them about God and prayed a prayer of blessing for them.

(Exhibit D). It would take an enormous ledger to record each act of kindness, each expression of generosity, each display of compassion. On the simplest

---

[2] Many of these letters were written in Russian or Ukrainian. For the convenience of the Court, only the translations are included in the exhibit. In the same way, hand-written letters have been transcribed. Should the Court wish to examine the originals, Mr. Korchevsky will certainly provide them.

level, people intuitively know that it is nearly impossible to feign genuine

empathy. Many who know Mr. Korchevsky well, describe their moments of

extreme difficulty, pain or desperation when, unbidden, he was there for them:

> My father Vladimir Tsukanov suddenly passed away
> September 5th 2018 and was buried right after.  When Vitaly
> found out about our tragedy he made a 5 hr trip from
> Brookhaven, PA to Westfield, MA just to attend the funeral
> service. This is just one of many examples of who Vital[y] is
> as a person.

(Letter from Vyacheslav Tsukanov attached as **Exhibit P**);

> Our family experienced a great loss, the death of our infant
> son. Brother Vitaly comforted us like a father, and took all
> the organizational issues with the funeral upon himself.

(Letter from Aleksei Kichuk attached as **Exhibit Q**);

> [W]hen our family got into a bad car accident. Right after the
> collision, before we even had a chance to come to terms with
> what just happened, he somehow appeared nearby; and we
> felt his fatherly, pastoral care. He comforted us, telling us
> that all would be well. After that, he left everything that was
> on his schedule aside, stayed with us providing necessary
> help, and went to the hospital with us.

(Letter from the Bukalov Family attached as **Exhibit R**).

> Last November, a day before Thanksgiving when my
> then 91 year old mom had a horrible fall and was
> between life and death Pastor Vitaly was the only one
> who stood by my side during that hard time. He spent a
> night at the hospital praying with me and talking to the
> doctors about my mom's health condition despite of
> having family and guests at his home for holiday
> celebration. Next morning on Thanksgiving Day he
> arranged a support line of the church members to stay
> with my mom at the hospital in order for me to take
> some rest after the sleepless night.

(Letter from Larisa Bibik attached as **Exhibit S**).

Mr. Korchevsky's nature is expressed in more than just a quiet, open heart; he is, as Yelena Silko expressed, "a doer." Sofia Usataia describes meeting Vitaly Korchevsky on a plane to New York, in a letter attached as **Exhibit T**.

> When we arrived from Russian to New York, I was really tired after the long flight. . . Then, we had a problem with renting a car because our credit card wasn't acceptable in America and I was ready to sleep on any floor. On the airplane we had met Vitaly Korchevsky for the first time. . . at the end [of the flight we] traded phone numbers. After our problem, we called Vitally (sic) for help with car rental. And we were really surprised when he offered a ride to his house and stay for a rest. . . They offered us the nice room and their son's room for our daughter.

(Exhibit T).

Love and concern often are expressed in practical ways, and the number of individuals that have experienced Vitaly's real, tangible help at a crucial time of need far exceeds the space allotted in this submission. The following are just a few representative examples:

> [I]n 2012, the only car we had broke down and we did not have money to fix it at all. At the same time, we were expecting a second child. It was difficult situation for us and we were desperate. Suddenly the phone rang, it was Vitaly and he asked us if we were doing ok. When he learned about our problems, he offered his help. We obviously did not expect that someone would offer us a car that was in great condition, though it was truly a necessity for us at the time. When I came to PA to take the car he told me that it is free and it is done in the name of Jesus! We would never forget such a deed. The only person who is capable of doing something like this is a person with big heart filled with love.

(Letter from Andrey Rusovuk attached as **Exhibit U**);

> [A]fter a year of marriage, my wife was diagnosed with a brain tumor.  After complete shock settled in we had no idea

what to do or where to go for help.  Not knowing what to do or to whom to turn to Vitaly reached out to friends of his at John Hopkins in Baltimore to help us see a specialist. The specialist saw us within a couple of days of Vitaly contacting him. The specialist ended up doing the operation within a week or two from ou[r] initial appointment. The operation was successful. Later on, we found out that the specialist was one of the top doctors at John Hopkins in his field. This all happened while we were living in Connecticut and were fairly young, twenty-eight to be exact. Vitaly at no time asked for anything or seek any kind of compensation or recognition from us.

(Letter from Joseph Timakov attached as **Exhibit V**);

For some time, I lived in state of Washington and was a long-haul truck driver. I always had a desire to study in a university but had never got an opportunity, because my parents were still living in Ukraine. Vitaly and Svetlana opened their house and invited me to stay with them so I could live in their house free of charge and study in the university. For few years I lived with them in their house and because of them I could finish my studies in the university and get a job in the field of my study.

(Letter from Timothy Rusovuk attached as **Exhibit W**);

 One particularly cold winter, when we were going through financial difficulties and didn't even have the means to order oil to keep warm, Vitaly took it upon himself to order heating oil delivered to our house at his cost. We never expressed our situation to him, yet with his keen sense he was able to determine our difficulties and did something about it. Never expecting anything in return.

(Letter from Tatyana Zalivchii attached as **Exhibit X**); and

I recall one of those days when I was at work and my wife experienced hypersensitive reaction to medications that in turn triggered ambiguous physical response that had a potential of developing into septic shock. I could not get home on time to take her to the hospital, but Vitaly happened to learn about that, dropped everything and took her to the nearest emergency room. At the hospital, while waiting for all the needed examinations, Vitaly comforted my youngest son who just turned 2 years old and refused to stay

> home with my elderly parents. Few days later, Vitaly and his
> wife stopped at my house to check up on my wife, brought
> some home prepared meals and picked up my wife's car that
> Vitaly drove during prior emergency rush to the hospital. By
> the time I got home that day, my wife's car was already
> returned and my wife informed me that Vitaly noticed that
> car's [brakes] were creating too much of the vibration and
> noise, so he took our car and replaced all the [brakes] on it.

(Letter from Vlad Nedeoglo attached as **Exhibit Y**).

Perhaps because Vitaly remembers how desperate he was to escape the repression he experienced in the Soviet Union and how difficult it was to establish himself in America, he has always gone above and beyond what is expected to help others from Russia and the Ukraine who come to the United States and make a better life for themselves. Over the years, he has sponsored dozens of immigrating families, many of whom spent time living in his house as they tried to find work and a place to live. The Akulov family, the Grigorenko family, the Nazarenko family and Plohova families, all have submitted letters discussing this attached collectively as **Exhibit Z**. They are examples of profoundly grateful people who were able to find their footing in this country because Vitaly Korchevsky was willing to sponsor them, or give them a place to stay, or find them an apartment, or find them a job or even put up his own money so they could buy a home. This was done for no personal benefit or gain, and indeed, were it not for this submission very few people would even know of Vitaly's actions.

### *Mr. Korchevsky's family: the forgotten victims*

Whenever a court considers imposing a sentence of imprisonment, hovering in the background is inescapable reality that the defendant's family is

punished—they suffer— as well, even though they are often completely blameless. As is discussed below, a case such as this is anything but straightforward in terms who are the victims of the convicted behavior. Yet, some victims in this case are easy to identify.

An enormous part of Mr. Korchevsky's characteristics is his relationship with his wife and with his children. His son, David, talks of his father in a letter attached as **Exhibit F**:

> I have a lot of grand memories with my dad, for example, in our church's summer camp my dad would go to our group and tell us stories. At night my dad would sometimes read Russian books about Christians that suffered in the Soviet Union. When we went on road trips my dad would ask me and my sister Bible riddles, and who guessed the most riddles won the round. Another good memory I have is that whenever dad was mowing the lawn, my dad would put me on his lap and let me control the lawnmower a little and that is how I learned to drive it. I love to go to the beach with my dad because my dad and me love to swim together, I almost always think of something new and most of the time he thinks it's funny and he laughs and I like to hear my dad laugh. . .
> I want more grand memories to come with my dad and me. But that can only happen if dad is home and that can only happen based on your decision. I want dad to teach me to drive like he taught my sister. I want to go to Israel or other trips with my dad just at least one more time. I don't know what else to think of because there are so many more things I want to do with my father.

(Exhibit F). David's friends express this in less eloquent, yet no less poignant terms saying, "[y]ou know it would be hard for everyone, especially their family. I could not imaging my family going through the same thing and how hard this would be[;]" "[i]f he is not going to be with us my heart, and everyone else's is going to be broke[;]" and "I want friends to have a dad with them. I think it is

hard to be without a dad." (Letters from David's friends attached collectively as **Exhibit BB**).

The pain of this untenable situation, the real, perhaps inevitable, heartbreak of the family who may be left alone is expressed by Mr. Korchevsky's 16-year-old daughter Anna, whose letter is attached as **Exhibit G**. She describes her feeling following the verdict:

> That week our family was in shock; we cried a lot, were mostly silent and it felt like the world just stopped moving and nothing mattered anymore. The day after our verdict our family went to the beach, but we didn't go absorb the sun and relax, we went on this cold, windy day, to the empty beach, to sit, quietly and just to try to still our hearts and minds. At this point, my world was broken, I thought that nothing like this could happen. . .  But now I see how naive I really was, we are all human after all. Your honor, I do not know anything about you but I am sure that you have lived through the emotion of full brokenness and helplessness.

(Exhibit G). The heavy burden of considering Mr. Korchevsky's personal characteristics must include his role as a husband, as a father. No one can speak to that better than his wife of nearly 30 years.

> Life is short. Recently, I learned it hard way when I was diagnosed with thyroid cancer. My cancer was removed, hopefully it will not be back, but it left me with a lesson to cherish every day of my life, to cherish my family and not to waste my life on things that are in vain. . . Money was never a priority in our lives with Vitaly. I do not mind losing them all as long as my husband will be home with us. Home is not a building or what you have in the bank, but it is when all of family members together and they love God and one another. Family is most precious thing that God has giving us beside our salvation. Please be merciful on us and keep us together.
>
> Vitaly is the best dad to my kids you can ask for. Kids always want to spend time with him and Vitaly always believe that we should take kids with us on all of our trips as long as it did not interfere with their schooling. Our daughter Anna is

16 now and her greatest dream that her dad would walk her down an aisle when she gets married. Our son David is 12 and as a boy and almost teen needs my husband more than ever.

Vitaly is also the best husband I could ask for.

(Exhibit E).

As the Court begins to balance the scales between what is just punishment with what might be greater than necessary, it is suggested that the weight of Mr. Korchevsky's nature and characteristics lies heavy on the side of leniency.

## III.    THE GOVERNMENT'S ASSESSMENT OF LOSS IS BOTH AMBIGUOUS AND UNFAIR AND CREATES AN INFLATED GUIDELINES LEVEL

### *The government's suggested calculation of loss for guidelines' purposes is, at best, an estimate and overstates Mr. Korchevsky's gain*

As was made clear in our objections, there are several issues with the way the government (adopted by Probation) has calculated the "loss" in this case.  Because there is no clear identity of victims, other than the newswire services, the notion of quantifying actual loss is impossible. In fact, the Guidelines indicate that a "court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." U.S.S.G. 2B1.1.

In insider trading cases, the sentencing Guidelines instruct that the use of gain, not victim losses, which is the measurement used in other fraud cases. *See, e.g., United States v. Nacchio*, 573 F.3d 1062, 1079 (10th Cir. 2009) ("The insider trading guideline commentary expressly rejects victim loss as a metric

of culpability."); *United States v. Mooney*, 425 F.3d 1093, 1100 (8th Cir. 2005) ("In explaining what is meant by the defendant's gain and why it is used for sentencing inside trading offenses, the commentary specifically rejects using victim losses in the calculation."). Mr. Korchevsky is alleged to have traded on material non-public information.  Therefore, to determine loss, the Court must calculate Mr. Korchevsky's gain, but it is in this calculation that the Court is faced with an ambiguous and, if accepting the government's measurement, unfair situation.

The Second Circuit, in a securities fraud context, has clarified that "[t]he loss must be the result of the fraud," and any "[l]osses from causes other than the fraud must be excluded from the loss calculation." *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006). Furthermore, "the offense in Section 10b-5 'is not the purchase of stock itself, but the use of a manipulative or deceptive contrivance in connection with the purchase.'" *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2012 WL 362031, at *9 (S.D.N.Y. Jan. 31, 2012) (citation omitted). Many courts, applying that instruction, hold that to calculate the defendant's gain, it is necessary to determine the "size of the increase in the price of a company's shares from the time that [the defendant] purchased them to the time that the public learned the inside information." *Id.* at *15. Practically, then, where a defendant bought shares in anticipation of an increase in the share price, the defendant's gain is equal to the amount of the increase in the price of the company's shares **from the time the defendant purchased them, to the time the public learned the inside information**. In

short-sales, the gain is equal to the decrease in value from the time that the defendant sold the borrowed shares to the time that the public learned the inside information. The logic of this is straightforward: the inside trader has illegally possessed information that has not yet been incorporated into the price of the stock; once the non-public information is made public, that information is legally possessed by everyone and is factored into the price of the stock. From that point onward, the stock price may move up or down in response to innumerable factors throughout the course of a day or days that are unrelated to the disclosure of previously non-public information.

The PSR's calculation, which is taken from the government estimate, ignores this, and focuses only on the overall gain calculated when Mr. Korchevsky closed the position be it 30 minutes, 30 hours, 30 days or longer, after the press release was made public. As a result, this "method could punish a defendant for exogenous market events and lead to unequal sentences for equal crimes." *United States v. Rajaratnam*, 2012 WL 362031, at * 5 (discussing *United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009)).

The *Rajaratnam* Court noted:

> Where the rise or decline in the price of a stock in response to a public announcement does not result from any action of the defendant giving rise to the offense, it is hard to say that a defendant's gain from the rise or decline is a "gain resulting from the offense" of insider trading. Indeed, the change in stock price following the public announcement of information that an insider traded on in advance does not measure the difference between a world in which the defendant acted lawfully and a world in which the defendant acted unlawfully. An insider and a lawful investor who purchase stock at the same time will earn the same profit.

*Rajaratnam*, 2012 WL 362031, at \*6.  The *Rajaratnam* Court then engaged in a three-pronged hypothetical in which a trader executes a trade based on inside information, and depending on when he sells (or does not sell) the stock, three different amounts are realized and lead to three different gain calculations. *Id.* 8-9.

Given that the largest part of the sentencing Guidelines number is constituted from the amount of loss/gain, the fact that there are different methodologies that could be employed to calculate the gain on each transaction creates a level of ambiguity that it troubling on its own. In addition, however, as was detailed in the objections to the PSR, the government's assessment of gain fails to take into account its own evidence indicating that there were times that the press releases were not available to the Dubovoys, and by extension, Mr. Korchevsky. The calculation of gain reflected in the initial PSR is based on the government's allegations in the indictment and at trial; it includes every trade made from 2011 to 2015 that meets the government-created set of criteria, and presumes that the press releases were obtained without interruption for the entire period.

The database compiled by the government, however, shows that between February of 2012 and January of 2013, Mr. Korchevsky makes over 100 trades, and only one of those trades corresponds to a Dubovoy trade. Furthermore, despite the government's representation that the trading focuses "almost exclusively on press releases issued by one . . . single newswire company," (Trial Transcript 1900), during this period, Mr. Korchevsky trades in

companies employing all three newswire services. It is obvious that this period would be one of the times that the Dubovoys testified when they did not have access to the press releases.

Looked at more closely, Mr. Korchevsky made over 40 trades in this period on stocks that used PR Newswire to distribute their press releases, despite the fact that in its summation the government told the jury, "[s]o you know why Korchevsky stops trading in PR Newswire in March of 2012, the hackers lost access and they were no longer able to get PR Newswire press releases." (Trial Transcript 13009). To be clear, the government represented to the jury that after March of 2012, Mr. Korchevsky did not have access to PR Newswire press releases and no longer traded on related stocks. Yet, all the PR newswire trades from later in 2012, 2013 and 2015 are included in the government's gains total.

It would be hard to argue that with significantly different approaches to calculating gain on specific trades and with a lack of clarity on the particular trades to be included in that calculation, determining the single accurate number for the total gain/loss attributable to Mr. Korchevsky is nearly impossible. The government has painted with a broad and inaccurate brush in its estimation of gain/loss being in excess of $25,000,000. A more detailed analysis indicates that the figure is millions of dollars below that Guidelines benchmark. The aspect that should give this Court pause, however, is that, in this case, regardless of whether the gain/loss is closer to $9,500,000 or over

$25,000,000, it creates a Guidelines recommendation that is unreasonably large and does not consider the harm actually committed by Mr. Korchevsky.

### *The Guidelines calculations in insider trading cases produce recommended sentences that are incongruous with the resultant harm.*

In a concurrence in *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013), *as corrected* (July 24, 2013), Judge Underhill encapsuled the challenge with the loss guidelines as follows:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges. As a well-known sentencing commentator has put it, "For the small class of defendants ... convicted of fraud offenses associated with very large Guidelines loss calculations, the Guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.

*Id.* at 380 (Underhill, J. concurring). This opinion in neither unique nor without practical application at the district level. *See United States v. Johnson,* No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) ("As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Gupta,* 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012)*, aff'd,* 747 F.3d 111 (2d Cir. 2014). ("By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively

ignored the statutory requirement that federal sentencing take many factors into account ... and, by contrast, effectively guaranteed that many such sentences would be irrational."); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (sentencing 60 months when Guidelines range was 360 months to life, noting that the Guidelines "have so run amok that they are patently absurd on their face," due to the kind of 'piling-on' of points for which the Guidelines have frequently been criticized" (quotation marks and citation omitted)).

The fact is that all offenses are not equal, and the Sentencing Guidelines do not always provide an adequate or appropriate benchmark. "[I]f the sentences so calculated are the product of placing an overwhelming emphasis on a factor that may be central to some frauds but largely incidental to others, the effect is to create, in the name of promoting uniformity, a sentencing disparity of the most unreasonable kind." *Gupta*, 904 F. Supp. 2d at 351. As Judge Underhill pointed out

> And not all actual loss is equally serious. A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees, or even declare the loss as material in public financial reports. Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible.

*Corsey*, 723 F.3d at 381.

To accurately determine what, if any, weight the Guidelines deserves, the Court must look at the specific facts of this crime.

### Even considering the specific crimes for which Mr. Korchevsky was convicted, the attendant harm does not warrant a Guidelines range sentence.

There is no question that Mr. Korchevsky was convicted of serious crimes, and those crimes should not be trivialized. Nevertheless, the facts of this particular case are at odds with the excessive guideline range found in the PSR—a  Guidelines range in excess of 188 months.[3] This is not a case like WorldCom, where Bernie Ebbers essentially caused the largest corporate bankruptcy on record; or Enron, where Ken Lay cost the shareholders of the company more than one billion dollars; or Bernie Madoff, whose Ponzi scheme wiped out the savings of thousands of individual, identified investors.

In this case, there are essentially no victims. The short roundtrips and lack of any event study make it nearly impossible to espouse the position that the companies were harmed. Because of the nature and volume of Mr. Korchevsky's trading, the companies on whose stocks he was trading sustained no loss of value. Similarly, the individuals who sold to or purchased stock from Mr. Korchevsky are not only impossible to identify, but it cannot be argued that they were harmed by the trades. This is not a fraud case where the defendant

---

[3] For example, had Mr. Korchevsky been convicted of Kidnapping in which the victim sustained serious bodily injury, (Guidelines level 34), Sexually Exploiting a Minor between 12 and 16 years-old by Production of Sexually Explicit Material (Guidelines level 34), or a Narcotics Conspiracy that involved 49 Kilos of Cocaine (Guidelines level 34) his recommended sentence would be lower (151-188 months).

made an affirmative, fraudulent representation that may have induced someone to act based on that representation. The nature of computer trading today is wholly different. Here, Mr. Korchevsky was "matched" with parties who were already pre-disposed to engage in the trade. The trades were done blindly and at arms-length—that is, the sellers wanted to sell irrespective of whether or not Mr. Korchevsky was going to buy (or vice versa). If Mr. Korchevsky did not buy the security, someone else would have. As such, there can be no blanket assertion that the individuals on the other side of the trades were harmed. Indeed, both sides may have profited from the sale of the security; there is just no way to know. Put simply, Mr. Korchevsky was convicted of buying stocks, albeit on non-public information, from unknown individuals who had already decided to sell the stocks.

The only identifiable "victims" are the newswire companies, and their victimization is difficult to quantify. Clearly, the hackers intruded into their systems, although the hacking predated Mr. Korchevsky's involvement and, if the government law enforcement agents are to be believed, continues to this day. The testimony at trial was that the companies did not feel compelled to notify their clients that their information had been compromised, nor was there any evidence of any loss of revenue to the newswires. The measure of the harm would to the newswires would appear to be limited to the cost of attempting to secure their servers, and only one company has submitted evidence of that expense.

Bluntly stated, Mr. Korchevsky is no Bernie Madoff. Before his sentencing, the government filed 113 statements from Bernie Madoff's victims, each one more heart-wrenching than the next. At trial nine victims testified, often choking back tears, describing the financial and emotional devastation Madoff had caused them.  Conversely, Judge Chin noted that there had not been a single letter in support of Mr. Madoff from family or friends. In this case, the Court is presented with exactly the opposite situation. Hundreds of people, aware of Mr. Korchevsky's conviction, have written on his behalf, literally begging the Court to show him mercy, and there has not been a single individual who has testified to being harmed by Mr. Korchevsky.

Relying on the Guidelines table of loss, intuitively strikes the wrong chord. The reason is that the table is designed to apply in a securities fraud case where a defendant has caused real or intended loss to victims by defrauding them of their money. Looked at this way, the loss table serves a useful function in recognizing that a greater loss causes greater harm, and a concomitantly greater guidelines sentence. In an insider trading case, as here, there is no victim who suffered a loss. Relying on the table in this case measures culpability based on gain, but the amount of gain bears no connection to an identifiable harm or level of culpability; it is simply a function of how much money the defendant chose to invest in a stock trade and whether the trade turned out to be profitable. Making the results even more anomalous, by counting Mr. Korchevsky responsible for Dubovoy's gains, his Guidelines calculation would be higher depending on how much Dubovoy invested

completely without Mr. Korchevsky's knowledge or participation. It makes Mr. Korchevsky more culpable for the same conduct based on the size of Mr. Dubovoy's bet.

Using either the government's inflated figures or even a more reasonable lower number, the offense level does not coincide with the seriousness of the offense. If the Court allows the Guidelines to be the driving force behind the sentence, given the totality of the other § 3553(a) factors, the outcome would truly be perverse. As outlined below, along with Mr. Korchevsky history and personal characteristics, the other goals of sentencing would be met with a sentence that was significantly below the Guidelines range.

## IV.   **A NON-CUSTODIAL SENTENCE IS APPROPRIATE, SUFFICIENT AND WARRANTED BY FACTORS CONTAINED IN 18 USC §3553**

### *Standard*

Section 3553(a) instructs sentencing courts to take a holistic approach to sentencing, requiring consideration of "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant." 18 U.S.C. § 3553(a) (l). Moreover, when imposing sentence, § 3553(a) further mandates this Court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to avoid any unwarranted sentence disparities." The statute's overarching requirement is that the Court "impose a sentence sufficient but not greater than necessary" to accomplish the goals of sentencing.

In other words, the Court must make "an individualized assessment" of all of the facts and circumstances. *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009) (internal quotation marks omitted). Such an assessment is particularly necessary in insider trading cases and cases involving U.S.S.G. 2B1.1, where judges imposing sentences in this circuit have criticized the Guidelines for "having little to say of helpfulness to the sentencing judge," Sentencing Hearing, *United States v. Gupta*, No. 11 Cr. 907 (JSR), (S.D.N.Y. Oct. 24, 2012), Tr. 9:12-17, and leading to "sometimes absurd or certainly unjust results," Sentencing Hearing, *United States v. Newman*, No. 12 Cr. 121 (RJS), (S.D.N.Y. May 2, 2012), Tr. 50:25-51:7.

It bears noting that the Probation Department has recognized in its recommendation to the Court that an analysis of the§ 3553(a) factors counsels in favor of imposing a sentence well below the Guidelines range in this case. Despite our disagreement with Probation's ultimate sentencing recommendation, its underlying view that this Court should impose a substantial variance from the advisory guideline range receives our strong endorsement.  Once this Court considers all of the § 3553(a) factors, the imposition of a non-custodial sentence is certainly "sufficient but not greater than necessary" to achieve the goals embodied in the statute.

### *Personal History and Characteristics*

As detailed above, Mr. Korchevsky possess an extraordinary personal story, work ethic, kindness, and a commitment to helping those less fortunate than himself overcome obstacles and achieve success.   In all these righteous

endeavors, Mr. Korchevsky's commitment, hard work, and compassion, was genuine.   We respectfully submit that, as described above and in the hundreds of letters presented by the Court, Mr. Korchevsky, at his core, is someone who has tirelessly dedicated his life to his faith, his family, his congregation, and all others he met in his life, whom he helped spiritually, charitably and practically. As is evident from the discussion above, it would be hard to imagine another defendant who has built up record of contribution and service to others, in scope and duration, as much as Mr. Korchevsky.  Mr. Korchevsky's personal history and characteristics are truly extraordinary, and his lifetime of good works outweigh a sentence of incarceration that would prevent him from continuing to contribute in the future.

Unlike other "white-collar defendants," whose occupation is in the financial sector, but on the side, contribute in some level to charity and humanitarian causes, Mr. Korchevsky main occupation *was* charity and giving back to others.   In connection with the religious, civic and community advancement for which Mr. Korchevsky is responsible, he was not a mere figurehead, but a true leader, who gave not just of his wallet, but of his seemingly endless time and unflagging energy to his community and local and international congregation.

Mr. Korchevsky's convicted conduct is inconsistent with the moral and law-abiding way he had lived his entire life.  In other cases where a defendant's convicted conduct is dramatically at odds with the defendant's life and characteristics, courts have considered the defendant's past history of good

works and lack of prior convictions and imposed sentences well below the Guidelines range. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) (noting that the defendant's "exemplary" past history and record of good deeds weighed in favor of a significant downward deviation from the Guidelines); Sentencing Hearing, *United States v. Collins*, 07 Cr. 1170 (LAP), (S.D.N.Y. July 15, 2013), Tr. 22:17-29:19 (describing the defendant's generosity and volunteerism  and imposing a sentence of one year and one day, well below the Guidelines recommendation of life in prison); *Gupta*, 904 F. Supp. 2d at 354-55 (imposing a two-year sentence, well below the Guidelines range, based on the defendant's lifetime of good works and service to others).

In fact, in *Gupta,* the defendant faced a Guidelines range of 78-97 months following his conviction at trial for insider trading, but, according to the sentencing court, his lifetime of good works merited a significant downward departure.  In imposing a sentence of 24 months, the sentencing court remarked:

> The Court can say without exaggeration that it has never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need. The Guidelines virtually ignore this measure of the man, but here as elsewhere the Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence. And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?

*Id*. at 354.

Notably, even in pre-*Booker* cases, courts recognized "truly extraordinary" charitable and community service, and imposed sentences well below the then-mandatory Guidelines. *See, e.g.*, *United States v. Greene*, 249 F. Supp. 2d 262, 264 (S.D.N.Y. 2003) (in tax fraud case, court found the defendant was entitled to a seven level downward departure because he had donated his time, not merely money, by adopting six "hard to place" orphaned children); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming downward departure based on defendant's volunteer service with Marine Corps and as volunteer firefighter, as well as three recent acts of good samaritanism); *United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003).

### Nature and Circumstance of the offense

Mr. Korchevsky stands before the Court for sentencing having been convicted after trial of serious crimes. Nevertheless, there are certain aspects of the offense conduct that we respectfully submit the Court should consider in determining the appropriate sentence.  In the first place, this crime is in large part, victimless.  This is not a case where innocent victims have suffered any financial losses.  No evidence has been presented showing that an individual sustained any loss. No evidence exists even suggesting that individuals suffered any detriment to their retirement or pension accounts.  Putting aside the expense of one newswire service incurred relating to cyber security, there was not one witness or document that established that anyone else, including the trader on the other end of Mr. Korchevsky's trades suffered any cost or depletion of their funds.  In fact, the opposite may likely hold true; the traders

on the other end of Mr. Korchevsky's transactions may have profited. Ironically, unlike the cases in which fraud victims line up to excoriate a defendant, here the only people lining up are ones that are prepared to speak highly of Mr. Korchevsky and emphasize his positive attributes to the Court.

Furthermore, this was not a case involving a defendant who committed fraud in order to support a lavish lifestyle, spending money on shallow and extravagant material items. Mr. Korchevsky and his family were humble people who preached charity and humility, and who practiced what they preached. There was no evidence that Mr. Korchevsky purchased large and ostentatious homes.  He and his family lived in a modest home that they had purchased in 2002, long before the alleged conspiracy began.  In true charitable fashion, Mr. Korchevsky purchased small homes for large families with children who were impoverished, and unable to afford a place to live that would accommodate them.

Also, neither Mr. Korchevsky nor his wife possessed any luxury items such as cars, boats or jewelry, that sometimes accompany fraud or insider trading cases.  As a matter of fact, Mr. Korchevsky, at of the time of the trial, Mr. Korchevsky owned a Toyota Avalon with 150,000 miles.  His wife, Svetlana owned a Toyota Sienna Mini Van with 200,000 miles.  They owned no jewelry to speak of, and no boats or anything of the kind.  Mr. Korchevsky was a simple man living a simple life in service to his church and those less fortunate.

### *Additional §3553(a) Sentencing Factors*

In addition to analyzing the relevant aspects of Mr. Korchevsky's personal characteristics and history, as well as the nature and circumstance of the crimes for which he was convicted, § 3553(a) also directs the Court to consider other goals. The sentence must, "reflect the seriousness of the offense," to "promote respect for the law," "provide just punishment for the offense" "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant" and "avoid unwarranted sentence disparities" with co-conspirators and defendants convicted of similar crimes. U.S.S. G. § 3553(a).  These factors are addressed in turn below.

**<u>A sentence of incarceration does not reflect the seriousness of the offense, promote respect for the law, or provide just punishment.</u>**

As Mr. Korchevsky stands before the Court, it is difficult to fathom how this Court might impose a more severe punishment than has already been meted out. Of course, Mr. Korchevsky faces significant time in prison, but the question is, does that potential incarceration further the goals of sentencing? Is there some greater measure of justice, respect for the law, specific or general deterrence that would be achieved by locking him in a cell for period of years? Respectfully, the answer to those questions is "no."

Mr. Korchevsky started with nothing when he came to the United States, and through education, dedication and hard work found a vocation, finance, and a calling, the ministry. He built a career, a congregation, a reputation, a home and a family. Most all of those things are now shattered. His family

remains devoted, and many of the members of his congregation have expressed love and support for him, but his sterling reputation is gone; he is marked with an indelible stain in his life as a public, religious leader.  His days of travelling the world, preaching his faith to those in Moldova, in Kazakhstan, in the Ukraine are over.  He is, and forever will be, a convicted felon. A lifetime of philanthropy, of good works, will now be seen cynically, or worse, discounted altogether.  Financially, he and his family are in ruins, and it is unlikely he will ever work in securities field again. This price has been paid all before the Court ever considers putting him in prison.

Mr. Korchevsky comes before this court now having already paid an enormous price; he has been stripped of everything that matters to him except his family, his faith, and the hope that at 53 years old there is hope of putting some of the pieces back together, of starting over. Incarceration cannot take his faith from him, but it can remove him from his family and all but kill his hope of re-building his life and of serving others in a meaningful way. Respectfully, that is not "just punishment."

## A non-custodial sentence can achieve the § 3553(a) goals

The Court can impose a just punishment on Mr. Korchevsky without sending him to prison. A non-custodial sentence could be fashioned that would address the § 3553(a) goals in a meaningful way. The financial penalties associated with the conviction are not insignificant. In addition, a sentence of probation could include home confinement and rigorous conditions such as community service. Additionally, home-confinement would serve to punish Mr.

Korchevsky by restricting his liberty and confining him from the engaging in day to day activities, but not punish the blameless. It would allow him the ability to be present for and support his wife and young children.

A non-custodial sentence of probation, with home confinement and community service will undoubtedly reflect the seriousness of the offense and respect for the law.  Respect for the law is not does not mean fear of the law. A prison sentence for someone of Mr. Korchevsky's history and character, might possibly engender fear of the law but not respect for it. A thoughtful, carefully considered sentence that does punish Mr. Korchevsky, through financial penalties, home restriction and community service, but does not extract harsh retribution, will send a message to the general community that crime has serious consequences, and that the particular crimes for which the jury found Mr. Korchevsky guilty are serious.

Courts have recognized that in an appropriate case, and if used wisely, probation is a sufficiently serious punishment to satisfy the statutory mandate that the sentence reflect the seriousness of the offense and provide just punishment. *See United States v. Brady*, 02 Cr. 1043 (JG), 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (probation "may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant") (Quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.);

*United States v. Coughlin,* No. CRIM. 06-20005, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1, 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive."). The court in *Coughlin,* acknowledging that white-collar offenses are "gravely serious and demanding of considerable punishment," nonetheless found that probation and home detention could accomplish the goals of punishment "more effectively than imprisonment" and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished." *Id.*

## A non-custodial sentence provides "adequate deterrence to criminal conduct and protects the "public from further crimes"

There is no argument that there is a need for general deterrence, but it has been persuasively demonstrated that the certainty of punishment, not its severity, provides deterrent power. *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?,* 10 Criminology & Pub. Pol'y 13, 37 (2011); *See* Valerie Wright, *Sentencing Project, and Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), *available at* http://www.sentencingproject. Org/doc/Deterrence% 20Briefing% 20.pdf. Except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and the length of imprisonment. Notably, despite the important role assigned to deterrence in criminal sentencing, "we do not have very solid and credible empirical evidence that deterrence through the imposition of criminal sanctions works very well." Raymond Paternoster,

*Crimes and Punishment: How Much Do We Really Know About Criminal Deterrence?*, 100 J. Crim. L. & Criminology 765, 766 (2010).

Further, there is considerable evidence that general deterrence of white-collar defendants, like Mr. Korchevsky, is achieved by the stigma of the indictment itself and the imposition of any punishment, regardless of severity. *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("even relatively short sentences can have a strong deterrent effect on 'white collar 'offenders") (citing Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005. *See also* Elizabeth Szockyj, *Imprisoning White-Collar Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)); *Coughlin,* 2008 WL 313099, at *6 (home detention was "capable of deterring corporate executives like Coughlin, who cherish their freedom of movement and right to privacy, from engaging in conduct similar to Coughlin's").

For many of the same reasons that a non-custodial sentence is a just sentence, a lengthy prison term is not necessary to "afford adequate deterrence to criminal conduct" 18 U.S.C. § 3553(a) (2) (B).  The goal of general deterrence has already been satisfied by the government's decision to bring charges against Mr. Korchevsky.   The shame and humiliation of the well-publicized indictment against Mr. Korchevsky has already irreparable damaged his reputation, which was built over decades.  Now, as a convicted felon, Mr. Korchevsky has already lost his position as president of the Slavic Baptist Ministry, and his personal savings. He will carry a felony conviction for the rest of his life, which will fundamentally curtail his career choices, and make many

employment goals almost impossible to achieve.  Mr. Korchevsky came to America with nothing.  It took him decades of attending college, working as a trader and analyst in the trading sector, and building a reputation and a church within the Slavic Baptist Ministry. Now, with this felony conviction, he must start all over again.  A lengthy prison term therefore is not necessary for specific deterrence, as he has already been punished. *See United States v. Stewart*, 590 F.3d 93, 141 (second Cir. 2009) (the "need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant") (quotations marks omitted).

Additionally, the Court can have confidence that the conduct that led to Mr. Korchevsky's conviction will not recur. This case has decimated the reputation that Mr. Korchevsky spent a lifetime building and has made him a pariah in the financial community and among securities brokerage firms.  Any term of incarceration is not be necessary to ensure that he does not return to the financial world, but it will deprive him of time with his wife and his family and the ability to provide needed support for his young children, Anna and David. There is no reason to think that Mr. Korchevsky would ever have either the opportunity or the motivation to engage in any similar conduct in the remaining years of his life.

Lastly, in weighing the need for specific deterrence, the Court should also strongly consider Mr. Korchevsky's age. According to statistics collected by the United States Sentencing Commission, the recidivism rate among offenders who are age 60 or older at the time of their sentencing is 14 percent,

significantly lower than any other age group.  United States Sentencing

Commission, "Recidivism among Federal Offenders: A Comprehensive

Overview," 23 (2016) available at

http://www.ussc.gov/sites/default/files/pdf/research-and

publications/research-publications/2016/recidivism overview.pdf.  Notably,

when considering § 3553(a) factors, courts have declined to impose Guidelines

sentences on defendants who are "over the age of 40, on the grounds that such

defendants exhibit markedly lower rates of recidivism in comparison to younger

defendants." *United States v. Hernandez*, No. 03-cr-1257 (RWS), 2005 WL

1242344, at *5 (S.D.N.Y. May 24, 2005); *see also United States v. Hodges*, No.

07-CR-706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting the

"inverse relationship between age and recidivism" and "tak[ing] into account

the defendant's age in fashioning his sentence"); *United States v. Carmona-*

*Rodriguez*, No. 04 CR667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11,

2005) (citing the defendant's age and low probability of recidivism as grounds

for imposing a below-Guidelines sentence).

### A non-custodial sentence will avoid any unwarranted sentencing disparities

Just as Mr. Korchevsky should not receive a sentence that overstates the

seriousness of his offense based on a "loss" determination, he should not

receive a sentence that is unjustifiably disparate from sentences imposed in

other securities fraud, particularly insider trading, cases.  In determining the

correct sentence, the Court must consider "the need to avoid unwarranted

sentenc[ing] disparities among defendants with similar records who have been

found guilty of similar conduct." 18 U.S.C. § 3553(a) (6). The Second Circuit has acknowledged this requirement, noting on multiple occasions that it is the sentencing court's duty to impose a sentence sufficient, but not greater than necessary, to comply with the purpose of § 3553(a), including the need to avoid unwarranted sentencing disparities. *See, e.g.*, *United States v. Brennan*, 395 F.3d 59, 69 (2d Cir. 2005); *United States v. Dorvee*, 616 F.3d 174,182-83 (2d Cir. 2010); *United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008).

The United States Sentencing Commission compiles statistics that provide an important starting point for this analysis. The Commission's 2017 Sourcebook of Federal Sentencing Statistics, *available at* https://www.ussc.gov/research/sourcebook-2017, demonstrates that, nationwide, only 49.1% of all sentences that year were within the applicable Guideline range. More important, 20.1% of all sentences were below the Guideline range for reasons other than a U.S.S.G. §5K motion from the government. Table N-2 to the 2017 Sourcebook (attached as **Exhibit EE**). With respect to Fraud cases, nationwide, the numbers are more compelling. Slightly less than 43% of those sentences are within the Guidelines, and 28% of sentences are below the Guideline range for non-§5K reasons. Table 27 to the 2017 Sourcebook (attached as **Exhibit FF**).

With those statistics in mind, the trend in the Second Circuit and the Eastern District is appreciably more toward lower sentences. In the Second Circuit, only 30.9% of all sentences are within the Guidelines, and **41.3%** (more than twice the national average) are below the Guidelines for non-§5K

reasons. (Exhibit EE). In the Eastern District, just 23% of all sentences are within the Guideline range; **nearly 45%**of all sentences are below the Guidelines for non-§5K reasons. Table 26 to the 2017 Sourcebook (attached as **Exhibit GG**).

With respect to the non-§5K sentences for fraud at the national level, the median percent decrease from the guideline minimum attributable to downward departures is 50%. The median decrease when the lower sentence involves a downward departure and a *Booker*-variance is 42.7%. And when only a *Booker*-variance is involved, the median decrease is 47.8% less than the Guideline minimum. Tables 31A, 31B, and 31C to the 2017 Sourcebook (attached as **Exhibit HH**).

The statistics demonstrate that a sentence below the Guideline minimum is common, particularly in fraud cases. Further, a review of sentences imposed in cases concerning securities fraud and conspiracy to commit securities fraud in the last 25 years also reveal that courts typically depart and vary lower, including in cases involving insider trading. This is true even in cases where the conduct at issue was objectively more serious than what the jury found Mr. Korchevsky guilty of (*i.e.* in cases where the defendant was found guilty of obstruction, perjury, where the economic impact of the conduct was significantly greater, larger losses, and where the conduct directly affected victims who sustained severe financial hardship). Mr. Korchevsky's sentence should not be disparately higher than the sentence of a defendant who was convicted of even more culpable conduct.

The following are a few examples of cases in which defendants who engaged in more egregious conduct and yet the sentencing courts imposed lower-that- Guidelines sentences:

- The defendant in *United States v. Collins*, 07 Cr. 1170 (LAP), (S.D.N.Y. July 15, 2013), an attorney, was convicted of securities fraud and conspiracy to commit securities fraud, money laundering, and making false filings with the SEC, in a $1 billion accounting fraud scheme.  The Guidelines range was 360 months to life in prison. At sentencing, the Court noted Mr. Collins' exceptional history of good works and charitable giving, specifically acknowledging that Mr. Collins' "good deeds were not performed to gain status or enhance his image." *Id.* at Tr. 26:12-13. After weighing all of the statutory factors, the Court imposed a sentence of one year and one day, followed by two years of supervised release;

- In *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), the defendant  was facing a Guidelines range of 78-97 months following his conviction at trial for insider trading,  Citing Mr. Gupta's "lifetime of good works," pursuant to §3553(a), the Court imposed a sentence of 24 months;

- In *United States v. Longueuil*, No. 1:11-cr-00161 (S.D.N.Y. April 28, 2011), the defendant admitted to participating in a four-year fraud involving a large number of participants. In addition, he admitted to obstruction of justice in connection with destroying a flash drive and hard drives that might contain evidence of his conduct. His plea agreement contained a presumptive Guidelines range of 46-57 months. The sentencing court, however, imposed a sentence of a 30 months;

- Executives at Computer Associates committed a $2.2 billion accounting fraud, dwarfing the numbers in this case, and received sentences below the applicable Guidelines range. *United States v. Kumar*, No. 04 Cr. 846 (E.D.N.Y. Nov. 2, 2006);

- Executives of HealthSouth participated in a $2.7 billion accounting scandal, which included conspiracy to commit securities fraud.[4] Of the HealthSouth employees who were charged and pleaded guilty, the longest sentence was five years. *See United States v. Owens*, 2:03-cr-00131 (N.D.

---

[4] . *See* Press Release, Department of Justice, HealthSouth Founder and Former CEO Richard Scrushy Charged in $2.7 Billion Accounting Fraud Conspiracy (Nov. 4, 2003) *available at* http://www.justice.gov/opa/pr/2003/November/03_crm_603.htm.

Ala. Feb. 27, 2006) (Docket Entry 35). Most of the other accused employees served little or no prison time.

Even in cases in which the defendant does not plead guilty or provide assistance to the government, sentences in securities fraud cases are frequently below the Guidelines range:

- The defendant, a vice president at Cendant Corporation, in *United States v. Shelton*, No. 02 Cr. 264 (D. Conn. Jan. 4, 2005), was found guilty of conspiracy to commit securities fraud and filing false statements with the SEC. When the fraud was reported, Cendant's market value dropped $14 billion in one day. The Guidelines range was 151-188 months. The court sentenced the defendant to 120 months;

- In *United States v. Rosoff*, No. 97 Cr. 336 (S.D.N.Y. 1999), Rosoff was convicted of conspiracy, securities fraud, obstruction and making false statements. The amount of restitution was determined to be $650 million dollars, and the court imposed a sentence of 87 months;

- In *United States v. McDermott*, No. 00 Cr. 61 (S.D.N.Y. April 27, 2000), the defendant went to trial and was convicted of trading based on material nonpublic information, while he was President, Chairman, and CEO of a financial services firm.  The Guidelines range was over 20 months but the court, based on McDermott's family circumstances, his exemplary community service, and acts of kindness, sentenced him to eight months in prison;

- In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), the two defendants were convicted of conspiracy to commit securities fraud, six counts of securities fraud, conspiracy to commit witness tampering, and obstruction. The court declined to impose the Guidelines sentence of 360 months to life, finding that such a severe sentence was not "sensible" in light of the conduct and was, therefore, not "realistic." *Id.* at 751. Citing *United States v. Adelson*, 441 F. Supp. 506 (S.D.N.Y. 2006), the court noted that the conduct in the Enron, WorldCom, and Computer Associates cases wreaked "unimaginable losses on major corporations and, in particular, on their companies' employees and stockholders, many of whom lost their pensions and were financially ruined." *Id.* at 746. The court acknowledged that the sentences in those cases were less than the low end of the Guidelines facing the defendants before it, 360 months to life.  The court imposed a sentence of 60 months;

- The defendant in *United States v. Butler* was convicted of conspiracy to commit securities fraud, securities fraud, and wire fraud. 264 F.R.D. 37 (E.D.N.Y. 2010). The government asserted that the applicable Guidelines range was life imprisonment. Even though the court explicitly stated that, the defendant's actions had a "severe" impact on the international short- and long-term securities markets, caused "vast damages," and "laid bare the pernicious and pervasive culture of corruption in the financial services industry," it found that a sentence of 60 months was appropriate because the defendant's family would benefit from the defendant's presence at home, both financially and psychologically and the defendant's had a high probability of rehabilitation.

In Mr. Korchevsky's case, as in these examples, if the court adopts the government's gain amount, then the Guidelines calculation would not only overstate the seriousness of offense, such a sentence would also be disparately higher than sentences imposed in other securities fraud cases in this jurisdiction and elsewhere, even those cases involving greater harm than in Mr. Korchevsky's case. Consequently, a Guidelines sentence would be in contravention of § 3553(a)(6). Based on the review of this subset of cases, full Guidelines sentences appear to be the exception rather than the rule.

## V.   A RESTITUTION ORDER IS INAPPLICABLE

Restitution in this matter is governed by 18 U.S.C. § 3663A et  seq. ("MVRA").  Under the MVRA, "a court's power to order restitution is limited to actual loss." *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000). Thus, the government may only seek restitution for the victims' losses "directly caused by the conduct composing the offense of conviction." *United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir. 1994). Indeed, the MVRA applies only when "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)

(I)(B). Accordingly, "even where a defendant's complex fraud scheme results in many victims whose identities and losses are difficult to ascertain, the district court should identify the victims and their actual losses prior to imposing restitution under the MYRA." *United States v. Catoggio*, 326 F.3d 323, 329 (2d Cir. 2003).

In *Catoggio*, the Second Circuit vacated the lower court's restitution order that was not based on an "accurate" figure of the victims' losses in that case. Finally, in seeking restitution, the government bears the burden of proving the amount of loss sustained by the victim resulting from the offense by a preponderance of the evidence. 18 U.S.C. § 3664(e).

Recently, the Supreme Court, in *Lagos v. United States*, 138 S. Ct. 1684, 201 L. Ed. 2d 1 (2018), further clarified that in cases, including those of fraud and deceit, in which a "victim" engaging in a private investigation, the victim is not entitled to restitution for that expense. The Court concluded "that the words 'investigation' and 'proceedings' in the Mandatory Victims Restitution Act refer to **government investigations and criminal proceedings**." *Id.* at 1690 (emphasis added).

In this case, the PSR has indicated only one claim for restitution. Business Wire submitted an affidavit claiming a "loss" of $1,265,767 related to this matter. This amount however falls outside the scope of the MVRA.

During trial, the Manager of Systems Engineering at the time of the intrusion, Robert Soares, testified that the company became aware of an intrusion on May 19, 2015 "through an internal cybersecurity employee." (Trial

Transcript 1372, 1385). On the next day, May 20, 2015, Business Wire privately engaged a cybersecurity firm, Fidelis, to investigate. (Trial Transcript 1385). Fidelis worked with Business Wire to investigate and "maintain their security." (Trial Transcript 1386). In fact, the remediation steps took place "immediately." (Trial Transcript 1375). The government was not involved in this investigation until after it was completed.[5] Under the clear holding in *Lagos*, the cost of this private investigation is not covered by the MVRA.

Apart from this single affidavit from Business Wire, the government has not, and cannot, demonstrate that any victims suffered any actual loss. As such, Mr. Korchevsky should not be assessed a restitution penalty.

## VI.   <u>CONCLUSION</u>

If this is a case about numbers, then perhaps the Court can forgo consideration of the § 3553(a) factors, the stated goals of sentencing and simply find that the crush of tens of thousands of pages trial exhibits overwhelms a few hundred letters from those whose lives Mr. Korchevsky has touched. Perhaps the allegations of millions of dollars made in trades carries more weight than the good accomplished by dozens upon dozens of acts of generosity, of selflessness. Perhaps the need to make a sentencing-statement in response to the hundreds of people outraged at the existence of unrelated Russian hackers deserves more consideration that the pain and brokenness of 16 year-old girl or a 12 year-old boy's need to have "more grand memories with

---

[5] Government 3500-RS-7, indicates that government only obtained the information in the fidelis report after the fact, when it had been completed.

his dad." Respectfully, since *Booker,* the law allows for, indeed calls for, something more.

The Court is presented with a simple but almost impossible task. The Court must acknowledge that "implicit in the requirement of individualized sentencing is the categorical imperative that no person may be used merely as an instrument of social policy, that human beings are to be treated not simply as means to a social end like deterrence, but also and always-as ends in themselves." *United States v. Barker*, 771 F.2d 1362, 1368–69 (9th Cir. 1985). The Court must, of course, look at the factors, the goals of sentencing, but then, we might suggest that this must be set to the side, and the human being must be considered: What good has Vitaly Korchevsky done with his life? What harm has he committed? What good might he have left to do?

Central to Vitaly Korchevsky's faith are the tenets of mercy, forgiveness and grace. Indeed, the scores of letters from his congregants reflect this, often literally begging the Court to show him mercy. While it is not the province of the Court to offer forgiveness, and mercy is more commonly called leniency, those voices point the Court to the overwhelming question that has permeated the pages of this submission: What is just?

It is respectfully submitted that fidelity to the law is not achieved, nor is the world a better place, with Vitaly Korchevsky in prison, and we would request that the Court impose a non-custodial sentence.

**RESPECTFULLY SUBMITTED.**


Dated: December 14, 2018.


SULLIVAN & BRILL, LLP
Attorneys for Defendant,
VITALY KORCHEVSKY

By:  s/_____

Steven Brill
James Healy
Rachel Brill