

U.S. Department of Justice

United States Attorney
Eastern District of New York

JMK/RMT:JN/DG
F.#2012R00103

271 Cadman Plaza East
Brooklyn, New York 11201

January 2, 2019

By Hand and ECF

Roberta Houlton
U.S. Probation Officer
Eastern District of New York
147 Pierrepont Street
Brooklyn, NY 11201

   Re: United States v. Vitaly Korchevsky
      Criminal Docket No. 15-381 (S-1) (RJD)

Dear Officer Houlton:

  The government respectfully submits this letter in response to the defendant Vitaly Korchevsky's November 12, 2018 objections to the Presentence Investigation Report ("Def. Ltr."). The paragraphs referenced below refer to the Presentence Investigation Report ("PSR").

- Paragraph 10:

    o The defendant argues that "he was not a member to the conspiracy between February 2010 and August 2015," and that he joined the conspiracy in December 2010 or January 2011. Def. Ltr. ¶ 2. The defendant is correct that trial testimony was consistent with him joining the conspiracy in or about December 2010. See Trial Transcript ("Trial Tr.") at 2318. However, the timeframe provided for in Paragraph 10 of the PSR is a general timeframe for the conspiracy as a whole.

    o Paragraph 10: The defendant argues that his role in the conspiracy "did not employ computer hackers." Def. Ltr. ¶ 3. However, as is accurately stated in Paragraph 10 of the PSR, "the conspiracy, [which the defendant was a part of], "employed skilled computer hackers…" This Paragraph is accurate and does not require amendment.

- Paragraph 23:  The government agrees that the defendant never resided in Odessa, Ukraine.  Def. Ltr. ¶ 23.

- Paragraph 28:  The defendant argues that he was "not acquainted with other co-defendants through the 'Russian Ukrainian community,'" and knew only Arkadiy Dubovoy.  Def. Ltr. ¶ 5.  Paragraph 28 of the PSR specifically states that "Arkadiy Dubovoy was acquainted with Korchevsky," therefore no change to the PSR is necessary as Paragraph 28 is otherwise accurate.

- Paragraph 29:  The defendant is correct that PR Newswire is no longer a wholly owned subsidiary of UBM plc.  Def. Ltr. ¶ 6.

- Paragraph 30:  The defendant is correct that the Victim Newswires were not authorized by the SEC to issue press releases.  See Def. Ltr. ¶ 7.  However, the victim companies that utilized the Victim Newswires to issue press releases did have to abide by Regulation FD, which provides that when a publicly traded company discloses any material, non-public information ("MNPI") regarding that issuer or its securities, the issuer must make a public disclosure of that information simultaneously.  The victim companies utilized the Victim Newswires to do just that.  The government therefore believes that Paragraph 30 should be amended to state as follows:  "The Victim Newswires issued press releases on behalf of the following publicly traded companies, who were regulated in such issuances by the Securities and Exchange Commission."  See Trial Tr. 1437-38 (Thomas Carocci testimony regarding Regulation FD).

- Paragraph 31:  The defendant argues that the evidence at trial did not establish that he traded on stolen press releases until January 2011, nor did it establish that he paid the hackers.  Def. Ltr. ¶ 8.  Paragraph 31 provides a general statement regarding the conspiracy.  The description of the defendant's role in the conspiracy is accurate, as are the descriptions of others' roles.  Moreover, Paragraph 31 does not state that the defendant paid the hackers directly.

- Paragraph 32:  The defendant objects to Paragraph 32 of the PSR in that it provides that "the Victim Newswires and Target Companies had a right to control the use of [the confidential press release] information."  Def. Ltr. ¶ 9.  The defendant argues that this statement is a legal conclusion that the government did not prove at trial.  Id.  The defendant is wrong.  The trial record is clear that the press releases were provided by the victim companies to the Victim Newswires and that the victim companies expected that the Victim Newswires would keep the information confidential.  See, e.g., Trial Tr. 1325, 1327, 2140-41.

- Paragraph 33:  The defendant objects to Paragraph 33 of the PSR and argues that the hackers did not provide the MNPI to the defendant directly, but through middlemen, and that Korchevsky never paid the hackers or had any contact with the hackers.  See Def.

2

Ltr. ¶ 10. Paragraph 33 does not discuss payment to the hackers. Furthermore, trial evidence clearly established that Korchevsky accessed the server that held the stolen press releases. See, e.g., Trial Tr. 1495 (Arkadiy Dubovoy testimony).

- Paragraph 35: The defendant contends that there is no basis in the evidence presented at trial that there was approximately $30,000,000 in illegal profits made by members of the conspiracy. See Def. Ltr. ¶ 11. The defendant is wrong. As discussed in more detail below, the total gain for the Trader Defendants was in excess of $30,000,000. See, e.g., GX 8002.

- Paragraph 37: The defendant also argues that Paragraph 37 of the PSR does not reflect the proof at trial. See Def. Ltr. ¶ 12. Here again, the defendant is incorrect. The government's expert witness, who examined PR Newswire's servers, testified that as of April 2010, there was unauthorized access to PR Newswire's network. Trial Tr. 1292. To the extent the defendant seeks to have the PSR amended to reflect that the access began in April 2010 instead of July 2010, the government does not object. Moreover, the government's expert testified that he and his team were able to determine that 43,527 press releases were stolen by the intruders from July 2010 and January 2011. Trial Tr. 1295-97. Lastly, as reflected in Paragraph 37 of the PSR, the government introduced evidence that on or about October 10, 2012, one of the hackers, sent a message to an unidentified individual stating "[I'm] hacking prnewswire.com." See GX 407(T).

- Paragraph 38: The defendant objects to Paragraph 38 of the PSR because it states that "stolen press releases were recovered from email accounts used by members of the conspiracy, including Korchevsky." See Def. Ltr. ¶ 13. Korchevsky argues that the government has not proven that he had access to email accounts where stolen press releases were housed and no press releases were recovered from any computers or phones in his possession. Id. This is incorrect. The trial evidence established that the defendant had access to the Loscal email account, which Igor Dubovoy used to send Korchevsky press releases. See, e.g., Trial Tr. 875-76.

- Paragraph 40:

    o The government agrees that the trial testimony reflects that a mutual friend introduced Mr. Dubovoy to the defendant. See Def. Ltr. ¶ 14.

    o The government agrees with the defendant regarding the $300,000 in investment losses, see Def. Ltr. ¶ 15, and suggests that Probation delete the relevant sentence in the PSR. The government also suggests that Probation amend Paragraph 40 as follows:

        In his tax return for 2009, Korchevsky described himself as a mutual fund manager, and claimed a total income of $1,760. In his tax return for 2010, Korchevsky again described himself as a

3

      mutual fund manager, and claimed a total income of -$2,197. See GX 706.

- o   The government does not object to removing the language regarding the defendant's professional and financial troubles, as long as the above language reflecting his reported tax return income is included. See Def. Ltr. ¶ 16.

- o   Lastly, the defendant objects to Paragraph 40 of the PSR because it states that Dubovoy believed Korchevsky "was an ideal partner for monetizing the stolen press releases." See Def. Ltr. ¶ 17. The evidence presented at trial reflects the fact that Mr. Dubovoy relied on Korchevsky to review and trade on the press releases since he himself had no such expertise. See, e.g., Trial Tr. 1504-1506, 1516.

- Paragraph 41:

  - o   The defendant appears to object to the statement in Paragraph 41 of the PSR indicating that he made a percentage of the profits from the illegal trading activity. See Def. Ltr. ¶ 18. As the defendant points out, there was testimony that Mr. Korchevsky was paid a percentage of the trading profits. See, e.g., Trial Tr. 1542. Paragraph 41 is therefore accurate.

  - o   The defendant also object to Paragraph 41 of the PSR because it states that the defendant and Arkadiy Dubovoy agreed that Korchevsky would access Dubovoy's accounts. See Def. Ltr. ¶ 19. The defendant argues that he only agreed to access one account. Id. The trial record is clear that Korchevsky traded in more than one of the Dubovoys' accounts. See, e.g., Trial Tr. 1527-1528; GX 6001-2 (Korchevsky's IP access to the Dubovoy brokerage accounts).

- Paragraph 42: The defendant argues that there was no testimony to support the statement in Paragraph 42 of the PSR that he "began to trade in his own accounts on the stolen press releases." See Def. Ltr. ¶ 20. The government presented evidence of Korchevsky's illegal trading in his own account. See, e.g., GX 8003 (Summary slides reflecting Korchevsky's trading presented by Dr. Eugene Canjels of the SEC).

- Paragraph 43: The defendant argues that the numbers included in the PSR in Paragraph 43 overstate his profitability because the government has not proven that the newswires were hacked in the time periods specified. See Def. Ltr. ¶ 21. We disagree. Trial testimony established that the newswires were consistently hacked throughout the time frame of the conspiracy. Moreover, the government presented evidence through the testimony of Dr. Canjels demonstrating that the defendant's trading during the time period was consistent with trading on MNPI. See GX 8003.

- Paragraph 45: The defendant objects to Paragraph 45 of the PSR and argues that there was no evidence to support the contentions in the Paragraph, and that there is no need for details about Mr. Khalupsky in the PSR. See Def. Ltr. ¶ 22. Mr. Khalupsky was the defendant's co-conspirator and had a similar role to Korchevsky in the scheme, therefore, the defendant's objection to references regarding Mr. Khalupsky are unwarranted. Moreover, there was trial testimony that Korchevsky complained about periods that he was unable to obtain the stolen press releases. See Trial Tr. 847-848, 1524-25.

- Paragraph 51: The defendant objects to Paragraph 51 of the PSR, which provides that Korchevsky received stolen press releases via email, and argues that there was no forensic or documentary evidence that he was in possession of stolen press releases. See Def. Ltr. ¶ 23. As stated above, the defendant is wrong. There was evidence presented at trial that the defendant had access to the Loscal email account, which Igor Dubovoy used to send Korchevsky press releases. See, e.g., Trial Tr. 875-76.

- Paragraph 54: The defendant objects to Paragraph 54 of the PSR and argues that it is "vague and misleading" without any explanation. See Def. Ltr. ¶ 24. As the defendant admits, Dr. Canjels testified that there were numerous periods of time where Korchevsky traded almost exclusively on press releases issued by a single newswire. See GX 8003 at 17, 18, 19, 20.

- Paragraph 55:

    - The defendant requests that the PSR reflect that he invested only $217,802 in the DNDN trade. See Def. Ltr. ¶ 25. The government does not object to this addition.

    - The defendant further objects to Paragraph 55 of the PSR and argues that the government's forensic expert, who analyzed the PR Newswire intrusion, testified that there was no evidence of any press releases being stolen after January 2011. Id. As discussed above, the defendant is incorrect. The government introduced chat messages reflecting that PR Newswire was still being hacked on or about October 10, 2012. See GX 407(T).

- Paragraph 56: As stated directly above, the government presented evidence that PR Newswire was hacked after January 2011. Moreover, as Paragraph 56 of the PSR reflects with respect to the LM trade, the government presented numerous examples of Korchevsky's trades that took place after the press release was uploaded to the particular Newswire but before it was made public. In the example of LM, Dr. Canjels testified that the trade was significant because it was placed close in time to the upload of the press release to the newswire, but well before the press release was made public. See Trial Tr. 1962-63; see also GX 8003 at 22. The government proved at trial, and the jury accepted, that Korchevsky's trading pattern was consistent with trading on stolen press releases.

Therefore, the defendant's objection regarding the LM press release is unfounded. See Def. Ltr. ¶ 26.

- Paragraph 57: The defendant objects to Paragraph 57 of the PSR, and appears to argue that because there was no Edward Life Sciences Corp. ("EW") press releases found on Korchevsky's devices, it should be excluded as an illicit trade. See Def. Ltr. ¶ 27. Similar to the above LM example, the government proved at trial, and the jury accepted, that Korchevsky's trading pattern was consistent with trading on stolen press releases. One of the trades that the government presented to the jury was the EW trade. See GX 8006 at 4-5; Trial Tr. 1991-93. The defendant's objection is therefore without merit.

- Paragraph 59: The defendant objects to Paragraph 59 of the PSR, in that it states that the "Traders paid the Hackers a percentage of the Traders' profits," and that "[t]o conceal their ties in this fraudulent scheme, the Traders wired their fraudulent trading proceeds to accounts in Estonia…" See PSR ¶ 59; Def. Ltr. ¶ 28. Trial evidence established that Arkadiy Dubovoy paid the hackers through his brother in the Ukraine. Without these payments to the hackers, Korchevsky would have lost access to the stolen information. However, the government consents to revising the relevant portion of Paragraph 59 to the following: "In exchange for the stolen MNPI, which the Traders used to trade on, Arkadiy Dubovoy paid the Hackers a percentage of the Traders' profits from their inside the window trades. To conceal both the Traders and Arkadiy Dubovoys' ties in this fraudulent scheme, Arkadiy Dubovoy, and others, wired their fraudulent trading proceeds to accounts in Estonia in the names of shell companies controlled by the Hackers and their co-conspirators."

- Paragraph 60: The defendant objects to Paragraph 60 of the PSR and argues that there is no basis that the gain in the offense was more than $30,000,000. See Def. Ltr. ¶ 29. As discussed below, the defendant's objection is without merit. The total gain for the Trader Defendants was in excess of $30,000,000. See, e.g., GX 8002.

- Paragraph 61:

  o The defendant also objects to Paragraph 61 of the PSR and argues that only the newswires can be considered victims of the scheme, not the companies, and that "the newswires did not see the companies as victims." See Def. Ltr. ¶ 30. The defendant misstates the record. Representatives of two victim companies were called to testify at trial and both stated in sum and substance that maintaining the confidentiality of earnings news that the victim companies provided to the newswires ahead of the market was extremely important to the victim companies and their shareholders. See Trial Tr. 1182-83 (Testimony of Louis DiPietro of Panera Bread); 2139-40 (Testimony of Darlan Monterisi of Computer Associates); see also Trial Tr. 1327, 1343 (Testimony of Dave Haapoija of PR Newswire) (stating that it was important to PR Newswire to keep press releases confidential prior to public distribution, and that upon learning that PR Newswire was hacked,

6

customers started calling PR Newswire almost immediately). Moreover, when the newswires notified the victim companies of the hacks is irrelevant for purposes of determining whether the victim companies are victims of the illegal scheme.

- o The defendant also objects to Paragraph 61 of the PSR because it includes a loss for Business Wire, which, based on Business Wire's affidavit, indicates that the expenses were incurred in connection with Business Wire providing assistance to the U.S. government in investigating the hack. See Def. Ltr. ¶ 31. The defendant cites no legal support for his general objection. However, as the government stated in its November 1, 2018 letter, filed in connection with Mr. Khalupsky's sentencing, see Docket Entry No. 364, in light of the Supreme Court's holding in United States v. Lagos, 138 S. Ct. 1684 (2018), additional information is required in order to determine the extent to which Business Wire's losses are fully recoverable under the Mandatory Victim Restitution Act ("MVRA").[1] Under Lagos, the timing and context of those investigations will be relevant to the determination of whether, and to what extent, associated costs are recoverable under the MVRA. Because restitution can be resolved within 90 days of sentencing, see 18 U.S.C. § 3664(d)(5), the government will request that the Court set a separate date, after sentencing, for the purpose of determining restitution as to Korchevsky and his co-defendant Khalupsky. The government understands that Business Wire intends to submit a revised affidavit of loss and that PR Newswire also intends to submit an affidavit of loss.

- o The government requests that the sentence in Paragraph 61 that currently states "[a]ccording to the government, the victims of the instant offense are the victim newswires whose servers were hacked, and the companies they represented" be revised as follows: "According to the government, the victims of the instant offense are the victim newswires whose servers were hacked, the companies they represented and the investors in those companies."

- Paragraph 62:

  - o The defendant objects to Paragraph 62 of the PSR and argues that his base offense level should only be increased by 20 levels, instead of 22 levels, since his gains were under $25,000,000. See Def. Ltr. ¶ 32. The defendant makes a number of arguments about which trades were illicit for purposes of the Guidelines calculation. First, he argues that he only made approximately $15,004,153 in profits based on the testimony and related exhibits of the government's expert witness Dr. Eugene Canjels. Id. He argues that to the extent he is held

---

[1] In Lagos, the Supreme Court held that the text and structure of the MVRA, among other things, compelled the result that the "investigation" and "proceedings" relate to the criminal investigation and prosecution, not a private investigation or civil matter. See Lagos, 138 S. Ct. at 1688-89.

7

responsible for trades in the Dubovoys' brokerage accounts, the gross profits in those accounts were only $3,202,000.  Id.  The defendant, therefore, concludes that his base offense level should be increased by 20, not 22.  Id.  The defendant is incorrect.  First, the defendant's calculation, and the calculation included in GX 8003 is based on net profit, and therefore does not reflect the unlawful gain in his brokerage accounts.  See GX 8003.  In other words, in claiming that his total unlawful gain was approximately $15 million for purposes of the Guidelines calculation, the defendant deducted all of his losses resulting from illegal trades.  These losses should not be deducted in determining the applicable Guidelines range based on unlawful gain.  See, e.g., U.S.S.G. § 2B1.4 comment (gain resulting from insider trading is the "total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information"); United States v. Goffer, 531 Fed. Appx. 8, 22 (2d Cir. 2013) (rejecting argument that district court erred by not deducting losses resulting from trades based on inside information and noting "[w]e find no precedent indicating that additional illegal trades made on MNPI that result in losses should mitigate the sentences of insider traders.").  Without deducting losses resulting from illegal trades, the unlawful gain in the defendant's brokerage accounts, when accounting for in the window trades of three days or less, is approximately $20,206,573 million.[2]  See GX 8002.

- o  The trial evidence also established that it was reasonably foreseeable to Korchevsky that the conspiracy would result in unlawful gains beyond the approximately $20.2 million in gains in his accounts.  As the defendant points out, the trial evidence established that Korchevsky also made illegal trades in the Dubovoys' brokerage accounts.  See Def. Ltr. ¶ 32; see also GX 6001-2 (showing Korchevsky's IPs accessing approximately nine of the Dubovoys' brokerage accounts).  Given Korchevsky's access to so many Dubovoy brokerage accounts, it was reasonably foreseeable to him that he was not the only one trading in the Dubovoys' accounts.  Therefore, it is reasonable to attribute to Korchevsky all of the gain in the Dubovoys' brokerage accounts.  The gain in the Dubovoys' brokerage accounts was approximately $11,713,534.[3]  See GX 8002.  When taking into account both the gains in the Korchevsky and the Dubovoys' brokerage accounts, as outline above, the total gains in the conspiracy well exceed $25,000,000.  Therefore, the appropriate level enhancement is 22 levels, as indicated in the PSR.

---

[2] This figure does not take into account the trading in the Korchevsky accounts in 2014 since trial testimony indicated that the Duboovys and Korchevsky lost access to the press releases during a portion of 2014.

[3] This figure does not take into account trading activity in the Dubovoys' accounts in 2014.

- o   The defendant makes a secondary argument that the profits attributed to him are inaccurate because some of the trades were legitimate and not based on hacked press releases. See Def. Ltr. ¶ 32.  The defendant appears to misconstrue the evidence presented at trial.  As discussed above, the testimony established that the newswires were being hacked all the time.  While the forensic examiners were able to collect evidence of hacking at certain points in time, sometimes based on when they were hired by the particular newswire, the cooperating witnesses stated in no uncertain terms that they were getting press releases and that Korchevsky and Khalupsky were trading on those press releases from early 2011 through part of 2015.  The defendant further ignores Dr. Canjels' testimony demonstrating that his trading was consistent with having MNPI in the time period between 2011 and 2015.  See, e.g., GX 8002.  The defendant is correct that witness testimony indicated that there was a period of time in approximately 2014 when the Dubovoys, Korchevsky and their co-conspirators lost access to the information for at least some time.  Trial testimony and evidence further indicates that Korchevsky regained access to the stolen information in 2015.  As a result, the government did not include the 2014 trades in its above calculation of total gains.

- o   The defendant further argues that the gain attributable to him should be based only on the trades that the government disclosed prior to trial, which the defendant attaches as Exhibit B to his submission. See Def. Ltr. ¶ 32 and Exhibit B to the Def. Ltr.  Those gains amount to only approximately $9,127,423.  Id.  First, as already discussed above, the defendant's figure completely excludes any other gains of the conspiracy, in particular the gains made by the Dubovoys as a result of the illicit trading.  Moreover, the defendant misconstrues the purpose of the trades that the government identified in advance of trial, which, as the government made clear in its letter to the defendant and the Court, were intended to identify for the defendant the trades that the government intended to highlight specifically for the jury through other testimony.

- o   In a footnote, the defendant raises, but does not fully argue, that the calculation of profit from the offense was done incorrectly, and should be calculated "as the difference between the cost of the opening of the position against the value of the position when the press release was made public." Def. Ltr. at fn 2.  This argument is irrelevant here.  For purposes of calculating the defendant's gain under the Guidelines, the government included only trades of three days or less.  Therefore, it only considered trades where the defendant exited his position shortly after the press releases were made public.

- o   The defendant contends that the enhancement for ten-or-more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) should not apply because "there has been no evidence that the companies whose press releases were the subject of the trades sustained any loss." Def. Ltr. at ¶ 33.  The defendant is incorrect.  Here, for Guidelines purposes, the victims of the defendant's offenses include the Victim Newswires

9

and the companies whose stock the defendant and his co-conspirators traded on based on stolen information, and the investors in those companies.  Cf. United States v. O'Hagan, 521 U.S. 642, 643 (1997) (trading based on material nonpublic information harms "members of the investing public"); United States v. Martoma, 2014 WL 4384143, at *7 (S.D.N.Y. Sept. 4, 2014) (investors are victims when defendant trades based on material nonpublic information).[4]  Each of the illegal trades that Korchevsky and his co-conspirators made had a counterparty on the other side.  And, as discussed above, representatives from two of the victim companies testified that keeping earnings information confidential until such information was intended to be disclosed was important to them and to their investors.

- o  The defendant contends that the enhancement for being convicted of an offense under 18 U.S.C. § 1030 (U.S.S.G. § 2B1.1(b)(17)(A))[5] does not apply because the defendant was convicted of conspiring to violate 18 U.S.C. § 1030, in violation of 18 U.S.C. § 371, and the guideline "appears to have been intended for those who committed or commissioned the actual computer intrusion.  Def. Ltr. ¶ 34.  The defendant is incorrect because "[u]nless otherwise specified, an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy . . . in respect to that particular statute."  U.S.S.G. § 1B1.3, note 7.  The defendant further appears to argue that the enhancement does not apply to him because the methods used by the hackers "involved a variety of hacking methods," that he was not aware of the methods used by the hackers, and that it was not reasonably foreseeable to him that the computer intrusions involved an intent to obtain personal information.  See Def. Ltr. ¶ 34.  The defendant is incorrect because, given the complexity of the scheme, the defendant's direct access to the stolen press releases, and the lengths the hackers went through to gain and regain access to the newswires, it was reasonably foreseeable that such a massive and sophisticated hacking scheme would involve an intent to obtain personal information.  Moreover, while the hacking scheme may have involved several methods of hacking, trial testimony clearly demonstrated that one of those methods was using personal information.

- o  The defendant contends that the enhancement for a "substantial part" of the scheme being committed outside of the United States (U.S.S.G. § 2B1.1(b)(2)(10)(B)) does not apply because the information that was stolen was

---

[4] But see United States v. Gupta, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012) (stating that marketplace is not the victim of insider trading).

[5] As the defendant notes, U.S.S.G. § 2B1.1(b)(17)(A) has recently been re-codified in U.S.S.G. § 2B1.1(b)(18)(A).  See Def. Ltr. ¶ 34.  This recodification has no effect on whether the Guideline applies to this defendant.

10

located in the United States and the trades were made in U.S. accounts, cleared in U.S. accounts and all profits were paid in the United States. Def. Ltr. ¶ 35. The defendant is incorrect because, among other things, the hackers, Roma, Pavel Dubovoy, Pychnenko and Khalupsky all committed their offenses from abroad. The information was stolen from abroad and transmitted to the United States, among other countries. In addition, although the defendant states that the "profits were paid in the United States," the evidence at trial showed payments being made at bank accounts all over the world.

- Paragraphs 70-78: Based on the above, the Guidelines level, as outlined in the PSR, is accurate and the defendant's requested Guidelines calculation is incorrect. See Def. Ltr. ¶ 36.

- Paragraph 113: For the reasons set forth above, the defendant's calculation of his total offense level is inaccurate, see Def. Ltr. ¶ 38, and the current estimate of 188-235 months outlined in Paragraph 113 should remain.

- Paragraphs 84, 92, 94 and 96: The government has no specific information regarding these paragraphs.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:   /s/
Richard M. Tucker
Julia Nestor
David Gopstein
Assistant U.S. Attorneys
(718) 254-6204/6297/6153

cc:   Clerk of Court (RJD) (by ECF)
      Defense counsel (by ECF)