

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RMT/JN/DG
F.#2012R00103

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 23, 2019

<u>By Hand and ECF</u>

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Vitaly Korchevsky
                  <u>Criminal Docket No. 15-381 (S-1) (RJD)</u>

Dear Judge Dearie:

        On July 6, 2018, a jury returned a guilty verdict against the defendant Vitaly Korchevsky (the "defendant" or "Korchevsky") on all five counts of the superseding indictment, charging the defendant and his co-defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One), conspiracy to commit securities fraud and computer intrusions, in violation of 18 U.S.C. § 371 (Count Two), two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Counts Three and Four) and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).  The charges stemmed from a conspiracy to steal thousands of press releases before they were distributed to the public, and to trade ahead of the market on the information those press releases contained.  The government respectfully submits this letter in advance of sentencing in the above-captioned matter, which is currently scheduled for March 21, 2019.  For the reasons set forth below, the government recommends that the Court impose a sentence of 96 months' imprisonment.  This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing and ensure consistency in sentencing as between co-defendants in this case.

I.  Factual Background[1]

Korchevsky became involved in the conspiracy at the very beginning, in or about late 2010, when Arkadiy Dubovoy ("Dubovoy") contacted Korchevsky and proposed the illegal trading scheme. See Trial Transcript ("Tr.") at 1504-1507. Years before they carried out the illegal scheme, Korchevsky had traded for Dubovoy in the stock market. Tr. at 1496-97. Dubovoy explained to Korchevsky that the information they were receiving was not public, and that they were receiving the information before the rest of the market. Tr. at 1504-1507. Korchevsky never expressed any concern. Tr. at 1507-08.

Dubovoy did not have an understanding of the stock market so he needed Korchevsky's expertise to carry out the illegal scheme. PSR ¶ 41. As a result, Dubovoy permitted Korchevsky to access Dubovoy's brokerage accounts and trade directly on Dubovoy's behalf. Id.; Tr. at 1519. Internet Protocol ("IP") evidence introduced during trial showed that from in or about January 2011 to in or about February 2015, Korchevsky accessed approximately nine different brokerage accounts in the names of both Igor and Arkadiy Dubovoy nearly 10,000 times. See GX 6001-2.

In the first part of the scheme, Dubovoy provided Korchevsky with codes to access a server that held the stolen press releases. Tr. at 1519. Korchevsky would then access the server, obtain the stolen press releases, and trade on the stolen information. Dubovoy told Korchevsky that the stolen press releases were coming from hackers in the Ukraine. Tr. at 1521. The two agreed that Dubovoy would pay Korchevsky a percentage of the trading profits. PSR ¶ 41; Tr. at 1565, 1571. Dubovoy would also pay the hackers a percentage of the profits from the illegal trading so that he, Korchevsky and their co-conspirator Vladislav Khalupsky, who also traded for Dubovoy, would continue to receive access to the stolen press releases.

Shortly after the scheme began, Korchevsky began using the stolen information to trade in his own brokerage accounts. PSR ¶ 42. Over the course of the illegal scheme, which lasted from approximately late 2010 to mid-2015, Korchevsky operated approximately five brokerage accounts for purposes of the illegal trading. See GX 8003. During the course of the conspiracy, Korchevsky made approximately $15,004,153 in net profit from the illegal trading, including more than $8 million in 2011, his first year of trading on the stolen information. See GX 8003. After trading on the stolen press releases for nearly a year, Korchevsky created NTS Capital Fund ("NTS") and used NTS to make hundreds of trades based on stolen press releases. PSR ¶ 44. Korchevsky also started a fund with Dubovoy called SNT Capital. Tr. at 861, 1582-83. While the fund did not become operational, the intent was for Korchevsky to use the illegal profits that he obtained in the Dubovoy brokerage accounts to attract potential investors to SNT. Tr. at 859.

---

[1] Because the Court is deeply familiar with the facts of this case from, among other things, presiding over the trial, the government provides only a brief summary of the facts below, and respectfully refers to the trial record and the Presentence Investigation Report ("PSR") for further detail.

      In the second part of the scheme, starting in early 2015, Korchevsky began receiving the stolen press releases via email, instead of by accessing a server. PSR ¶ 51. Instead of trading directly in the Dubovoys' brokerage accounts, Korchevsky began providing Igor Dubovoy coded directions on how to trade on the stolen information. PSR ¶ 52. During this time period and until approximately May 2015, Korchevsky continued trading in his own brokerage accounts based on the stolen information. He made more than $2 million in net profits during just half a year of trading. See GX 8003. In mid-2015, right before their arrest, when Dubovoy became weary of continuing the scheme, Korchevsky pushed him and Igor Dubovoy to get the stolen information and even gave them $500,000 to continue the trading. See, e.g., Tr. at 940, 1633-35; GX 403-A at 5-6, 707-B. During the scheme, Korchevsky directed that the Dubovoys purchase computers, internet hotspots and other electronic devices for him to use for the illegal trading. Tr. at 1522-23; 835. At the time of Korchevsky's arrest, law enforcement found him with numerous electronic devices in his house, including three cellular phones in a safe that were used to communicate with other co-conspirators. Tr. at 674-76; 681-82.

      II.    <u>Guidelines</u>

      The government recommends that the Court adopt the below Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§§ 2S1.1(a)(1), 2B1.1) | 35 |
| Plus: Defendant convicted under 18 U.S.C. § 1956 (§2S1.1(b)(2)(B)) | +2 |
| Total: | <u>37</u> |

As stated above, the Base Offense Level is determined by reference to § 2B1.1 and reflects the following calculations:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(1)) | 7[2] |

---

[2] In its calculation of the defendant's Guidelines, Probation listed the base offense level as 6. PSR ¶ 70. As the Court found in sentencing Khalupsky, the appropriate base offense level should be 7. U.S.S.G. § 2B1.1(a)(1) provides that the base offense level is 7 if "(A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more." Here, the defendant was convicted of offenses that fit these two criteria, specifically conspiracy to commit wire fraud (Count One) and securities fraud (Counts Three and Four). As a result, the base offense level under U.S.S.G. § 2B1.1 should be 7. See, e.g., United States v. Salado, 590 Fed. Appx. 692 (9th Cir. 2015) (unpublished) (base offense level 7 where defendant convicted of money laundering offense and an offense referenced to U.S.S.G. § 2B1.1); United States v. Nikolovski, 565 Fed. Appx. 397, 401-402, n.4 (6th Cir. 2014) (same); United States v. Mirzoyan, 2017 WL 1501394, at *18 (S.D.N.Y. Apr. 26, 2017) (same). In his Objections to the PSR, tKorchevsky also pointed out that the base offense level should be 7. See Defendant PSR Objections ("Def. Obj.") at fn 5.

| | |
|---|---:|
| Plus: Gain of more than $25,000,000 (§ 2B1.1(b)(1)(L)) | +22 |
| Plus: Ten or more victims ((§2B1.1(b)(2)(A)(i)) | +2 |
| Plus: Substantial part of scheme committed from outside of United States ((§2B1.1(b)(10)(B)) | +2 |
| Plus: Defendant convicted under 18 U.S.C. § 1030 and offense involved intent to obtain personal information | +2 |
| Total: | <u>35</u> |

Because the defendant is in criminal history category I, the applicable Guidelines range is 210-262 months' imprisonment.

The defendant asserted a number of objections to the Guidelines calculations. We address these objections below.

### A.  Gain Calculation

The defendant argues that the PSR's gain calculation is inaccurate because it is based on the difference in price between opening and closing positions, as opposed to the difference in price between opening positions and when the public learned of the stolen information. See Defendant's Letter ("Def. Ltr.") at 20-23. As a result, Korchevsky contends that the calculation may include post-distribution gains that he and his co-conspirators may have earned in positions they closed "30 minutes, 30 hours, 30 days or longer, after the press release was made public." Id. at 22. These post-distribution gains, Korchevsky contends, may reflect market factors unrelated to the material nonpublic information upon which the defendant traded and therefore should not be factored into the Guidelines' gain calculation. See id. Korchevsky suggests that "a more detailed analysis indicates that [gain] is millions of dollars below" $25 million, but he provides neither an estimate of the gain nor an alternative methodology for calculating gain from the illegal trades. See id. at 24.

The defendant's argument about potential gains based on post-distribution extrinsic market factors has no bearing on the Guidelines calculation in this case because the government's gain calculation includes <u>only</u> round trips of three days or less. In other words, the gain calculation reflects stock prices shortly after press releases were publicly distributed and does not include any trade that Korchevsky held for more than three days. Even applying this limitation, a "reasonable estimate" of gain is still greater than $25 million. U.S.S.G. §2B1.1 cmt. n.3(C) (discussing reasonable estimate of loss); United States v. Martoma, 48 F. Supp. 3d 555, 562 (S.D.N.Y. 2014) (discussing reasonable estimate of gain). Considering only trades that were (i) in the window and (ii) round trips of three days or less, and excluding trades made in 2014, when the trial record reflects Korchevsky and the Dubovoys lost access to the stolen press releases, Korchevsky gained more than $20.2 million in his own accounts, and the Dubovoys

4

gained more than $11.7 million in their accounts. See GX 8002.[3] All of the trades underlying these gains were closed within three calendar days of the corresponding press release's public distribution.

In fact, the trial evidence showed that Korchevsky's round trips of three days or less were usually just one-day round trips, in which Korchevsky closed his position the day after he opened it. See Trial Tr. 1919:14-22. (Dr. Canjels testifying that "most of the time it's one day round trips"). The chart below includes the ten most profitable trades in Korchevsky's accounts and shows that, in each case, Korchevsky closed his position within one day of the press release's public distribution (and often in the first hour of trading when a press release was issued after the market closed the previous day).

| Ticker | Press Release Distribution Time | Close Time | Profit |
|---|---|---|---|
| DNDN | 8/3/11 16:01 | 8/4/11 9:39 | $2,335,198 |
| CAT | 1/26/12 7:30 | 1/26/12 10:00 | $841,073 |
| OVTI | 8/25/11 16:18 | 8/26/11 10:13 | $757,391 |
| ALGN | 10/17/13 16:00 | 10/18/13 9:07 | $647,722 |
| CSTR | 1/13/11 16:30 | 1/14/11 9:48 | $485,620 |
| PNRA | 10/22/13 16:05 | 10/23/13 9:39 | $482,397 |
| CAT | 10/24/11 7:31 | 10/24/11 14:59 | $448,241 |
| QCOM | 11/2/11 16:00 | 11/3/11 15:16 | $406,177 |
| SGI | 2/7/12 16:05 | 2/8/12 9:30 | $362,857 |
| EW | 4/23/13 16:01 | 4/24/13 10:02 | $297,741 |

Source: GX 8002.

The chart reflects Korchevsky's practice of closing positions very shortly after stolen press releases were issued – a practice that maximized the likelihood that the movement in a stock's price would be based on the stolen material, non-public information, and limited the possibility that the movement would be based on post-distribution extrinsic market events that he

---

[3] Applying the same parameters, the Momotok accounts gained over $1.5 million and the Garkusha account gained $133,396. See GX 8002. These sums are not taken into account for purposes of the defendant's gain calculation under the Guidelines.

now claims inflate the Guidelines' calculation. That possibility is even further reduced by the government's application of the three-day round trip parameter.

In United States v. Royer, 549 F.3d 886 (2d Cir. 2008), the Second Circuit upheld this Court's sentencing determination that was based in part on a gain calculation including gains made in the three days after the inside information was publicly disseminated. Royer, 549 F.3d at 903-04. By definition, all of Korchevsky's round trips of three days or less fall within that parameter and, as set forth above, Korchevsky usually closed his positions either the same day or the day after a press release's public distribution – i.e., shortly after the public learned of the information.[4] Cf. United States v. Rajaratnam, 2012 WL 362031, at *21 (S.D.N.Y. Jan. 31, 2012) (estimating gains based on price increase between when defendant purchased stock and a time "shortly after" public learned of insider information); United States v. Nacchio, 573 F.3d 1062, 1078 (10th Cir. 2009) (stating that disgorgement in loss avoidance cases is generally "the difference between the value of the shares when the insider sold them while in possession of material, non-public information, and their market value a reasonable time after public dissemination of the inside information." (internal quotations omitted) (emphasis added).[5]

---

[4] In his sentencing letter, the defendant cites United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006), for the general proposition that losses "must be the result of the fraud" and "losses from causes other than the fraud must be excluded from the loss calculation." Def. Ltr. at 26 (quoting Ebbers at 128). Ebbers, which involved the WorldCom fraud, did not address trades based on inside information. Moreover, Korchevsky has not argued that the gain calculation in this case should account for extrinsic market factors during the short time period between when Korchevsky opened a position and press releases were publicly distributed. Nevertheless, we note that calculating gain in insider trading cases is different from loss calculations in other cases, such as those involving fraudulent misrepresentations to investors:

> [I]n fraudulent misrepresentation cases, it makes sense to isolate the effect of the defendant's conduct on the market from other market forces, because the defendant's "offense" directly relates to the effect that his misrepresentations had on the market. In insider trading cases, however, the focus is not on the effect of the defendant's trading on the market, but instead on the fact that the defendant has engaged in unlawful trading and benefited from it. Since the insider trading defendant stood to—and, presumably, hoped to—benefit from market forces, it is not unjust to refuse to exclude the effect of those same market forces in calculating the gain from his offense. Martoma, 48 F. Supp. 3d at 569 (emphasis in original).

Applying the above analysis, the district court in Martoma concluded that extrinsic market factors are "irrelevant" to the gain calculation. Id. at 567.

[5] Because application of the three-day round trip parameter results in a universe of trades in which gain is determined based on stock price shortly after the public distribution of press releases, the Court need not address the broader question of how post-disclosure extrinsic market factors should be considered in determining gain in insider trading cases. Courts have split on this issue. Compare Rajaratnam, 2012 WL 362031, at *10 ("a defendant's decision to hold stock after inside information is public is no less 'lawful trading' than any other investor's

Korchevsky also argues that the government's assessment of gain is overstated because it "fails to take into account its own evidence indicating that there were times that the press releases were not available to the Dubovoys, and by extension, to Mr. Korchevsky." Def. Ltr. at 23-24. Korchevsky attempts to support his position by citing to periods of time that Korchevsky traded, but the Dubovoys did not, and to periods where Korchevsky traded on more than one newswire's press releases. Id. First, as stated above, the Guidelines require a "reasonable estimate" of gain. See U.S.S.G. §2B1.1 cmt. n.3(C) (discussing reasonable estimate of loss). While the defendant asks the Court to reject the government's gain calculation, he does not attempt to provide his own calculation. See Def. Ltr. at 23-24. Second, the government's gain calculation is reasonable in that it takes into account only short term trades during the relevant period, which its expert identified as suspicious, and excludes trades from 2014, where trial testimony indicated the defendant and his co-conspirators lost access to the inside information. See GX 8003.

Third, although Korchevsky held some of his illegal trades for a longer period of time, the government did not include those trades in its calculation.[6] For example, on October 21, 2011 at 1:28 p.m., a press release for LECO Corporation ("LECO") was uploaded to PR Newswire. See GX 8002. Just over two hours later, at 3:32 p.m., the Dubovoys opened a position in LECO. Id. Ten minutes later, at 3:42 p.m., Korchevsky opened a position in his own account. Although the LECO press release was uploaded on October 21, 2011, it was not publicly distributed until October 27, 2011 at 8:08 a.m. Korchevsky closed his position less than two hours later and profited $112,911; the Dubovoys closed their position the following day and profited $45,717. Id. These trades were not closed within three days and, as result, the more than $150,000 that the co-conspirators gained is not included in the government's estimate.

Fourth, the government does not hold the defendant accountable for all of his co-conspirators' trading, but only for that of the Dubovoys, whose accounts he consistently accessed (nearly 10,000 times during the period of the conspiracy). While the trial evidence established that it was reasonably foreseeable to Korchevsky that given the sprawling nature of the conspiracy, the unlawful gains of its members would be well beyond those made by him and the Dubovoys, the government does not seek to hold Korchevsky accountable for the gains of other co-conspirators.

---

decision to purchase it.") and Nacchio, 573 F.3d at 1078 (the "gain resulting from the offense" is solely that which results from the fraudulent conduct) with United States v. Mooney, 425 F.3d 1093, 1100 (8th Cir. 2005) (the "gain resulting from the offense" means the "total profit actually made from a defendant's illegal securities transactions").

[6] Excluding 2014, Korchevsky gained over $3 million in inside-the-window trades he held for more than three days, and the Dubovoys gained more than $1.5 million. See GX 8002 (The gains on trades Korchevsky held for more than three days were outweighed by losses – Korchevsky's trades of more than three days resulted in a net loss of over $2.4 million during the same time periods, and the Dubovoys' trades resulted in a net loss of over $1.1 million. See id.).

Finally, as the government stated in its response to the defendant's PSR Objections, trial testimony established that the newswires were repeatedly hacked throughout the time frame of the conspiracy, and while there were many times when one particular newswire was being hacked, that was not the case during all periods.  While the forensic examiners that testified at trial were able to collect evidence of hacking at certain points in time, sometimes based on when they were hired by the particular newswire, the cooperating witnesses stated in no uncertain terms that they were getting press releases and that Korchevsky and Khalupsky were trading on those press releases from early 2011 through part of 2015.[7]  Furthermore, as stated above, where witness testimony established that the Dubovoys and Korchevsky lost access to pre-distribution press releases in 2014, the government did not include the entire period of trades in its Guidelines calculation.

In sum, Korchevsky's contention that the government's gain calculation is overstated is inconsistent with how he executed his illegal trades and, in any event, mooted by application of the three-day round trip parameter, which limits the gain calculation to trades closed shortly after the distribution of press releases and excludes certain trades made by Korchevsky that were based on the stolen information.

      B.      <u>Number of Victims</u>

Relatedly, in his Objections to the PSR, Korchevsky argues that U.S.S.G. § 2B1.1(b)(2)(A)(i))'s enhancement for ten-or-more victims should not apply because "there has been no evidence that the companies whose press releases were the subject of the trades sustained any loss." Def. Obj. at ¶ 33.  As the government stated in its response to the defendant's objections, for Guidelines purposes, the victims of the defendant's offenses include the Victim Newswires and the companies whose stock the defendant and his co-conspirators traded on based on stolen information, and the investors in those companies. <u>Cf.</u> <u>United States v. O'Hagan</u>, 521 U.S. 642, 643 (1997) (trading based on material nonpublic information harms "members of the investing public"); <u>United States v. Martoma</u>, 2014 WL 4384143, at *7 (S.D.N.Y. Sept. 4, 2014) (investors are victims when defendant trades based on material nonpublic information).[8]  Each of the illegal trades that Korchevsky and his co-conspirators made had one or more counterparties on the other side, a number of whom were identified through trading data.  <u>See</u> GX 851.  And representatives from two of the victim companies testified that keeping earnings information confidential until such information was intended to be disclosed was important to them and to their investors.

---

[7] The government also presented chats between the hackers showing that they were consistently hacking more than one newswire at a time.  <u>See</u> GX 406(T) and 407(T).

[8] But see <u>United States v. Gupta</u>, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012) (stating that marketplace is not the victim of insider trading).

8

### C.    Substantial Part of the Scheme Committed Outside the United States

Similarly, in his PSR objections, the defendant contends that the enhancement for a "substantial part" of the scheme being committed outside of the United States (U.S.S.G. § 2B1.1(b)(2)(10)(B)) does not apply because the information that was stolen was located in the United States and the trades were made in U.S. accounts, cleared in U.S. accounts and all profits were paid in the United States.  Def. Obj. ¶ 35.  The defendant is incorrect because, among other things, the trial evidence showed that the hacks were initiated from abroad, and numerous members of the conspiracy, including the hackers, Roma, Pavel Dubovoy, Pychnenko and Khalupsky all committed their offenses from abroad.  In addition, although the defendant states that the "profits were paid in the United States," the evidence at trial showed payments being made at bank accounts all over the world.  Moreover, trial evidence also established that Korchevsky conducted at least some of his trading from abroad.  See Tr. at 1523.  In sum, the trial evidence clearly established that a substantial portion of the scheme was committed from outside the United States.[9]

### D.    Conviction Under 18. U.S.C. § 1030

Lastly, in his PSR objections, the defendant contends that the enhancement for being convicted of an offense under 18 U.S.C. § 1030 (U.S.S.G. § 2B1.1(b)(17)(A)) does not apply because the defendant was convicted of conspiring to violate 18 U.S.C. § 1030, in violation of 18 U.S.C. § 371.  Def. Obj. ¶ 34.  The defendant is incorrect because "[u]nless otherwise specified, an express direction to apply a particular factor only if the defendant was convicted of a particular statute includes the determination of the offense level where the defendant was convicted of conspiracy . . . in respect to that particular statute."  U.S.S.G. § 1B1.3, note 7.  Thus, because Korchevsky was convicted of conspiring to violate 18 U.S.C. § 1030, the enhancement for being "convicted of an offense under 18 U.S.C. § 1030" applies.  See United States v. Ugoh, 537 Fed. Appx. 126, 129 (3d Cir. 2013) (finding "no ambiguity" in Guidelines and affirming application of enhancement for conviction under 18 U.S.C. § 1956 where defendant was convicted of conspiracy to violate 18 U.S.C. § 1956, in violation of 18 U.S.C. § 371).

The defendant further argues that the enhancement does not apply to him because the methods used by the hackers "involved a variety of hacking methods," that he was not aware of the methods used by the hackers and that it was not reasonably foreseeable to him that the computer intrusions involved an intent to obtain personal information.  See Def. Obj. ¶ 34.  The defendant is incorrect because, given the complexity of the scheme, the defendant's direct access to the stolen press releases, and the lengths the hackers went through to gain and regain access to the newswires, it was reasonably foreseeable that such a massive and sophisticated hacking scheme would involve an intent to obtain personal information.  Moreover, while the hacking scheme may have involved several methods of hacking, trial testimony clearly demonstrated that

---

[9] Even if the enhancement did not apply, another enhancement in the same provision of the Guidelines would: the use of sophisticated means (U.S.S.G. § 2B1.1(b)(2)(10)(C)).

one of those methods was using personal information (specifically, information related to numerous employees of the hacked newswires).

### III. The Appropriate Sentence

Contrary to the defendant's assertions, given the seriousness of the conduct here, the scope of the offense and the defendant's role in the offense, a sentence of probation is insufficient to provide just punishment, to promote respect for the law and effect adequate deterrence. Indeed, for the reasons set forth below, the government respectfully recommends a sentence of 96 months' imprisonment, which is well below the applicable advisory Guidelines range of 210-262 months. The government makes this recommendation in light of the Court's previously imposed sentence of 48 months' imprisonment for Korchevsky's co-conspirator, Khalupsky. The government's requested sentence is appropriate for this defendant, and ensures consistency in sentencing as between co-defendants in this case.

#### A. The Seriousness of the Defendant's Conduct Should be Given Great Weight in Reaching a Just Sentence

The defendant seeks a probationary sentence for his crimes and cites to his personal history and the inflation of the Guidelines, among other factors. See Def. Ltr. at 3. However, the nature and circumstances of the defendant's conduct in this case is extremely serious and requires just punishment. 18 U.S.C. § 3553(a)(2)(A).

First, the defendant's conduct was pervasive and calculated. Because of his prior work in the industry, including having passed multiple FINRA exams (see GX 815), and familiarity with the prohibitions of trading on stolen information, he fully understood the illegal nature of his conduct and its effects. Yet, the defendant was not deterred from doing exactly what he knew he should not – trading on stolen press releases ahead of the market. His conduct spanned several years and involved thousands of illegal trades. He not only traded in several of the Dubovoys' brokerage accounts on the illegal information, but he also had at least five brokerage accounts of his own that he conducted illegal trading in during the course of the scheme. He used multiple devices specifically designated for the scheme in order to carry out – and hide – his illegal activity. He even traveled abroad to conduct some of his trading in an attempt to avoid detection.

Second, Korchevsky played an essential role in the scheme. In order to monetize the press releases, the hackers and the Dubovoys needed Korchevsky and others to quickly analyze the press releases and make trades based on them. Korchevsky used his experience as a trader to do just that. He went to great lengths to use his experience to advance his criminal conduct.

Third, the defendant was involved in the full scope of the scheme. In addition to illegally trading in his own accounts, he had access to multiple Dubovoy accounts, executed trades in those accounts and personally accessed the hacked press releases through the hackers' portal. Moreover, the defendant's unlawful trading resulted in enormous illegal profits – more than $15 million in profits to him alone and, as set forth above, millions more for the Dubovoys.

Simply put, given the defendant's role and conduct in this scheme, a sentence of probation would be entirely inadequate to reflect the seriousness of the defendant's offenses, promote respect for the law and provide just punishment.

B.  Sentencing Consistency is an Important Factor Here

The government agrees that there is a need to avoid unwarranted sentencing disparities in this case, see 18 U.S.C. § 3553(a)(6) and Def. Ltr. at 42-43,[10] and to ensure that Korchevsky's sentence is proportionate to that of his co-conspirators, in light of the scope of his conduct. To that end, the government has taken into account the Court's sentence of 48 months in prison for the defendant's co-conspirator Khalupsky in seeking a below-Guidelines sentence of 96 months for Korchevsky. In sentencing Khalupsky, the Court stressed the essential nature of Khalupsky's role in carrying out the novel crime by interpreting and trading on information stolen by hackers. As discussed in more detail below, the government believes that the Court's rationale with respect to Khalupsky is just as relevant with respect to Korchevsky.

However, when weighing Korchevsky's conduct against that of Khalupsky, it is clear that Korchevsky's conduct was significantly broader in scope. While the two served similar roles, Korchevsky made significantly more in profits – approximately $15 million – as compared to Khalupsky – who made less than $700,000 – throughout the course of the conspiracy. The magnitude of the differential in profits was due almost entirely to the fact that Korchevsky was trading in his own accounts on the stolen information without telling the Dubovoys, and without paying any money to the hackers from the profits he earned. Moreover, Korchevsky was involved in the scheme for longer than Khalupsky. Lastly, as discussed in more detail below, Korchevsky appears to take absolutely no responsibility for his conduct.

C.  The Guidelines Are Relevant for the Court's Consideration Here

The defendant contends that the Guidelines calculation in insider trading cases, and presumably general fraud cases, produce sentences that are inconsistent with the harm that resulted from the crime itself, see Def. Ltr. at 25-27. We disagree with the defendant's contention that the Guidelines are higher than necessary in these types of cases, however, as outlined herein, in light of the Court's guidance in sentencing Khalupsky, the government requests a sentence well below the defendant's Guidelines range in this case. Nonetheless, while the Guidelines are advisory and the Court's inquiry does not end at its determination of a defendant's Guidelines range, it is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point

---

[10] The defendant argues that a probationary sentence is appropriate and would avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. Def. Ltr. at 42-43. He cites to a number of cases where courts have imposed a below-guidelines sentence for defendants who have either pleaded guilty for their fraudulent conduct or have been found guilty after a trial. See Def. Ltr. at 45-46. Most of the sentences in the examples cited by the defendant did not result in probation, and in fact, many resulted in significantly lengthy prison sentences. Id.

11

and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Therefore, the government addresses below, the defendant's arguments with respect to the applicability of the Guidelines in this case, as well as other relevant sentencing considerations.

First, in arguing that the Guidelines are overstated in insider trading cases and as to the defendant particularly, the defendant completely disregards that, in addition to securities fraud offenses, he was convicted of conspiracy to commit wire fraud, computer intrusions and money laundering. These offenses had different victims and required different criminal conduct. The wire fraud and computer intrusions provided the defendant with the material, non-public information he needed in order to commit securities fraud. The securities fraud resulted in millions of dollars in illicit profits. And the illicit profits were then laundered, in part through payments to the overseas hackers designed to ensure that they would continue the computer intrusions upon which the defendant's unlawful trades were based. In other words, the defendant and others created a market for the stolen information and an increased incentive for the hackers to continue stealing press releases. This cycle of criminal conduct spanned more than four years, involved thousands of illegal trades, unlike many insider trading cases, and resulted in profits of more than $15 million to him and many millions to his co-conspirators.

Moreover, the defendant's conduct was not an isolated incident, but rather persistent and intentional conduct driven by greed. The defendant did not just trade for the Dubovoys and make a percentage of those profits, he made the conscious decision – from the very beginning of the conspiracy – to trade in his own brokerage accounts. And he did so without telling the Dubovoys the scope of his trading or his profits. In fact, throughout the course of the conspiracy, Korchevsky made more money than the Dubovoys on the illicit trading. The defendant's conduct in 2015 is telling of his culpability for his crimes–when the Dubovoys were ready to give it all up in 2015, Korchevsky persisted and wanted to continue with the scheme. See, e.g., Tr. at 940, 1633-35; GX 403-A at 5-6, 707-B.

While some of the cases the defendant cites point to the flaw in calculating the Guidelines using loss amount, see, e.g., Def. Ltr. at 25-26 citing United States v. Corsey, 723 F.3d 366, 380 (2d Cir. 2013), although the loss Guidelines were used here, the loss amounts were not used to calculate the defendant's Guidelines. Instead, the defendant's calculation is based on his and the Dubovoys' gain, i.e., the specific amount they made as a result of their illegal conduct. The government disagrees with the defendant that his gain is a poor measure of his culpability. See Def. Ltr. at 29-30. In fact, it is precisely the benefit that the defendant obtained from his illegal conduct that measures the wrongfulness of his acts. Furthermore, the defendant argues that holding him responsible for the Dubovoys' gains is improper, see Def. Ltr. at 29-30, but fails to acknowledge that he was responsible for many of the trades in the Dubovoys accounts. But even more significantly, the defendant's Guidelines calculation takes into account only his own trading activity and that of the Dubovoys, whose accounts the defendant accessed more than 10,000 times throughout the course of the conspiracy. The Guidelines calculation does not hold the defendant responsible for the gains of others, which should have been foreseeable to him as a result of his role in this vast conspiracy, including those of Garkusha and Momotok, as well as others who were trading based on the stolen press releases.

The defendant also argues that the Guidelines are incongruous with his conduct because "[i]n this case, there are essentially no victims." See Def. Ltr. at 27-30.[11] The defendant entirely disregards the real impact his conduct, and the conduct of others who choose to engage in similar crimes, has on the defrauded corporations and the marketplace as a whole. First, hacking U.S. institutions is an extremely serious crime and the defendant was complicit in – and provided the financial incentive for – that conduct. Moreover, the defendant chose to cheat and corrupt the system that was created specifically to ensure that there is an even playing field for all investors in the market. See Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), reprinted in 1988 U.S.C.C.A.N. 6043, 6044, (stating that "[i]nsider trading damages the legitimacy of the capital market and diminishes the public's faith .... [T]he small investor will be--and has been--reluctant to invest in the market if he feels it is rigged against him"); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"). The defendant cheated and he stole from everyday investors who did not have the information he possessed. In so doing, he undermined the public's faith in the market. Furthermore, the defendant's rationalization that certain of the victims of his fraud were simply not sympathetic enough because they could withstand the financial and reputational impacts of his fraud is unconvincing, and in large part demonstrates his lack of remorse for his crimes, which, as discussed below, is prevalent in his sentencing submission.

> D.   The Defendant's Personal History and Characteristics Do Not Outweigh The Serious Nature of His Crime

While the Court should certainly consider the defendant's personal history and characteristics in sentencing the defendant, those circumstances must be weighed against the serious nature of his crime, as discussed above. 18 U.S.C. § 3553(a)(1). The defendant's personal characteristics do not outweigh the serious nature of his crime. 18 U.S.C. § 3553(a)(2)(A).

The defendant's conduct, as described above, was calculated and egregious. The defendant was not motivated by any financial necessity in the more than four years that he was trading on the hacked press releases. As the defendant points out in his letter, he had a career in finance,[12] and unlike many defendants who commit crimes out of financial necessity, that is not

---

[11] The defendant argues that his fraud was not the same as Worldcom or Enron, or the crimes of Bernie Madoff. The government agrees that these were extremely egregious crimes, and we note that these crimes came with extremely hefty sentences: 25 years for Bernie Ebbers of WorldCom and 150 years for Madoff. While Kenneth Lay of Enron faced a sentence of up to 45 years in prison for his crimes, he died of a heart attack prior to sentencing.

[12] The defendant's assertions that he was extremely successful in his financial career are largely irrelevant for purposes of his sentence. However, the government points out that the defendant provides absolutely no support for the claims he makes regarding his outsized returns. See Def. Ltr. at 8. Moreover, as was born out at trial, the defendant was not as

13

true for this defendant. And, while the defendant's conduct may have been inconsistent with his position in the community, he made the decision to engage in the illicit conduct knowingly, rationally and repeatedly. The defendant decided to continue committing his crimes each of the thousands of times he made an illegal trade. Nor is there any evidence that the defendant ever had a change of heart with respect to his criminal conduct. In fact, the opposite is true. As discussed above, he urged the Dubovoys to continue the illegal scheme right before he and the Dubovoys were arrested. He even gave the Dubovoys $500,000 to invest in their brokerage accounts to keep the scheme going and to maintain access to the stolen press releases.

Moreover, the defendant spends much of his sentencing submission recounting all the letters of support that his parishioners wrote on his behalf. See, e.g., Def. Ltr. at 8-17. The government does not dispute that those who know Korchevsky in his role as a pastor have great regard for him, nor does the government fail to acknowledge that Korchevsky has done good in his life. However, what was evident from the testimony of Korchevsky's personal friends and parishioners at trial, and from the letters written on his behalf at sentencing, is that Korchevsky was very much a man with two personas. There was the pastor Korchevsky, who was well respected and did good for others. But there was also the Korchevsky who chose to commit the crimes described above, not for a day, not for a week, but for more than four years. It was also evident that his parishioners and others who knew him in that capacity had no knowledge of Korchevsky's other persona. It is telling that the letters sent to the Court on Korchevsky's behalf are mostly from his parishioners and people who knew him in his personal life. None are from anyone who he came to know working in the financial services industry, a profession he worked in for many years. While this dual-persona phenomenon is nothing new in financial fraud cases, often driven by greed, it is an important factor for the Court to consider in sentencing the defendant.

The defendant also argues that his age makes him an unlikely candidate to commit future crimes, therefore necessitating a lower sentence. See Def. Ltr. at 41-42. As an initial matter, the government does not dispute that recidivism rates tend to decrease with a defendant's age. However, the defendant committed the instant crime when he was already in his 40's and had been in the financial industry for years with full awareness of his duties and obligations under the law, and repeated training and instruction on the prohibitions of insider trading. See United States v. Turner, 629 Fed. Appx. 66, 68 (2d Cir. 2015) (citing United States v. Trupin, 475 F.3d 71, 75-76 (2d Cir. 2007) (discrediting the low recidivism argument associated with age where evidence shows that aging has not increased a defendant's respect for the law).

Also significant for the Court's consideration is the defendant's failure to take any responsibility for his actions to date. Korchevsky, through his sentencing memorandum filed with Your Honor and public statements made to his congregation after the verdict, shows no

---

successful as he claims. In his tax return for 2009, Korchevsky described himself as a mutual fund manager, and claimed a total income of $1,760. See GX 706. In his tax return for 2010, Korchevsky again described himself as a mutual fund manager, and claimed a total income of $2,197. Id.

remorse for his actions. Even after the defendant was swiftly convicted of securities fraud, wire fraud, computer intrusions and money laundering by a jury, he still appears to take no responsibility for his conduct. While completely discounting the victims of his fraud, see, e.g., Def. Ltr. at 27, the defendant argues that his family are the real "forgotten victims," see Def. Ltr. at 17-28. Of course the family members of each defendant that commits a crime suffer, but that suffering is a direct result of the defendant's own conduct, for which he fails to show any remorse. This is also evident from the defendant's public statements, including a statement he made to his congregation, summarized in an article written about this scheme:

> Free on bond, after the verdict, Korchevsky addressed his Philadelphia congregation to thank them for their support. With a smile of a man vindicated, he said he would appeal the verdict:
>
> 'The Lord showed with certainty that they could not present a single piece of evidence that I ever held any information. It doesn't exist. Of course a story was told that I destroyed the computer, though they found a 17-year-old computer in my house. But God knows and we can express it bravely before him: that there was nothing of the sort. Not a single computer or cell phone was ever destroyed.'

https://www.theverge.com/2018/8/22/17716622/sec-business-wire-hack-stolen-press-release-fraud-ukraine. These public statements seem in contrast to the defendant's argument in his sentencing memorandum, seeking a non-custodial sentence, that "[t]he shame and humiliation of the well-publicized indictment against [him] has already irreparable [sic] damaged his reputation…" Def. Ltr. at 40.

    E.  A Substantial Sentence is Appropriate to Promote Respect for the Law and Effect Deterrence

Finally, the government asks this Court to consider the need for deterrence of Korchevsky and others who played a role in this crime, which is particularly important in this case. 18 U.S.C. § 3553(a)(2)(B) (sentencing court shall consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct"). The crime committed by the defendant and his co-conspirators used today's technological advances to conduct an illegal scheme on a massive scale. What made this scheme so substantial and lucrative was the ability of this defendant and others to hack into U.S. corporations from abroad, steal thousands of press releases and then monetize the stolen press releases within a very short time period. The defendant's role directly enabled the hackers to carry out the scheme. A substantial sentence will send a strong deterrent message to those who share the defendant's skills and expertise.

Furthermore, given that sophisticated fraud schemes, like the instant scheme with multiple international actors, are difficult to detect and prosecute, there is greater need for general deterrence. See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties"). Because "economic and fraud-based crimes are more rational, cool and

calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence."). It is precisely the type of conduct involved in this case that makes this conduct so difficult to detect and more lucrative and enticing for criminals throughout the world. The illegal conduct here spanned across continents and involved numerous types of criminals, including hackers, middlemen who paid for the stolen information, and traders like the defendant. The defendant, like his co-conspirators, faced a low probability of being caught and enormous upside by engaging in the crime. [13] Yet, the damage to the market and to investors from such a massive hacking and insider trading scheme is substantial.

Moreover, the defendant's actions flouted important regulations enacted by the Securities and Exchange Commission ("SEC") such as Regulation FD, which aims to prevent selective disclosure of material, non-public information in order to instill confidence in the integrity of the markets and prevent unfair disclosure practices. The defendant cheated those who were honest participants in the free market system.

The defendant's conduct and the conduct of his co-conspirators necessitates that this Court send a strong message of deterrence to those that are similarly situated to the defendant and capable of committing similar crimes and to others who are still at large and continuing to engage in criminal activity.[14]

---

[13] As the defendant points fout in his sentencing memorandum, law enforcement agents believe that the hackers are still active today. See Def. Ltr. at 28. In fact, Oleksandr Ieremenko, one of the hackers responsible for stealing the press releases in the instant case and who is still at large in the Ukraine, was recently indicted again in the District of New Jersey for computer hacking and securities fraud in connection with a hack into the SEC's computer systems and trading on the stolen information. See District of New Jersey press release, January 15, 2019, https://www.justice.gov/usao-nj/pr/two-ukrainian-nationals-indicted-computer-hacking-and-securities-fraud-scheme-targeting.

[14] The defendant argues that he should not be ordered to pay restitution. Def. Ltr. at 47-49. As noted in the government's response to the defendant's objections to the PSR, the government understands that Business Wire will submit a revised affidavit of loss and that PR Newswire will also submit an affidavit of loss. To the extent the victim newswires suffered losses recoverable under the Supreme Court's decision in United States v. Lagos, 138 S. Ct. 1684 (2018), the defendant should be ordered to pay restitution. (In Lagos, the Supreme Court

IV.     Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 96 months' imprisonment, which is well below the applicable Guidelines range. This sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing. See U.S.S.G. § 3553(a)(2).

Respectfully Submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/
Richard M. Tucker
Julia Nestor
David Gopstein
Assistant U.S. Attorneys
(718) 254-6204/6297/6153

cc:     Clerk of Court (RJD) (by ECF)
        Defense counsel (by ECF)

---

held that the text and structure of the MVRA, among other things, compelled the result that the "investigation" and "proceedings" relate to the criminal investigation and prosecution, not a private investigation or civil matter. See Lagos, 138 S. Ct. at 1688-89.). Because restitution can be resolved within 90 days of sentencing, see 18 U.S.C. § 3664(d)(5), the government will request that the Court set a separate date, after sentencing, for the purpose of determining restitution as to Korchevsky, and his co-defendant Khalupsky.