


**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DCP/JKW                                      *271 Cadman Plaza East*
F. #2012R00103                               *Brooklyn, New York 11201*

April 17, 2023

<u>By Hand and ECF</u>

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Vitaly Korchevsky
           <u>Criminal Docket No. 15-381 (S-1) (RJD)</u>

Dear Judge Dearie:

        The government respectfully submits this memorandum in opposition to defendant Vitaly Korchevsky's <u>pro se</u> motion, under 28 U.S.C. § 2255, for vacatur of his conviction.  <u>See</u> ECF Docket No. 494 ("Def. Mot.").  The defendant raises three principal claims: prosecutorial misconduct; ineffective assistance of counsel; and perjury by a government witness.  For the reasons set forth below, these claims are without merit and the defendant's motion should be denied.

I.     <u>Background</u>

     A.  <u>Offense Conduct</u>

        On August 5, 2015, a grand jury in the Eastern District of New York ("EDNY") returned the original indictment in this case charging Vladislav Khalupsky and Vitaly Korchevsky ("Khalupsky", "Korchevsky" or the "defendant", collectively "the defendants") with conspiracy to commit wire fraud, conspiracy to commit securities fraud, two counts of substantive securities fraud and money laundering conspiracy.  ECF Docket No. 1.  On September 13, 2016, another EDNY grand jury returned a superseding indictment adding computer intrusions as a second object of the original securities fraud conspiracy charge.  ECF Docket No. 105.  The charges in both indictments stemmed from defendants' involvement in a large-scale international conspiracy, which spanned from approximately 2010 through 2015, to trade ahead of securities markets on information contained in hundreds of stolen press releases that were obtained by defendants' conspirators through hacking of three different newswires: PR Newswire, Marketwired and Business Wire (the "Victim Newswires").

Trial began on June 11, 2018.  The government introduced the testimony of over 30 witnesses including: (1) three cooperating witnesses Arkadiy Dubovoy ("Arkadiy"), Igor Dubovoy ("Igor") and Alexander Garkusha, who identified defendants as the traders who participated in the scheme; (2) several witnesses who testified regarding the electronic devices and email accounts used by defendants and the hackers and the evidence recovered from those devices and email accounts, including (a) evidence that Korchevsky received log-in credentials for an email account that received stolen press releases, (b) electronic evidence that defendants accessed the press releases, (c) evidence that Korchevsky sent coded text messages with instructions on how to trade on the stolen press releases, (d) evidence that Khalupsky sent several emails to himself attaching a photograph of a pre-distribution Oracle press release, and (e) evidence from the computers recovered from hackers in the Ukraine; as well as (3) testimony from Dr. Eugene Canjels, an expert economist from the Securities and Exchange Commission ("SEC"), who analyzed defendants' and their conspirators' trades and determined that their trading patterns were consistent with trading based on non-public information obtained from pre-distribution press releases stolen after the releases were uploaded to the Victim Newswires.

Arkadiy testified that he first learned about the scheme in 2010 from his brother Pavel Dubovoy ("Pavel"), who told Arkadiy that he had a source of information that could be used to trade in the stock market.  At Pavel's suggestion, Arkadiy asked Korchevsky to help them evaluate whether the scheme could be profitable.  Trial Transcript ("Tr.") 1502.  In approximately late 2010 or early 2011, Arkadiy and Garkusha met with Korchevsky, and Arkadiy explained to Korchevsky that individuals in Ukraine "broke into sources of information" and, as a result, could provide the information for a fee.  Tr. 2306, 2319, 2365.[1]  When Korchevsky was initially skeptical, Arkadiy provided Korchevsky with login credentials so Korchevsky could access and evaluate the information himself.  Tr. 1506, 1516, 1519.  Korchevsky subsequently informed Arkadiy that he could use the information to conduct stock trades and directed Arkadiy to open and fund a brokerage account so that Korchevsky could trade on the information.[2]  Tr. 1519.  Arkadiy told Korchevsky that the information Korchevsky was trading on was coming from hackers in Ukraine who were getting the information before it

---

[1] Pavel provided Arkadiy and Garkusha with access to a web-based server where the hackers posted stolen pre-distribution earnings press releases; Arkadiy later provided Korchevsky access to the program.  Tr. 2311-12, 2314; Government Exhibit ("GX") 207(T), 214(T).

[2] At Korchevsky's request, Arkadiy also purchased a computer, iPad and cellular phone for Korchevsky so that Korchevsky could conduct the trading.  Tr. 1522-23.  Korchevsky also told Igor to buy him other electronics, such as wireless internet "hot spots" and disposable cellular phones that he could use in furtherance of the scheme.  Tr. 835-36.  Igor testified that he gave Korchevsky multiple computers, and that he installed the "server access program" Korchevsky needed to access the stolen press releases on the devices.  Id.  Korchevsky told Igor that he would discard the computers in the trash in the Ukraine after he was done using them.  Tr. 837.  At the time of Korchevsky's arrest, law enforcement agents recovered several cellular phones inside a safe in the closet of Korchevsky's bedroom.  Tr. 674-75, 677.  Igor testified that he purchased one of those phones for Korchevsky.  Tr. 902.  All but one of the text messages on the phone were deleted.  Tr. 707.

was accessible to the market.  Tr. 1520-21, 1524-1526.  Because Arkadiy lacked familiarity with investing using online brokerage accounts, Korchevsky would access brokerage accounts set up by Arkadiy and trade in those accounts on Arkadiy's behalf.  Tr. 1522-23.  In return, Arkadiy and Korchevsky agreed that Korchevsky would periodically receive a percentage of Arkadiy's illicit trading profits.  Tr. 856, 1565, 1571, 1565; GX828(T).  Internet Protocol ("IP") address records showed Korchevsky accessed the Dubovoy brokerage accounts on nearly 10,000 occasions between January 28, 2011 and February 17, 2015.  Tr. 2244-45, 2305-2306.

Arkadiy and Pavel provided the hackers with a percentage of Arkadiy's trading profits as payment for continued access to the press releases.  Tr. 1538-40, 1542. However, Arkadiy soon opened accounts that he did not tell the hackers about so that he could profit without paying a percentage to the hackers (Tr. 1689), and Arkadiy allowed Igor to begin to copy Korchevsky's trading in Arkadiy's accounts (Tr. 788-89).  Meanwhile, Korchevsky began to trade in his own accounts on the stolen releases without telling Arkadiy and without paying profits to the hackers.  Tr. 1572, 1899-1900; GX8003.

Korchevsky called six witnesses in a defense case.  Yaroslav Zayats testified that approximately a year prior to trial, Arkadiy denied providing Korchevsky with illegally obtained information.  Tr. 2706-07, 2712.  On cross-examination, the government presented evidence showing that Zayats and his son had business dealings with and received numerous payments from Korchevsky.  Tr. 2728, 2730.  Four additional character witnesses testified; none of them had any knowledge of or involvement in Korchevsky's trading activities.  Tr. 2750-51, 2758, 2882-83.

Lastly, Korchevsky called an expert, Michael Mayer, to testify regarding the defense's analysis of Korchevsky's trading activity.  In sum and substance, Mayer testified that Korchevsky was consistently an earnings trader, that he had a similar trading pattern in the period prior to when Korchevsky was accused of accessing stolen press releases as he did during the charged period and that certain of Korchevsky's trades were inconsistent with having had access to pre-distribution press releases.  Tr. 2797-99.

During cross-examination, the government established that Korchevsky generally made riskier trades, including options trades, after January 2011, once he had access to the stolen press releases, that prior to January 2011 only approximately 19 percent of Korchevsky's trades were actually earnings trades, that most of Korchevsky's trades fell within the window during the period of the conspiracy, and that Korchevsky invested much larger sums of money during that period.  Tr. 2839-2846

The defendants were found guilty of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One), conspiracy to commit securities fraud and computer intrusions, in violation of 18 U.S.C. § 371 (Count Two), two counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff (Counts Three and Four) and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Five).

B. <u>Sentencing and Appeal</u>

The Court sentenced Korchevsky to five years' imprisonment, three years' supervised release, $339,062.99 in restitution, a $500 special assessment and forfeiture of $14,452,245.00.  ECF Docket No. 434.

Korchevsky and his co-defendant Khalupsky appealed, arguing that the evidence was insufficient to support conviction, venue was improper on the securities fraud counts, the government's proof at trial constructively amended the indictment, the district court erred by instructing the jury on conscious avoidance, and the district court erred in how it responded to a jury note.  <u>See</u> Mem. Opinion and Order, <u>United States v. Khalupsky and Korchevsky</u>, Nos. 19-197-cr, 19-780-cr (2d Cir. 2021).  On July 19, 2021, the Second Circuit rejected these arguments and affirmed the defendants' convictions.  <u>Id.</u>  On January 10, 2022, the U.S. Supreme Court denied Korchevsky's petition for a writ of certiorari.

C. <u>The Instant Petition</u>

On November 1, 2022, the defendant filed a petition for relief under 28 U.S.C. 2255.  ECF Docket No. 494.  The defendant moves the court to vacate his conviction or, in the alternative, grant him a new trial.  <u>See</u> Mot. at 6, 15.  Korchevsky advances three principal claims in support of his request for relief.  First, he argues that the government committed prosecutorial misconduct when prosecutors "attempted openly to coerce" an individual named Mikhail Zalivchii ("Zalivchii") who was on the defendant's witness list to testify for the government rather than the defense, and dissuaded Zalivchii from testifying in the defendant's case by labeling the witness a "subject" of the investigation.  <u>Id.</u> at 6.  Second, Korchevsky argues that his attorneys were ineffective.  He claims, among other things, that his attorney failed to cross-examine prosecution witnesses "vigorously and in detail," lied to him about work that was completed by an expert witness and about images found on the defendant's cell phone, and failed to call character witnesses on his behalf.  <u>Id.</u> at 12-16.  Third, Korchevsky argues that one of the government's key cooperating witnesses, Arkadiy Dubovoy, committed perjury in his testimony at Korchevsky's trial.  <u>Id.</u> at 18.

For the reasons set forth below, each of Korchevsky's claims are without merit and should be rejected.

II.  <u>Relevant Law</u>

A. <u>General Principles of Section 2255</u>

Title 28, U.S.C., § 2255 allows federal prisoners to challenge the constitutionality of their convictions.  This section provides, in pertinent part, that:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

To qualify for relief under § 2255, it is the petitioner's burden to show "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in complete miscarriage of justice.'" Graziano v. United States, 83 F.3d 587, 590 (2d Cir. 1996) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995)). In considering a § 2255 petition, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). The court must determine whether, viewing the record "in the light most favorable to the petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009). However, "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987); Haouari v. United States, 510 F.3d 350, 354 (2d Cir. 2007).

B.   Timeliness Requirements of Section 2255

After the enactment of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996, all defendants are required to file their 28 U.S.C. § 2255 petitions within one year from:

> (1) the date on which the judgment of conviction becomes final; (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action; (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

In the case of an appealed criminal judgment, the Supreme Court has held that a conviction becomes final on the date when the time for filing a petition for writ of certiorari expires, which is 90 days after entry of judgment by the court of appeals. Clay v. United States, 537 U.S. 522, 525 (2003).

With respect to Section 2255(f)(4), a petition based upon this subsection "resets the limitations period's beginning date, moving it from the time when the conviction became final, to the later date on which the particular claim accrued." Wims v. United States, 225 F.3d

186, 190 (2d Cir. 2000) (citation omitted).  By its terms, Section 2255(f)(4) restarts the limitations period on the date, not on which the operative facts are actually discovered, but rather on the date those facts "could have" been discovered through the exercise of due diligence.  Thus, "[t]he proper task . . . is to determine when a duly diligent person in petitioner's circumstances would have discovered [the pertinent facts]."  Id.  "Due diligence" under Section 2255(f)(4) means "reasonable" diligence, not "the maximum feasible diligence."  Id. at 190 n.4.

C.  Procedural Default

"In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal."  United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011); see also Yick Man Mui v. United States, 614 F.3d 50, 53-54 (2d Cir. 2010); Zhang v. United States, 506 F.3d 162, 166 (2d Cir. 2007).  However, an exception applies if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence.  Id.  However, "[a]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."  Massaro v. United States, 538 U.S. 500, 504 (2003).

D.  Prosecutorial Misconduct

To merit habeas relief on a claim of prosecutorial misconduct, petitioner must show that the alleged misconduct denied him a fair trial.  Greer v. Miller, 483 U.S. 756, 765 (1987).  Specifically, the defendant must establish that the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quotation and citation omitted).

E.  Ineffective Assistance of Counsel

To succeed on a claim of ineffective assistance of counsel, a defendant must (1) show that counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) "affirmatively prove prejudice."  Strickland v. Washington, 466 U.S. 668, 687-88, 693-94 (1984); accord Chang v. United States, 250 F.3d 79, 84 (2d Cir. 2001); Cullen v. United States, 194 F.3d 401, 403 (2d Cir. 1999).  As to the first prong, "a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  United States v. Venturella, 391 F.3d 120, 135 (2d Cir. 2004) (quotation marks and citation omitted).  As to the second prong, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  The burden is on the defendant to establish both elements.  See id. at 687.

"The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances," Kimmelman v. Morrison, 477 U.S. 365, 381 (1986), "bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way,'" United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689) (brackets omitted)).  A chosen strategy's lack of

success should not cause a court to second-guess an attorney's judgments.  See Cuevas v. Henderson, 801 F.2d 586, 590 (2d Cir. 1986).

To establish prejudice, a defendant must demonstrate not just "some conceivable effect," Strickland, 466 U.S. at 693, but rather, as noted above, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  Speculative arguments about an error's impact do not establish prejudice. See United States v. Weiss, 930 F.2d 185, 199 (2d Cir. 1991).  Indeed, the Second Circuit generally "requires some objective evidence other than defendant's assertions to establish prejudice."  Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003) (citing United States v. Gordon, 156 F.3d 376, 380-81 (2d Cir. 1998)).

## F.  Perjury by Government Witness

The Second Circuit "has established two slightly different tests for cases involving alleged 'perjury' or 'false evidence.'"  Rosemond v. United States, 378 F. Supp. 3d 169, 180 (E.D.N.Y. 2019).  "Under one test, a court must ask (i) 'whether the perjury was material to the jury's verdict' and also (ii) the 'extent to which the prosecution knew or should have known about the perjury'; under the other, whether (i) 'the witness actually committed perjury' and whether the alleged perjury was (ii) material, (iii) known or constructively known to the government at the time of trial and (iv) undisclosed during trial."  Id. (quoting United States v. Ferguson, 676 F.3d 260, 282 (2d Cir. 2011) (contrasting tests under United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) and United States v. Zichettello, 208 F.3d 72, 102 (2d Cir. 2000), and declining to reconcile the cases).

Two standards of review exist based on whether the government had knowledge of the alleged perjury.  "If the prosecution knew or should have known of the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.  But where the government was unaware of the perjury, a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." Ferguson, 676 F.3d at 280 n.19 (internal citations and quotations omitted).

"Reversal of a conviction based upon allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances."  Zichettello, 208 F.3d 72, 102 (2d Cir. 2000) (internal citation marks omitted).

## III.  Argument

For the reasons set forth below, each of Korchevsky's arguments is meritless, without factual basis and he fails to meet the requisite legal standard for any of his claims. Korchevsky contorts the factual record and inserts his subjective view of the evidence, which was rejected by the jury.  When all else fails, Korchevsky engages in post-hoc criticism of his

defense counsel and attempts to impugn the integrity of the government and his counsel. Accordingly, each of his claims should be dismissed without a hearing.[3]

## A. Prosecutorial Misconduct

### i. Background

In his Motion, for the first time, Korchevsky raises allegations of prosecutorial misconduct by the alleged "intimidation of a key witness." Mot. at 5. While Korchevsky's allegations comprise mostly conclusory, inflammatory allegations against the government, they can specifically be reduced to three specific allegations of prosecutorial misconduct which Korchevsky concludes are each designed to intimidate Zalivchii so he would not testify. First, that four weeks before trial, the government sent Zalivchii a trial subpoena and an FBI agent visited him at his home. Id. Second, that on the first day of jury selection, prosecutors approached Zalivchii in the courtroom and tried to convince him to testify for the government. Korchevsky claims that after Zalivchii refused, the prosecutors "offered to take him out for lunch where they would provide him some information so he would know details and what to say." Id. Korchevsky further alleges that prosecutors "brought up an issue of [Zalivchii] potentially inculpating himself if he would testify for the defense, and reminded him that he has six small children, even told him that he was unfairly underpaid as an employee of the NTS Capital Fund and that it is in his best interest to testify for the Government." Id. Third, Korchevsky alleges that during trial, the government informed defense counsel that Zalivchii was a "subject" of the government's investigation and then informed the Court of the same in order to "scare" Zalivchii and prevent him from testifying. Id. Korchevsky claims that each of these infringed on his right to a fair trial.

In support of his allegation, Korchevsky submitted a three-page sworn affidavit from Zalivchii. Mot. at 7-9. Most of the affidavit consists of Zalivchii's assertions related to the criminal scheme and his relationship to the defendant. One paragraph of the affidavit addresses Korchevsky's allegations of prosecutorial misconduct and, as noted below, differs from Korchevsky's allegations in material ways. Mot. at 8.

### ii. Argument

#### a) The Defendant has Defaulted on his Prosecutorial Misconduct Claims

As an initial matter, the defendant has procedurally defaulted on this claim by not raising it on direct appeal. Hickman v. Nash, 8 F. App'x 59, 60 (2d Cir. 2001) ("[A] federal prisoner who fails to raise an issue on direct appeal is procedurally barred from asserting it for the first time on habeas review unless he can show 'cause and actual prejudice.'") (citing United States v. Frady, 456 U.S. 152, 167–68 (1982). The only justification that Korchevsky even

---

[3] Korchevsky's Motion is timely. It was filed on November 1, 2022, within one year of when the United States Supreme Court denied Korchevsky's petition for a writ of certiorari on January 10, 2022. See 28 U.S.C. § 2255(f)

attempts for this failure is the cursory statement that "upon the advice of the Appeal Counsel, the Appeal was limited to points of Law and Trial procedures."  Mot. at 6.  Korchevsky's unsupported cursory allegations are insufficient to demonstrate cause or actual prejudice.  See Hickman, 8 F. App'x at 60 ("Because Hickman makes only conclusory allegations that he failed to pursue a direct appeal on the advice of his counsel, he fails to make the necessary showing of 'cause and actual prejudice.'").

      b)  <u>The Defendant's Claims of Prosecutorial Misconduct are Meritless</u>

Even if the defendant has not defaulted on his claims, they should be rejected as a matter of law.  Even accepting Korchevsky's allegations as true,[4] Korchevsky cannot assert that the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Wainwright, 477 U.S. at 181.

Korchevsky's first allegation, that the government committed prosecutorial misconduct by sending Zalivchii a trial subpoena and purportedly sending FBI agents to visit him at home by an FBI agent, does not constitute prosecutorial misconduct in any way.  As an initial matter, contrary to Korchevsky's assertion, Zalivchii does not allege that an FBI agent visited him at his home.  Compare Mot. at 5 (Korchevsky claiming that an "FBI agent visited [Zalivchii] at his house one week before the trial") with Mot. at 5 (Zalivchii stating that "a month before the trial, I received a subpoena.  Latter [sic] I was even told that I was a person of interest.").  But even if Korchevsky's allegations were true, there would have been absolutely nothing improper about the conduct.  Both sides in a criminal action are authorized to issue a trial subpoena and the government had ample reason to ensure that Zalivchii was available to testify and to try and interview him prior to trial.

Moreover, Korchevsky's assertion that the government's subpoena directed to Zalivchii deprived the defendant of a fair trial can be rejected by reference to Korchevsky's own submission.  Although Korchevsky summarily claims that Zalivchii was intimidated, Zalivchii insists that he was prepared and eager to testify despite the purported conduct of the government.  Indeed, Zalivchii stated in his affidavit that he was prepared to testify until he was not called by

---

    [4] Of course, the government disputes the veracity of many of the factual allegations raised by both Zalivchii and Korchevsky.  Indeed, the record establishes that some of the claims are simply wrong.  Zalivchii claims that two prosecutors, whom he named, tried to speak with him on the first day of trial.  Mot. at 8.  However, the record reflects that it was one government prosecutor and one FBI special agent who tried to speak with him that day (consistent with standard procedure to have a law enforcement agent present when speaking with a witness) and later informed the Court of that meeting.  Tr. at 2346-47.  Moreover, the assertion that government prosecutors offered to take the same witness to lunch and "offer details about the trial" at any point, let alone while trial was ongoing, is non-sensical.  And beyond the clear issues with the substance of the testimony, the government respectfully submits that the Court should consider the source of the allegations – the defendant's friend of more than 30 years who referred to the defendant as a "man of Godly character…who has been unfairly and unjustly prosecuted."  Mot. 8, 9.  Nevertheless, because Zalivchii's allegations, even if taken as true, are insufficient to merit the relief sought, the government will address Zalivchii's allegations as if they were true.

defense counsel for strategic reasons.[5]  Accordingly, Korchevsky cannot assert that the purported misconduct "infected the trial with unfairness."  See United States v. Simmons, 670 F.2d 365, 371 (D.C. Cir. 1982) ("The record does not indicate that the counsel's advice [not to testify] had anything to do with any alleged threat by the prosecutor.")

For similar reasons, Korchevsky's second allegation, that prosecutors improperly approached Zalivchii at the beginning of trial, can also be rejected.  Importantly, Korchevsky's motion differs from Zalivchii's affidavit in a very important respect.  Korchevsky claims that prosecutors "brought up an issue of him potentially inculpating himself if he would testify or the defense, and reminded him that he has six small children…"  Mot. at 5.  Once again, Korchevsky's allegations do not square with the facts, even those facts proffered by his own hand-picked witness.  What Zalivchii actually stated in his affidavit was, that on the first day of trial, "two AUSAs…met me and offered to go out for lunch so they could offer me details about the trial, and they asked me to cooperate and work with the government."  Mot. at 8.  Zalivchii said nothing about the government discussing his children or warning him about inculpating himself.  Indeed, there are no facts supporting Korchevsky's allegation in the record.  Moreover, Zalivchii's factual assertions, even if true, do not allege government misconduct, either objectively or subjectively.  There is simply nothing inappropriate or unethical about government attorneys approaching an unrepresented witness to discuss his or her potential testimony.  Zalivchii had relevant information and was identified as a possible witness and it was both reasonable and proper for the government to approach him to see if he would speak with them.[6]  See United States v. Polanco, 510 F. App'x 10, 12 (2d Cir. 2013) ("a prosecutor does not engage in misconduct merely by interviewing a potential defense witness") (citing United States v. Simmons, 670 F.2d 365, 371 (D.C. Cir. 1982).  Even if the prosecutors had asked Zalivchii to testify against Korchevsky, that does not, on its own, constitute a threat.  See Simmons, 670 F.2d at 371 (noting that, even when applied to a co-defendant "it is likewise incorrect to interpret every attempt by a prosecutor to enlist a co-defendant as a witness as threatening that

_____

[5] Korchevsky's claims of ineffective assistance of counsel for not calling Zalivchii as witness at trial are addressed, infra, and are unrelated to the allegations of prosecutorial misconduct.

[6] Although Zalivchii does not allege the government told him he could inculpate himself if he testified, even if they had, it would not have constituted prosecutorial misconduct.  See United States v. Williams, 205 F.3d 23, 29 (2d Cir. 2000) ("courts have held that a due process violation does not arise merely because…the government warns a defense witness of the consequences of committing perjury") (citing United States v. Thompson, 130 F.3d 676, 687 (5th Cir. 1997).

witness…[i]t is easy for the co-defendant to perceive that he is being intimidated, merely from the authority of the prosecutor, but it takes more than that to prove a threat.").

Indeed, the prosecutors informed the Court that they had tried to speak with Zalivchii a number of times to learn if he had any information.  See Tr. at 2346-49.  And again, even if true, the allegations advanced by Zalivchii had no effect on the trial.  Although Zalivchii now concludes that the government's conduct comprised "intimidating tactics…to prevent me from testifying before the Jury," his own statements demonstrate the opposite.  As Zalivchii confirmed, he "declined the government's offer and requested they put him on the witness stand."  Mot. at 8.

Korchevsky's final allegation of prosecutorial misconduct, that the government improperly classified Zalivchii as a subject of the investigation, is also meritless.  In fact, Korchevsky's allegations demonstrate that the government was candid to the Court and defense counsel and acted to ensure Zalivchii was not put in criminal jeopardy.  As an initial matter, by any measure, Zalivchii is a subject of the government's investigation.  A subject is defined in the Justice Manual as "a person whose conduct is within the scope of the grand jury's investigation."  Justice Manual § 9-11.151.  Zalivchii's own description of his relationship with Korchevsky demonstrates that this is indeed the case.  Zalivchii worked for Korchevsky as an equity analyst and trader and both recommended stocks and helped him execute trades.  Mot. at 7.  Given this backdrop as well as the allegations in the indictment and at trial that many of the trades were made based on material non-public information, it was reasonable for the government to conclude that Zalivchii was a subject.

The record is also clear that what Korchevsky classifies as prosecutorial misconduct, is actually just government attorneys ensuring that a witness did not incriminate himself and had the benefit of counsel.  As Korchevsky recognizes, the government raised Zalivchii's status to both defense counsel and the Court to ensure Zalivchii understood the potential issue and was provided with counsel, at no cost to him, to advise him.  Indeed, the government specifically acknowledged that they did not want to restrict the defense's ability to call witnesses.  See Tr. at 2346 ("We don't want to impede on the defense in any way, but the Government's concern is that there is a potential here that this witness may have knowledge or his testimony may take him to a place where he is potentially inculpating himself.");  id. at 2346-47 ("[W]hen I spoke with him with Agent Polonitza on the first day of jury selection because the Government served a trial subpoena on him, we raised this issue with him and offered to help him get counsel.").  Indeed, both defense counsel and the Court also treated the issue seriously and advised Zalivchii of his potential exposure and offered to provide him with counsel to advise him.[7]  Tr. at 2347-49.  Of course, after receiving notice of his status and rejecting offers to engage counsel, Zalivchii indicated his willingness to testify and did not retain counsel.  Despite

---

[7] Korchevsky alleges that his defense counsel "SHOULD HAVE notified the Court, in session, immediately of the despicable acts of the government, making the Jury knowledgeable of the tactics employed by the prosecutors, the effect which would have constitute egregious misconduct…and should have resulted in a mistrial."  Mot. at 6.  This is a puzzling allegation because, as discussed above, defense counsel and the government notified the Court of Zalivchii's status as a subject and that the government had tried to speak with him.

the fact that this issue was raised and discussed at trial by all parties, no one, at any point raised an issue with the government's classification of Zalivchii as a subject or with what was said during the contact between Zalivchii and the government.  Korchevsky now asserts, without any support in the record, the summary conclusion that the concern for Zalivchii's rights were pretextual and were instead "scare tactics."  Mot. at 5.  His conclusory allegation should be rejected.

For the reasons stated above, Korchevsky's claims of prosecutorial misconduct were procedurally defaulted and, even if the Court were to consider them, are legally and factually meritless and should be rejected.

## B.  Ineffective Assistance of Counsel

### i.  Background

In the Motion, Korchevsky raises a litany of allegations against his trial counsel, attorneys at Sullivan Brill LLP, alleging ineffective assistance of counsel.  In order to ensure that these claims were properly addressed, on November 7, 2022, the Court ordered the government to "obtain and file with its return an affidavit from the attorney in question addressing the merits of the [defendant's ineffective assistance of counsel claim [.]"  ECF Docket No. 495.  Following that order, the government contacted trial counsel and asked for counsel to provide an affidavit addressing Korchevsky's claims.  Defense counsel expressed a concern that the attorney-client privilege would prevent him from submitting such an affidavit.  Accordingly, on December 6, 2022, the government filed a motion to the Court for an order requesting that Korchevsky confirm and agree that the privilege with regard to his attorneys was waived and provided a waiver form to the defendant.  See ECF Docket No. 500.  On December 12, 2022, the Court granted the government's motion and directed Korchevsky to sign the waiver form or withdraw his ineffective assistance of counsel claims.  See ECF Docket No. 501.  On March 3, 2023, the government received the signed waiver from the defendant, which the clerk of court had docketed on February 28, 2023.  See ECF Docket No. 505.  On March 12, 2023, Steven Brill, a partner at Sullivan Brill submitted an affidavit to the government which addressed Korchevsky's ineffective assistance of counsel claims (the "Brill Affidavit" or "Brill Aff.").  A copy of the Brill Affidavit is attached hereto as Exhibit A.

As set forth below, Korchevsky's claims are a mix of conclusory allegations second-guessing strategic decisions made by defense counsel, often with the defendant's approval, and flat misrepresentations regarding the evidentiary record and his communications with counsel.  At the outset, it is important to note that Korchevsky's claims are made against retained counsel that represented him for over six years, from the time he was arrested through and including post-conviction motion practice.  Brill Aff. ¶¶ 1-2.  Defense counsel has represented that they reviewed terabytes of discovery material, engaged in "incalculable" hours of meetings and communications with Korchevsky and his family, interviewed and retained expert witnesses.  Id. ¶ 3.  Moreover, defense counsel has confirmed that they were in "constant contact" with Korchevsky and "discussed any substantive trial decisions with him."  Id. ¶ 4.

It is through this lens that the Court should consider the specific allegations raised by Korchevsky in the Motion that fall into seven specific categories of allegations: (i) Failing to

Cross-Examine Cooperating Witnesses and Introduce Evidence; (ii) Failing to Call the Technology Expert to Testify; (iii) Failure to Address Evidence of the "LOSCAL" Email Address; (iv) Failure to Address Evidence of the Defendant's Accessing Brokerage Accounts; (v) Failure to Address the Government's Expert on Trading; (vi) Failure to Call Defense Witnesses; and (vii) Ineffective Assistance Regarding the Defendant Testifying.

> ii.   Alleged Failures to Cross-Examine Cooperating Witnesses and Introduce Evidence

At the outset, Korchevsky makes the general claim that defense counsel did not "interrogate Prosecution Witnesses vigorously and in detail," particularly the government's cooperating witnesses, and did not introduce exhibits the defendant believed were important. Mot. at 12.  Notably, the defendant's allegations are not based on specific examples of ineffective performance, but on ad hominem attacks on defense counsel, their performance at trial and their preparation at trial.  See id. ("[d]efendant attributed this to Insufficient Counsel knowledge of the issues of the Case resulting from substandard preparation.  The volume and the tone of Defense Counsel's statements and inquiries to the Court were weak and passive and made in a manner not suggesting confidence.").

The cursory and conclusory nature of Korchevsky's claims support their dismissal.  See Stewart v. Greene, No. 05-CV-0566 (WHP) (THK), 2009 WL 4030833, at *3 (S.D.N.Y. Nov. 19, 2009) ("Self-serving, conclusory allegations are insufficient to establish ineffective assistance of counsel." (citing United States v. Torres, 129 F.3d 710, 715–17 (2d Cir. 1997)).[8]  Moreover, defense counsel's affidavit disprove the defendant's unsubstantiated and amorphous claims.  As defense counsel makes clear, not only did they intensively prepare for trial for years, at trial "decisions regarding evidence, trial exhibits, and cross and direct examinations were made thoughtfully and strategically and done entirely in Mr. Korchevsky's best interest."  Brill Aff. at ¶ 5.  Korchevsky's assertions are also belied by the trial record.  As the Court will recall, and as the trial transcript demonstrates, defense counsel vigorously cross-examined each of the witnesses, particularly the government's cooperating witnesses, in a manner that was consistent with their trial strategy – to argue that "there was no direct evidence that Mr. Korchevsky had possessed or seen a press release containing the non-public information before he made his stock trades."  Brill Aff. ¶ 9.

For example, the cross-examination of cooperating witness Arkadiy Dubovoy lasted nearly a full trial day and comprised nearly 70 pages of trial testimony.  Defense counsel

---

[8]  Similarly, it is clear from both Korchevsky's claims and the Brill Affidavit, that the defendant regularly consulted with defense counsel during the trial.  See Brill Aff. at ¶ 4 ("I kept in constant contact with Mr. Korchevsky…and discussed any substantive trial decisions with him.  Whatever thoughts and ideas Mr. Korchevsky expressed regarding his defense were thoroughly discussed and considered as well.").  This is consistent with defense counsel's obligations to a client.  See Fla. v. Nixon, 543 U.S. 175, 187 (2004) ("An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy. . . . That obligation, however, does not require counsel to obtain the defendant's consent to 'every tactical decision.'" (internal citations omitted).

focused on a litany of topics on cross examination, including purported inconsistencies in Arkadiy's testimony and his previous criminal conduct.  While Korchevsky may now assert that he is not pleased with defense counsel's cross examination strategy, pursuing that strategy does not constitute ineffective assistance of counsel. "The conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (citing United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (no ineffective assistance despite defendant's claim that lawyer had failed to thoroughly impeach prosecution witnesses because decisions as to nature and extent of cross-examination are strategic); see also United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature" and will not support an ineffective assistance claim).

This is particularly the case where the only specific area of cross examination that Korchevsky identified as ineffective was defense counsel's "failure" to cross examine cooperating witnesses about "legal businesses" that Korchevsky claims he was engaged in with the cooperators that explains the millions of dollars exchanged between himself and the cooperators.  Mot. at 12.  Defense counsel has asserted that they prepared for that line of cross-examination by "collecting and organizing all documentation (mostly emails) regarding these purported business ventures" and had them prepared to use at trial. Brill Aff. ¶ 6.  However, defense counsel concluded that this strategy would be damaging to the defense because Korchevsky's purported business ventures never got off the ground and did not have contracts or agreements.  Id. ¶ 7.  Defense concluded that "we would not have been able to explain to the jury why these non-existent business ventures would lead to an exchange of a substantial amount of funds."  Id.  Moreover, defense counsel did cross examine cooperating witnesses, including Arkadiy Dubovoy, about legitimate business profits and expenditures.  Tr. at 1700-1703.

Further, defense counsel's decision not to introduce some of the exhibits they prepared for trial does not constitute ineffective assistance.  These are standard strategic decisions left to the discretion of trial counsel, particularly as here where counsel had valid reasons for not introducing the exhibits.  See Strickland, 466 U.S. at 690 (holding counsel's decision not to present or investigate certain evidence was strategic and virtually unchallengeable); see also Amado v. Lee, No. 09-CV-450 (JBA), 2014 WL 1057004, at *13 (D. Conn. Mar. 18, 2014) (finding that trial counsel's decision to forgo the introduction of a co-conspirators criminal record as an exhibit at trial was a strategic choice that "fell within the range of competent professional legal assistance").

While Korchevsky's failure to demonstrate deficient performance merits dismissing this claim of ineffective assistance of counsel, Korchevsky also cannot demonstrate prejudice.  The only specific area of cross examination Korchevsky identified was actually raised on cross-examination, rendering him unable to demonstrate that additional questioning on that topic would have generated a different outcome.  See Lynn v. Bliden, 443 F.3d 238, 248 (2d Cir. 2006) ("a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.") (citing Strickland, 466 U.S. at 695-96).

14

### iii.  Alleged Failure for Not Calling the Technology Expert to Testify

Next, Korchevsky claims that defense counsel was "incompetent" for retaining a "technology expert" but not calling the expert to testify or entering any evidence produced by the expert.  Mot. at 12.  Korchevsky made a number of summary assertions that the "technology expert" should have been called to rebut evidence that Korchevsky believed was inaccurate or misleading.  Id. at 12, 13.  Korchevsky's claims should be rejected as he cannot demonstrate either deficient performance or prejudice.

With regard to performance, it is clear that defense counsel, retained and utilized the technology expert appropriately and effectively.  As explained in the Brill Affidavit, Korchevsky's defense team engaged an expert about a year before the trial to help analyze electronic evidence, including extracting and organizing evidence and making it readable.  Brill Aff. ¶ 8.  Although the defense did not rule out testimony if the need arose, "it was never [their] intention that this expert would testify for the defense," a fact that Korchevsky was apprised of prior to trial.  Id.  Indeed, the expert's work primarily ended several months before trial began.  Id.  Particularly in light of this, Korchevsky's summary assertions that the defense should have called this expert to testify at trial about purported issues with the electronic evidence ring hollow.  The expert was retained to extract and organize electronic evidence, not testify about details in the extraction report.

Moreover, Korchevsky's claims that the technology expert should have been called to testify is undercut by his own allegations.  Korchevsky admits that when he claimed to his counsel that he never received a particular message and that the "TECH EXPERT" needed to analyze the extraction report, counsel did so and confirmed with the technology expect that the message was indeed on the defendant's cell phone and that counsel was focused on how to explain it to the jury.  Mot. at 13.  While Korchevsky may not have liked the answer counsel received from the technology expert, it certainly does not constitute deficient performance to not call a witness that would highlight inculpatory evidence.  While Korchevsky continues to assert that no such message exists, he cannot criticize his counsel after the fact for failing to follow him blindly down the primrose path when the evidence shows the opposite.

Finally, while Korchevsky cannot demonstrate deficient performance, he also cannot demonstrate prejudice.  Korchevsky has made no allegation that calling the "technology expert" at trial would have helped him in any way, let alone "a reasonable probability that…the result of the proceeding would have been different."  Bliden, 443 F.3d at 247.  Calling a witness that would have confirmed an important piece of evidence presented by the government would only serve to strengthen that evidence, not undercut it.  Accordingly, Korchevsky's allegation of ineffective assistance regarding the technology expert should be rejected.

### iv.  Alleged Failure to Address Evidence of the "LOSCAL" Email Address

Korchevsky next asserts that defense counsel was ineffective for failing to effectively rebut evidence of Korchevsky's connection to the "LOSCAL" email address that Korchevsky used to communicate with Arkadiy about the non-public information at the heart of the fraudulent scheme.  Mot. at 13.  As defense counsel noted, at trial the government presented voluminous evidence regarding Korchevsky's connection to the LOSCAL email address,

including communications and trading by Korchevsky that were directly correlated to emails sent to the LOSCAL account.  In light of the evidence established by the government, defense counsel made the "strategic decision" to "stick with our main theory of defense which is that there was no direct evidence that Mr. Korchevsky had possessed or seen a press release containing the non-public information before he made his stock trades."  Brill Aff. ¶ 9.

In his motion, Korchevsky asserts that this decision was ineffective because there was no evidence of the LOSCAL email address in his phone.  Mot. at 13.  However, as defense counsel noted, there was a text message from the cooperating witness to Korchevsky with the email address on the cooperator's phone, which would have allowed the government to argue that Korchevsky deleted it.  Brill Aff. ¶ 9.  The strategic choice to preclude the government from arguing that Korchevsky had consciousness of guilt by deleting incriminating evidence is the definition of an informed strategic decision that Korchevsky cannot now second guess.  See Cullen v. Pinholster, 563 U.S. 170, 195 (2011) (quoting Strickland and referencing "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions").

Finally, Korchevsky also ignores the crucial fact that defense counsel did elicit evidence about the LOSCAL email address and did attempt to address the evidence in summation.  See, e.g., Tr. 2491-92 (cross examining government witness on access to LOSCAL account and lack of evidence on Korchevsky's device); 3069 (noting in defense summation that "It was Igor that set up the Loscal account, not Vitaly Korchevsky"); 3082 (arguing that the jury "saw no evidence that Vitaly Korchevsky requested Loscal.  He's not requesting this material.  He shouldn't be responsible for somebody else's decision to send it to him."); 3083 (arguing, twice, that there was "Not one artifact in Loscal found on any of [Korchevsky's] devices).  Not only does defense counsel's efforts to undercut the LOSCAL evidence negate Korchevsky's allegations of deficient performance, they also eviscerate any allegation of prejudice.  Korchevsky cannot demonstrate that additional questioning on the LOSCAL email address would have changed the result of the trial when it was put before the jury and rejected.

v. Alleged Failure to Handle Evidence of the Defendant's Accessing Brokerage Accounts

Korchevsky next argues that defense counsel was ineffective in the way it handled the evidence of the defendant accessing Arkadiy's brokerage account.  Mot. at 13-14.  In essence, Korchevsky's claims are yet another attempt to relitigate the evidence presented at trial; only filtered through his lens that all of the evidence at trial was wrong and his subjective recollection is correct.  See, e.g., Mot. at 13 ("it was obvious even to the unqualified observer that information presented in GX-6001-2 was inaccurate and misleading.").  In particular, Korchevsky takes issue with counsel's performance for failing to establish that the evidence showed that the brokerage account was accessed in multiple places around the world nearly simultaneously, including places that Korchevsky never visited.  Id.  Once again, Korchevsky's disagreement with the import of the evidence, or the conclusions reached by the unanimous jury, is not a ground to find ineffective assistance of counsel.  See Holland v. United States, No. 11-CV-1868 (JBA), 2014 WL 2940889, at *9 (D. Conn. June 30, 2014) (rejecting ineffective assistance claim and noting that defendant "describes a number of documents and other evidence not introduced at trial, but is not clear if they are being claimed as relating to an ineffective

assistance of counsel claim or are instead attempts to relitigate his criminal liability on collateral review").

Indeed, the trial transcript demonstrates that the government witness who presented the evidence related to the defendant's access to the account was cross-examined extensively about the data showing Korchevsky's access of Arkadiy's account, including that the accounts were accessed nearly simultaneously in locations around the world.  See Tr. 2266-67. Where there was evidence that Korchevsky accessed Arkadiy's accounts thousands of times and an explanation for the simultaneous access that the jury accepted, see Brill Aff. at ¶ 10, Korchevsky cannot argue that counsel was ineffective for ignoring the issue or that counsel's strategy was wrong.  And again, Korchevsky cannot demonstrate prejudice.  The issues he raised were addressed at trial and although Korchevsky does not like the result, he does not and cannot allege the result would have been different.

### vi.   Alleged Failure to Address the Government's Expert on Trading

Korchevsky also asserts that defense counsel was ineffective for failing to rebut evidence provided at trial by the government's expert witness, Dr. Eugene Canjels.  Mot. at 14. Korchevsky's argument is yet another example of him claiming his defense counsel was ineffective because he disagrees with the evidence.  And yet again, Korchevsky summarily dismisses the evidence at trial and tries to relitigate the factual issues.  While Korchevsky is absolutely wrong about the accuracy of the evidence, the more important point is that contrary to the defendant's assertion, his defense counsel absolutely attempted to rebut the evidence provided by Dr. Canjels.

At trial, Dr. Canjels presented detailed testimony regarding the defendant's trading patterns and his success when trading on inside information.  As defense counsel now recognizes, that evidence was powerful and overwhelming.  See Brill Aff. at ¶ 11-13 (characterizing the evidence as overwhelming).  But defense counsel nevertheless attacked the evidence and tried to create reasonable doubt, including by presenting some of the arguments that Korchevsky now raises in his Motion.  Defense counsel conducted a lengthy cross-examination of Dr. Canjels (Tr. 1998-2073, 2134-2135) and called a defense expert, Michael Mayer, to present a differing view of the trading practice (Tr. 2788-2871).  Defense counsel also focused on the evidence relating to trading in great detail in closing arguments, including focusing on the testimony of Mayer and the similarity in the defendant's trading in 2009 and 2010 (Tr. 3089-3092).  Ultimately, the jury disagreed with the defendant's arguments, but the notion that defense counsel was ineffective despite all of the efforts they took should be rejected out of hand.

For that reason, it is also obvious that Korchevsky cannot demonstrate prejudice. Defense counsel devoted great resources to presenting a number of arguments to call into question the result of the trading data and they did not work.  There is no reason to believe that raising the arguments Korchevsky now asserts would have changed the result of the trial.

vii. Alleged Failure to Call Defense Witnesses

The defendant alleges that counsel was ineffective by refusing "to call Defense witnesses available to testify concerning Defendant's Character, as well as other business activities that would explain the nature of the relationship between the Defendant and the Government Cooperating Witnesses." Mot. at 14. The defendant's claims should be rejected.

With regard to character witnesses, the defendant's claims can be easily dismissed. As defense counsel noted, and the Court witnessed at trial, the defense called five character witnesses at trial, "considerably more than typically called," who testified about "an array of pertinent character traits and specific instances of conduct." Brill Aff. at ¶ 14. Korchevsky cannot credibly assert that it was deficient performance to not call more than five character witnesses, particularly when he does not explain which additional character witnesses defense counsel "refused" to call or what they would have testified to that was different from the other character testimony put before the jury. Moreover, given that a number of character witnesses were called to testify and the defendant was convicted, the defendant cannot claim prejudice as there is no credible argument that the result of the trial would have been different simply if more character witnesses been called. Cf. Krasniqi v. United States, 195 F. Supp. 3d 621, 633–34 (S.D.N.Y. 2016) (holding it was "not unreasonable" for the defendants' attorneys to elect not to call the defendants' parents as character witnesses "given that several other character witnesses were called who testified to these same general topics" and the testimony of the defendants' parents "would have been merely cumulative of the evidence otherwise presented by defense counsel"); see also Luciano, 158 F.3d at 660 ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess.").

Similarly, the defendant's assertion that defense counsel was ineffective for not calling Michael Zalivchii as a defense witness should also be rejected. Korchevsky claims throughout the Motion that Zalivchii's testimony was important to understand "the essence of the Defendant's business including research, trading strategy and trade execution." Mot. at 5. Again, Korchevsky's general assertions of the testimony he wanted to elicit at trial ignore the realities of the actual evidence and counsel's legitimate assessment of the trial risk. Defense counsel's affidavit makes plain that they "had every intention to call [Zalivchii] as a defense witness" and "prepared him for his testimony." Brill Aff. ¶ 15. As part of the preparation for that testimony, counsel discovered a "very damaging email" from the defendant to Zalivchii, disclosing material, non-public information that they would have had to disclose to the government. Id. As defense counsel noted, had the government obtained that information, it would have been able to argue even more forcefully that Korchevsky was colluding with the cooperating witnesses regarding that information and would have completely undercut both Zalivchii's testimony and "the theory of defense that had been presented over the previous three weeks of trial." Id. at ¶¶ 15, 16. This is precisely the sort of strategic decision that is given deference under Strickland.

Moreover, Korchevsky's post hoc allegations of ineffective assistance are false and should be rejected. In the Brill Affidavit, defense counsel has stated that after discovering this email, they told the defendant about the document and "strongly advised against" calling

Zalivchii.  Moreover, Korchevsky "unequivocally agreed" with the decision not to call Zalivchii, although he was disappointed.  Id. at ¶ 17.

Finally, even if it was ineffective performance to not call Zalivchii, the defendant cannot demonstrate prejudice.  Indeed, as noted above, Zalivchii's testimony would actually lead to inculpatory evidence against the government.  Accordingly, contrary to his summary assertions, Korchevsky cannot argue that the result of the trial would have been different had Zalivchii testified a trial.

    viii.   Alleged Ineffective Assistance Regarding the Defendant Testifying

Finally, Korchevsky claims that counsel "misled the Defendant and his family about the importance and necessity of the Defendant to take a witness stand."  Mot. at 15. Korchevsky claims that he intended to take the witness stand throughout trial but, "[b]eing not familiar with judicial process and procedures the Defendant yielded to the Counsel arguments and agreed not to take the witness stand."  Id.

It is a fundamental principle "that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  Rock v. Arkansas, 483 U.S. 44, 49, (1987).  Moreover, "although counsel has the right, and indeed the professional duty, to advise his client of the benefits and pitfalls of a decision to take the stand on his own behalf, the ultimate decision regarding whether to testify belongs to the defendant."  Brown v. Artuz, 124 F.3d 73, 78 (2d Cir. 1997) (citations omitted).  Counsel is required to "inform the defendant that the ultimate decision whether to take the stand belongs to the defendant, and counsel must abide by the defendant's decision on this matter."  Id.  As a result, "any claim by the defendant that defense counsel has not discharged this responsibility—either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify—must satisfy the two-prong test established in Strickland."  Id.

The Brill Affidavit makes plain that Korchevsky's counsel advised him that it "was [Korchevsky's] right and his choice to testify" but that counsel "advised against it."  Brill Aff. at ¶ 18.  The Brill Affidavit also makes plain that Korchevsky and his counsel had a detailed discussion about whether the defendant should testify and counsel explained "all his options regarding his right to testify and each scenario depending on his ultimate decision."  Id.  Counsel advised against testifying and, Korchevsky "agreed . . . and decided not to testify."  Id. at ¶ 19. And, as the Court is aware and is referenced in the Brill Affidavit, Korchevsky was clearly advised by the Court of his "absolute" right to testify, that it was his personal decision and that he waived that right and declined to testify.  Id. at ¶ 20.

Notably, Korchevsky does not claim that he was not advised of his rights to testify, that he was not advised it was his personal decision to testify or that he did not discuss the decision with his attorneys.  Moreover, he does not argue that counsel overrode his decision to testify.  Instead, Korchevsky simply asserts that they "debated" the issues and his attorneys tried to "convince" him not to testify and he followed their advice.  Mot. at 15.  This self-serving allegation is disputed by defense counsel, who assert that "we explained all angles of his right to testify to him, and he calmly agreed."  Brill Aff. at ¶ 19.  Regardless, Korchevsky's allegations do not demonstrate ineffective assistance under the applicable legal standard.  See McKenzie v.

United States, No. 12-CV-3221 (KAM), 2015 WL 6680108, at *10 (E.D.N.Y. Nov. 2, 2015) ("Turner's affidavit further corroborates the trial record that petitioner was not denied effective assistance of counsel because his attorney did, in fact, inform him of his right to testify at trial.") (citing United States v. Ozsusamlar, No. 05-CR-1077, 2007 WL 2826601, at *14 (S.D.N.Y. Sept. 20, 2007) (finding ineffective assistance of counsel claim not credible where attorney testified that he had discussed petitioner's right to testify but advised against it because of his prior history). Even if true, Korchevsky's allegations reflect nothing more than lawyers advising a client on his legal right to testify, which culminated in a knowing waiver of that right before the Court.

Korchevsky's claim that he was further swayed into not testifying by his attorney's assurance that he would present "the truth" regarding Korchevsky's business, trading and nature of his relationship with cooperating witness, and did not in fact do so during summation, is equally unavailing. Cf. Henry v. Stinson, 129 F.3d 113 (2d Cir. 1997) (finding that counsel's choice of "what to argue in summation may be viewed as a strategic decision," and therefore petitioner did not have a basis for arguing his counsel's performance was ineffective).

Finally, Korchevsky cannot demonstrate that he suffered prejudice from the strategic decision not to testify. Korchevsky did not and cannot demonstrate that the result of the trial could have been different had he testified. See United States v. Caracappa, 614 F.3d 30, 49 (2d Cir. 2010) (citing Strickland, 466 U.S. at 694). Korchevsky does not explain how his testimony would have convinced the jury he was innocent. Indeed, Korchevsky only summarily asserts that he would have presented and explained to the jury the "accurate facts" of the case, such as "the true nature of the business" but does not explain what those facts are or how they would have explained away the overwhelming evidence of his guilt. Korchevsky's reliance on facts that the jury has already rejected and that defense counsel believed were strategically risky call into question whether his testimony would have helped him at all. See Rega v. United States, 263 F.3d 18, 22 (2d Cir. 2001) (finding no prejudice even when counsel failed to properly advise defendant of his right to testify because defendant's testimony would have done more harm than good). Moreover, as Korchevsky himself concedes, he was advised there was a likelihood that the government would "trick" him into making inconsistent statements, which would further call into question a change in result. Mot. at 15.

For the reasons set forth above, each of Korchevsky's claims of ineffective assistance of counsel are without merit and should be rejected.

C.   Alleged Perjury by a Government Witness

Finally, Korchevsky claims that Arkadiy Dubovoy, a government witness at trial, offered perjured testimony. In support of his claim, Korchevsky advances an affidavit offered by Yaroslav Zayats, an acquaintance of the defendant, who asserts that the testimony of Arkadiy was "not the whole truth, and some of it was completely false." Mot. at 18. Although Zayats's affidavit does not assert what testimony is allegedly false, it includes a series of claims directed at Arkadiy, including that Arkadiy asked Zayats to apologize to Korchevsky and that Arkadiy

purportedly lied to avoid "a lengthy imprisonment term."[9]  Id.  For the reasons set forth below, Korchevsky's claims of perjured testimony should be rejected.

In the first instance, the defendant has procedurally defaulted this claim by not bringing it on direct appeal.  Korchevsky does not directly address this failure, only summarily asserting that he first learned of Arkadiy's purported admission of false testimony in August 2022.  Korchevsky has thus shown neither cause for the procedural default nor ensuing prejudice.  Zhang, 506 F.3d at 166.  Both Korchevsky and Zayats were present at trial when Arkadiy offered his purportedly false testimony, but Korchevsky did not raise those claims on direct appeal.  Indeed, Zayats stated that he believed Arkadiy's testimony was false at the time of trial, "but was not heard."  Mot. at 20.  Zayats's statement implies that Zayats raised his purported belief that false testimony was provided to Korchevsky, whom he was clearly at trial to support, and Korchevsky did not raise it on appeal.[10]  Accordingly, Korchevsky cannot show cause for his failure to bring the claims on direct appeal.  See United States v. Borkoski, 154 F. Supp. 2d 262, 269 (D. Conn. 2001) (finding a defendant was barred from raising claims of perjurious testimony when the defendant "had access to some of the information underlying his claim that [the witness's] testimony was perjurious at the time of trial"); see also Knowles v. United States, No. 11-CR-630 (KMK), 2022 WL 999078, at *16 (S.D.N.Y. Mar. 30, 2022) (citing United States v. Corley, No. 13-CR-48 (AJN), 2020 WL 4676650, at *11 (S.D.N.Y. Aug. 11, 2020) (finding claim procedurally barred where the petitioner did "not put forward any cause for not raising these arguments on appeal").  Moreover, because Korchevsky has failed to show cause for his procedural default, it is unnecessary to determine whether Arkadiy's trial testimony prejudiced him.  See Knowles, 2022 WL 999018 at *16.

Similarly, Korchevsky cannot demonstrate actual innocence to overcome his procedural default.  "In order to demonstrate his actual innocence, [a petitioner] must prove his 'factual innocence, not mere legal insufficiency,' and 'demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'  Corley, 2020 WL 4676650, at *11 (quoting Bousley v. United States, 523 U.S. 614, 623 (1998)).  As discussed in more detail below, Korchevsky does not even argue what false testimony was offered at trial.  It is impossible for Korchevsky to demonstrate that jury would not have convicted him based on purportedly false testimony when the defendant cannot even allege what testimony was false.  Cf Knowles, 2022 WL 999078 at *17 ("Given that it is not entirely clear from the transcript exactly what [the witness] appears to be recanting, and given the fact that [the witness] did not even testify at trial, Petitioner cannot show that it was more likely than not that no reasonable juror would have convicted him without [the witness's] statement to the Government.").

_____

[9] Zayats's affidavit also includes allegations made against Arkaidy by an unnamed third person regarding a purported additional fraud committed by Arkaidy a number of years ago in the Ukraine.  Mot. at 22.  Those unsubstantiated allegations are clearly intended to attack Arkaidy and are completely unrelated to the issues in the Motion.

[10] The timing is particularly perplexing given that Zayats testified at trial after Arkaidy testified so would not have been present in the courtroom for Arkaidy's testimony.

Even if Korchevsky had not procedurally defaulted on his claims, they fail on the merits.  The majority of Korchevsky's motion and Zayats's affidavit is focused not on the purported perjury, but on extraneous attempts to denigrate Arkadiy and his character.  Korchevsky's entire perjury claim is entirely based on a portion of an affidavit from Zayats, a close friend, who claims that Arkadiy told him years after the trial that Arkadiy lied on the stand.  Critically, neither Korchevsky nor Zayats allege what false testimony Arkadiy purportedly offered at trial.  In his affidavit, Zayats only claims that Arkadiy "expressed regrets, confessing that the information that he brought forward was not the whole truth and there were many outright lies."  Mot. at 20.  Relying on that affidavit, Korchevsky offers no details on the purportedly false testimony, simply claiming that "what [Arkadiy] had said on the witness stand during the trial was not the whole truth and some of it was a complete lie."  Mot. at 18.  Clearly, such general, substantiated allegations cannot "leave the court with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  Cotto v. Fischer, No. 09-CV-9813 (SAS) (MHD), 2012 WL 5500575, at *30 (S.D.N.Y. Aug. 23, 2012), report and recommendation adopted sub nom. Cotto v. Fischer, No. 09-CV-9813 (SAS) (MHD), 2012 WL 5499890 (S.D.N.Y. Nov. 12, 2012) (citing Sanders v. Sullivan, 863 F.2d 218, 226 (2d Cir. 1988).

Korchevsky's claims are further diminished by the source of the purported allegations.  By his own admission, Zayats has been a friend of Korchevsky's for over 20 years and continues to stay in contact with him and has visited him in prison.  Mot. at 20.  Notably, Zayats has also advanced virtually identical testimony before Korchevsky submitted this affidavit, including at trial, where Zayats testified that, approximately a year before trial, Arkadiy had denied providing Korchevsky with illegally obtained information.  Tr. at 2706-07.  The jury did not credit Zayats's uncorroborated allegation, perhaps after it was also revealed on cross-examination that Zayats had business dealings with the defendant and received money from him in the past.  Nonetheless, it is exceedingly convenient for Korchevsky that Arkadiy allegedly provided Zayats with the same statement at the undated meeting in Atlanta.  Id.  Even if Arkadiy's purported statements were true, and even if Korchevsky could actually describe specific false testimony, Korchevsky's claims would still fail.  "[T]he recantation of testimony given on trial is looked upon with the utmost suspicion."  Sanders v. Sullivan, 863 F.2d 218, 225 (2d Cir. 1988).  Even assuming Arkadiy did actually recant any portion of his testimony, it does not mean his prior statements were actually false.  The recantation could have been driven by a desire to help his friend, to mitigate his reputation or to curry favor with Zayats.

Finally, Korchevsky does not claim that the government "knew, or should have known, of" any false testimony offered by Arkadiy.  See Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) (citing Napue v. Illinois, 360 U.S. 264, 269, (1959)).  And because Korchevsky does not point to any specific false testimony by Arkadiy,[11] there is no basis for the Court to

---

[11] Indeed, Korchevsky devotes most of this portion of the Motion to criticizing defense counsel for failing to cross-examine Arkaidy properly.  See Mot. at 18 ("The most concerning element of all this is the fact that during the interrogation phase of Mr. Dubovoy's testimony the Defense Counsel failed to bring into evidence any of the multiple exhibits of the documents provided by the Defendant to be used to show and prove the actual nature of the relationship of the Defendant with Mr. Dubovoy.").  As noted above, this allegation is meritless as defense counsel vigorously cross-examined Arkaidy during the trial.  Moreover, Korchevsky's

conclude that Arkadiy's purportedly false testimony was "material" and that "but for the perjured testimony, the defendant would most likely not have been convicted." Ferguson, 676 F.3d at 280 n.19 ("[W[here the government was unaware of the perjury, a new trial is warranted only if the testimony was material and the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted."  (internal quotation marks omitted)).

IV.   Conclusion

        For the reasons set forth above, the Motion should be denied in its entirety without a hearing.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:      /s/                 
        David C. Pitluck
        Jessica K. Weigel
        Assistant U.S. Attorneys
        (718) 254-6108/6157

cc:  Clerk of Court (RJD) (by ECF and Hand)
    Vitaly Korchevsky (by U.S. Certified Mail)

---

allegations regarding ineffective assistance are irrelevant in assessing whether a new trial should be ordered on the grounds of purported perjury.